# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

———————————————————————— X
                  :

In re:                  :

                  :

THE FINANCIAL OVERSIGHT AND      :    PROMESA

MANAGEMENT BOARD FOR PUERTO RICO,  :    Title III

                  :

      as representative of      :    Case No. 17-BK-3283 (LTS)

                  :

THE COMMONWEALTH OF PUERTO RICO *et al.,*  :    (Jointly Administered)

                  :

        Debtors.[1]      :

———————————————————————— X

THE SPECIAL CLAIMS COMMITTEE OF THE  :

FINANCIAL OVERSIGHT AND        :

MANAGEMENT BOARD FOR PUERTO RICO,  :

ACTING BY AND THROUGH ITS MEMBERS,  :    Adv. Proc. No. 19-00280 (LTS)

                  :

      and             :

                  :

THE OFFICIAL COMMITTEE OF UNSECURED  :

CREDITORS OF THE COMMONWEALTH OF  :

PUERTO RICO,           :

                  :

      as co-trustees respectively, of  :

                  :

THE COMMONWEALTH OF PUERTO RICO *et al.,*  :

                  :

      Plaintiffs,[2]      :

---

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK- 3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523 (LTS)) (Last Four Digits of Federal Tax ID: 3801).

[2] The members of the Special Claims Committee, on the one hand, and the Official Committee of Unsecured Creditors, on the other hand, serve as co-trustees and co-plaintiffs in the prosecution of this adversary proceeding as described in that certain *Stipulation And Agreed Order By And Among Financial Oversight And Management Board, Its Special Claims Committee, And Official Committee Of Unsecured Creditors Related To Joint Prosecution Of Debtor Causes Of Action,* Case No. 17-BK-3283 (LTS), ECF No. 6501-1, which is referenced herein to the extent necessary and appropriate. The UCC acts as co-plaintiff solely in a representative capacity for the Title III Debtors other than PBA.

|   | : |
|---|---|
| v. | : |
|   | : |
| BARCLAYS CAPITAL, BofA SECURITIES, MERRILL LYNCH CAPITAL SERVICES, INC., CITIGROUP INC., GOLDMAN SACHS & CO., J.P. MORGAN CHASE & CO., JEFFERIES GROUP LLC, MESIROW FINANCIAL, INC., MORGAN STANLEY, RAMIREZ & CO., INC., RBC CAPITAL MARKETS, SANTANDER SECURITIES, UBS FINANCIAL SERVICES, INC. OF PUERTO RICO, VAB FINANCIAL, BMO CAPITAL MARKETS, RAYMOND JAMES, SCOTIA MSD, TCM CAPITAL, and SIDLEY AUSTIN LLP, | : |
|   | : |
|   | : |
| Defendants. | : |
| _____ | X |

## **FIRST AMENDED ADVERSARY COMPLAINT**

Pursuant to (i) Federal Rules of Bankruptcy Procedure 7001(1) and (9), made applicable to these Title III cases by section 310 of the Puerto Rico Oversight, Management, and Economic Stability Act (48 U.S.C. § 2170) ("PROMESA"), (ii) 11 U.S.C. § 108, made applicable by section 301 of PROMESA, and (iii) the *Stipulation and Agreed Order By and Among Financial Oversight and Management Board, Its Special Claims Committee, and Official Committee of Unsecured Creditors Related to Joint Prosecution of Debtor Causes of Action* [ECF No. 6501-1], (i) the Special Claims Committee (the "SCC") of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), acting by and through its members, as representative of the Commonwealth of Puerto Rico (the "Commonwealth"), and (ii) the Official Committee of Unsecured Creditors of all title III Debtors (except COFINA and PBA) (the "Committee"), in each case by and through undersigned counsel, files this First Amended Adversary Complaint (the "Amended Complaint"), filed contemporaneously herewith the *Urgent Motion For Leave Of Court To File First Amended Adversary Complaint* (the "Motion"), to

amend the *Adversary Complaint* (the "Complaint") [ECF No. 1 in Case No. 19-00280] and

respectfully states as follows:

## NATURE OF PROCEEDINGS

1.      By May 3, 2017, the date the Commonwealth of Puerto Rico (the

"Commonwealth") commenced this Title III case, the Commonwealth, its agencies, the public

corporations that provided utilities services and other public corporations and instrumentalities of

the Commonwealth were burdened with approximately $74 billion of debt, an amount grossly

disproportionate to the economy, and revenues available to, the Commonwealth.  During the

years that this debt load was incurred, non-party Government Development Bank for Puerto Rico

(the "GDB") was supposed to be the steward of the Commonwealth's fiscal health.  It failed in

that role.  This action arises from that failure and from the exploitation of GDB's misfeasance by

the Defendants for their own profit and unjust enrichment.

2.      As a fiduciary of the Commonwealth, GDB owed to the Commonwealth duties of

loyalty, due care and good faith.  Additionally, it had a duty to scrupulously adhere to the law,

including the Constitution of the Commonwealth. By statute, GDB was charged with "aid[ing]

the Commonwealth Government in the performance of its fiscal duties and more effectively to

carry out its governmental responsibility to develop the economy of Puerto Rico . . ."  P.R. Laws

Ann. tit. 7, § 551 (2015).  GDB was the intragovernmental bank and financial advisor to the

Commonwealth.  In its role as financial advisor, GDB had oversight of bond issuances by the

Commonwealth and the public corporations that provided services to the people and businesses

of Puerto Rico.

3.      Instead of exercising due care, GDB caused the Commonwealth to unnecessarily

incur hundreds of millions of dollars of costs and expenses to execute multiple issuances of

bonds by the Commonwealth and its instrumentalities.  These bond issuances deepened the insolvency of the Commonwealth without providing for a long-term, sustainable path towards meeting the needs of the Commonwealth to fund essential services and pension liabilities.  In successive years leading to the commencement of these Title III cases, various bond issuances organized and approved by GDB merely kicked the proverbial can down the road by repeatedly refinancing existing bond debt – sometimes on terms far more burdensome than the debt being refinanced.

4.     Moreover, GDB approved and orchestrated the practice of issuing general obligation bonds, *i.e.*, bonds backed by the full faith, credit, and taxing power of the Commonwealth, to refinance debt of the Commonwealth that was not backed by the full faith, credit, or taxing power of the Commonwealth.  While the foregoing course of conduct placed the financial condition of the Commonwealth on increasingly precarious footing, it simultaneously enriched the Defendants, many of whom participated in serial fashion in successive bond issues that generated tremendous profits for them and earned them enormous fees that were directly or indirectly funded by the Commonwealth.

5.     In its breach of its fiduciary duties, GDB was aided and abetted by the Defendants, each of whom had knowledge that GDB was breaching its fiduciary duties and that it was not adhering to the law.  Notwithstanding this knowledge, each of the Defendants provided substantial assistance to GDB in the course of conduct described herein.

6.     GDB's misfeasance culminated with the issuance in 2014 of $3.5 billion in principal amount of bonds (the "2014 GO Bonds") backed by the full faith, credit, and taxing power of the Commonwealth.  The issuance of the 2014 GO Bonds was extraordinary in that all of the Defendants that participated in the issuance were aware that the Commonwealth was

insolvent and could not repay the 2014 GO Bonds. These Defendants nonetheless substantially assisted, and aided and abetted, GDB's breaches of fiduciary duty in connection with the 2014 GO Bond issuance in order to earn fees and make profits from the issuance at the expense of the Commonwealth.

7.     As a result of the 2014 GO Bond issuance, many of the Defendants not only received additional unearned profits, but also received proceeds of the 2014 GO Bonds in the form of redemption or repurchase of other outstanding bonds of the Commonwealth.  In addition, many of the Defendants received unearned discounts on the bonds they purchased for resale to their customers. Because the Commonwealth was clearly insolvent at such time, as alleged below, such proceeds and profits are recoverable as fraudulent transfers.

## PARTIES

**Plaintiffs:**

8.     The Financial Oversight and Management Board ("<u>FOMB</u>") was created under Section 101(b)(1) of PROMESA (48 U.S.C. § 2121(b)(1)).  FOMB, through the individual members of its duly appointed Special Claims Committee, brings this action as representative of the Commonwealth of Puerto Rico and the Title III Debtors pursuant to 48 U.S.C. § 2175.

9.     The Official Committee of Unsecured Creditors of all Title III Debtors (other than COFINA and PBA) (the "<u>Committee</u>"), pursues this action, pursuant to the Joint Stipulation [D.E. 6524] as entered by the Court on April 26, 2019, in its capacity as co-trustee and co-plaintiff with respect to the Co-Plaintiff Adversary Proceedings as defined therein.

**Defendants**:

**_The Underwriter Defendants_**[3]

10.     Barclays Capital ("Barclays") is a British multinational investment bank providing advisory, financing, and risk management services. Barclays was a lead underwriter of the 2014 GO Bond issuance. It was also an underwriter for the GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A, B, and C; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; and PBA Bond Series 2009 P and Q.

11.     BofA Securities is a United States-based multinational investment bank under the management of Bank of America. BofA Securities, then known as Bank of America Merrill Lynch, served as an underwriter for the 2014 GO Bond issuance. It was also underwriter for the GO Bond Series 2012 A and B; Series 2011 A, C, D, and E; and PBA Bond Series 2011 R, S, and U.

---

[3] The Underwriter Defendants who participated in the 2014 GO Bond issuance shall be referred to as the "2014 GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2012A shall be referred to as the "2012 Series A GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2012B shall be referred to as the "2012 Series B GO Bond Underwriters." The Underwriter Defendants who participated in the Series 2011 A shall be referred to as the "2011 Series A Bond Underwriters." The Underwriter Defendants who participated in the Series 2011 C shall be referred to as the "2011 Series C Bond Underwriters." The Underwriter Defendants who participated in the Series 2011 D shall be referred to as the "2011 Bond Series D Underwriters." The Underwriter Defendants who participated in the Series 2011 E shall be referred to as the "2011 Series E Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2012 U shall be referred to as the "2012 Series U PBA Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2011 R shall be referred to as the "2011 Series R PBA Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2011 S shall be referred to as the "2011 Series S PBA Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2011 T shall be referred to as the "2011 Series T PBA Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2009A shall be referred to as the "2009 Series A GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2009B shall be referred to as the "2009 Series B GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2009C shall be referred to as the "2009 Series C GO Bond Underwriters." The Underwriter Defendants who participated in the 2009 PBA Bond Series P and Q  shall be referred to as the "2009 Series P and Q PBA Bond Underwriters."   The Underwriter Defendants who participated in the 2009 PBA Bond Series K shall be referred to as the "2009 Series K PBA Bond Underwriters."   The Underwriter Defendants who participated in the ERS Bond Series A shall be referred to as the "ERS Series A Bond Underwriters." The Underwriter Defendants who participated in the ERS Bond Series B and C shall be referred to as the "ERS Series B and C Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2007A-4 shall be referred to as the "2007 Series A-4 GO Bond Underwriters."

12.     Merrill Lynch Capital Services, Inc. ("Merrill Lynch") was also an underwriter of the GO Bond Series 2009 A, B, and C; PBA Bond Series 2009 K, P, and Q; and ERS Bond Series 2008 A.

13.     Citigroup Inc. ("Citigroup") is a United States-based multinational investment bank and financial services corporation. It was an underwriter for Puerto Rico's 2003 GO Bond issuance, Series B and C; GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 C; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; and ERS Bond Series 2008 A.

14.     Goldman Sachs & Co. ("Goldman Sachs") is a United States-based multinational investment bank and financial services company. Goldman Sachs was an underwriter of the 2014 GO Bond issuance. It was also an underwriter of the GO Bond Series 2012 A; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A, B, and C; PBA Bond Series 2011 S; PBA Bond Series 2012 U; PBA Bond Series 2009 P and Q.

15.     J.P. Morgan Chase & Co. ("J.P. Morgan") is a United States-based multinational investment bank and financial services company. J.P. Morgan was an underwriter of the 2014 GO Bonds. J.P. Morgan was also an underwriter for the GO Bond Series 2012 A; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A and C; GO Bond Series 2007 A-4; PBA Bond Series 2011 S; PBA Bond Series 2012 U; and PBA Bond Series 2009 P and Q.

16.     Jefferies Group LLC ("Jefferies") is a United States-based multinational investment bank and financial services company. Jefferies was an underwriter of the 2014 GO Bond issuance and was also an underwriter of the GO Bond Series 2012 A; GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.

17.     Mesirow Financial, Inc. ("Mesirow") is a United States financial services company providing investment management, capital markets, and investment banking services. Mesirow was an underwriter of the 2014 GO Bond issuance.

18.     Morgan Stanley ("Morgan Stanley") is a United States-based multinational investment bank and financial services company. Morgan Stanley was an underwriter of the 2014 GO Bond issuance, the GO Bond Series 2012 A; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A and C; GO Bond Series 2007A-4; PBA Bond Series 2011 S; PBA Bond Series 2012 U; PBA Bond Series 2009 P and Q.  In addition to being an underwriter, Morgan Stanley was also an interest rate swap agreement counterparty to the Commonwealth.

19.     Ramirez & Co., Inc. ("Ramirez") is security brokerage firm based in New York City.  It was an underwriter of the 2014 GO Bond issuance. It was also an underwriter of the GO Bond Series 2012 A and B; GO Bond Series 2011 A; GO Bond Series 2009 A, B, and C; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; PBA Bond Series 2009 K, P and Q;  and ERS Bond Series 2008 A.

20.     RBC Capital Markets ("RBC") is a Canadian multinational investment bank.  It was a senior managing underwriter on the 2014 GO Bond issuance. It was also an underwriter for the GO Bond Series 2012 A; GO Bond Series 2011 A, C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.

21.     Santander Securities ("Santander") was an underwriter of the 2014 GO Bond issuance. It was also an underwriter of the GO Bond Series 2012 A and B; GO Bond Series 2011 C, D, and E; GO Bond Series 2011 A; GO Bond Series 2009 C; PBA Bond Series 2011 R, S, and T; PBA Bond Series 2012 U; PBA Bond Series 2009 P and Q; and ERS Bond Series 2008 A, B, and C.

22.     UBS Financial Services Inc. of Puerto Rico ("UBS") was an underwriter of the 2014 GO Bond issuance.  UBS was also an underwriter for the GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A, B, and C; PBA Bond Series 2011 R, S, and T; PBA Bond Series 2012 U; PBA Bond Series 2009 P and Q; and ERS Bond Series 2008 A, B and C.

23.     VAB Financial ("VAB") is a Puerto Rico-based financial broker and dealer.  It served as an underwriter for GO Bond Series 2012 A; GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.

24.     BMO Capital Markets ("BMO") is the investment banking subsidiary of Canadian Bank of Montreal. BMO Capital Markets served as a GO Bond underwriter for GO Bond Series 2012 A, GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.

25.     Raymond James ("Raymond James") is a United States-based multinational independent investment bank. It served as a GO Bond underwriter for GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E; PBA Bond Series 2011 R and S; and PBA Bond Series 2012 U.

26.     Scotia MSD ("Scotia MSD") is a Canadian multinational bank. It served as an underwriter for GO Bond Series 2012 A and B; GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; and ERS Bond Series 2008 A.

27.     TCM Capital ("TCM Capital") is a Puerto Rico-based financial services firm. It served as an underwriter for the ERS Bond Series 2008 A.

*__The Swap Counterparty Defendants__*

28.     UBS Financial, in addition to being an underwriter of bonds issued by the Commonwealth, its agencies, the public corporations that provided utilities services and other public corporations and instrumentalities of the Commonwealth ("Public Entities"), was an interest rate swap counterparty to the Commonwealth that was paid termination fees from the proceeds of the 2014 GO Bond issuance. As a swap counterparty, UBS received $93,132,840 in termination fees paid for swaps between 2006 and 2014.

29.     In addition to being an underwriter of bonds issued by the Debtors, Morgan Stanley was a swap counterparty to the Debtors that received $299,409,992 in termination fees for swaps from 2006 to 2014.

30.     Merrill Lynch was an interest rate swap counterparty to the Debtors that was paid termination fees from the proceeds of the 2014 GO Bond issuance. As a swap counterparty, it received $1,807,880 in termination fees for swaps from 2006 to 2014.

*__Law Firm Defendant__*

31.     Sidley Austin LLP ("Sidley Austin") is a United States-based law firm headquartered in Chicago, Illinois. It served as underwriters' counsel during the 2014 GO Bond offering, bond counsel for the PBA Bond Series 2012 U; and underwriters' counsel for ERS Bond Series 2008 A, B and C.

__JURISDICTION AND VENUE__

32.     This Court has jurisdiction over this action pursuant to 48 U.S.C. § 2166. Furthermore, this Court has jurisdiction under Section 306(a) of PROMESA, which grants this Court original and exclusive jurisdiction over all cases under Title III of PROMESA and original jurisdiction over all civil proceedings arising under Title III of PROMESA or arising in or related to cases under Title III of PROMESA. *Id*. § 2166(a)(2).

33.     This Court has personal jurisdiction over all of the Defendants pursuant to Section 306(c) of PROMESA. 48 U.S.C. § 2166(c).  It also has supplemental jurisdiction to entertain all state law claims pursuant to 28 U.S.C. § 1367.

34.     Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to these claims occurred in this District.  Venue is also proper under 48 U.S.C. § 2167 because this adversary proceeding is brought in a Title III proceeding.

35.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]." 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.

## FACTUAL BACKGROUND

36.     In 1948, GDB was created as a Puerto Rico public corporation.  By statute, GDB was charged with "aid[ing] the Commonwealth Government in the performance of its fiscal duties and more effectively to carry out its governmental responsibility to develop the economy of Puerto Rico . . ." 7 L.P.R.A. § 551.  At all relevant times, GDB was a financial advisor to the Commonwealth and the Public Entities. GDB approved all bond issuances by the Commonwealth and its approval was also required for borrowings by substantially all of the Public Entities.  It also served as a lender to substantially all of the Public Entities, and purchased and guaranteed debt issued by substantially all of the Public Entities.

37.     GDB was governed by a Board of Directors, whose members were appointed by the Governor with approval of the Council of Secretaries (the group consisting of the heads of the executive departments of Puerto Rico).  The Board, in turn, appointed a President, who acted

as GDB's chief executive officer and ran the bank's day-to-day operations.  GDB was staffed by both political appointees ("*empleados de confianza*") and "career" employees ("*empleados de carrera*").  The *empleados de confiaza* were GDB personnel who handled legislation, public policy, and bond issuances.  The political nature of the top positions at GDB created a culture in which *empleados de confianza* joined and left GDB for positions with private financial institutions.  Former GDB executives had particular connections with Santander.

38.     In its role as financial advisor, GDB selected the investment banks that served as the lead and senior managing underwriters, as well as those banks that made up the underwriting syndicate, which assisted in pricing, diligence, and marketing of the bonds. GDB hired from a roster of preferred investment banks to underwrite the bond issuances of the Commonwealth and other Public Entities. This roster overlapped with some of the same private financial institutions with which its *empleados de confianza* had connections.

39.     Due to its close relationships with the underwriting banks that participated in the bond issuances, GDB had a practice of allowing underwriting banks to present financing proposals for the Commonwealth and other Public Entities for consideration by GDB. The underwriters would present GDB officials with financing proposals aimed to meet the liquidity needs of the Commonwealth and other Public Entities, and GDB would select a proposal and assign roles based on which proposal it selected.

40.     GDB also selected counsel for the Commonwealth and other Public Entities' bond issuances. In fact, GDB chose both bond counsel and underwriters' counsel. GDB chose bond counsel and underwriters' counsel similarly to how it chose underwriters, from a small pool of law firms that had a well-established history of working with GDB. Underwriting banks would

officially request chosen counsel's services and engage them, but GDB made the initial decision to use a certain law firm over another.

41.    At all times since 1961, the Constitution of the Commonwealth prohibited the issuance of notes or bonds backed by the full faith, credit, and taxing power of the Commonwealth if the issuance would result in debt service (cash required to cover the repayment of principal and the payment of interest) in any year on such bonds or notes exceeding 15% of the average internal revenues for the two fiscal years preceding the issuance (the "Debt Service Limit").  Specifically, Article VI, Section 2 of the Constitution provides that:

> [N]o direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, shall exceed 15% of the average total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year.

P.R. Laws Ann. Const. art. VI, § 2.

42.    As an additional measure of protection against fiscal irresponsibility, Article VI, Section 7 of the Commonwealth Constitution (the "Balanced Budget Clause") provides that "[t]he appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. Laws Ann. Const. art. VI, § 7.

43.     The appropriations required to be covered by estimated total revenues (including available surplus) or the imposition of sufficient taxes consist of "the ordinary operating expenses of the Commonwealth" and "the payment of interest on and amortization of the public debt." P.R. Laws Ann. Const. art. VI, § 6.

44.     Because the proceeds of borrowing are not included in "total revenues," the Balanced Budget Clause effectively prohibits deficit financing (*i.e.*, borrowing money to cover ordinary operating expenses and debt service payments that the Commonwealth is unable to fund from its total revenues, including available surplus). *Id.*

45.     In its capacity as financial advisor to the Commonwealth, GDB owed a duty to the Commonwealth to ensure that the Commonwealth complied with the Constitution of the Commonwealth, including the Debt Service Limit and the Balanced Budget Clause. Instead of adhering to this duty, however, beginning as early as 2008, GDB engaged in the practice of: (i) funding the operating and other financing requirements of the Commonwealth and other Public Entities with loans by GDB to the Commonwealth and other Public Entities that they foreseeably would be unable to repay; and (ii) although the "bad debts" of the Commonwealth and other Public Entities were not backed by the full faith, credit and taxing power of the Commonwealth, when the Commonwealth and other Public Entities were unable to repay GDB for the "bad debts," approving the issuance by the Commonwealth of bonds backed by the full faith, credit and taxing power of the Commonwealth ("General Obligation Bonds" or "GO Bonds") to repay the "bad debts" as well as to provide additional financing to the Commonwealth and other Public Entities and refinance outstanding General Obligation Bonds. Though this pattern and practice, the Commonwealth financed the operating expenses and other financing requirements of the

14

Commonwealth and other Public Entities with General Obligation Bonds that that were issued in contravention of the Debt Service Limit.

46.     Each successive refinancing increased the burden on the Commonwealth because, among other reasons, a substantial portion of the proceeds from the sale of bonds was never received by the Commonwealth but instead inured to the economic benefit of the underwriters who purchased the GO Bonds at a significant discount to the face value of the bonds.  Other material portions of the proceeds from the sale of bonds were expended for fees of counsel and other professionals and other costs of issuance of the Commonwealth GO Bonds. Moreover, the financial terms on which the Commonwealth could issue GO Bonds became increasingly onerous as it became known to the credit rating agencies and the investing public that the Commonwealth did not have the means to meet its debt service obligations.  Meanwhile, underwriters, counsel and other professionals all benefited from this pattern of repeatedly refinancing existing, maturing debt by issuing new bonds and by effectively rolling obligations not backed by the full faith, credit, and taxing power of the Commonwealth into GO Bond indebtedness.  The underwriters, counsel and other professionals, including the Defendants, earned enormous fees from the many financing transactions that GDB approved and facilitated but that did not benefit the Commonwealth but, rather, caused the Commonwealth to become increasingly insolvent.

47.     As alleged below, from 2008 through the issuance of the 2014 GO Bonds, the Defendants knowingly participated in bond issuances that were unlawful, that deepened the

insolvency of the Commonwealth and that resulted in other harm to the Commonwealth and the other Debtors, including damage to their credit.[4]

### The ERS Bond Series A, B & C

48.     In 2008, GDB approved the issuance by ERS of three series of bonds.  ERS Senior Pension Funding Bonds, Series A, Series B and Series C (the "ERS Bonds") were issued on January 31, 2008, June 2, 2008 and June 30, 2008, respectively, and had a combined face amount of nearly $3 billion.

49.     For all three ERS Bond series, the relevant parties included, ERS as the issuer, GDB as ERS's financial advisor, Mesirow as financial advisor to GDB, and affiliates of UBS and Santander (among others) as underwriters of the ERS Bonds.

50.     The ERS Bonds were pitched to ERS as part of an "arbitrage investment strategy" that would supposedly increase the funds available to pay pension benefits and reduce its unfunded accrued actuarial pension liability.  When the strategy first came under consideration, the plan involved the sale of $7 billion in principal amount of ERS Bonds. The net proceeds from the sale of $7 billion in bonds would be split between funding current demands on the pension system and investment of the remainder in order to fund future demands.

---

[4]   In the *Omnibus Objection Of (I) Financial Oversight And Management Board, Acting Through Its Special Claims Committee, And (II) Official Committee Of Unsecured Creditors, Pursuant To Bankruptcy Code Section 502 And Bankruptcy Rule 3007, To Claims Filed Or Asserted By Holders Of Certain Commonwealth General Obligation Bonds* [ECF No. 4784] (the "Joint Claim Objection"), the FOMB and the Committee objected to the validity of the GO bonds issued from March 2012 through 2014 on the basis that, among other things, the bonds violated the Debt Service Limit.  In addition, the FOMB and the Committee reserved their rights in the Joint Claim Objection "to raise additional objections to the validity of other issuances of GO bonds, including on the basis that such bonds were issued in violation of the Debt Service Limit, whether because certain other debt was not properly included in the Debt Service Limit calculation or otherwise."  Joint Claim Objection at ¶ 11.  Accordingly, the FOMB and the Committee include in this Adversary Complaint allegations about GO bond issuances not subject to the Joint Claim Objection in the event that the FOMB and the Committee subsequently object to the validity of such bonds.  In any event, these earlier GO bond issuances, the PBA bonds, and the ERS bonds are the subject of the pending *Omnibus Conditional Objection of the Ad Hoc Group of General Obligation Bondholders to Claims Filed or Asserted by the Public Buildings Authority, Holders of Public Buildings Authority Bonds, and Holders of Certain Commonwealth General Obligations Bonds* [Case No. 17-03283, ECF No. 6099] and the *Omnibus Objection of Official Committee of Unsecured Creditors to Claims Asserted by Holders of Bonds Issued by Employee Retirement System of Government of Puerto Rico* [Case No. 17-03566, ECF No. 381] (the "ERS Claim Objection"), respectively.  The FOMB and the Committee incorporate by reference herein the Joint Claim Objection and the ERS Claim Objection.

51.      The availability of most of the proceeds of the planned $7 billion issuance for investment was critical to the "arbitrage investment strategy" that was the basis for the plan. Pursuant to the rationale for this strategy, if ERS could raise $7 billion at attractive interest rates and then make long-term investments with those proceeds, the investment fund earnings on the net proceeds would be available to fund ERS's future pension obligations. However, critical to the feasibility of the strategy was the sufficiency of the amount of net proceeds from the ERS Bond issuances that would be available for long-term investment. If insufficient funds were raised and/or those funds were used primarily to fund current pension liabilities, the ERS Bond issuances would fail their essential purpose and leave the already-challenged pension retirement system more challenged. During early 2008, it became known to GDB that market conditions would not support the full $7 billion issuance and, even if the full amount could be issued, the interest rates would be too high for the arbitrage investment strategy to plausibly succeed. Notwithstanding its awareness of these factors, and the knowledge that market conditions would doom the strategy to failure and leave ERS worse off, GDB advised ERS to proceed with the ERS Bonds issuances. Further, notwithstanding the known risks, GDB, in gross violation of its duty of care, approved and facilitated the issuance by ERS of nearly $3 billion in ERS Bonds during the first half of 2008.

52.      Foreseeably, less than one-third of the net proceeds of the ERS Bonds were available for investment by ERS, with the remainder being used to fund current liabilities. Also foreseeably, due to worsening market conditions, no additional ERS bonds could be issued later in 2008 or in subsequent years, thereby dooming the arbitrage investment strategy to failure.

53.      Mesirow and the underwriters for the ERS Bonds knew that GDB would be breaching its fiduciary duty to the Commonwealth by approving the ERS Bonds issuance and

nevertheless substantially assisted and aided and abetted such breach by planning and executing the ERS Bonds issuance.

54.     Prior to issuing the ERS bonds, ERS retained an affiliate of UBS Puerto Rico to consult on its investment portfolio. Parts of the ERS portfolio were managed by asset management affiliates of Mesirow and Santander Securities.  Each of these entities stood to gain by earning future fees on the increase in ERS's investment portfolio that would result from investment of proceeds of ERS Bonds.

55.     When affiliates of UBS and Santander Securities acted as underwriters for the ERS bonds, and another affiliate of Mesirow acted as GDB's financial advisor in connection with the ERS Bonds, these firms were subject to a conflict of interest between their own interest in an affiliate making more money and the best interests of their clients, ERS and GDB.

### *PBA Bond Series*

56.     In 2004, the Puerto Rico Public Buildings Authority ("PBA") issued: (a) its Government Facilities Revenue Refunding Bonds, Series K ("PBA Series K Bonds") and its Government Facilities Revenue Bonds, Series L ("PBA Series L Bonds") on June 10, 2004, with an aggregate face amount of $353,860,000; and (b) its Government Facilities Revenue Bonds, Series I (the "PBA Series I Bonds") and its Government Facilities Revenue Refunding Bonds, Series J (the "PBA Series J Bonds") on June 10, 2004 with an aggregate face amount of $1,167,965,000.

57.     For the PBA Series K Bonds, the PBA Series L Bonds, the PBA Series I Bonds and the PBA Series J Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and affiliates of banks UBS Financial Services Inc., Merrill Lynch & Co., Banc

of America Securities LLC, Citigroup, Goldman Sachs, J.P. Morgan, Morgan Stanley, Raymond James & Associates, Inc., and Samuel A. Ramirez & Co., Inc. as underwriters.

58.     Sidley Austin served as bond counsel for the PBA Series K Bonds, the PBA Series L Bonds, the PBA Series I Bonds and the PBA Series J Bonds.

59.     The net proceeds of the PBA Series K Bonds and the PBA Series L Bonds were used to (a) refund certain other bonds of PBA issued under its 1995 Bond Resolution; (b) refund interest (but not principal) on certain other bonds issued by PBA under its 1995 Bond Resolution; and (c) pay the costs of the issuance of the PBA Series K Bonds and the PBA Series L Bonds.  The net proceeds of the PBA Series I Bonds were used to (a) pay a portion of the costs of construction of certain buildings and facilities leased by the PBA to various departments, agencies, instrumentalities and municipalities of the Commonwealth, (b) repay (together with a portion of the net proceeds of the PBA Series L Bonds, a portion of certain advances made to the PBA by GDB under a line of credit facility, (c) pay capitalized interest on the PBA Series I Bonds, and (d) pay costs of issuance of the Series I Bonds.  The net proceeds of the PBA Series J Bonds were used to (a) refund certain other bonds issued by PBA under its 1995 Bond Resolution, (b) refund interest (but not principal) on certain other bonds issued by the PBA under its 1995 Bond Resolution, and (c) pay the costs of issuance of the PBA Series J Bonds.

60.     In 2007, the PBA issued its Government Facilities Revenue Refunding Bonds, Series M (the "PBA Series M Bonds"), its Government Facilities Revenue Bonds, Series N (the "PBA Series N Bonds"), and its Government Facilities Revenue Bonds, Series O (the "PBA Series O Bonds") on December 20, 2007 in an aggregate face amount of $895,290,000.

61.     For the PBA Series M Bonds, the PBA Series N Bonds and the PBA Series O Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and Bear,

Stearns & Co., Inc., RBC Capital Markets, Banc of America Securities LLC, Citigroup, DEPFA First Albany Securities, LLC, Goldman Sachs, J.P. Morgan, Loop Capital, Merrill Lynch & Co., Morgan Stanley, Samuel A. Ramirez & Co., Inc., Santander Securities, Scotia Bank, TCM Capital, and UBS Investment Bank as underwriters.

62.     The net proceeds of the PBA Series M Bonds were used to (a) refund certain other bonds issued by the PBA under its 1995 Bond Resolution, (b) refund interest (but not principal) on certain other bonds issued by the PBA under its 1995 Bond Resolution, and (c) pay the costs of issuance of the PBA Series M Bonds.  The net proceeds of the PBA Series N Bonds were used to (a) pay a portion of the costs of construction of certain buildings and facilities leased by the PBA to various departments and instrumentalities of the Commonwealth, (b) pay the principal of and a portion of the accrued interest on certain outstanding notes of the PBA held by GDB, evidencing amounts loaned by GDB to the PBA to finance a portion of the cost of its capital improvements program (the "GDB Notes"), (c) pay capitalized interest on the PBA Series N Bonds, and (d) pay costs of issuance of the PBA Series N Bonds.  The net proceeds of the PBA Series O Bonds were used to (a) pay a portion of the accrued interest on the GDB Notes, (b) pay capitalized interest on the PBA Series O Bonds, and (c) pay the costs of issuance of the PBA Series O Bonds.

63.     In 2009, PBA issued: (a) its Government Facilities Revenue Refunding Bonds, Series P (the "PBA Series P Bonds") on July 1, 2009, with a face amount of $330,935,000; and (b) its Government Facilities Revenue Refunding Bonds, Series Q (the "PBA Series Q Bonds") on October 28, 2009, with a face amount of $152,540,000.

64.     For the PBA Series P Bonds and the PBA Series Q Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and Merrill Lynch & Co., Ramirez

& Co., Inc., Barclays, Goldman Sachs, J.P. Morgan, Morgan Stanley, Santander Securities, and UBS as underwriters.

65.     The net proceeds of the PBA Series P Bonds were used to (a) refund certain other bonds issued by the PBA under its 1995 Bond Resolution; (b) fund swap termination payments and related fees; and (c) pay costs of the issuance of the PBA Series P Bonds.  The net proceeds of the PBA Series Q Bonds were used to (a) refund interest (but not principal) on certain other bonds issued by the PBA under its 1995 Bond Resolution and certain bonds issued by the PBA under its 1978 Bond Resolution, and its 1970 Bond Resolution, (b) repay certain advances made to PBA by GDB under a line of credit facility, (c) pay capitalized interest on the PBA Series Q Bonds, and (d) pay costs of the issuance of the PBA Series Q Bonds.

66.     PBA issued its Government Facilities Revenue Bonds, Series R (the "PBA Series R Bonds") bonds on August 24, 2011 ("PBA Series R"), with a face amount of $756,449,000.

67.     For the PBA Series R Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and BofA Merrill Lynch, Santander Securities Corporation, UBS, Barclays, Citigroup, Ramirez & Co., Inc., Raymond James, and Scotia MSD as underwriters.

68.     The net proceeds of the PBA Series R Bonds were used to (a) pay part of the cost of constructing, renovating, remodeling and/or improving approximately 100 public schools and acquiring land together with equipment, furnishings, landscaping and other site improvements, and (b) pay the costs of the issuance of the PBA Series R Bonds.

69.     PBA issued its Government Facilities Revenue Bonds, Series S (the "PBA Series S Bonds") on August 24, 2011 with a face amount of $303,945,000.

70.     For the PBA Series S Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and Ramirez & Co., Inc., RBC Capital Markets, Barclays, BMO

Capital Markets, BofA Merrill Lynch, Citigroup, Goldman Sachs, Jefferies, J.P. Morgan, Morgan Stanley, Raymond James, UBS, Santander Securities, Scotia MSD, and VAB Financial as underwriters.

71.     The net proceeds of the PBA Series S Bonds were used to (a) repay certain advances made to PBA by GDB under line of credit facilities (i) to pay interest due January 1 and July 1, 2011 on certain other bonds issued by the PBA under its 1995 Bond Resolution and certain bonds issued by the PBA under its 1970 Bond Resolution, and (ii) pay a portion of the construction costs of certain buildings and facilities leased by the PBA to various departments, agencies, instrumentalities and municipalities of the Commonwealth, and (b) pay the costs of issuance of the PBA Series S Bonds.

72.     PBA issued its Government Facilities Revenue Bonds, Series T (the "PBA Series T Bonds") on December 22, 2011, with a face amount of $121,528,000.

73.     For the PBA Series T Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and Santander Securities and UBS as underwriters.

74.     The net proceeds of the PBA Series T Bonds were used to (a) pay part of the cost of renovating and rehabilitating certain public schools, and (b) the costs of issuance of the PBA Series T Bonds.

75.     PBA issued its Government Facilities Revenue Refunding Bonds, Series U (the "PBA Series U Bonds") on June 21, 2012, with a face amount of $582,345,000.

76.     For the PBA Series U Bonds, the relevant parties included PBA, as issuer, GDB, as financial advisor to PBA, and Goldman Sachs, BMO Capital Markets, RBC Capital Markets, Barclays, BofA Merrill Lynch, Citigroup, Jefferies, J.P. Morgan, Morgan Stanley, Ramirez &

Co. Inc., Raymond James/Morgan Keegan, Santander Securities, Scotia MSD, UBS FS Puerto Rico, and VAB Financial as underwriters.

77. Sidley Austin served as bond counsel for the PBA Series U Bonds.

78. The net proceeds of the PBA Series U Bonds were used to (a) refund in whole PBA's Series J Bonds; (b) refund a portion of PBA's Series D Bonds and Series G Bonds; (c) repay certain advances made to PBA by GDB under a line of credit; (d) pay capitalized interest on the PBA Series U Bonds; and (e) pay costs of the issuance of the Series U Bonds.

### *GO Bond Series 2007A-4*

79. In 2009, GDB approved the remarketing of the Commonwealth's Public Improvement Refunding Bonds, Series 2007 A-4 (the "GO Series 2007A-4 Bonds").  The GO Series 2007A-4 Bonds were issued, with the approval of GDB, as variable rate bonds on October 16, 2007, with a face value of $93,382,000.

80.  For the remarketing of the GO Series 2007A-4 Bonds, the relevant parties included, the Commonwealth, as the issuer, GDB as the Commonwealth's financial advisor, and Morgan Stanley and J.P. Morgan as remarketing agents.  Morgan Stanley and J.P. Morgan were also underwriters for the issuance of the GO Series 2007A-4 Bonds.

81. The GO Series 2007A-4 Bonds were issued for the purpose of refunding certain outstanding improvement and public improvement refunding bonds of the Commonwealth, for debt service savings.

### *GO Bond Series 2009A and 2009B*

82. GDB approved the issuance by the Commonwealth of its Public Improvement Refunding Bonds, Series 2009A (the "GO Series 2009A Bonds") and its Public Improvement Refunding Bonds, Series 2009B (the "GO Series 2009B Bonds"). The GO Series 2009A Bonds

were issued on September 17, 2009, with a face amount of $3,425,000. The GO Series 2009B Bonds were issued on November 17, 2009, with a face amount of $372,685,000.

83.     For both the GO Series 2009A Bonds and GO Series 2009B Bonds, the relevant parties included the Commonwealth of Puerto Rico, as the issuer,   GDB   as   the Commonwealth's   financial   advisor, and Morgan Stanley, J.P. Morgan, Barclays, Goldman Sachs, Merrill Lynch, Ramirez & Co, Santander Securities, and UBS as underwriters.

84.     The net proceeds of the GO Series 2009A Bonds were used to (a) refund on a current basis a portion of the Commonwealth's GO Series 2007A-4 Bonds (which, in turn, refunded other Commonwealth GO Bonds), and (b) funding a portion of a termination payment under an interest rate swap agreement entered into in connection with the issuance of the Commonwealth's GO Series 2007A-4 Bonds.

85.     The net proceeds of the GO Series 2009B Bonds were used to (a) refund interest (but not principal) on certain GO Bonds issued between 1993 and 2002, (b) repay certain advances made to the Commonwealth by GDB under a line of credit facility (c) pay capitalized interest on the GO Series 2009B Bonds, and (d) pay costs of issuance of the GO Series 2009B Bonds.

### *GO Bond Series 2009C*

86.     GDB approved the issuance by the Commonwealth of its Public Improvement Refunding Bonds, Series 2009C (the "GO Series 2009C Bonds").  The GO Series 2009C Bonds were issued on December 16, 2009, with a face amount of $210,250,000.

87.     For the GO Series 2009C Bonds, the relevant parties included the Commonwealth as the issuer, GDB as the Commonwealth's financial advisor, and Morgan Stanley, Citigroup,

J.P. Morgan,  Barclays, Goldman Sachs, Merrill Lynch & Co., Ramirez & Co., Inc., UBS, and Santander Securities as underwriters.

88.     The net proceeds of the GO Series 2009C Bonds were used to (a) refund interest (but not principal) on certain GO Bonds of the Commonwealth, and (b) pay the costs of issuance of the GO Series 2009C Bonds.

### *GO Bond Series 2011A*

89.     GDB approved the issuance by the Commonwealth of its Public Improvement Refunding Bonds, Series 2011A (the "GO Series 2011A Bonds").  The GO Series 2011A Bonds were issued on February 17, 2011, with a face amount of $356,520,000.

90.     For the GO Series 2011A Bonds, the relevant parties included the Commonwealth as the issuer, GDB as the Commonwealth's financial advisor, and Barclays, Jefferies, BofA Merrill Lynch, Citigroup, Goldman Sachs, J.P. Morgan, Morgan Stanley, Ramirez & Co. Inc., Raymond James, RBC Capital Markets, UBS, and Santander Securities, as underwriters.

91.     The net proceeds of the GO Series 2011A Bonds were used to (a) refund a portion of the principal (but not the interest) payable on July 1, 2011 on certain general obligation bonds and notes of the Commonwealth; (b) refund, in whole or in part, certain other general obligation bonds and notes of the Commonwealth; (c) repay certain GDB lines of credit used to deposit moneys in the Commonwealth's Redemption Fund to cover a portion of the principal (but not the interest) payable on July 1, 2011 on certain general obligation bonds and notes of the Commonwealth; (d) fund termination payments under certain interest rate swap agreements entered into in connection with the refunding of the refunded bonds; and (e) pay the cost of issuance of the GO Series 2011A Bonds.

## *The Series 2012 B GO Bonds and the Series 2012 A GO Bonds*

92.     In March 2012, UBS acted as the lead underwriter for the Commonwealth's $415,270,000 Public Improvement Refunding Bonds, Series 2012 B (the "Series 2012 B GO Bonds"). The other underwriters included Bank of America Merrill Lynch, Barclays, and Ramirez & Co., Inc.

93.     The principal uses of the proceeds of the Series 2012 B GO Bonds were to (a) repay a GDB line of credit, and (b) refund outstanding General Obligation Bonds.

94.     At the time of the Series 2012 B GO Bond offering, the debt of the Commonwealth exceeded the Debt Service Limit.

95.     Accordingly, the Series 2012 B GO Bonds were void *ab initio*.

96.     In April 2012, Barclays, J.P. Morgan, Goldman Sachs, Jefferies, Bank of America Merrill Lynch, Ramirez & Co., UBS, and Santander all participated in underwriting the Commonwealth's $2,318,190,000 Public Improvement Refunding Bonds, Series 2012 A (the "Series 2012 A GO Bonds"). Barclays and J.P. Morgan were the lead underwriters for that offering.  The proceeds of the Series 2012 A GO Bonds were used to (a) repay GDB lines of credit, (b) refund outstanding General Obligation Bonds, (c) pay capitalized interest on the Series 2012 A GO Bonds through 2015, and (d) pay termination fees on interest rate swap agreements. A total of $125,386,600 was paid to Deutsche Bank, Morgan Stanley, RBC, and UBS in respect of such termination fees.

97.     Morgan Stanley, UBS, and RBC Capital Markets also received swap termination fees from the proceeds of that offering.

98.     At the time of the Series 2012 A GO Bond offering, the debt of the Commonwealth exceeded the Debt Service Limit.

99.     Accordingly, the Series 2012 A GO Bonds were void *ab initio*.

**<u>The 2014 GO Bonds</u>**

100.    In 2013, the Puerto Rico Highways and Transportation Authority (the "HTA") was unable to repay to repay a $2 billion obligation that it had incurred to the GDB. GDB desperately needed the funds due from the HTA in order to repay other debt obligations and continue funding the operations of the Commonwealth.

101.    On December 4, 2013, GDB board members and high-ranking officials wrote a letter to then-Governor García Padilla requesting that he implement measures to protect the fiscal health of Puerto Rico, including increasing the gas tax and increasing Puerto Rico Electric Power Authority's ("PREPA") rates.   After the Governor chose not to implement these fiscally responsible measures, GDB began to consider various alternative means to get through the fiscal emergency caused by the threatened default by HTA.

102.    In January and February 2014, GDB hired various financial advisors, including Millstein & Co. ("Millco").   Although Millco is well-known as a firm with expertise in restructuring, Millco was purportedly simply providing a "routine liquidity analysis." Another restructuring firm engaged at the time, Cleary Gottlieb Steen & Hamilton LLP ("Cleary"), was hired to advise broadly on alternatives for various contingency scenarios with respect to the Commonwealth and the Public Entities.

103.    In early 2014, financial institutions, including Citigroup, prepared a memorandum for then-Chairman of GDB's Board, David Chafey, as well as other high-ranking GDB officials, proposing a comprehensive approach to the fiscal distress of the Commonwealth and the Public Entities.  In this memorandum, Citigroup made a variety of suggestions, including legislation to impose fiscal responsibility.  Non-legislative proposals were also included in the memorandum.

These were (i) the establishment of a five-member oversight body including appointees of the Federal Reserve and U.S. Treasury, and (ii) the issuance of municipal bonds backed by property tax and sales tax revenues. The Citigroup memorandum specifically advised against attempting to resolve the fiscal crisis through a long-term bond issuance backed by the full faith, credit and taxing power of the Commonwealth.

104.    Notwithstanding the advice GDB received regarding a responsible path to financial solvency, it elected to pursue a further issuance of General Obligation Bonds. Citigroup determined that it could not in good conscience underwrite another bond while proposing a different path.

105.    On February 7, 2014, the Commonwealth's outstanding GO Bonds were downgraded to non-investment-grade by the credit rating agencies. Factors contributing to the downgrade included Puerto Rico's ongoing economic recession, the Commonwealth's high and growing debt levels, its chronic budget deficits, multi-year trends regarding large operating deficits in the General Fund and related deficit financing, its reduced liquidity and increased refinancing risk, and its increased reliance on external short-term debt.

106.    In early March 2014, the GDB Board learned that it had insufficient cash on hand to meet the needs of the Commonwealth and the Public Entities to fund their obligations for twelve months. Without additional funding, GDB's auditors would be unable to provide a clean audit opinion and would instead be required to issue a "going concern" qualification to the Commonwealth's financial statements.

107.    A going concern qualification to the Commonwealth's financial statements could have negatively impacted the credit ratings for issued and outstanding bonds of the Public Entities and of the Commonwealth because credit rating agencies considered GDB's willingness

and ability to extend liquidity to Puerto Rico-related issuers to be a key factor in evaluating bonds of the Commonwealth and the Public Entities.

108.    While fully aware of the insolvency of the Commonwealth but eager to avoid a going concern qualification, GDB forged ahead with another general obligations bond offering. Repeating the pattern of refinancing the Commonwealth's unsustainable debt load, the underwriters selected by GDB included many who had served as underwriters on prior issuances. Moreover, affiliates of the selected underwriters were known to have participated in other financial transactions with the Commonwealth, the Public Entities, GDB and its subsidiaries and affiliates.  Some had acted as asset-managers who stood to enjoy additional fees associated with burgeoning accounts as a result of the issuance of additional GO Bonds.

109.    On March 4, 2014, the Legislative Assembly of Puerto Rico enacted Law 34 of 2014, authorizing an issuance of $3.5 billion of GO Bonds (the "2014 GO Bond issuance").

110.    The same day, Melba Acosta Febo, Secretary of the Treasury, sent an email to Jose Coleman Tio, GDB General Counsel, copying, among others, Sidley Austin, underwriters' counsel, regarding Puerto Rico's annual financial statements, stating, "We are working to be on time but there are many issues out of our control, many coming from gdb for example as restatement of cofina."

111.    On March 5, 2014, GDB issued a Special Liquidity Update to the market, providing a brief overview of GDB's liquidity position as of January 31, 2014 and a liquidity projection as of that date, based on certain assumptions.  The Special Liquidity Update also revealed that Millco had been engaged to evaluate potential funding sources and financing proposals, analyze cash flow projections and liquidity for the Commonwealth, and analyze the Commonwealth's capital structure.

112.   This disclosure sparked speculation that Millco was hired to aid GDB through a Commonwealth restructuring.   The Wall Street Journal published an article the next day suggesting as much, and quoting a GDB source as saying, "[w]e can say clearly, we have not hired anyone to advise on restructuring."   Internally, however, a high-ranking GDB official expressed concern that this statement was false, and should be reframed.

113.   In the midst of these events and aware of the approaching fiscal crisis, GDB moved ahead with the issuance of the 2014 GO Bonds.

114.   To issue the 2014 GO Bonds, GDB entered into a purchase contract (the "2014 Purchase Contract") with Barclays, as the lead underwriter and representative of the syndicate of underwriters, which included Bank of America Merrill Lynch, Goldman Sachs, J.P. Morgan, Ramirez & Co., Inc., Jefferies, Mesirow, Santander Securities, and UBS.

115.   Pursuant to the 2014 GO Bond Offering Statement, Barclays agreed "that the Underwriters w[ould], jointly and severally, purchase the Bonds from the Commonwealth at an aggregate discount of $28,130,460.67 from the initial offering price of the Bonds.

116.   The Underwriters were also compensated through management fees, risk fees, and sales credits.

117.   Several underwriters that had participated in prior issuances of bonds by the Commonwealth or the Public Entities received proceeds of the 2014 GO Bond issuance in the form of the redemption or repurchase price of bonds held by them or their affiliates at the time of the 2014 GO Bond issuance.   These underwriters included J.P. Morgan and Banco Santander Puerto Rico, which held $59.8 million and $98.7 million, respectively, in aggregate principal of bonds issued by the Commonwealth and/or the Public Entities that were refunded with proceeds of the 2014 GO Bond issuance.

118.    Morgan Stanley and Merrill Lynch Capital Services (an affiliated entity of Bank of America Merrill Lynch), were also paid swap termination fees (and transactional fees related to the termination of the interest rate exchange agreements) from the 2014 GO Bond issuance.

### *The Swaps Transactions and Subsequent Termination Fees*

119.    Starting in or around 2003, interest rates began to rise from the historic lows experienced during the first years of the millennium.  While rates were still low, the Underwriter Defendants pitched GDB on the idea of raising funds through the issuance of variable rate bonds. Upon information and belief, these Underwriter Defendants advised that given the market's awareness of the possibility that interest rates would rise over the course of the life of a long-term bond, variable rate long-term bonds were more marketable than fixed-rate bonds under then prevailing conditions.   At the same time, in conjunction with this advice, the Underwriter Defendants also advised GDB to hedge the risk that interest rates would rise by entering into interest rate swap agreements.  These swaps would convert the variable rate liability of the Commonwealth into fixed rate liability.

120.    In 2006, prompted by financial advisors and as the result of lobbying of the Legislature, including lobbying by financial institutions (including Goldman Sachs), the legislature enacted Act 39, authorizing the Commonwealth to enter into certain interest rate swap agreements, subject to the limitations prescribed in Act 39.  Act 39 authorizes swaps to manage "the risks or costs of the Commonwealth related to the fluctuations in the interest rates, investments, changes in the level of prices or the credit risks of any obligation."  Act 39 prohibits Puerto Rico from entering into a swap transaction "for the purpose of financial speculation." Puerto Rico cannot "perform functions as a broker" with respect to swap transactions.

Additionally, the nominal amount of a swap transaction cannot exceed the principal of the underlying bond obligation.

121.    Underwriter Defendants and Swap Counterparty Defendants induced the Commonwealth and the Public Entities to enter into swap transactions by advising that interest rates would trend up from the then prevailing level.  While interest rate swaps were pitched as necessary and prudent in order to protect against rising interest rates on variable rate bonds, interest rate swaps are inherently risky for the counterparty that is at the wrong end of the swap. This advice given to GDB by the Underwriter Defendants and the Swap Counterparty Defendants was reckless and wrong.  The swap agreements approved by GDB and entered into by the Commonwealth were catastrophic in their impact on the Commonwealth.

122.    GDB, in its role as financial advisor, oversaw and approved the entry by the Commonwealth and the Public Entities into swap agreements with counterparties. These swap transactions, purportedly entered into under the authority of Act 39, were in fact high risk transactions. Despite the known risk and inherently speculative nature of interest rate swap agreements, GDB authorized the entry by the Commonwealth and the Public Entities into scores of speculative interest rate swaps.  In so doing, GDB breached its fiduciary duties to the Commonwealth.

123.    From 2004 through 2008, with the approval of GDB and the substantial assistance of Underwriter Defendants and Swap Counterparty Defendants, the Commonwealth and the Public Entities entered into at least 77 swap transactions. By exposing the Commonwealth to the risks inherent in the toxic combination of variable rate bonds and interest rate swaps, GDB breached its duty of due care.

124.    With the onset of the financial crisis in 2007, interest rates plummeted to levels lower than ever before, subjecting swap transactions to collateral calls and termination events.

125.    To avoid costly early termination of the swap agreements, the Commonwealth or the Public Entity issuer was required by the terms of the swap agreements to post collateral as security.  As interest rates began to fall, the Commonwealth, acting under the advice of GDB, first attempted to ride out these changes by posting collateral.  GDB approved the issuance of additional bonds to generate the cash it needed to satisfy the collateral requirements.

126.     By 2009, the Commonwealth was exposed to over $9 billion in liabilities based on interest rate swaps that had been approved by GDB. Faced with this liability, GDB advised and approved the termination of many swaps, thereby incurring liability for swap termination fees.  Thereafter, year after year, the Commonwealth and the Public Entities continued to terminate swaps as their liabilities exceeded their values.

127.    By September 30, 2014, the Commonwealth and the Public Entities had paid over $1.085 billion in net termination fees to the Swap Counterparty Defendants. Proceeds from the GO Bond Series 2014 and 2012A issuances were used to fund the swap termination fees.

128.    The Swap Counterparty Defendants knew that GDB breached its fiduciary duty to the Commonwealth by approving the swap transactions and nevertheless substantially assisted and aided and abetted such breach by originating and executing the swap transaction. Swap counterparties received total annual swap termination fees (the "Swap Termination Fees") from the Commonwealth in at least the amounts set forth below:

| Fiscal Year | Termination Fees Paid |
| --- | --- |
| 2009 | $74,596,346 |
| 2010 | $44,254,000 |
| 2011 | $58,552,030 |
| 2012 | $577,574,600 |

| | |
|---|---|
| 2013 | $375,000 |
| 2014 | $252,075,040 |
| **TOTAL:** | **$1,006,677,016** |

129.    The Commonwealth did not receive reasonably equivalent value for the Swap Termination Fees.

130.    As a result of their receipt of Swap Termination Fees, the Swap Counterparty Defendants were unjustly enriched.

### ***Other Professionals Help Complete the 2014 GO Bond issuance***

131.    Sidley Austin acted as counsel to the 2014 GO Bond Underwriters in connection with the offering.   They were responsible for reviewing the debt limit certification.   By participating as counsel to the underwriters of the 2014 GO Bonds, Sidley Austin breached its fiduciary duty to the Commonwealth which it had represented in 2003 in connection with the B and C Public Improvement Refunding Bonds.

132.    Sidley Austin failed to engage in reasonable diligence in respect of assessing whether the 2014 GO Bonds could be issued in compliance with the calculations for the Debt Service Limit.

133.    Indeed, the 2014 GO Bond Underwriters worked with GDB to structure the future debt service payments to avoid a determination that the Constitutional Debt Service Limit was violated.

134.    Using calculations that had been prepared on behalf of the Commonwealth, the debt service was 14.2%, just shy of the 15% Debt Service Limit. However, these calculations were improper in that they excluded the debt service on PBA Bonds that are guaranteed by the full faith, credit, and taxing power of the Commonwealth.   Because the PBA Bonds are guaranteed by the full faith, credit, and taxing power of the Commonwealth and, apart from that

guarantee, are, in substance, obligations of the Commonwealth backed by its full faith, credit, and taxing power, debt service payable on those bonds should have been included in calculating whether the Constitutional Debt Service Limit would be exceeded upon issuance of the 2014 GO Bonds.

135.    The PBA Bonds also failed to include approximately $425 million in interest.

136.    On March 17, 2014, the Commonwealth issued the 2014 GO Bonds, with a maturity of July 1, 2035, approximately twenty years after their issuance.

137.    The 2014 GO Bonds had a face amount of $3.5 billion.  After underwriting discounts, original issue discount, and transaction fees, the Commonwealth received net proceeds of $3.255 billion.

138.    The net proceeds from the 2014 GO Bonds were applied as follows: (a) to repay GDB's limes of credit and a deposit to the Commonwealth's Redemption Fund ($1,896,072,196); (b) to repay COFINA bond anticipation notes, which were not obligations of the Commonwealth or guaranteed by the full faith, credit, and taxing power of the Commonwealth ($342,365,760); (c) to refinance refunded bonds from 2003 that refunded bonds from 1987 and 1989, which were originally underwritten by eleven of the fourteen 2014 GO Bond Underwriters ($466,574,005); (d) to pay fees owed to interest rate swap counterparties ($90,417,100); (e) to pay interest on the bonds ($422,749,408); and (f) to pay costs of issuance ($36,821,531).

139.    The Swap Termination Fees owed to interest rate exchange counterparties were obligations backed by the full faith, credit, and taxing power of the Commonwealth. Nonetheless, Puerto Rico excluded the Swap Termination Fees from its Debt Service Limit calculation.

140.    The financial professionals and advisors who participated in the 2014 GO Bond issuance reaped the rewards of the depleted bargaining power of the Debtors.  Defying all financially-sound logic and reason, the proceeds of the higher interest 2014 GO Bonds were used to refund outstanding GO bonds with a lower interest rate.

141.    Many of the 2014 GO Bond Underwriters affiliates held aggregate principal amounts of the bonds that were refunded at higher interest rates through the 2014 GO issuance – and thus were repaid through the issuance *and* received fees through the transaction, including J.P Morgan Chase Bank, National Association ($14.9 million), J.P. Morgan Chase Bank ($59.8 million), and Banco Santander Puerto Rico ($98.7 million).

142.    The Official Statement for the 2014 GO Bonds also disclosed that the Commonwealth might not be able to maintain a balanced budget, and included a disclosure about potential "restructuring, moratorium, and insolvency risk and that GDB was evaluating alternative courses of action 'with financial and legal advisors' in the event Puerto Rico's financial condition did not improve."

143.    Sure enough, on June 29, 2014 – little more than three months after the 2014 GO Bond issuance – the Recovery Act was enacted, establishing a restructuring regime for Puerto Rico's public corporations and the Puerto Rico-Related Entities.  It appears that two prominent restructuring firms retained *before* the 2014 GO Bond issuance helped draft the legislation.

## ALL CLAIMS ARE TIMELY MADE

144.    To the extent that any claims herein are subject to applicable statutes of limitations, Debtors expressly reserve all rights and assert that all claims asserted herein are timely made and/or have been tolled under the applicable tolling doctrines, including but not limited to the discovery rule and *contra non valentem*.

### *COUNTS RELATED TO GO BOND SERIES 2014A*

#### COUNT 1
#### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
#### (UNDERWRITERS – 2014 GO BOND ISSUANCE)

145.    Debtors repeat and reallege the paragraphs above as if set forth herein.

146.    GDB owed a fiduciary duty to Debtors.

147.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

148.    The 2014 GO Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to the Commonwealth's incurrence of further debt. Through the underwriting process, the 2014 GO Bond Underwriters became intimately familiar with the Commonwealth's financial conditions and mounting debt obligations.

149.    The 2014 GO Bond Underwriters substantially assisted and aided and abetted GDB's breaches of fiduciary duty to the Commonwealth by, among other things, underwriting the 2014 GO Bonds, even though they knew or should have known that the Commonwealth's debt obligations exceeded the Constitutional Debt Service Limit.

150.    Debtors have been damaged by the Defendants' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty.  Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2014 GO Bond Underwriters.

## COUNT 2
## AIDING & ABETTING BREACH OF FIDUCIARY DUTY
## (SWAP COUNTERPARY DEFENDANTS – 2014 GO BOND ISSUANCE)

151.    Debtors repeat and reallege the paragraphs above as if set forth herein.

152.    GDB owed a fiduciary duty to Debtors.

153.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

154.    The Swap Counterparty Defendants had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the Swap Counterparty Defendants became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

155.    The Swap Counterparty Defendants substantially assisted and aided and abetted GDB's breach of fiduciary duty by, among other things, (i) lobbying Puerto Rico's government to pass Act 39, which authorized GDB to engage in swap transactions in certain circumstances, (ii) recommending and causing Puerto Rico's issuers to enter into swap transactions despite the substantial risks of these transactions should interest rates decline, (iii) recommending and causing Puerto Rico's issuers to enter into swap transactions tied to bonds that the counterparties themselves underwrote.[5] The Swap Counterparty Defendants, through their substantial assistance

---

[5] The Swap Counterparty Defendants knew that the underlying bonds tied to these swap transactions carried substantial risk, and therefore the swap transaction would likely be subject to collateral posting and termination risks. Despite this knowledge, the Swap Counterparty Defendants continued to recommend and cause Puerto Rico's issuers to enter into additional swap

to GDB's breach of its fiduciary duty, are liable to Debtors for aiding and abetting GDB's breach of fiduciary duty.

156.    Debtors were damaged by GDB's breach of fiduciary duty in an amount to be determined at trial. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the Swap Counterparty Defendants.

**COUNT 3**
**AIDING & ABETTING BREACH OF FIDUCIARY DUTY**
**(SIDLEY AUSTIN – 2014 GO BOND ISSUANCE)**

157.    Debtors repeat and reallege the paragraphs above as if set forth herein.

158.    GDB owed a fiduciary duty to Debtors.

159.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

160.    Sidley Austin was underwriters' counsel for the 2014 GO Bond issuance. In performing its duties to the 2014 GO Bond Underwriters, Sidley Austin also became aware of Puerto Rico's irresponsible pattern of incurring new debt to pay off old.

161.    Sidley Austin substantially assisted and aided and abetted GDB's breach of fiduciary duty by, among other things, underwriting the 2014 GO Bonds, even though they knew or should have known that Puerto Rico's debt obligations exceeded the Constitutional Debt Service Limit.

---

transactions on bonds they themselves underwrote. Indeed, Puerto Rico issuers ended up paying over $1 billion in termination fees under the swap agreements.  These swap transactions were ultra vires, and therefore void *ab initio*. Such swap transactions were purely speculative, and not used to hedge against interest rate risk.

162.     Debtors have been damaged by Sidley Austin's aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by Sidley Austin.

**COUNT 4**
**(RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500**
**AND 11 U.S.C. § 544(B))**
**(2014 GO BOND UNDERWRITERS)**

163.     Debtors repeat and reallege the paragraphs above as if set forth herein.

164.     At the time the 2014 GO Bonds were issued, the Commonwealth was in a state of insolvency.

165.     The 2014 GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

166.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

167.     The 2014 GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2014 GO Bonds.

168.     Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2014 GO Bonds greatly exceeded the price at which the 2014 GO Bonds were sold to the Commonwealth to the 2014 GO Bond Underwriters, the 2014 GO Bond Underwriters were able to reap large profits from the resale of the 2014 GO Bonds to investors. The amounts that the 2014 GO Bond Underwriters received in excess of the amounts they paid for the 2014 GO Bonds

effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

169. The profits realized from the 2014 GO Bonds by the 2014 GO Bond Underwriters exceeded the effective or reasonable benefits that the Underwriters should have received in connection with the 2014 GO Bonds. The 2014 GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2014 GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2014 GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

## COUNT 5
## RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500 AND 11 U.S.C. § 544(B) (SWAP COUNTERPARTIES – 2014 GO BOND ISSUANCE)

170. Debtors repeat and reallege the paragraphs above as if set forth herein.

171. At the time the 2014 GO Bonds were issued, the Commonwealth was in a state of insolvency.

172. The 2014 GO Bond Swap Counterparties knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

173. The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

174. The 2014 GO Bond Swap Counterparties knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2014 GO Bonds.

175.    The Debtors received insufficient consideration in exchange for the payments made to the 2014 GO Bond Swap Counterparties.

176.    Consequently, Debtors request that any alleged contracts between the Debtors and the 2014 GO Bond Swap Counterparties be deemed null and void and that any funds paid to or benefits received by the 2014 GO Bond Swap Counterparties be avoided and recovered to the Debtors.

## COUNT 6
## RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500 AND 11 U.S.C. § 544(B)
## (SIDLEY AUSTIN – 2014 GO BOND ISSUANCE)

177.    Debtors repeat and reallege the paragraphs above as if set forth herein.

178.    At the time the 2014 GO Bonds were issued, the Commonwealth was in a state of insolvency.

179.    Sidley Austin, underwriters' counsel for the Debtors for the 2014 GO Bonds, knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

180.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

181.    Sidley Austin knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2014 GO Bonds.

182.    The Debtors received insufficient consideration in exchange for the payments made to Sidley Austin.

183.    Consequently, Debtors request that any alleged contracts between the Debtors and Sidley Austin be deemed null and void and that any funds paid to or benefits received by Sidley Austin be avoided and recovered to the Debtors.

## COUNT 7
## UNJUST ENRICHMENT
## (UNDERWRITERS – 2014 GO BOND ISSUANCE)

184.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

185.    2014 GO Bond Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2014 GO Bond Underwriters were unjustly enriched by at least $28,130,460 for their participation in the 2014 GO Bond issuance.

186.    Equity and good conscience require that the 2014 GO Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

## COUNT 8
## UNJUST ENRICHMENT
## (SWAP COUNTERPARTY DEFENDANTS – 2014 GO BOND ISSUANCE)

187.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

188.    The Commonwealth paid over $90 million in swap termination payments to swap counterparties, approximately ninety four percent of the fees it owed on those instruments. Since the fair value for a bankrupt municipality is only thirty percent of swap counterparties' termination fees, Defendant swap counterparties received a windfall and were enriched at the Commonwealth's expense. In total, Puerto Rico's swap counterparties were unjustly enriched by at least $61,717,100.00.

189.    Equity and good conscience require that the 2014 GO Bond Swap Counterparties return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

**COUNT 9**
**UNJUST ENRICHMENT**
**(SIDLEY AUSTIN – 2014 GO BOND ISSUANCE)**

190.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

191.    The Commonwealth paid fees to Sidley Austin, as underwriters' counsel out of the proceeds of the 2014 GO Bond issuance.  The services provided permitted the Commonwealth to make issuances that were not in Puerto Rico's best financial interest, and accordingly, Sidley Austin was unjustly enriched in the amount of the fees paid in connection with the 2014 GO Bond issuance.

192.    Equity and good conscience require that the Sidley Austin return any fees it received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

**COUNT 10**
**BREACH OF CONTRACT**
**(UNDERWRITERS - 2014 PURCHASE AGREEMENT)**

193.    Debtors repeat and reallege the paragraphs above as if set forth herein.

194.    The 2014 GO Bond Underwriters, through their representative, Barclays Capital Inc., and the Commonwealth of Puerto Rico, through the Secretary of the Treasury of the Commonwealth, entered into a valid and binding agreement for the purchase of General Obligation Bonds, dated March 11, 2014 (the "2014 Purchase Contract").

195.    Pursuant to the terms of the 2014 Purchase Contract, the 2014 GO Bond Underwriters were obligated to comply with the requirements of the rules of the Municipal Securities Rulemaking Board (the "MSRB").

196.    The 2014 GO Bond Underwriters breached the 2014 Purchase Contract by, among other things, failing to comply with MSRB Rules G-17 by sufficiently disclosing the

details of the selection process for the purchasers of the 2014 GO Bonds, including compensation and potential conflicts of interest information.

197.    As a result of the 2014 GO Bond Underwriters' breach of the 2014 Purchase Contract, the Commonwealth has suffered damages in an amount to be determined at trial.

### *COUNTS RELATED TO THE SERIES 2012 A GO BOND ISSUANCE*

### COUNT 11
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – SERIES 2012 A GO BOND ISSUANCE)

198.    Debtors repeat and reallege the paragraphs above as if set forth herein.

199.    GDB owed a fiduciary duty to Debtors.

200.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

201.    The 2012 Series A GO Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2012 Series A GO Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

202.    The 2012 Series A GO Bond Underwriters aided and abetted GDB's breach of fiduciary duty by, among other things, underwriting the 2012 Series A GO Bonds, even though they knew or should have known that Puerto Rico's debt obligations exceeded or were at risk of exceeding the Constitutional limit.

203.     Debtors have been damaged by the 2012 Series A GO Bond Underwriters' aiding and abetting of GDB's breach of its fiduciary duty in an amount to be determined at trial. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2012 Series A GO Bond Underwriters.

**COUNT 12**
**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500,**
**11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)**
**(UNDERWRITERS - SERIES 2012 A GO BOND ISSUANCE)**

204.     Debtors repeat and reallege the paragraphs above as if set forth herein.

205.     At the time the 2012 Series A GO Bonds were issued, the Commonwealth was in a state of insolvency.

206.     The 2012 Series A GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

207.     As of the date Petition Date, the IRS was a creditor of the Debtors.[6]

208.     As of the Petition Date, the Debtors had other unsecured creditors.

209.     The fees paid to the 2012 Series A GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

210.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

211.     The 2012 Series A GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2012 Series A GO Bonds.

---

[6] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

212.	Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2012 Series A GO Bonds greatly exceeded the price at which the 2012 Series A GO Bonds were sold to the Commonwealth to the 2012 Series A GO Bond Underwriters, the 2012 Series A GO Bond Underwriters were able to reap large profits from the resale of the 2012 Series A GO Bonds to investors. The amounts that the 2012 Series A GO Bond Underwriters received in excess of the amounts they paid for the 2012 Series A GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

213.	The profits realized from the 2012 Series A GO Bonds by the 2012 Series A GO Underwriters exceeded the effective or reasonable benefits that the 2012 Series A GO Underwriters should have received in connection with 2012 Series A GO Bonds. The 2012 Series A GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2012 Series A GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2012 Series A GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

214.	Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2012 Series A GO Bond Underwriters. As a result, to the extent necessary, Debtors may recover the fees paid to the 2012 Series A GO Bond Underwriters pursuant to 11 U.S.C. § 550.

**COUNT 13**
**UNJUST ENRICHMENT**
**(UNDERWRITERS – SERIES 2012 A GO BOND ISSUANCE)**

215.	Debtors repeat and reallege the paragraphs above as if fully set forth herein.

216.     Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.   The 2012 Series A GO Bond Underwriters were unjustly enriched by at least $14,723,016 for their participation in the 2012 Series A GO Bond issuance.

217.     Equity and good conscience require that the 2012 Series A GO Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO THE SERIES 2012 B GO BOND ISSUANCE*

### COUNT 14
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – SERIES 2012 B GO BOND ISSUANCE)

218.     Debtors repeat and reallege the paragraphs above as if set forth herein.

219.     GDB owed a fiduciary duty to Debtors.

220.     GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

221.     The 2012 Series B GO Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2012 Series B GO Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

222.    The 2012 Series B GO Bond Underwriters aided and abetted GDB's breach of fiduciary duty by, among other things, underwriting the 2012 Series B GO Bonds, even though they knew or should have known that Puerto Rico's debt obligations exceeded or were at risk of exceeding the Constitutional limit.

223.    Debtors have been damaged by the 2012 Series B GO Bond Underwriters' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2012 Series B GO Bond Underwriters.

**COUNT 15**
**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)**
**(UNDERWRITERS – SERIES 2012 B GO BOND ISSUANCE)**

224.    Debtors repeat and reallege the paragraphs above as if set forth herein.

225.    At the time the 2012 Series B GO Bonds were issued, the Commonwealth was in a state of insolvency.

226.    The 2012 Series B GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

227.    As of the date Petition Date, the IRS was a creditor of the Debtors.[7]

228.    As of the Petition Date, the Debtors had other unsecured creditors.

---

[7] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

229.    The fees paid to the 2012 Series B GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

230.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

231.    The 2012 Series B GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the Series 2012 B GO Bonds.

232.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2012 Series B GO Bonds greatly exceeded the price at which the 2012 Series B GO Bonds were sold by the Commonwealth to the 2012 Series B GO Bond Underwriters, the 2012 Series B GO Bond Underwriters were able to reap large profits from the resale of the 2012 Series B GO Bonds to investors.  The amounts that the 2012 Series B GO Underwriters received in excess of the amounts they paid for the 2012 Series B GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

233.    The profits realized from the 2012 Series B GO Bonds by the 2012 Series B GO Underwriters exceeded the effective or reasonable benefits that the 2012 Series B GO Underwriters should have received in connection with 2012 Series B GO Bonds. The 2012 Series B GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the Series 2012 Series B GO Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2012 Series B GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

234.     Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2012 Series B GO Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2012 Series B GO Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 16
### UNJUST ENRICHMENT
### (UNDERWRITERS – SERIES 2012 B GO BOND ISSUANCE)

235.     Debtors repeat and reallege the paragraphs above as if fully set forth herein.

236.     Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.   The 2012 Series B GO Bond Underwriters were unjustly enriched by at least $2,333,613 for their participation in the Series 2012 B GO Bond issuance.

237.     Equity and good conscience require that the 2012 Series B GO Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO THE GO BOND SERIES 2011 D&E*

### COUNT 17
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – SERIES 2011 D&E GO BOND ISSUANCE)

238.     Debtors repeat and reallege the paragraphs above as if set forth herein.

239.     GDB owed a fiduciary duty to Debtors.

240.     GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and

that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

241.    The 2011 Series D Bond Underwriters and the 2011 Series E Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2011 Series D Bond Underwriters & 2011 Series E Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

242.    The 2011 Series D Bond Underwriters and 2011 Series E Bond Underwriters aided and abetted GDB's breach of fiduciary duty by, among other things, underwriting the Series 2011 D&E GO Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit or at risk of exceeding it.

243.    Debtors have been damaged by the 2011 Series D Bond Underwriters' and the 2011 Series E Bond Underwriters' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2011 Series D Bond Underwriters and the 2011 Series E Bond Underwriters.

<u>**COUNT 18**</u>
<u>**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)**</u>
<u>**(UNDERWRITERS – SERIES 2011 D&E GO BOND ISSUANCE)**</u>

244.    Debtors repeat and reallege the paragraphs above as if set forth herein.

245.    At the time the 2011 Series D&E GO Bonds were issued, the Commonwealth was in a state of insolvency.

246.    The 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

247.    As of the date Petition Date, the IRS was a creditor of the Debtors.[8]

248.    As of the Petition Date, the Debtors had other unsecured creditors.

249.    The fees paid to the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

250.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

251.    The 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2011 Series D&E GO Bonds.

252.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2011 Series D GO Bonds and the 2011 Series E GO Bonds greatly exceeded the price at which the 2011 Series D GO Bonds and the 2011 Series E GO Bonds were sold to the Commonwealth to the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters, the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters were able to reap large profits from the resale of the 2011 Series D GO Bonds and the 2011 Series E GO Bonds to investors.  The amounts that the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters received in excess of the amounts

---

[8] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

they paid for the 2011 Series D GO Bonds and the 2011 Series E GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

253.    The profits realized from the 2011 Series D GO Bonds and the 2011 Series E GO Bonds by the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters exceeded the effective or reasonable benefits that the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters should have received in connection with the 2011 Series D GO Bonds and the 2011 Series E GO Bonds. The 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

254.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2011 Series D GO Bond Underwriters and the 2011 Series E GO Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 19
### UNJUST ENRICHMENT
### (UNDERWRITERS – SERIES 2011 D&E GO BOND ISSUANCE)

255.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

256.    Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial

interest.  The 2011 Series D Bond Underwriters and the 2011 Series E Bond Underwriters were unjustly enriched by at least $3,585,168 for their participation in the 2011 Series D&E GO Bond issuance.

257.    Equity and good conscience require that the 2011 Series D Bond Underwriters and the 2011 Series E Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO THE GO BOND SERIES 2011 C*

### COUNT 20
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – SERIES 2011 C GO BOND ISSUANCE)

258.    Debtors repeat and reallege the paragraphs above as if set forth herein.

259.    GDB owed a fiduciary duty to Debtors.

260.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

261.    The 2011 Series C GO Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2011 Series C GO Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

262.    The 2011 Series C GO Bond Underwriters aided and abetted GDB's breach of fiduciary duty by, among other things, underwriting the Series 2011 C GO Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit or at risk of exceeding it.

263.    Debtors have been damaged by the 2011 Series C GO Bond Underwriters' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2011 Series C GO Bond Underwriters.

## COUNT 21
## RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
## (UNDERWRITERS – SERIES 2011 C GO BOND ISSUANCE)

264.    Debtors repeat and reallege the paragraphs above as if set forth herein.

265.    At the time the 2011 Series C GO Bonds were issued, the Commonwealth was in a state of insolvency.

266.    The 2011 Series C GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

267.    As of the date Petition Date, the IRS was a creditor of the Debtors.[9]

268.    As of the Petition Date, the Debtors had other unsecured creditors.

269.    The fees paid to the 2011 Series C GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

---

[9] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

270.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

271.    The 2011 Series C GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the Series 2011 C GO Bonds.

272.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2011 Series C GO Bonds greatly exceeded the price at which the 2011 Series C GO Bonds were sold to the Commonwealth to the 2011 Series C GO Bond Underwriters, the 2011 Series C GO Bond Underwriters were able to reap large profits from the resale of the 2011 Series C GO Bonds to investors.  The amounts that the 2011 Series C GO Bond Underwriters received in excess of the amounts they paid for the 2011 Series C GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

273.    The profits realized from the 2011 Series C GO Bonds by the 2011 Series C GO Bond Underwriters exceeded the effective or reasonable benefits that the 2011 Series C GO Bond Underwriters should have received in connection with the 2011 Series C GO Bonds. The 2011 Series C GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2011 Series C GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2011 Series C GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

274.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2011 Series C GO Bond Underwriters.  As a

result, to the extent necessary, Debtors may recover the fees paid to the 2011 Series C GO Bond

Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 22
### UNJUST ENRICHMENT
### (UNDERWRITERS – SERIES 2011 C GO BOND ISSUANCE)

275.     Debtors repeat and reallege the paragraphs above as if fully set forth herein.

276.     Underwriters availed themselves of underwriting discounts and collected fees at

Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial

interest.  The 2011 Series C Bond Underwriters were unjustly enriched by at least $2,648,794 for

their participation in the 2011 Series C GO Bond issuance.

277.     Equity and good conscience require that the 2011 Series C GO Bond

Underwriters return any fees they received for their services and any assets associated with the

transactions that ultimately only increased the depth of the Commonwealth's financial crisis.


### *COUNTS RELATED TO THE GO BOND SERIES 2011A*

### COUNT 23
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – SERIES 2011 A GO BOND ISSUANCE)

278.     Debtors repeat and reallege the paragraphs above as if set forth herein.

279.     GDB owed a fiduciary duty to Debtors.

280.     GDB breached that fiduciary duty by, among other things, authorizing the

Debtors to continue to amass additional debt obligations even though it knew that the

Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and

that such additional debt obligations would only serve to deepen the Commonwealth's

insolvency.

281.    The 2011 Series A GO Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2011 Series A GO Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

282.    The 2011 Series A GO Bond Underwriters aided and abetted the GDB's breach of fiduciary duty by, among other things, underwriting the Series 2011 A GO Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit or at risk of exceeding it.

283.    Debtors have been damaged by the Defendants' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2011 Series A GO Bond Underwriters.

**COUNT 24**
**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)**
**(UNDERWRITERS – SERIES 2011 A GO BOND ISSUANCE)**

284.    Debtors repeat and reallege the paragraphs above as if set forth herein.

285.    At the time the 2011 Series A GO Bonds were issued, the Commonwealth was in a state of insolvency.

286.    The 2011 Series A GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

287.    As of the date Petition Date, the IRS was a creditor of the Debtors.[10]

288.    As of the Petition Date, the Debtors had other unsecured creditors.

289.    The fees paid to the 2011 Series A GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

290.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

291.    The 2011 Series A GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2011 Series A GO Bonds.

292.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2011 Series A GO Bonds greatly exceeded the price at which the 2011 Series A GO Bonds were sold to the Commonwealth to the 2011 Series A GO Bond Underwriters, the 2011 Series A GO Bond Underwriters were able to reap large profits from the resale of the 2011 Series A GO Bonds to investors.  The amounts that the 2011 Series A GO Bond Underwriters received in excess of the amounts they paid for the 2011 Series A GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

293.    The profits realized from the 2011 Series A GO Bonds by the 2011 Series A GO Bond Underwriters exceeded the effective or reasonable benefits that the 2011 Series A GO Bond Underwriters should have received in connection with the 2011 Series A GO Bonds. The 2011 Series A GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2011 Series A GO Bond Underwriters were fully aware that the

---

[10] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Commonwealth was insolvent. As a result, the excessive benefit to the 2011 Series A GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

294. Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2011 Series A GO Bond Underwriters. As a result, to the extent necessary, Debtors may recover the fees paid to the 2011 Series A GO Bond Underwriters pursuant to 11 U.S.C. § 550.

**COUNT 25**
**UNJUST ENRICHMENT**
**(UNDERWRITERS – SERIES 2011 A GO BOND ISSUANCE)**

295. Debtors repeat and reallege the paragraphs above as if fully set forth herein.

296. Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest. The 2011 Series A GO Bond Underwriters were unjustly enriched by at least $2,182,886 for their participation in the 2011 Series A GO Bond issuance.

297. Equity and good conscience require that the 2011 Series A GO Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

**_COUNTS RELATED TO THE 2009 SERIES A GO BONDS_**

**COUNT 26**
**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)**
**(UNDERWRITERS – SERIES 2009 A GO BOND ISSUANCE)**

298. Debtors repeat and reallege the paragraphs above as if set forth herein.

299. At the time the 2009 Series A GO Bonds were issued, the Commonwealth was in a state of insolvency.

300.    The 2009 Series A GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

301.    As of the date Petition Date, the IRS was a creditor of the Debtors.[11]

302.    As of the Petition Date, the Debtors had other unsecured creditors.

303.    The fees paid to the 2009 Series A GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

304.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

305.    The 2009 Series A GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2009 Series A GO Bonds.

306.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2009 Series A GO Bonds greatly exceeded the price at which the 2009 Series A GO Bonds were sold to the Commonwealth to the 2009 Series A GO Bond Underwriters, the 2009 Series A GO Bond Underwriters were able to reap large profits from the resale of the 2009 Series A GO Bonds to investors.  The amounts that the 2009 Series A GO Bond Underwriters received in excess of the amounts they paid for the 2009 Series A GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

307.    The profits realized from the 2009 Series A GO Bonds by the 2009 Series A GO Bond Underwriters exceeded the effective or reasonable benefits that the 2009 Series A GO

---

[11] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Bond Underwriters should have received in connection with the 2009 Series A GO Bonds. The 2009 Series A GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2009 Series A GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2009 Series A GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

308.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2009 Series A GO Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2009 Series A GO Bond Underwriters pursuant to 11 U.S.C. § 550.

## COUNT 27
## UNJUST ENRICHMENT
## (UNDERWRITERS – SERIES 2009 A GO BOND ISSUANCE)

309.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

310.    The 2009 Series A GO Bond Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2009 Series A GO Bond Underwriters were unjustly enriched by at least $24,208 for their participation in the 2009 Series A GO Bond issuance.

311.    Equity and good conscience require that the 2009 Series A GO Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

## *COUNTS RELATED TO THE 2009 SERIES B GO BONDS*

## COUNT 28
## RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. §

**544(B), AND 26 U.S.C. § 6502(A)**
**(UNDERWRITERS – SERIES 2009 B GO BOND ISSUANCE)**

312.     Debtors repeat and reallege the paragraphs above as if set forth herein.

313.     At the time the 2009 Series B GO Bonds were issued, the Commonwealth was in a state of insolvency.

314.     The 2009 Series B GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

315.     As of the date Petition Date, the IRS was a creditor of the Debtors.[12]

316.     As of the Petition Date, the Debtors had other unsecured creditors.

317.     The fees paid to the 2009 Series B GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

318.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

319.     The 2009 Series B GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2009 Series B GO Bonds.

320.     Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2009 Series B GO Bonds greatly exceeded the price at which the 2009 Series B GO Bonds were sold to the Commonwealth to the 2009 Series B GO Bond Underwriters, the 2009 Series B GO Bond Underwriters were able to reap large profits from the resale of the 2009 Series B GO Bonds to investors.  The amounts that the 2009 Series B GO Bond Underwriters received in excess of the amounts they paid for the 2009 Series B GO Bonds effectively resulted in an

---

[12] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

321.    The profits realized from the 2009 Series B GO Bonds by the 2009 Series B GO Bond Underwriters exceeded the effective or reasonable benefits that the 2009 Series B GO Bond Underwriters should have received in connection with the 2009 Series B GO Bonds. The 2009 Series B GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2009 Series B GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2009 Series B GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

322.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2009 Series B GO Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2009 Series B GO Bond Underwriters pursuant to 11 U.S.C. § 550.

## COUNT 29
## UNJUST ENRICHMENT
## (UNDERWRITERS – SERIES 2009 B GO BOND ISSUANCE)

323.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

324.    The 2009 Series B GO Bond Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2009 Series B GO Bond Underwriters were unjustly enriched by at least $2,447,007 for their participation in the 2009 Series B GO Bond issuance.

325.    Equity and good conscience require that the 2009 Series B GO Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO THE SERIES 2009 C GO BONDS*

### COUNT 30
### RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
### (UNDERWRITERS – SERIES 2009 C GO BOND ISSUANCE)

326.    Debtors repeat and reallege the paragraphs above as if set forth herein.

327.    At the time the 2009 Series C GO Bond were issued, the Commonwealth was in a state of insolvency.

328.    The 2009 Series C GO Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

329.    As of the date Petition Date, the IRS was a creditor of the Debtors.[13]

330.    As of the Petition Date, the Debtors had other unsecured creditors.

331.    The fees paid to the 2009 Series C GO Bond Underwriters were within the ten year lookback period prior to the Petition Date.

332.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

333.    The 2009 Series C GO Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2009 Series C GO Bonds.

334.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2009 Series C GO Bonds greatly exceeded the price at which the 2009 Series C GO Bonds were sold to the Commonwealth to the 2009 Series C GO Bond Underwriters, 2009 Series C GO

---

[13] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Bond Underwriters were able to reap large profits from the resale of the 2009 Series C GO Bonds to investors. The amounts that the 2009 Series C GO Bond Underwriters received in excess of the amounts they paid for the 2009 Series C GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

335.    The profits realized from the 2009 Series C GO Bonds by the 2009 Series C GO Bond Underwriters exceeded the effective or reasonable benefits that the 2009 Series C GO Bond Underwriters should have received in connection with the 2009 Series C GO Bonds. The 2009 Series C GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2009 Series C GO Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2009 Series C GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

336.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2009 Series C GO Bond Underwriters. As a result, to the extent necessary, Debtors may recover the fees paid to the 2009 Series C GO Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 31
### UNJUST ENRICHMENT
### (UNDERWRITERS – SERIES 2009 C GO BOND ISSUANCE)

337.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

338.    The 2009 Series C GO Bond Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest. The 2009 Series C GO Bond Underwriters were unjustly enriched by at least $1,401,755 for their participation in the 2009 Series C GO Bond issuance.

339.    Equity and good conscience require that the 2009 Series C GO Bond
Underwriters return any fees they received for their services and any assets associated with the
transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO THE GO BOND SERIES 2007A-4*

### COUNT 32
### RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
### (UNDERWRITERS – SERIES 2007 A-4 GO BOND ISSUANCE)

340.    Debtors repeat and reallege the paragraphs above as if set forth herein.

341.    At the time the 2007 Series A-4 GO Bonds were issued, the Commonwealth was
in a state of insolvency.

342.    The 2007 Series A-4 GO Bond Underwriters knew or should have known that the
Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as
they became due.

343.    As of the date Petition Date, the IRS was a creditor of the Debtors.[14]

344.    As of the Petition Date, the Debtors had other unsecured creditors.

345.    The fees paid to the 2007 Series A-4 GO Bond Underwriters were within the ten
year lookback period prior to the Petition Date.

346.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient
to satisfy all the debts weighing upon it.

347.    The 2007 Series A-4 GO Bond Underwriters knew or should have known that the
Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time
of the 2007 Series A-4 GO Bonds.

---

[14] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

348.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2007 Series A-4 GO Bonds greatly exceeded the price at which the 2007 Series A-4 GO Bonds were sold to the Commonwealth to the 2007 Series A-4 GO Bond Underwriters, 2007 Series A-4 GO Bond Underwriters were able to reap large profits from the resale of the 2007 Series A-4 GO Bonds to investors.  The amounts that the 2007 Series A-4 GO Bond Underwriters received in excess of the amounts they paid for the 2007 Series A-4 GO Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

349.    The profits realized from the 2007 Series A-4 GO Bonds by the 2007 Series A-4 GO Bond Underwriters exceeded the effective or reasonable benefits that the 2007 Series A-4 GO Bond Underwriters should have received in connection with the 2007 Series A-4 GO Bonds. The 2007 Series A-4 GO Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2007 Series A-4 GO Bond Underwriters were fully aware that the Commonwealth was insolvent.  As a result, the excessive benefit to the 2007 Series A-4 GO Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

350.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2007 Series A-4 GO Bond Underwriters. As a result, to the extent necessary, Debtors may recover the fees paid to the 2007 Series A-4 GO Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 33
### UNJUST ENRICHMENT
### (J.P. MORGAN AND MORGAN STANLEY – SERIES 2007A-4 GO BOND ISSUANCE)

351.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

352.    The 2007 Series A-4 GO Bond Remarketing Agents (J.P. Morgan and Morgan Stanley) availed themselves of discounts and collected fees at Puerto Rico's expense by remarketing issuances that were not in Puerto Rico's best financial interest. The 2007 Series A-4 GO Bond Remarketing Agents were unjustly enriched for their participation in the 2007 Series A-4 GO Bond issuance.

353.    Equity and good conscience require that the 2007 Series A-4 GO Bond Remarketing Agents return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO PBA BOND SERIES R 2011*

**COUNT 34**
**AIDING & ABETTING BREACH OF FIDUCIARY DUTY**
**(UNDERWRITERS – 2011 SERIES R PBA BOND ISSUANCE)**

354.    Debtors repeat and reallege the paragraphs above as if set forth herein.

355.    GDB owed a fiduciary duty to Debtors.

356.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

357.    The 2011 Series R PBA Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2011 Series R

PBA Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

358.   The 2011 Series R PBA Bond Underwriters aided and abetted the GDB's breach of fiduciary duty by, among other things, underwriting the 2011 Series R PBA Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit.

359.   Debtors have been damaged by the 2011 Series R PBA Bond Underwriters' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2011 Series R PBA Bond Underwriters.

### COUNT 35
### (RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A))
### (UNDERWRITERS – 2011 SERIES R PBA BOND ISSUANCE)

360.   Debtors repeat and reallege the paragraphs above as if set forth herein.

361.   At the time the 2011 Series R PBA Bonds were issued, the Commonwealth was in a state of insolvency.

362.   The 2011 Series R PBA Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

363.   As of the date Petition Date, the IRS was a creditor of the Debtors.[15]

364.   As of the Petition Date, the Debtors had other unsecured creditors.

---

[15] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

365.    The fees paid to the 2011 Series R PBA Bond Underwriters were within the ten year lookback period prior to the Petition Date.

366.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

367.    The 2011 Series R PBA Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2011 Series R PBA Bonds.

368.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2011 Series R PBA Bonds greatly exceeded the price at which the 2011 Series R PBA Bonds were sold to the Commonwealth to the 2011 Series R PBA Bond Underwriters, 2011 Series R PBA Bond Underwriters were able to reap large profits from the resale of the 2011 Series R PBA Bonds to investors.  The amounts that the 2011 Series R PBA Bond Underwriters received in excess of the amounts they paid for the 2011 Series R PBA Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

369.    The profits realized from the 2011 Series R PBA Bonds by the 2011 Series R PBA Bond Underwriters exceeded the effective or reasonable benefits that the 2011 Series R PBA Bond Underwriters should have received in connection with the 2011 Series R PBA Bonds. The 2011 Series R PBA Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2011 Series R PBA Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2011 Series R PBA Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

370.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a)
Debtors are empowered to avoid the fees paid to the 2011 Series R PBA Bond Underwriters.  As
a result, to the extent necessary, Debtors may recover the fees paid to the 2011 Series R PBA
Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 36
### UNJUST ENRICHMENT
### (UNDERWRITERS – 2011 SERIES R PBA BOND ISSUANCE)

371.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

372.    2011 Series R PBA Bond Underwriters availed themselves of underwriting
discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in
Puerto Rico's best financial interest.  The 2011 Series R PBA Bond Underwriters were unjustly
enriched by at least $7,287,632 for their participation in the 2011 Series R PBA Bond issuance.

373.    Equity and good conscience require that the 2011 Series R PBA Bond
Underwriters return any fees they received for their services and any assets associated with the
transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO 2011 SERIES S PBA BONDS*

### COUNT 37
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – 2011 SERIES S PBA BOND ISSUANCE)

374.    Debtors repeat and reallege the paragraphs above as if set forth herein.

375.    GDB owed a fiduciary duty to Debtors.

376.    GDB breached that fiduciary duty by, among other things, authorizing the
Debtors to continue to amass additional debt obligations even though it knew that the
Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and

that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

377.    The 2011 Series S PBA Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2011 Series S PBA Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

378.    The 2011 Series S PBA Bond Underwriters aided and abetted GDB's breach of fiduciary duty by, among other things, underwriting the 2011 Series S PBA Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit.

379.    Debtors have been damaged by the Defendants' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2011 Series S PBA Bond Underwriters.

## COUNT 38
## (RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A))
## (UNDERWRITERS - 2011 SERIES S PBA BOND ISSUANCE)

380.    Debtors repeat and reallege the paragraphs above as if set forth herein.

381.    At the time the 2011 Series S PBA Bonds were issued, the Commonwealth was in a state of insolvency.

382. The 2011 Series S PBA Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

383. As of the date Petition Date, the IRS was a creditor of the Debtors.[16]

384. As of the Petition Date, the Debtors had other unsecured creditors.

385. The fees paid to the 2011 Series S PBA Bond Underwriters were within the ten year lookback period prior to the Petition Date.

386. The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

387. The 2011 Series S PBA Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2011 Series S PBA Bonds.

388. Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2011 Series S PBA Bonds greatly exceeded the price at which the 2011 Series S PBA Bonds were sold to the Commonwealth to the 2011 Series S PBA Bond Underwriters, 2011 Series S PBA Bond Underwriters were able to reap large profits from the resale of the 2011 Series S PBA Bonds to investors. The amounts that the 2011 Series S PBA Bond Underwriters received in excess of the amounts they paid for the 2011 Series S PBA Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

389. The profits realized from the 2011 Series S PBA Bonds by the 2011 Series S PBA Bond Underwriters exceeded the effective or reasonable benefits that the 2011 Series S PBA

---

[16] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Bond Underwriters should have received in connection with the 2011 Series S PBA Bonds. The 2011 Series S PBA Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2011 Series S PBA Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2011 Series S PBA Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

390.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2011 Series S PBA Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2011 Series S PBA Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 39
### UNJUST ENRICHMENT
### (UNDERWRITERS – 2011 SERIES S PBA BOND ISSUANCE)

391.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

392.    2011 Series S PBA Bond Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2011 Series S PBA Bond Underwriters were unjustly enriched by at least $1,942,490 for their participation in the 2011 Series S PBA Bond issuance.

393.    Equity and good conscience require that the 2011 Series S PBA Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

*COUNTS RELATED TO 2011 SERIES T PBA BONDS*

<u>COUNT 40</u>
**<u>AIDING & ABETTING BREACH OF FIDUCIARY DUTY</u>**
**<u>(UNDERWRITERS – 2011 SERIES T PBA BOND ISSUANCE)</u>**

394.    Debtors repeat and reallege the paragraphs above as if set forth herein.

395.    GDB owed a fiduciary duty to Debtors.

396.    GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

397.    The 2011 Series T PBA Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2011 Series T PBA Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

398.    The 2011 Series T PBA Bond Underwriters aided and abetted the GDB's breach of fiduciary duty by, among other things, underwriting the 2011 Series T PBA Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit.

399.    Debtors have been damaged by the Defendants' aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all damages actually and proximately caused to the Commonwealth as a result of the underlying

breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by the 2011 Series T PBA Bond Underwriters.

## COUNT 41
### (RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A))
### (2011 SERIES T PBA BOND UNDERWRITERS)

400.     Debtors repeat and reallege the paragraphs above as if set forth herein.

401.     At the time the 2011 Series T PBA Bonds were issued, the Commonwealth was in a state of insolvency.

402.     The 2011 Series T PBA Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

403.     As of the date Petition Date, the IRS was a creditor of the Debtors.[17]

404.     As of the Petition Date, the Debtors had other unsecured creditors.

405.     The fees paid to the 2011 Series T PBA Bond Underwriters were within the ten year lookback period prior to the Petition Date.

406.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

407.     The 2011 Series T PBA Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2011 Series T PBA Bond issuance.

408.     Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2011 Series T PBA Bonds greatly exceeded the price at which the 2011 Series T PBA Bonds were sold to the Commonwealth to the 2011 Series T PBA Bond Underwriters, 2011

---

[17] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Series T PBA Bond Underwriters were able to reap large profits from the resale of the 2011 Series T PBA Bonds to investors.  The amounts that the 2011 Series T PBA Bond Underwriters received in excess of the amounts they paid for the 2011 Series T PBA Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

409.    The profits realized from the 2011 Series T PBA Bonds by the 2011 Series T PBA Bond Underwriters exceeded the effective or reasonable benefits that the 2011 Series T PBA Bond Underwriters should have received in connection with the 2011 Series T PBA Bonds. The 2011 Series T PBA Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2011 Series T PBA Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2011 Series T PBA Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

410.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2011 Series T PBA Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2011 Series T PBA Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 42
### UNJUST ENRICHMENT
### (UNDERWRITERS – 2011 SERIES T PBA BOND ISSUANCE)

411.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

412.    Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2011 Series T PBA Bond Underwriters were unjustly enriched by at least $665,591 for their participation in the 2011 Series T PBA Bond issuance.

413.     Equity and good conscience require that the 2011 Series T PBA Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

## *COUNTS RELATED TO PBA BOND SERIES U*

### COUNT 43
### AIDING & ABETTING BREACH OF FIDUCIARY DUTY
### (UNDERWRITERS – 2012 SERIES U PBA BOND ISSUANCE)

414.     Debtors repeat and reallege the paragraphs above as if set forth herein.

415.     GDB owed a fiduciary duty to Debtors.

416.     GDB breached that fiduciary duty by, among other things, authorizing the Debtors to continue to amass additional debt obligations even though it knew that the Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and that such additional debt obligations would only serve to deepen the Commonwealth's insolvency.

417.     The 2012 Series U PBA Bond Underwriters had knowledge of GDB's breach of its fiduciary duty because they underwrote many of the bond obligations that contributed to Puerto Rico's incurrence of further debt. Through the underwriting process, the 2012 Series U PBA Bond Underwriters became intimately familiar with Puerto Rico's financial conditions and mounting debt obligations.

418.     The 2012 Series U PBA Bond Underwriters aided and abetted the GDB's breach of fiduciary duty by, among other things, underwriting the 2012 Series U PBA Bonds, even though they knew or should have known that Puerto Rico's debt obligations were beyond the Constitutional limit.

419.    Debtors have been damaged by the 2012 Series U PBA Bond Underwriters'
aiding and abetting of the GDB's breach of its fiduciary duty in an amount to be determined at
trial and are therefore liable for all damages actually and proximately caused to the
Commonwealth as a result of the underlying breaches of fiduciary duty. Debtors' damages
include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by
the 2012 Series U PBA Bond Underwriters.

**COUNT 44**
**AIDING & ABETTING BREACH OF FIDUCIARY DUTY**
**(SIDLEY AUSTIN – 2012 SERIES U PBA BOND ISSUANCE)**

420.    Debtors repeat and reallege the paragraphs above as if set forth herein.

421.    GDB owed a fiduciary duty to Debtors.

422.    GDB breached that fiduciary duty by, among other things, authorizing the
Debtors to continue to amass additional debt obligations even though it knew that the
Commonwealth was insolvent, lacked the ability to repay such additional debt obligations, and
that such additional debt obligations would only serve to deepen the Commonwealth's
insolvency.

423.    Sidley Austin, as bond counsel, had an obligation to ensure that the 2012 Series U
PBA Bond issuance complied with the constitutional Debt Service Limit.

424.    By certifying the legality of the bonds despite the bonds exceeding or being at risk
to exceed the constitutional Debt Service Limit, Sidley Austin aided and abetted GDB's breach
of its duty to Puerto Rico.

425.    Debtors have been damaged by Sidley Austin's aiding and abetting of the GDB's
breach of its fiduciary duty in an amount to be determined at trial and are therefore liable for all
damages actually and proximately caused to the Commonwealth as a result of the underlying

breaches of fiduciary duty. Debtors' damages include, but are not limited to, their deepened insolvency as a result of the aiding and abetting by Sidley Austin.

## COUNT 45
## (RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A))
## (2012 SERIES U PBA BOND UNDERWRITERS)

426.    Debtors repeat and reallege the paragraphs above as if set forth herein.

427.    At the time the 2012 Series U PBA Bonds were issued, the Commonwealth was in a state of insolvency.

428.    The 2012 Series U PBA Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

429.    As of the date Petition Date, the IRS was a creditor of the Debtors.[18]

430.    As of the Petition Date, the Debtors had other unsecured creditors.

431.    The fees paid to the 2012 Series U PBA Bond Underwriters were within the ten year lookback period prior to the Petition Date.

432.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

433.    The 2012 Series U PBA Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2012 Series U PBA Bond issuance.

434.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2012 Series U PBA Bonds greatly exceeded the price at which the 2012 Series U PBA Bonds were sold to the Commonwealth to the 2012 Series U PBA Bond Underwriters, 2012

---

[18] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Series U PBA Bond Underwriters were able to reap large profits from the resale of the 2012 Series U PBA Bonds to investors. The amounts that the 2012 Series U PBA Bond Underwriters received in excess of the amounts they paid for the 2012 Series U PBA Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

435. The profits realized from the 2012 Series U PBA Bonds by the 2012 Series U PBA Bond Underwriters exceeded the effective or reasonable benefits that the 2012 Series U PBA Bond Underwriters should have received in connection with the 2012 Series U PBA Bonds. The 2012 Series U PBA Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2012 Series U PBA Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2012 Series U PBA Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

436. Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2012 Series U PBA Bond Underwriters. As a result, to the extent necessary, Debtors may recover the fees paid to the 2012 Series U PBA Bond Underwriters pursuant to 11 U.S.C. § 550.

## COUNT 46
## RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
## (SIDLEY AUSTIN - 2012 SERIES U PBA BOND ISSUANCE)

437. Debtors repeat and reallege the paragraphs above as if set forth herein.

438. At the time the 2012 Series U PBA Bonds were issued, the Commonwealth was in a state of insolvency.

439.     Sidley Austin, bond counsel for the Debtors for the 2012 Series U PBA Bonds, knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

440.     As of the date Petition Date, the IRS was a creditor of the Debtors.[19]

441.     As of the Petition Date, the Debtors had other unsecured creditors.

442.     The fees paid to Sidley Austin were within the ten year lookback period prior to the Petition Date.

443.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

444.     Sidley Austin knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2012 Series U PBA Bond issuance.

445.     The Debtors received insufficient consideration in exchange for the payments made to Sidley Austin.

446.     Consequently, Debtors request that any alleged contracts between the Debtors and Sidley Austin be deemed null and void and that any funds paid to or benefits received by Sidley Austin be avoided and recovered to the Debtors.

447.     Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to Sidley Austin.  As a result, to the extent necessary, Debtors may recover the fees paid to Sidley Austin pursuant to 11 U.S.C. § 550.

---

[19] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

**COUNT 47**
**UNJUST ENRICHMENT**
**(UNDERWRITERS – 2012 SERIES U PBA BOND ISSUANCE)**

448.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

449.    2012 Series U PBA Bond Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2012 Series U PBA Bond Underwriters were unjustly enriched by at least $3,808,729 for their participation in the 2012 Series U PBA Bond issuance.

450.    Equity and good conscience require that the 2012 Series U PBA Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

**COUNT 48**
**UNJUST ENRICHMENT**
**(SIDLEY AUSTIN – 2012 SERIES U PBA BOND ISSUANCE)**

451.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

452.    The Commonwealth paid fees to Sidley Austin for its professional services rendered as bond counsel for the 2012 Series U PBA Bond issuance.  Sidley Austin's participation as bond counsel permitted the Commonwealth to make issuances that were not in Puerto Rico's best financial interest, and accordingly, Sidley Austin was unjustly enriched in the amount of the fees paid in connection with the 2012 Series U PBA Bond issuance.

453.    Equity and good conscience require that Sidley Austin return any fees it received for its services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

***COUNTS RELATED TO PBA BOND SERIES P&Q***

**COUNT 49**
**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. §**

**544(B), AND 26 U.S.C. § 6502(A)**
**(2009 SERIES P AND Q PBA BOND UNDERWRITERS)**

454.     Debtors repeat and reallege the paragraphs above as if set forth herein.

455.     At the time the PBA Bond Series P&Q were issued, the Commonwealth was in a state of insolvency.

456.     The 2009 Series P and Q PBA Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

457.     As of the date Petition Date, the IRS was a creditor of the Debtors.[20]

458.     As of the Petition Date, the Debtors had other unsecured creditors.

459.     The fees paid to the 2009 Series P and Q PBA Bond Underwriters were within the ten year lookback period prior to the Petition Date.

460.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

461.     The 2009 Series P and Q PBA Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2009 Series P and Q PBA Bond issuances.

462.     Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2009 Series P and Q PBA Bonds greatly exceeded the price at which the 2009 Series P and Q PBA Bonds were sold to the Commonwealth to the 2009 Series P and Q PBA Bond Underwriters, 2009 Series P and Q PBA Bond Underwriters were able to reap large profits from the resale of the 2009 Series P and Q PBA Bonds to investors. The amounts that the 2009 Series P and Q PBA Bond Underwriters received in excess of the amounts they paid for the 2009 Series

---

[20] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

P and Q PBA Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

463.     The profits realized from the 2009 Series P and Q PBA Bonds by the 2009 Series P and Q PBA Bond Underwriters exceeded the effective or reasonable benefits that the 2009 Series P and Q PBA Bond Underwriters should have received in connection with the 2009 Series P and Q PBA Bonds. The 2009 Series P and Q PBA Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2009 Series P and Q PBA Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2009 Series P and Q PBA Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

464.     Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2009 Series P and Q PBA Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2009 Series P and Q PBA Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 50
### UNJUST ENRICHMENT
### (UNDERWRITERS – 2009 SERIES P AND Q PBA BOND ISSUANCES)

465.     Debtors repeat and reallege the paragraphs above as if fully set forth herein.

466.     Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The 2009 Series P and Q PBA Bond Underwriters were unjustly enriched by at least $3,257,893 for their participation in the 2009 Series P and Q PBA Bond issuances.

467.    Equity and good conscience require that the 2009 Series P and Q PBA Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

## *COUNTS RELATED TO PBA BOND SERIES K*

### COUNT 51
### RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
### (2009 SERIES K PBA BOND UNDERWRITERS)

468.    Debtors repeat and reallege the paragraphs above as if set forth herein.

469.    At the time the 2009 Series K PBA Bonds were issued, the Commonwealth was in a state of insolvency.

470.    The 2009 Series K PBA Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

471.    As of the date Petition Date, the IRS was a creditor of the Debtors.[21]

472.    As of the Petition Date, the Debtors had other unsecured creditors.

473.    The fees paid to the 2009 Series K PBA Bond Underwriters were within the ten year lookback period prior to the Petition Date.

474.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

475.    The 2009 Series K PBA Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the 2009 Series K PBA Bond issuances.

---

[21] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

476.     Because, for among other reasons, the Commonwealth's debt obligations pursuant to the 2009 Series K PBA Bonds greatly exceeded the price at which the 2009 Series K PBA Bonds were sold to the Commonwealth to the 2009 Series K PBA Bond Underwriters, 2009 Series K PBA Bond Underwriters were able to reap large profits from the resale of the 2009 Series K PBA Bonds to investors.  The amounts that the 2009 Series K PBA Bond Underwriters received in excess of the amounts they paid for the 2009 Series K PBA Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

477.     The profits realized from the 2009 Series K PBA Bonds by the 2009 Series K PBA Bond Underwriters exceeded the effective or reasonable benefits that the 2009 Series K PBA Bond Underwriters should have received in connection with the 2009 Series K PBA Bonds. The 2009 Series K PBA Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the 2009 Series K PBA Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the 2009 Series K PBA Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

478.     Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the 2009 Series K PBA Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the 2009 Series K PBA Bond Underwriters pursuant to 11 U.S.C. § 550.

**COUNT 52**
**UNJUST ENRICHMENT**
**(UNDERWRITERS – 2009 SERIES K PBA BOND ISSUANCE)**

479.     Debtors repeat and reallege the paragraphs above as if fully set forth herein.

480.    Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.   The 2009 Series K PBA Bond Underwriters were unjustly enriched by at least $1,501,454 for their participation in the 2009 Series K PBA Bond issuance.

481.    Equity and good conscience require that the 2009 Series K PBA Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

### *COUNTS RELATED TO ERS BOND SERIES A*

### COUNT 53
### RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
### (ERS SERIES A BOND UNDERWRITERS)

482.    Debtors repeat and reallege the paragraphs above as if set forth herein.

483.    At the time the ERS Series A Bonds were issued, the Commonwealth was in a state of insolvency.

484.    The ERS Series A Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

485.    As of the date Petition Date, the IRS was a creditor of the Debtors.[22]

486.    As of the Petition Date, the Debtors had other unsecured creditors.

487.    The fees paid to the ERS Series A Bond Underwriters were within the ten year lookback period prior to the Petition Date.

488.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

---

[22] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

489.    The ERS Series A Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the ERS Series A Bond  issuance.

490.    Because, for among other reasons, the Commonwealth's debt obligations pursuant to the ERS Series A Bonds greatly exceeded the price at which the ERS Series A Bonds were sold to the Commonwealth to the ERS Series A Bond Underwriters, ERS Series A Bond Underwriters were able to reap large profits from the resale of the ERS Series A Bonds to investors.  The amounts that the ERS Series A Bond Underwriters received in excess of the amounts they paid for the ERS Series A Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

491.    The profits realized from the ERS Series A Bonds by the ERS Series A Bond Underwriters exceeded the effective or reasonable benefits that the ERS Series A Bond Underwriters should have received in connection with the ERS Series A Bonds. The ERS Series A Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the ERS Series A Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the ERS Series A Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

492.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the ERS Series A Bond Underwriters.  As a result, to the extent necessary, Debtors may recover the fees paid to the ERS Series A Bond Underwriters pursuant to 11 U.S.C. § 550.

**COUNT 54**
**RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)**
**(SIDLEY AUSTIN – ERS SERIES A BOND ISSUANCE)**

493.     Debtors repeat and reallege the paragraphs above as if set forth herein.

494.     At the time the ERS Series A Bond were issued, the Commonwealth was in a state of insolvency.

495.     Sidley Austin, underwriters' counsel for the Debtors for the ERS Series A Bond issuance, knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

496.     As of the date Petition Date, the IRS was a creditor of the Debtors.[23]

497.     As of the Petition Date, the Debtors had other unsecured creditors.

498.     The fees paid to Sidley Austin were within the ten year lookback period prior to the Petition Date.

499.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

500.     Sidley Austin knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the ERS Series A Bond issuance.

501.     The Debtors received insufficient consideration in exchange for the payments made to Sidley Austin.

502.     Consequently, Debtors request that any alleged contracts between the Debtors and Sidley Austin be deemed null and void and that any funds paid to or benefits received by Sidley Austin be avoided and recovered to the Debtors.

---

[23] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

503.     Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to Sidley Austin.  As a result, to the extent necessary, Debtors may recover the fees paid to Sidley Austin pursuant to 11 U.S.C. § 550.

**COUNT 55**
**UNJUST ENRICHMENT**
**(UNDERWRITERS – ERS SERIES A BOND ISSUANCE)**

504.     Debtors repeat and reallege the paragraphs above as if fully set forth herein.

505.     Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The ERS Series A Bond Underwriters were unjustly enriched by at least $16,755,153 for their participation in the ERS Series A Bond issuance.

506.     Equity and good conscience require that the ERS Series A Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

**COUNT 56**
**UNJUST ENRICHMENT**
**(SIDLEY AUSTIN – ERS SERIES A BOND ISSUANCE)**

507.     Debtors repeat and reallege the paragraphs above as if fully set forth herein.

508.     The Commonwealth paid fees to Sidley Austin, the ERS Series A Bond Underwriters' Counsel, out of the proceeds of the ERS Series A Bond issuance.  The services provided permitted the Commonwealth to make issuances that were not in Puerto Rico's best financial interest, and accordingly, Sidley Austin was unjustly enriched in the amount of the fees paid in connection with the ERS Series A Bond issuance.

509.     Equity and good conscience require that Sidley Austin return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

## COUNT 57
## BREACH OF CONTRACT
## (UNDERWRITERS - ERS SERIES A PURCHASE CONTRACT)

510.    Debtors repeat and reallege the paragraphs above as if set forth herein.

511.    The ERS Series A Bond Underwriters, through their representative, UBS, and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico entered into a valid and binding agreement for the purchase of General Obligation Bonds, dated January 30, 2008 (the "ERS Series A Purchase Contract").

512.    Pursuant to the terms of the ERS Series A Purchase Contract, the ERS Series A Bond Underwriters were obligated to comply with the requirements of the rules of the Municipal Securities Rulemaking Board (the "MSRB").

513.    The ERS Series A Bond Underwriters breached the ERS Series A Purchase Contract by, among other things, failing to comply with MSRB Rules G-17 by sufficiently disclosing the details of the selection process for the purchasers of the ERS Series A Bonds, including compensation and potential conflicts of interest information.

514.    As a result of the ERS Series A Bond Underwriters' breach of the ERS Series A Purchase Contract, the Commonwealth has suffered damages in an amount to be determined at trial.

### *COUNTS RELATED TO ERS BOND SERIES B AND C:*

### COUNT 58
### RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
### (ERS SERIES B AND C BOND UNDERWRITERS)

515.    Debtors repeat and reallege the paragraphs above as if set forth herein.

516.    At the time the ERS Series B and C Bonds were issued, the Commonwealth was in a state of insolvency.

517.     The ERS Series B and C Bond Underwriters knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

518.     As of the date Petition Date, the IRS was a creditor of the Debtors.[24]

519.     As of the Petition Date, the Debtors had other unsecured creditors.

520.     The fees paid to the ERS Series B and C Bond Underwriters were within the ten year lookback period prior to the Petition Date.

521.     The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

522.     The ERS Series B and C Bond Underwriters knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the ERS Series B and C Bond.

523.     Because, for among other reasons, the Commonwealth's debt obligations pursuant to the ERS Series B and C Bonds greatly exceeded the price at which the ERS Series B and C Bonds were sold to the Commonwealth to the ERS Series B and C Bond Underwriters, ERS Series B and C Bond Underwriters were able to reap large profits from the resale of the ERS Series B and C Bonds to investors.  The amounts that the ERS Series B and C Bond Underwriters received in excess of the amounts they paid for the ERS Series B and C Bonds effectively resulted in an increase the Commonwealth's debt obligations without the receipt by the Commonwealth of any corresponding value in return.

524.     The profits realized from the ERS Series B and C Bonds by the ERS Series B and C Bond Underwriters exceeded the effective or reasonable benefits that the ERS Series B and C

---

[24] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

Bond Underwriters should have received in connection with the ERS Series B and C Bonds. The ERS Series B and C Bond Underwriters received this unreasonable benefit from the sale of bonds to third parties while the ERS Series B and C Bond Underwriters were fully aware that the Commonwealth was insolvent. As a result, the excessive benefit to the ERS Series B and C Bond Underwriters should be declared null and void and such fraudulently obtained excess benefits should be returned to the Commonwealth.

525. Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to the ERS Series B and C Bond Underwriters. As a result, to the extent necessary, Debtors may recover the fees paid to the ERS Series B and C Bond Underwriters pursuant to 11 U.S.C. § 550.

### COUNT 59
### RESCISSION OF TRANSFER PURSUANT TO 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(B), AND 26 U.S.C. § 6502(A)
### (SIDLEY AUSTIN – ERS SERIES B AND C BOND ISSUANCES)

526. Debtors repeat and reallege the paragraphs above as if set forth herein.

527. At the time the ERS Series B and C Bonds were issued, the Commonwealth was in a state of insolvency.

528. Sidley Austin, underwriters' counsel for the Debtors for the ERS Series B and C Bonds, knew or should have known that the Commonwealth was insolvent, in the vicinity of insolvency, or unable to satisfy its obligations as they became due.

529. As of the date Petition Date, the IRS was a creditor of the Debtors.[25]

530. As of the Petition Date, the Debtors had other unsecured creditors.

531. The fees paid to Sidley Austin were within the ten year lookback period prior to the Petition Date.

---

[25] The IRS filed notice of claim #120662 on June 28, 2018 for $2,483,293.07.

532.    The Commonwealth's insolvency pre-supposes that its patrimony is insufficient to satisfy all the debts weighing upon it.

533.    Sidley Austin knew or should have known that the Commonwealth's patrimony was insufficient to satisfy all the debts weighing upon it at the time of the ERS Series B and C Bond issuances.

534.    The Debtors received insufficient consideration in exchange for the payments made to Sidley Austin.

535.    Consequently, Debtors request that any alleged contracts between the Debtors and Sidley Austin be deemed null and void and that any funds paid to or benefits received by Sidley Austin be avoided and recovered to the Debtors.

536.    Pursuant to 11 U.S.C. § 544, 31 L.P.R.A. §§ 3491-3500, and 26 U.S.C. § 6502(a) Debtors are empowered to avoid the fees paid to Sidley Austin.  As a result, to the extent necessary, Debtors may recover the fees paid to Sidley Austin pursuant to 11 U.S.C. § 550.

### COUNT 60
### UNJUST ENRICHMENT
### (UNDERWRITERS – ERS SERIES B AND C BOND ISSUANCES)

537.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

538.    Underwriters availed themselves of underwriting discounts and collected fees at Puerto Rico's expense by underwriting issuances that were not in Puerto Rico's best financial interest.  The ERS Series B and C Bond Underwriters were unjustly enriched by at least $9,976,338 for their participation in the ERS Series B and C Bond issuances.

539.    Equity and good conscience require that the ERS Series B and C Bond Underwriters return any fees they received for their services and any assets associated with the transactions that ultimately only increased the depth of the Commonwealth's financial crisis.

## COUNT 61
## UNJUST ENRICHMENT
## (SIDLEY AUSTIN – ERS SERIES B AND C BOND ISSUANCES)

540.    Debtors repeat and reallege the paragraphs above as if fully set forth herein.

541.    The Commonwealth paid fees to Sidley Austin, the ERS Series B and C Bond
Underwriters' Counsel, out of the proceeds of the ERS Series B and C Bond issuances.  The
services provided permitted the Commonwealth to make issuances that were not in Puerto Rico's
best financial interest, and accordingly, Sidley Austin were unjustly enriched in the amount of
the fees paid in connection with the ERS Series B and C Bond issuances.

542.    Equity and good conscience require that Sidley Austin return any fees they
received for their services and any assets associated with the transactions that ultimately only
increased the depth of the Commonwealth's financial crisis.

## COUNT 62
## BREACH OF CONTRACT
## (UNDERWRITERS - ERS SERIES B AND C PURCHASE CONTRACTS)

543.    Debtors repeat and reallege the paragraphs above as if set forth herein.

544.    The ERS Series B and C Bond Underwriters, through their representative, UBS,
and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico,
entered into valid and binding agreements for the purchase of ERS Series B Bonds, dated May
28, 2008, and for purchase of the ERS Series C Bonds, dated June 26, 2009 (the "ERS Series B
and C Purchase Contracts").

545.    Pursuant to the terms of the ERS Series B and C Purchase Contracts, the ERS
Series B and C Bond Underwriters were obligated to comply with the requirements of the rules
of the Municipal Securities Rulemaking Board (the "MSRB").

546.    The ERS Series B and C Bond Underwriters breached the ERS Series B and C
Purchase Contracts by, among other things, failing to comply with MSRB Rules G-17 by

sufficiently disclosing the details of the selection process for the purchasers of the ERS Series B and C Bonds, including compensation and potential conflicts of interest information.

547.    As a result of the ERS Series B and C Bond Underwriters' breach of the ERS Series B and C Purchase Contracts, the Commonwealth has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Debtors, through their attorneys, respectfully request the following relief:

1.      Enter judgment in Debtors' favor on all counts.

2.      Enter judgment awarding Debtors all of the damages that they have incurred as a proximate result of Defendants' aiding and abetting of GDB's breach.

3.      Enter judgment awarding Debtors the amounts by which the Defendants were unjustly enriched.

4.      Enter judgment pursuant to 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(b), and 26 U.S.C. § 6502(a), avoiding all of the fees paid to and benefits received by Defendants, and, pursuant to 11 U.S.C. § 550, recovering such fees and benefits for the benefit of the Debtors.

5.      Enter judgment pursuant to 31 L.P.R.A. §§ 3491-3500, 11 U.S.C. § 544(b), and 26 U.S.C. § 6502(a), voiding all contracts pursuant to which debtors received insufficient consideration for payments they made and recovering pursuant to 11 U.S.C. § 550 all such payments for the benefit of the Debtors.

6.      Enter judgment awarding Debtors all of the damages that it has incurred as a result of Defendants' breaches of contracts.

7.      Enter judgment awarding Debtors all damages associated with the deepening insolvency of the Commonwealth as a result of Defendants' aiding and abetting of GDB's breach.

8.      Order any other and further relief as this Court deems just and proper.

Respectfully Submitted,

Date:  September 17, 2021

/s/ Sunni P. Beville
**BROWN RUDNICK LLP**
Sunni P. Beville, Esq. (*Pro Hac Vice*)
Tristan G. Axelrod, Esq. (*Pro Hac Vice*)
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
sbeville@brownrudnick.com
taxelrod@brownrudnick.com

*Counsel to the Special Claims Committee of the
Financial Oversight and Management Board, acting by
and through its members*

/s/ John Arrastia
**GENOVESE JOBLOVE & BATTISTA, P.A**
John Arrastia, Esq. (Pro Hac Vice)
John H. Genovese, Esq. (Pro Hac Vice)
Jesus M. Suarez, Esq. (Pro Hac Vice)
Angelo M. Castaldi, Esq. (Pro Hac Vice)
100 SE 2nd Street, Suite 4400
Miami, Florida 33131
Tel: 305-349-2300
jarrastia@gjb-law.com
jgenovese@gjb-law.com
jsuarez@gjb-law.com
acastaldi@gjb-law.com

*Special Litigation Counsel to the
Official Committee of Unsecured Creditors*

/s/ Kenneth C. Suria
**ESTRELLA, LLC**
Kenneth C. Suria, Esq. (USDC-PR 213302)
Alberto Estrella, Esq. (USDC-PR 209804)
Carlos Infante, Esq. (USDC-PR 301801)
P. O. Box 9023596
San Juan, Puerto Rico 00902–3596
Tel.: (787) 977-5050
Fax: (787) 977-5090

*Local Counsel to the Special Claims Committee of the
Financial Oversight and Management Board, acting by
and through its members*

/s/ Juan J. Casillas Ayala
**CASILLAS, SANTIAGO & TORRES LLC**
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Luis F. Llach Zúñiga, Esq., USDC – PR 2231112
Israel Fernández Rodríguez, Esq., USDC - PR 225004
Juan C. Nieves González, Esq., USDC - PR 231707
Cristina B. Fernández Niggemann, Esq., USDC - PR
306008
PO Box 195075
San Juan, PR 00919-5075
Tel.: (787) 523-3434
Fax: (787) 523-3433
jcasillas@cstlawpr.com
lllach@cstlawpr.com
ifernandez@cstlawpr.com
jnieves@cstlawpr.com
cfernandez@cstlawpr.com

*Counsel to the Official Committee of Unsecured
Creditors (other than COFINA and PBA)*