UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of,<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br>Debtors.[1] | PROMESA<br>Title III<br><br>Case No. 17-BK-3283 (LTS)<br><br>(Jointly Administered) |
| DRIVETRAIN, LLC, in its capacity as the Trustee of<br>the Commonwealth Avoidance Actions Trust,<br>Plaintiff,<br><br>v.<br><br>BARCLAYS CAPITAL, INC.; BMO CAPITAL<br>MARKETS CORP.; BofA SECURITIES, INC., A/K/A<br>BANC OF AMERICA SECURITIES LLC, A/K/A<br>BofA MERRILL LYNCH; CITIBANK N.A., NEW<br>YORK; CITIGROUP GLOBAL MARKETS INC.;<br>GOLDMAN SACHS & CO. LLC; GOLDMAN<br>SACHS BANK USA, f/k/a GOLDMAN SACHS<br>CAPITAL MARKETS, L.P.; GOLDMAN SACHS<br>MITSUI MARINE DERIVATIVE PRODUCTS, L.P.;<br>JEFFERIES GROUP LLC; J.P. MORGAN<br>SECURITIES LLC; MERRILL, LYNCH, PIERCE,<br>FENNER & SMITH INC.; MERRILL LYNCH<br>CAPITAL SERVICES, INC.; MORGAN STANLEY &<br>CO. LLC; MORGAN STANLEY CAPITAL | Adv. Proc. No. 19-280 (LTS) |

[1] The Debtors in these Title III cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are (i) the Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("CO-FINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474), (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747), and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 17-BK-5523-LTS) (Last Four Digits of Federal Tax ID: 3801).

SERVICES LLC, f/k/a MORGAN STANLEY
CAPITAL SERVICES, INC.; RBC CAPITAL
MARKETS, LLC; ROYAL BANK OF CANADA;
SAMUEL A. RAMIREZ & CO., INC.; SANTANDER
SECURITIES LLC; UBS AG; UBS FINANCIAL
SERVICES, INC. OF PUERTO RICO; and JOHN
DOES 1-10,

                    Defendants.

## SECOND AMENDED COMPLAINT

Plaintiff Drivetrain, LLC, ("Drivetrain" or the "Trustee") solely in its capacity as Trustee

of the Avoidance Actions Trust (the "Trust"), pursuant to the Avoidance Actions Trust Agreement

(the "Trust Agreement"), by and through its attorneys, Selendy Gay Elsberg PLLC, Casillas,

Santiago & Torres LLC, and Continental PLLC, for its complaint against Barclays Capital, Inc.

("Barclays"); BMO Capital Markets Corp. ("BMO"); BofA Securities, Inc., a/k/a Banc of America

Securities LLC, a/k/a BofA Merrill Lynch ("BofA"); Citigroup Global Markets Inc. ("Citigroup");

Citibank, N.A., New York ("Citibank"); Goldman Sachs & Co. LLC ("Goldman"); Goldman

Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P. ("Goldman USA"); Goldman Sachs

Mitsui Marine Derivative Products, L.P. ("Goldman Mitsui"); Jefferies Group LLC ("Jefferies");

J.P. Morgan Securities, LLC ("JP Morgan"); Merrill, Lynch, Pierce, Fenner & Smith Inc. ("Merrill

Lynch"); Merrill Lynch Capital Services, Inc. ("Merrill Lynch Capital"); Morgan Stanley & Co.

LLC ("Morgan Stanley"); Morgan Stanley Capital Services, LLC f/k/a Morgan Stanley Capital

Services Inc. ("Morgan Stanley Capital"); RBC Capital Markets, LLC ("RBC Capital"); Royal

Bank of Canada ("RBC"); Samuel A. Ramirez & Co., Inc. ("Ramirez"); Santander Securities LLC

("Santander"); UBS Financial Services, Inc. of Puerto Rico ("UBS PR"); UBS AG; and John Does

1-10 (collectively, the "Defendants"), alleges as follows:

**NATURE OF ACTION**

1.      The thirteen major banks named as Defendants in this action inflicted a financial tragedy of epic proportion on the Commonwealth of Puerto Rico and its citizens.[2] By 2008, the Commonwealth was irredeemably insolvent. The Defendants—who underwrote the municipal bonds issued by Puerto Rico and/or entered into interest rate swap agreements with Puerto Rico— knew it. Instead of helping Puerto Rico climb out of its financial hole, the Defendants handed the Commonwealth and its agencies bigger and bigger shovels, urging them to issue a slew of expensive bonds so that Puerto Rico could pay down existing obligations to the banks. These bonds were issued without statutory authority or in violation of Puerto Rico's constitutional debt limit. This "scoop and toss" scheme plunged the Commonwealth and its agencies deeper and deeper into debt, making their unavoidable default inevitably worse.

2.      In 2014, when Puerto Rico could scoop and toss no more, its debt balloon finally burst, and its people suffered dearly. The government of Puerto Rico was forced to make drastic cuts to essential public services, including schools, hospitals, pensions, utilities, and basic infrastructure, and simply stopped paying many of its ordinary, day-to-day creditors. Because the Commonwealth and its instrumentalities had continued to rack up debt, these cuts were larger and more painful than they would have been if Puerto Rico had defaulted in 2008. Puerto Rico entered a years-long effort to restructure, which cost more than $2 billion, and from which it has only recently begun to emerge.

3.      Drivetrain, as Trustee for the Trust, brings this action against the Defendants on behalf of Puerto Rico's unsecured creditors. These unsecured creditors are innocent victims of

---

[2] Unless otherwise indicated, "Puerto Rico" refers generally to the Government of Puerto Rico, including all its agencies, instrumentalities, and public corporations. The "Commonwealth" refers specifically to the Debtor entity, as issuer of General Obligation Bonds.

Puerto Rico's financial collapse. They are, overwhelmingly, Puerto Rico-based individuals and businesses who provided services to Puerto Rico, or who have litigation awards against it, whom Puerto Rico never paid. Some have waited over a decade for their money while Puerto Rico paid off institutional creditors, like the Defendants.

4.      This lawsuit seeks to hold Defendants accountable for their role in Puerto Rico's financial crisis. Each of Defendants UBS PR, Santander, BofA, Merrill Lynch, Barclays, Ramirez, RBC Capital, BMO, Goldman, Morgan Stanley, JP Morgan, Citigroup, and Jefferies (collectively, the "Underwriter Defendants"), was a lead underwriter for one or more bond issuances from 2008 to 2014 (the "Bonds") for the Commonwealth, the Puerto Rico Public Buildings Authority (the "PBA"), or the Employees Retirement System of the Government of the Commonwealth of Puerto Rico (the "ERS" and, with the Commonwealth and the PBA, the "Issuers") and, as such, received substantial fees and payments from the Issuers. The Bonds at issue are listed on Exhibit 1. Each of Defendants Morgan Stanley Capital, Citibank, UBS AG, Goldman USA, Goldman Mitsui, RBC, Merrill Lynch Capital, and John Does 1–10 (collectively, the "Swap Defendants") entered one or more interest rate swap agreements with the Commonwealth, the Puerto Rico Highways and Transportation Authority (the "HTA"), or the PBA (the "Swap Agreements"), and received sub-stantial payments and swap termination fees in connection therewith. The Swap Agreements at issue are listed on Exhibit 2.[3]

5.      By the early 2000s, Puerto Rico was in financial trouble. Congress had repealed a key tax credit that promoted investment in Puerto Rico. Money, jobs, and people were leaving the

---

[3] The Trustee has conducted a reasonable investigation of the Debtors' records and documents to identify the full universe of Swap Agreements entered into by the Commonwealth, the HTA, and the PBA, however, the Debtors' records are incomplete. On information and belief, the Trustee alleges that the Swap Defendants entered into additional Swap Agreements with the Common-wealth, the HTA, and the PBA beyond those identified on Exhibit 2.

island, as Puerto Rico's social spending increased. Puerto Rico began running deficits. To pay

them off, Puerto Rico issued massive amounts of debt. By 2008, by any reasonable measure, the

Commonwealth was hopelessly insolvent, unable to repay all its debts in full.

6.      Once the Commonwealth became insolvent, Puerto Rico could have confronted its

financial condition and tried to restructure its debts. As painful as default would have been then,

the pain would have been limited to the Commonwealth's and its instrumentalities' obligations as

of 2008. But Puerto Rico, spurred on by the Defendants, opted to "scoop and toss"—to pay off old

obligations by issuing new bonds, often on worse terms. Puerto Rico's deficits exploded after

2008, and it fell even deeper into debt. As Puerto Rico's total public debt grew, so did its annual

budget deficits—showing that it had no hope of recovery:





7.      By 2014, this scheme became unsustainable. Puerto Rico tried to restructure its debts, failed, and then defaulted, being forced to make crippling cuts to essential public services along the way.

8.      It was never supposed to be this bad. There were supposed to be guardrails. For example, the Government Development Bank for Puerto Rico (the "GDB"), the Issuers' fiscal agent responsible for overseeing and approving bond issuances and interest rate swap agreements, was supposed to offer the Issuers prudent financial advice. It did not.

9.      The GDB did not stop Puerto Rico's financial crisis; it encouraged it. The GDB ignored the warnings of its own employees and led the Commonwealth and its agencies into risky interest rate swap agreements that the GDB did not understand and did not track. It also worked with the Defendants to press the Issuers to issue new bonds after the Commonwealth became in-solvent, scooping and tossing its debts down the road. With high turnover and low institutional

memory, the GDB relied heavily on the Defendants to guide its decisions, even as employees of various Defendants moved into and out of high-level positions at the GDB, which then hired those banks to underwrite bonds.

10.     There were other guardrails. Puerto Rico law required that all contracts with the Government be publicly registered to enable public auditing. Legislation identified which entities could issue debt and which could not. The Puerto Rico Constitution prohibited the Commonwealth from issuing new debt that would take its total debt over a set limit. And the Constitution required that public funds be used scrupulously, for the benefit of the public order.

11.     The Defendants pushed Puerto Rico to blow past these limits.

12.     The Swap Defendants ignored Puerto Rico's registration law in pressing the Commonwealth, the HTA, and the PBA to enter interest rate swap agreements for some bonds. These contracts exposed the Commonwealth, the HTA, and the PBA to huge swap payments or massive termination fees if interest rates dropped. In 2008, rates plunged, and the Commonwealth and its instrumentalities soon owed approximately $1.32 billion in fees to terminate the contracts. The Commonwealth and the PBA paid those fees from public funds, often raised from new bond issuances, while they sank deeper into debt. These swap contracts were never publicly registered as Puerto Rico law required.

13.     Underwriter Defendants UBS PR and Santander ignored Puerto Rico law in underwriting three bond issuances for the ERS (the "ERS Bonds").[4] The ERS had no statutory authority to issue these bonds; Puerto Rico's legislature would later describe them as "illegally made." The

---

[4] The Senior Pension Funding Bonds, Series A issued on January 31, 2008 ("ERS Series A Bonds"), the Senior Pension Funding Bonds, Series B issued on June 2, 2008 ("ERS Series B Bonds"), and the Senior Pension Funding Bonds, Series C issued on June 30, 2008 ("ERS Series C Bonds").

7

ERS Bonds were also a financial disaster. At the Defendants' urging, the ERS pursued an arbitrage strategy, hoping to earn more from investing the ERS Bonds' proceeds than it would owe in interest. The strategy failed. As the Puerto Rico legislature found, the ERS Bonds were "so badly structured… [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System." The banks, of course, made off with handsome fees.

14.     Underwriter Defendants Barclays, Morgan Stanley, JP Morgan, BofA, UBS PR, Goldman, Santander, RBC Capital, and BMO ignored Puerto Rico's constitutional debt limit in underwriting four bond issuances from 2012 to 2014 (the "Excessive Debt Bonds").[5] The Commonwealth could not issue or guarantee a debt if its total debt service for any year would be over 15% of its average internal revenues for the prior two years. Puerto Rico reached this limit, at the latest, in 2012. Yet, after that, the banks underwrote the Excessive Debt Bonds, pretending that the PBA's bonds did not count against the Commonwealth's constitutional debt limit. But the PBA's bonds *did* count. Because the Commonwealth guaranteed them with its full faith and credit, the PBA's bonds were obligations of the Commonwealth, subject to the limit. Accounting for the PBA's bonds, each of the Excessive Debt Bonds violated that limit.

15.     The Underwriter Defendants also ignored Puerto Rico's constitutional requirement that public funds be used scrupulously by inducing the Commonwealth and the PBA to issue sixteen bonds after the Commonwealth became insolvent in 2008 (together, with the Excessive Debt

---

[5] The Excessive Debt Bonds include the Public Improvement Refunding Bonds, Series 2012B (the "GO Series 2012B Bonds"), the Public Improvement Refunding Bonds, Series 2012A (the "GO Series 2012A Bonds"), the Government Facilities Revenue Refunding Bonds, Series U (the "PBA Series U Bonds"), and the General Obligation Bonds of 2014, Series A (the "2014 GO Bonds").

Bonds, the "Scoop and Toss Bonds")[6] the proceeds of which were used, at least in part, to pay off prior obligations. This scoop and toss scheme saddled the Commonwealth with additional debt that deepened its insolvency. The scheme enriched the Underwriter Defendants, who collected underwriting fees for each new issuance, and the Swap Defendants, who were paid swap termination fees from Scoop and Toss Bond proceeds. Because the Scoop and Toss Bonds harmed Puerto Rico while benefiting the banks, they were not a scrupulous use of public funds and therefore were unconstitutional.

16.     The Trustee seeks to hold the Defendants accountable for their conduct. It seeks, first, to recover all payments made to the Swap Defendants under the unregistered Swap Agreements, as those payments were unauthorized and contrary to law. It seeks, second, to recover underwriting fees paid to the Underwriter Defendants and payments from bond proceeds made to all the Defendants in connection with the ERS Bonds, the Excessive Debt Bonds, and the Scoop and Toss Bonds (collectively, the "Illegal Bonds"), as those bonds and their related underwriting contracts were void *ab initio*. The Trustee seeks, finally, to avoid payments by the Commonwealth and its agencies to the lead underwriters of the Illegal Bonds, as those transfers were both intentionally and constructively fraudulent. Puerto Rico knew that the Illegal Bonds were illegal, yet it

---

[6] The Scoop and Toss Bonds include the four Excessive Debt Bonds (*supra* note 5), as well as the Public Improvement Refunding Bonds, Series 2007 A-4 (the "GO Series 2007A-4 Bonds"), the Public Improvement Refunding Bonds, Series 2009A (the "GO Series 2009A Bonds"), the Public Improvement Refunding Bonds, Series 2009B (the "GO Series 2009B Bonds"), the Public Improvement Refunding Bonds, Series 2009C (the "GO Series 2009C Bonds"), the Public Improvement Refunding Bonds, Series 2011A (the "GO Series 2011A Bonds"), the Public Improvement Bonds, Series 2011 (the "GO Series 2011 Bonds"), the Public Improvement Refunding Bonds, Series 2011C (the "GO Series 2011C Bonds"), the Public Improvement Refunding Bonds, Series 2011D (the "GO Series 2011D Bonds"), the Public Improvement Refunding Bonds, Series 2011E (the "GO Series 2011E Bonds"), the Government Facilities Revenue Refunding Bonds, Series P (the "PBA Series P Bonds"), the Government Facilities Revenue Refunding Bonds, Series Q (the "PBA Series Q Bonds"), and the Government Facilities Revenue Bonds, Series S (the "PBA Series S Bonds").

intentionally diverted funds from those bonds to underwriters to the disadvantage of other credi-

tors. And because the Illegal Bonds were void *ab initio*, any obligations under those bonds were

worthless and not reasonably equivalent value for the transfers.

## THE PARTIES

17.     Plaintiff Drivetrain is a financial services and restructuring firm, with its principal

place of business in New York, New York. On March 15, 2022, pursuant to the Trust Agreement

and the Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of

Puerto Rico, *et al*. (the "Plan"), Case No. 17-BK-3283, Dkt. 19784, the Puerto Rico Financial

Oversight and Management Board (the "FOMB") and the Unsecured Creditors Committee desig-

nated Drivetrain as Trustee of the Trust, an express trust created by the Plan. The Plan established

the Trust "for the sole purpose of [bringing] Avoidance Actions and distributing its assets," and

vested the Trust with the "sole right, authority, and standing to prosecute, settle or otherwise dis-

pose of all Avoidance Actions." The "net proceeds of any such litigation or settlement" will be

distributed to certain holders of allowed general unsecured claims as provided for in the Plan.[7]

18.     Defendant Barclays is a broker-dealer with its principal place of business in New

York. Barclays served as lead underwriter of the GO Series 2011, GO Series 2011A, GO Series

2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and 2014 GO Bonds, and as a

syndicate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO Series

2007 A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, and GO Series 2012B Bonds.

19.     Defendant BMO is a broker-dealer with its principal place of business in New York.

BMO served as lead underwriter of the PBA Series U Bonds, and as a syndicate underwriter of the

---

[7] Confirmation Order, at 19; Plan §§ 78.2, 79.1.

GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, PBA Series S, and GO Series 2012A Bonds.

20.    Defendant BofA is a broker-dealer with its principal place of business in New York. BofA served as lead underwriter of the GO Series 2012B Bonds, and as a syndicate underwriter of the PBA Series S, PBA Series U, GO Series 2011A, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and 2014 GO Bonds.

21.    Defendant Citibank is a federally-chartered bank with its principal place of business in New York. Citibank was a counterparty to the HTA under at least two Swap Agreements, who, upon information and belief, received swap termination payments funded by the Commonwealth.

22.    Defendant Citigroup is a broker-dealer with its principal place of business in New York. Citigroup served as lead underwriter of the GO Series 2009C Bonds, and as a syndicate underwriter of the ERS Series A, ERS Series C, PBA Series S, PBA Series U, GO Series 2011A, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and GO Series 2012B Bonds.

23.    Defendant Goldman is a broker-dealer with its principal place of business in New York. Goldman served as lead underwriter of the PBA Series U Bonds, and as a syndicate under-writer of the PBA Series P, PBA Series Q, PBA Series S, GO Series 2007 A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, GO Series 2011A, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and 2014 GO Bonds.

24.    Defendant Goldman USA is a New York State-chartered bank with its principal place of business in New York.  Goldman USA is registered as a swap dealer with the U.S. Com-modity Futures Trading Commission (the "FTC") and as a security-based swap dealer with the

Securities and Exchange Commission. Goldman USA was a counterparty to the Commonwealth under at least six Swap Agreements.

25.     Defendant Goldman Mitsui is an investment bank and brokerage firm with its principal place of business in New York. Goldman Mitsui is registered as a swap dealer with the FTC and was a counterparty to the Commonwealth under at least one Swap Agreement.

26.     Defendant Jefferies is a broker-dealer with its principal place of business in New York. Jefferies served as lead underwriter of the GO Series 2011A Bonds, and as a syndicate underwriter of the PBA Series S, PBA Series U, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and 2014 GO Bonds.

27.     Defendant JP Morgan is a broker-dealer with its principal place of business in New York. JP Morgan served as lead underwriter of the GO Series 2007A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, GO Series 2011, GO Series 2011D, GO Series 2011E, and GO Series 2012A Bonds, as a syndicate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO Series 2011A, GO Series 2011C and 2014 GO Bonds, and as a co-remarketing agent on the 2009 remarketing of the GO Series 2007A-4 Bonds.

28.     Defendant Merrill Lynch was a broker-dealer with its principal place of business in New York. Merrill Lynch was acquired in whole by Bank of America Corporation on January 1, 2009, but was not fully merged into Bank of America Corporation until October 1, 2013. Merrill Lynch operated under the marketing name "Bank of America Merrill Lynch" until May 2019. Merrill Lynch served as lead underwriter of the PBA Series P and PBA Series Q Bonds, and as a syndicate underwriter of the ERS Series A, ERS Series C, GO Series 2009A, GO Series 2009B, and GO Series 2009C Bonds.

29.     Defendant Merrill Lynch Capital acted as a counterparty for certain derivative fi-

nancial products, including interest rate and currency swaps, caps and floors, and options.  Merrill

Lynch Capital had its principal place of business in New York. Merrill Lynch Capital was acquired

by Bank of America Corporation on January 1, 2009. Merrill Lynch Capital was a counterparty to

the Commonwealth under at least two Swap Agreements.

30.     Defendant Morgan Stanley is a broker-dealer with its principal place of business in

New York. Morgan Stanley served as lead underwriter of the GO Series 2007A-4, GO Series

2009A, GO Series 2009B, GO Series 2009C, GO Series 2011C, and 2014 GO Bonds, as a syndi-

cate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO Series

2011A, GO Series 2011, GO Series 2011D, GO Series 2011E, and GO Series 2012A Bonds, and

as co-remarketing agent on the 2009 remarketing of the GO Series 2007A-4 Bonds.

31.     Defendant Morgan Stanley Capital engages in over-the-counter derivative transac-

tions as a market maker. It is conditionally registered with the Securities & Exchange Commission

as a security-based swap dealer and as an over-the-counter derivative dealer, and it is registered

with the Commodity Futures Trading Commission as a swap dealer. Morgan Stanley Capital has

its principal place of business in New York. Morgan Stanley Capital was a counterparty to the

Commonwealth under at least thirteen Swap Agreements.

32.     Defendant RBC Capital is a broker-dealer with its principal place of business in

New York. RBC Capital served as lead underwriter of the PBA Series S, PBA Series U, and 2014

GO Bonds, and as a syndicate underwriter of the GO Series 2011A, GO Series 2011, GO Series

2011C, GO Series 2011D, GO Series 2011E Bonds, and GO Series 2012A Bonds.

33.     Defendant RBC is a commercial bank and financial services company with a New

York branch. RBC was a counterparty to the Commonwealth under at least two Swap Agreements

and the PBA under at least one Swap Agreement. On information and belief, RBC's New York branch entered into the Swap Agreement.

34.    Defendant Ramirez is a broker-dealer with its principal place of business in New York. Ramirez served as lead underwriter of the PBA Series P, PBA Series Q, and PBA Series S Bonds, and as a syndicate underwriter of ERS Series A, ERS Series C, PBA Series U, GO Series 2007A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, GO Series 2011A, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, GO Series 2012B, and 2014 GO Bonds.

35.    Defendant Santander is a broker-dealer with its principal place of business in New York. Santander served as lead underwriter of the ERS Series A, ERS Series B, ERS Series C, and GO Series 2012B Bonds, and as a syndicate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO Series 2007A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, GO Series 2011A, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and 2014 GO Bonds.

36.    Defendant UBS AG is a financial products and services company and investment management firm with a New York branch. UBS AG was a counterparty to Puerto Rico under at least five Swap Agreements. On information and belief, UBS AG's New York branch entered into the Swap Agreements.

37.    Defendant UBS PR is a broker-dealer with its principal place of business in Puerto Rico. UBS PR served as lead underwriter of the ERS Series A, ERS Series B, ERS Series C, and GO Series 2012B Bonds, and a syndicate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO Series 2007A-4, GO Series 2009A, GO Series 2009B, GO Series

2009C, GO Series 2011A, GO Series 2011, GO Series 2011C, GO Series 2011D, GO Series 2011E, GO Series 2012A, and 2014 GO Bonds.

38.     Defendants John Does 1-10 are additional entities that were counterparties to Puerto Rico and the PBA under Swap Agreements. Upon information and belief, they are affiliates of the Defendants. After an investigation and review of documents in its possession, the Trustee has identified counterparties to the Swap Agreement as reflected above. The Defendants currently hold the best information as to the specific identities of any other affiliates who are counterparties to the Swap Agreements.

39.     The Underwriter Defendants served as lead and co-lead underwriters for bonds issued by Puerto Rico between 2008 and 2014.

40.     The Swap Defendants entered the Swap Agreements with the Commonwealth, the HTA, or the PBA between 2004 and 2009.

## JURISDICTION & VENUE

41.     This court has subject matter jurisdiction over this action under 48 U.S.C. § 2166. This court has original and exclusive jurisdiction over all cases under Title III of PROMESA and original (but not exclusive) jurisdiction over all civil proceedings arising under Title III or arising in or related to cases under Title III. 48 U.S.C. § 2166(a). This court may exercise supplemental jurisdiction to entertain related state law claims, including claims under Puerto Rico law, under 28 U.S.C. § 1367.

42.     This court has personal jurisdiction over all Defendants under 48 U.S.C. § 2166(c).

43.     Venue is proper in this District under 28 U.S.C. § 1391 because all or a substantial part of the events giving rise to the claims in this case occurred in this District. Venue is also proper in this District under 48 U.S.C. § 2167 because this adversary proceeding is brought under Title III of PROMESA.

44.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA. Fed. R. Bankr. P. 7001; 48 U.S.C. § 2170 ("The Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to [such] cases.").

## FACTUAL ALLEGATIONS

### I.     The Commonwealth of Puerto Rico

45.     Puerto Rico is an organized territory of the United States with Commonwealth status. The Foraker Act of 1900 empowered Puerto Rico and its municipalities to issue bonds. The Jones Act of 1917 gave Puerto Rico "triple tax exempt" status, so its bonds were exempt from municipal, state, and federal taxation and so uniquely attractive to investors.

46.     The Federal Relations Act of 1950 authorized Puerto Rico to draft its own Constitution, which was ratified by popular referendum and approved by the United States Congress in 1952. Among other things, Puerto Rico's Constitution sets limits on the ability of the Commonwealth and its instrumentalities to issue municipal debt.

47.     Article VI, Section 2 of the Puerto Rico Constitution imposes a strict limit on Puerto Rico's municipal debt based on a calculation of its future debt service payments, prior-year guarantee payments, and average revenues (the "Constitutional Debt Limit"). It prohibits the Commonwealth from issuing general obligation debt (bonds or notes to which it has pledged its full faith and credit and taxing power), if the sum of (1) the maximum principal and interest on all the Commonwealth's outstanding general obligation debt payable in any fiscal year, and (2) any amounts actually paid in the previous fiscal year on account of any bonds or notes guaranteed by the Commonwealth, exceeds (3) 15% of the average of the Commonwealth's internal revenues over the prior two years:

16

> [N]o direct obligations of the Commonwealth for money borrowed
> directly by the Commonwealth evidenced by bonds or notes for the
> payment of which the full faith credit and taxing power of the Com-
> monwealth shall be pledged shall be issued by the Commonwealth
> if the total of (i) the amount of principal of and interest on such
> bonds and notes, together with the amount of principal of and inter-
> est on all such bonds and notes theretofore issued by the Common-
> wealth and then outstanding, payable in any fiscal year and (ii) any
> amounts paid by the Commonwealth in the fiscal year next preced-
> ing the then current fiscal year for principal or interest on account of
> any outstanding obligations evidenced by bonds or notes guaranteed
> by the Commonwealth, shall exceed 15% of the average of the total
> amount of the annual revenues raised under the provisions of Com-
> monwealth legislation and covered into the Treasury of Puerto Rico
> in the two fiscal years next preceding the then current fiscal year;…
> and the Commonwealth shall not guarantee any obligations evi-
> denced by bonds or notes if the total of the amount payable in any
> fiscal year on account of principal of and interest on all the direct
> obligations referred to above theretofore issued by the Common-
> wealth and then outstanding and the amounts referred to in item (ii)
> above shall exceed 15 percent of the average of the total amount of
> such annual revenues.

48.     Article VI, Section 9 of the Puerto Rico Constitution establishes an independent,

qualitative standard that "[p]ublic property and funds shall only be disposed of for public purposes,

for the support and operation of state institutions, and pursuant to law" (the "Public Funds

Clause"). It "impos[es] upon the State the duty to ensure that the use of taxpayers' monies are

always tied to the general welfare of all citizens." *Cecort Realty Dev. Inc. v. Llompart-Zeno*, 100

F. Supp. 3d 145, 159 (D.P.R. 2015).

49.     The Public Funds Clause works alongside Section 3372 of Puerto Rico's Civil

Code, 31 L.P.R.A. § 3372, which prohibits the Commonwealth from entering into contracts con-

trary to the "public order." To be consistent with public order, contracts disbursing public funds

must reflect the "constitutionally-based policy that mandates the *scrupulous use of public funds*."

*De Jesús González v. Autoridad de Carreteras*, 148 D.P.R. 255, 268–69 (1999) (unofficial trans-

lation) (emphasis added) (collecting cases).

50.     Puerto Rico's Civil Code also requires that "[g]overnment and municipal entities of the Commonwealth of Puerto Rico, with no exception whatsoever, shall keep a registry of all contracts executed, including amendments thereto, and shall remit a copy thereof to the Office of the Comptroller [(the "Comptroller")] within fifteen (15) days following the date of the execution or amendment of the contract." 2 L.P.R.A. § 97(a). Public funds cannot be lawfully disbursed under an unregistered contract. 2 L.P.R.A. § 97(d).

## II.     The Government Development Bank

51.     The executive branch of the Government of Puerto Rico operates multiple public agencies and corporations. One of Puerto Rico's most important public corporations was the GDB, the public bank responsible for authorizing Puerto Rico's bond issuances at all relevant times. The GDB was governed by a board of directors (the "GDB Board"), which was appointed by the Governor with approval of the heads of Puerto Rico's executive departments.

52.     The GDB's enabling act provides that the GDB was created to "aid the Commonwealth Government in the performance of fiscal duties and more effectively carry out its governmental responsibility to develop the economy of Puerto Rico." 7 L.P.R.A. § 551. The GDB's primary purpose was to act as Puerto Rico's fiscal agent, and as such it was responsible for authorizing bond issuances for Puerto Rico. The Puerto Rico Legislative Assembly granted the GDB the authority to take any action "for the purpose of registering, authenticating or countersigning the bonds, notes or other evidence of indebtedness of" Puerto Rico and to oversee creditor and investor relationships on their behalf. 7 L.P.R.A. § 581(A). The GDB also provided short-term lines of credit to Puerto Rico.

53.     The GDB's day-to-day operations were overseen by a president appointed by the GDB Board. The GDB employed both political appointees ("empleados de confianza") and "career" employees ("empleados de carrera"). 21 L.P.R.A. § 4554. Its high-level staffers were

*empleados de confianza* who handled (among other things) legislation, public policy, and bond issuances. As political appointees, the individuals filling these high-level positions typically changed with each gubernatorial administration. Throughout the relevant time period, these *empleados de confianza* commonly joined the GDB from—or left the GDB for—the same private financial institutions transacting with Puerto Rico, including many Defendants.

### A.   Puerto Rico's Bond Issuers

54.     Guided and authorized by the GDB, the Commonwealth and its agencies issued numerous bonds. Three types of bonds are at issue here.

55.     ***General Obligation Bonds.*** General Obligation bonds ("GO Bonds") are issued by the Commonwealth. Article VI, Section 2 of the Puerto Rico Constitution provides in relevant part that "[t]he power of the Commonwealth of Puerto Rico to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly…." The Legislature periodically enacts legislation authorizing the Secretary of the Treasury to issue bonds, pursuant to resolutions adopted by the Department of the Treasury and approved by the Governor. Each resolution sets forth the details of the bond issuance, including the aggregate principal, the uses of proceeds raised by the issuance, the interest rate, and the maturity date.

56.     Despite becoming insolvent no later than 2008 (*see infra* Part IV), the Commonwealth, spurred on by the Underwriter Defendants who served as lead and co-lead underwriters on the bonds, issued twelve series of GO Bonds that are issue in this action:

> a.     GO Series 2007A-4 Bonds, remarketed on September 11, 2009;
>
> b.     GO Series 2009A Bonds, issued on September 17, 2009;
>
> c.     GO Series 2009B Bonds, issued on November 17, 2009;
>
> d.     GO Series 2009C Bonds, issued on December 16, 2009;
>
> e.     GO Series 2011A Bonds, issued on February 17, 2011;

19

  f.  GO Series 2011C Bonds, issued on March 17, 2011;

  g.  GO Series 2011 Bonds, issued on July 12, 2011;

  h.  GO Series 2011D Bonds, issued on July 12, 2011;

  i.  GO Series 2011E Bonds, issued on July 12, 2011;

  j.  GO Series 2012B Bonds, issued on March 29, 2012;

  k.  GO Series 2012A Bonds, issued on April 3, 2012; and

  l.  2014 GO Bonds, issued on March 17, 2014.

57. The Commonwealth entered purchase contracts for each GO Bond (the "GO Bond Purchase Contracts"), under which it agreed to pay fees to the banks underwriting each issuance. The GO Bond Purchase Contracts are identified on Exhibit 3.

58. ***Public Building Authority Bonds.*** The PBA issued bonds backed by its own revenues (the "PBA Bonds"). The PBA is a public corporation of Puerto Rico, created in 1958 to design, construct, administer, and maintain Puerto Rico's public buildings, including office buildings, courts, and healthcare facilities. Act No. 56-1958 (as amended and as codified at 22 L.P.R.A. § 901 *et seq.,* the "PBA Enabling Act") and Resolution No. 468, passed on June 22, 1995 (as amended and supplemented, the "PBA Bond Resolution") authorize the PBA to issue bonds and require the PBA to earn sufficient aggregate revenue from rents on its leased properties to pay debt service on those bonds. The PBA's leases are structured to ensure that rents will cover principal and interest due on the PBA Bonds: (1) each lease terminates when the PBA Bonds issued to finance or refinance the acquisition or construction of the relevant facility have been paid in full; (2) the leases provide that the rent obligations due are absolute, unconditional, and require continued payment even if the facilities have been sold or are destroyed and regardless of any fault of the lessee; and (3) the rents due under the leases are periodically reviewed and, if necessary, adjusted to ensure they are sufficient to pay the debt service on the PBA Bonds.

59.     Despite the Commonwealth becoming insolvent no later than 2008 (*see infra* at Part IV), the PBA, spurred on by the Underwriter Defendants who served as lead and co-lead underwriters on these bonds, issued four series of PBA bonds that are at issue in this action:

     a.     PBA Series P Bonds, issued on July 1, 2009;

     b.     PBA Series Q Bonds, issued on October 28, 2009;

     c.     PBA Series S Bonds, issued on August 24, 2011; and

     d.     PBA Series U Bonds, issued on June 21, 2012.

60.     The PBA entered purchase contracts for each PBA Bond (the "<u>PBA Bond Purchase Contracts</u>"), under which it agreed to pay fees to the banks underwriting the issuance. The PBA Bond Purchase Contracts are identified on Exhibit 3.

61.     ***Employee Retirement System Bonds.*** The ERS also issued bonds ("<u>ERS Bonds</u>"). The ERS is a statutory trust of Puerto Rico, that was created in 1951 to provide pension and other benefits to retired public employees, which are funded by government and employee contributions. Act 447-1951 (as amended, the "<u>ERS Enabling Act</u>") empowered the ERS to seek intergovernmental loans to meet shortfalls in its funding requirements. 3 L.P.R.A § 779(d). No legislation empowers the ERS to issue bonds.

62.     Despite lacking any statutory authority to issue bonds, the ERS, spurred on by Santander and UBS PR, issued three series of ERS Bonds that are at issue in this action:

     a.     ERS Series A Bonds, issued on January 31, 2008;

     b.     ERS Series B Bonds, issued on June 2, 2008; and

     c.     ERS Series C Bonds, issued on June 30, 2008

63.     The ERS entered purchase contracts for each ERS Bond (the "ERS Bond Purchase Contracts"), under which it agreed to pay fees to the banks underwriting the issuance.[8] The ERS Bond Purchase Contracts are identified on Exhibit 3.

## III.    By 2002, Puerto Rico Faces Structural Deficits

64.     There are many causes of Puerto Rico's economic decline, but the repeal of the "possession tax credit" was a turning point. That credit, enacted in 1976, allowed U.S. corporations with business operations in Puerto Rico to eliminate federal tax on some foreign-source income related to their Puerto Rico operations. *See* Tax Reform Act of 1976, 26 U.S.C. § 936 (1976). This made Puerto Rico attractive to mainland companies and generated tens of thousands of on-island jobs. In 1996, Congress repealed the credit, but grandfathered in ten years of tax exemptions for companies already using the credit. *See* Small Business Protection Act, Pub. L. No. 104–188 (1996).

65.     The consequences were stark. Economists estimate that phasing out the credit, alone, cost Puerto Rico 80,000 jobs. As the jobs left, so did the people. Puerto Rico's population dropped 9 percent between 2000 and 2015. Those who left largely were trained professionals, creating a "brain drain," and young people, resulting in an older average population. At the same time, Puerto Rico expanded its entitlement programs, simultaneously increasing the cost of its social programs, elder care, and pensions while shrinking its tax base.

66.     Puerto Rico's lack of adequate budgetary controls further exacerbated its economic hardship. In preparing its annual budgets, Puerto Rico frequently overestimated the revenue it would collect, allowing its legislature to increase appropriations while passing what appeared to

---

[8] The GO Bond Purchase Contracts, the PBA Bond Purchase Contracts, and the ERS Bond Purchase Contracts are collectively referred to as the "Purchase Contracts."

be balanced budgets. To make matters even worse, Puerto Rico's agencies regularly spent more than even these inflated appropriations, facilitated by the lack of limiting regulations.

67.     Puerto Rico had one solution to cover these persistent deficits: issue debt. Puerto Rico had the same solution to repay its debt: issue more debt.

68.     The GDB, as Puerto Rico's fiscal agent and financial advisor, guided this strategy with the encouragement of private banks, including Defendants, that profited at every turn from Puerto Rico's eventual economic demise. The GDB also facilitated Puerto Rico's failure to implement responsible fiscal policies by extending lines of credit to the Commonwealth and its agencies to patch over their short-term liquidity problems. Melba Acosta, Puerto Rico's Budget Director from 2001 to 2004, and her staff realized that the GDB was propping up various branches of government with $4 billion in outstanding loans. As she later recalled, "[w]e were like, '$4 billion? Oh my God!'"[9]

**A.     Starting in 2004, Puerto Rico Enters Swap Agreements to Hedge the Interest Rate Risk of Its Debt, Encouraged by the Swap Defendants**

69.     As Puerto Rico sank into crisis, the Swap Defendants knew or should have known that Puerto Rico was facing budgetary issues, both from public information and their relationship with the GDB. The Swap Defendants dangled interest rate swaps, which hedged against fluctuations in the variable interest rates of some bonds, as a way for Puerto Rico to get cash—and fast.

70.     The Swap Defendants actively lobbied the Commonwealth and its agencies to enter the swap market. In 2005, for example, Goldman marketed a swap to the GDB, which, as Puerto Rico's fiscal agent, had to approve any such agreement. Goldman offered a $100 million upfront payment if Puerto Rico would sign. The GDB was reluctant. Goldman then approached Puerto

---

[9] M. Williams Walsh, *Puerto Rico: A Debt Problem That Kept Boiling Over*, N.Y. TIMES (May 5, 2017), https://www.nytimes.com/2017/05/05/business/dealbook/puerto-rico-debt.html (last visited Sept. 14, 2022).

Rico's legislative and executive branches, proposing that they pass legislation to let them directly

negotiate and enter Swap Agreements without the GDB's approval.

71.     On August 1, 2005, Puerto Rico's legislature enacted Act 39, the legislation pro-

posed by Goldman, which authorized the Commonwealth, the HTA, and the PBA to enter "quali-

fied interest rate exchange agreements." It further authorized the Secretary of the Treasury to

pledge the "good faith," credit, and taxing power of Puerto Rico for the payment of obligations

incurred under such agreements.

72.     Relevant here, Act 39 allowed the Commonwealth, the HTA, and the PBA to enter

"Synthetic Fixed Swaps," tied to specific bonds, in which the Swap Defendants would pay the

Puerto Rico entities entering the agreements ("Swap Issuers") if the relevant interest rate (*i.e.*,

LIBOR or the SIFMA Municipal Swap Index) increased; but if the interest rate dropped, the Swap

Issuers would be obligated to pay the Swap Defendants. It also let the Commonwealth, the HTA,

and the PBA enter "Basis Swaps" (together with Synthetic Fixed Swaps, "Swap Agreements") in

which the Swap Issuers and the Swap Defendants took opposite bets on the movements of market

interest rates, untethered to particular bonds (usually, a taxable rate such as LIBOR, and a tax-

exempt rate, such as the SIFMA Municipal Swap Index).

73.     Act 39 provided that the calculation of Puerto Rico's Constitutional Debt Limit

excluded termination fee payments for Puerto Rico Basis Swaps and PBA Swap Agreements but

included fixed interest payments and interest paid under qualified interest rate swap agreements.

It was silent on whether termination fees for non-basis Puerto Rico Swap Agreements, like Syn-

thetic Fixed Swaps, should be counted.

74.     Puerto Rico law requires that contracts between private parties and the government

be registered with the Comptroller (*see supra* ¶ 50). Act 39 did not exempt Swap Agreements from

24

the registration requirement with the Comptroller, but none of the Swap Agreements Puerto Rico entered with the Swap Defendants ever were registered, as required under Puerto Rico law.

75.     Even after Act 39 was enacted, at least one high-level GDB manager wrote a memorandum to the GDB Board advising against entering into the Swap Agreements. He or she warned that: (1) such agreements were inherently risky; (2) the GDB did not have a formal monitoring procedure for exiting the Swap Agreements; and (3) entering the Swap Agreements could negatively impact the credit ratings for the Commonwealth's GO bonds.

76.     The manager was right— the GDB was unequipped to take on such a large stable of Swap Agreements. Yet the Swap Issuers did so anyway.

77.     The GDB employees responsible for making key decisions related to the Swap Agreements did not fully understand the terms or risks that they posed. Unable to effectively manage Puerto Rico's swap portfolio, the GDB increasingly relied on outside advisors to evaluate interest rate swap agreements—but only *after* the GDB already had decided to enter those agreements.

78.     Adding to the GDB's disarray, the officials who approved Swap Agreements did not consistently document the transactions' key terms, including legal and business terms and collateral posting requirements. When those officials left the GDB, they took that knowledge with them, leaving the GDB without any institutional knowledge or system for managing key decisions relating to the Swap Agreements to which Puerto Rico was contractually bound.

79.     From 2004 to 2008, the Commonwealth and certain of its instrumentalities entered at least 77 Swap Agreements. The Commonwealth, the HTA, and the PBA entered at least forty-one, six, and two Swap Agreements, respectively. Additional detail regarding certain of these Swap Agreements can be found in Exhibit 2.

80.     These Swap Agreements contained termination provisions. Each party could termi-nate the agreements early and demand termination payments from their counterparty if, among other things: (1) the counterparty defaulted on their payment obligations under the Swap Agree-ments; or (2) interest rates and credit ratings for the relevant bond fell below certain thresholds.

81.     Most Swap Agreements let a party post collateral to defer early termination events. For Synthetic Fixed Swaps, the collateral amount was inversely related to the credit rating of the underlying bond (*i.e.*, a decreasing credit rating increased the amount that the Swap Issuers had to post).

82.     By 2009, the GDB had lost track of Puerto Rico's true exposure to the Swap Agree-ments. It had only a single spreadsheet covering its entire swap portfolio, with non-descript "one-liners" for each Swap Agreement. The GDB had to hire an adviser, who spent months tracking down the relevant documentation in part by calling interest rate swap dealers and asking them if they had trades with Puerto Rico.

83.     The advisor eventually found that the Swap Agreements carried a notional amount of $9 billion. About one third of that exposure was to affiliates of Goldman.

**B.     In 2006, Puerto Rico Creates COFINA, a Mechanism to Issue New Bonds to Pay Old Debt Without Regard to the Constitutional Debt Limit**

84.     In 2006, after the possession tax credit was fully repealed, Puerto Rico slid into a recession that eventually ended with the Commonwealth filing for bankruptcy protection pursuant to Title III of PROMESA on May 3, 2017. But Puerto Rico knew and publicly acknowledged that it had a serious debt problem no later than 2006. In its 2005 *Financial Information and Operating Data Report*, Puerto Rico admitted that it was "currently experiencing a budget imbalance in fiscal year 2006 which comes in the wake of several recent fiscal years during which the Commonwealth had insufficient recurring revenues to cover its expenditures."

85.     By June 2006, to deal with its deficits, Puerto Rico had amassed $6.847 billion in "extraconstitutional debt"—debt payable solely from legislative appropriations (*i.e.*, legislative acts that provided for budgetary appropriations to make debt service payments) without an identified source of repayment. As Puerto Rico admitted in its Statement of Motives to Act 91-2006, it had been "contracting debts to finance its operation without succeeding in identifying effective methods for their repayment." Because these debts were not backed by the Commonwealth's full faith, credit, and taxing power, they did not contribute to the Constitutional Debt Limit, making them "extraconstitutional" debts. Puerto Rico's extraconstitutional debts accumulated over many years, most significantly from lines of credit the GDB extended to the Commonwealth. By 2006, the cost to Puerto Rico of servicing this debt was over $500 million per year.

86.     Desperate to pay off its extraconstitutional debt, unable to raise positive net revenues, and too close to the Constitutional Debt Limit to issue more general obligation bonds, Puerto Rico created an all-new "Sales Tax Financing Corporation," known by its Spanish acronym, "COFINA," through Act No. 91 of 2006 and Act No. 56 of 2007. In Act No. 56 of 2007, the Legislature provided that COFINA could issue bonds backed by a new sales and use tax.

87.     Because they were not backed by Puerto Rico's full faith, credit, and taxing power, these bonds (like the debt they repaid) would not count towards the Constitutional Debt limit. As the First Circuit put it in a decision denying appeals from the Puerto Rico District Court's approval of COFINA's Title III Plan of Adjustment:

> The Commonwealth of Puerto Rico consistently spent much more than it received in taxes and other payments. Rather than balance spending and revenues, it repeatedly opted to borrow more by issuing general obligation bonds ("GO bonds"). It did so until limits on sovereign debt contained in the Commonwealth's Constitution substantially constrained the Commonwealth's direct access to the credit markets. To address the situation, in 2006 the Commonwealth passed Act 91 establishing COFINA as a public corporation, separate and independent from the Commonwealth.[10]

88.     In a 2013 presentation to RBC Capital, COFINA would say explicitly that it "served the Commonwealth well as a borrowing mechanism to achieve… *avoidance of GO debt issuance limitations*."[11]

89.     While COFINA's original purpose was to pay off extraconstitutional debt, by 2009 Puerto Rico began using COFINA bonds to fund operating expenses. By 2017, COFINA had amassed $17.6 billion in outstanding debt.

90.     The FOMB later hired an independent investigator, who explained that COFINA "exemplifies the extent to which Puerto Rico turned to debt to address difficult times without solving the underlying persistent operating deficits. This approach may have prolonged the day of reckoning but—unchecked by constitutional limitations—it added several billions more to Puerto Rico's debt problem."

## IV.     By 2008, The Commonwealth Is Insolvent

91.     By 2008, under any reasonable projection, the Commonwealth could not meet its future financing obligations. Puerto Rico's total public debt had ballooned to $49.77 billion. The Commonwealth's general fund deficit had grown from $173 million in 2002 to $1.77 billion in

---

[10] *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 987 F.3d 173, 177 (1st Cir. 2021), *cert. denied sub nom. Elliott v. Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 142 S. Ct. 74 (2021).

[11] Case No. 17-00257-LTS, Docket No. 347-22, Exhibit 14 to FOMB Summary Judgment Motion.

2008, and the general fund's excess of expenditures and other financing uses over revenue and other financing sources in 2008 alone was $1.263 billion on a GAAP accounting basis.[12]

92.     Moody's downgraded the Commonwealth's GO debt to Baa3 in 2006, and Standard & Poor's followed with a BBB- rating in 2007, citing a "*a long history of structural imbalance and the ongoing difficulties anticipated with further efforts to reduce the accrued deficit.*" (emphasis added). Moody's affirmed its Baa3 rating on $500 million of public improvement bonds and $1 billion of refunding bonds in September 2007, citing a "[m]ulti-year trend of large General Fund *operating deficits*, primarily due to overspending, and *financed by deficit borrowing*." (emphasis added). In a September 2008 ratings report, Standard & Poor's criticized "*chronic budget deficits*" and "*high debt levels*," and noted that "[w]hile the passage of a 5.5% sales and use tax in fiscal 2007 provided additional revenue flexibility, declining economic activity has *limited the commonwealth's overall revenue-generating potential*." (Emphasis added).

93.     Publicly available financial statements showed that the Commonwealth was insolvent by 2008, issuing debt it could not repay, and that its eventual default was inevitable. Preliminary analysis of the Commonwealth's general fund finances conducted by a financial advisory firm engaged by the Special Claims Committee shows that the Commonwealth was insolvent according to several metrics: balance sheet solvency, budget solvency, short-term solvency, long-term solvency, and service delivery solvency.

94.     ***Balance sheet solvency*** measures an entity's net asset position. The Commonwealth's balance sheet was insolvent since 2002 based on a negative net asset position and by 2008

---

[12] All references to the finances of "the Commonwealth" in this section refer to the Puerto Rico Primary Government and its "Blended Component Units," including the PBA, which are reported in Puerto Rico's financial statements as part of the "Primary Government." The reference to Puerto Rico's total public debt, *supra,* includes all of Puerto Rico's corporation debt and municipal debt.

the Commonwealth was over $17 billion in the red; by 2014 this figure had increased to approximately $50 billion:



95.   ***Budget solvency*** measures a government entity's ability to cover its fiscal year spending using current revenues. Each year, the Commonwealth had to submit a balanced budget to the legislature for approval for its general operating fund. While it budgeted for positive net revenues every year until fiscal 2010, its actual net revenues fell below zero beginning in 2005. Net revenues remained negative in each of the next three fiscal years, fell further in 2009, and did not recover until the Commonwealth restructured its debt:



96.     By 2008, the Commonwealth's net cashflow was negative. It was able to submit
balanced budgets only by issuing bonds through COFINA. *See supra* ¶¶ 86–90. The Common-
wealth's need to resort to COFINA shows that it was cash-flow insolvent—without those funds, it
lacked sufficient cash reserves to cover its projected operating deficits. Put differently, if the Com-
monwealth had been able to service its debt with cash, it would not have needed to create COFINA.
COFINA's express purpose was to pay off extraconstitutional debt that the Commonwealth other-
wise could not pay.

97.     ***Short-term solvency*** refers to an entity's ability to meet its near-term debt service
obligations. Cash reserves are an indicator of whether a municipality can meet its debt service
obligations in the following year. The Commonwealth's balance sheet, viewed in isolation, sug-
gested that it had sufficient cash reserves in its restricted accounts to meet debt payments as they

came due. But this was only because the Commonwealth engineered its near-term debt payments by issuing additional debt and pushing principal payments beyond the current period, kicking its current obligations down the road.

98. Other metrics show that the Commonwealth could not meet its near-term debt obligations without these gimmicks. The Commonwealth's ratio of current assets over current liabilities was below 1.0 every year from 2002 through 2008, showing that its reserves could not meet it operating shortfalls. By the mid-2000s, the Commonwealth could meet its existing obligations only by issuing new debt and, in 2006 and 2007, it relied on issuing COFINA bonds to pay existing debt service obligations and to pay down its existing lines of credit with the GDB. During Fiscal Year 2008 alone, COFINA issued $5.2 billion in new debt that the Commonwealth used to retire or refinance existing debt and make interest payments.

99. ***Long-term solvency*** examines whether an entity has enough revenue generating assets available to meet its long-term spending commitments. This is a critical metric, as long-term positive cash flows can overcome short-term cash constraints. An entity can be long-term solvent, while not meeting short term obligations, if it can project cash flow growth sufficient to pay future debt service obligations. The main drivers of that growth are population, gross domestic product ("GDP"), and tax revenue.

100. By 2008, the Commonwealth could not reasonably project long-term solvency. The Commonwealth projected nearly $400 million in debt service obligations in 2009, and between $735 million and $750 million in debt service obligations every year thereafter through 2016. At that time, it had been generating negative net revenues for three consecutive years. And financial modeling shows that as of 2008 the Commonwealth would have been expected to continue generating negative cash flows. It was not reasonable at that time to project that the population, GDP,

or tax revenues would grow so as to allow the Commonwealth to generate break-even revenues, let alone sufficient positive revenue to cover its upcoming obligations.

101.    The Commonwealth could not rely on population growth. Modeling shows that the Commonwealth would have required a projected 3.36% compound annual growth rate ("CAGR") from 2008 to 2013 just to reach break-even revenues. And paying off $750 million in annual debt service would have required a projected CAGR of 5.58%. But the United States Census estimated that Puerto Rico's population would *decrease* over that period. Even the more optimistic United Nations estimate projected an increase of only 0.4%, nowhere near enough to attain solvency:



102.    The Commonwealth also could not rely on increasing its GDP. To hit break-even revenues, Puerto Rico needed to project a GDP growth rate of 10.89% over the five years beginning in 2008. To generate enough revenue to meet debt service obligations of $750 million per

year, it needed to project 15% growth. Even under the Puerto Rico Government Planning Board's overly optimistic GDP growth projection of 4.82%, the Commonwealth would have continued to generate negative cashflow:



103.    The Commonwealth also could not rely on increasing tax revenues. By 2008, income tax receipts had declined, following emigration and rising unemployment, and Puerto Rico was in a recession. Just to generate positive net revenues the Commonwealth would have had to raise tax rates by approximately 15 percent. But the government had already increased taxes in 2005 through a "Sales and Use Tax" (a consumption tax), tied to the securitization of COFINA debt. Raising taxes dramatically so soon after this, even if politically feasible, would have further stressed an already troubled economy and would have failed to generate the necessary net positive revenues.

104.    **Service delivery solvency**, closely related to long-term solvency, measures whether a government entity can render services at an acceptable level and whether there is "slack" in a government's taxing ability to cover potential economic shocks or long-term fiscal risks, to ensure adequate service delivery going forward. By 2006, the Commonwealth could not increase taxes and had to rely on COFINA to issue new debt. Its only other option would have been to cut services to unacceptable levels. The Commonwealth thus failed the service delivery test.

105.    As of June 2008, the Commonwealth knew or should have known that it was hopelessly insolvent. The information necessary to show its insolvency was publicly available in its financial statements. Puerto Rico's financial agent, the GDB, had open access to its finances, through a statutory right to inspect the "books, records and other documents" of "any instrumentality or public incorporation of the Commonwealth of Puerto Rico." P.R. Laws Ann. tit. 7, § 581(B) (2018).

106.    Puerto Rico effectively admitted the Commonwealth's insolvency: By creating COFINA in 2006, to issue new extraconstitutional debt to pay off its old debt, Puerto Rico acknowledged that the Commonwealth could not cover its debt obligations with its projected revenues or cash reserves.

107.    On January 8, 2009, Puerto Rico Governor Luis Fortuño signed an executive order declaring a fiscal emergency, stating that "[t]he fiscal situation of the Commonwealth of Puerto Rico is critical," with a $3 billion budget deficit, and that "the State could run out of resources during the present fiscal year to attend to its basic obligations." P.R. Exec. Order No. OE-2009-001 (Jan. 8, 2009) (unofficial translation).

108.    On January 14, 2009, the Legislature enacted Act No. 1 of 2009, which recognized the dire state in which the Commonwealth found itself:

> The Commonwealth of Puerto Rico is undergoing *one of the worst fiscal crises in its history*, with a *budgetary deficit* for fiscal year 2008-2009 estimated to total around $ 3.2 billion. Under the present revenue and expense structure, the *next three fiscal years would also experience budgetary deficits* of approximately $ 3 billion a year. These deficits represent almost forty percent (40%) of recurrent revenues. *This situation is the aftermath of eight years during which the Executive Branch failed to take the necessary measures to establish a balanced budget*. (Emphases added).

109.    Two months later, in Act No. 7-2009, the "Special Act to Declare a State of Fiscal Emergency and to Establish a Comprehensive Fiscal Stabilization Plan to Salvage the Credit of Puerto Rico," the Commonwealth acknowledged that its debt was "on the verge of degradation to junk credit." The Commonwealth "[did] not have the resources to cover its operating expenses," and it was facing "an *immediate solvency crisis*." (Emphasis added).

## V.    Beginning in 2008, Puerto Rico's Employee Retirement System Issues Illegal Bonds

### A.    The ERS Issues Bonds Sold to the Public Without Authority

110.    The ERS was responsible for financing and paying out pensions for public employees. ERS pensions were notoriously underfunded, with only part of the revenues coming from employee contributions.

111.    The ERS Enabling Act, enacted in 1951, empowered the ERS to seek intergovernmental loans to meet shortfalls in its funding requirements. 3 L.P.R.A § 779(d) (2008) (authorizing the ERS to "take on a loan from any financial institution of the Government of the Commonwealth of Puerto Rico or the Federal Government of the United States of America or through the direct placement of debts, securing said debt with the assets of the [ERS].").

112.    The ERS was not legally authorized to issue bonds.

36

113.    A municipal entity's authority to issue "negotiable bonds" for sale to the public must be expressly granted by the legislature and cannot be implied from a general power to borrow money or incur debts. There was no such legislation for the ERS. The ERS Enabling Act authorized "direct placement of debts," which permitted the ERS to privately sell securities directly to institutional investors, not to issue bonds to the public.

114.    Despite this, in 2008, the ERS issued the ERS Bonds.

115.    In 2011, the Puerto Rico Legislature amended the ERS Enabling Act through Act 116-2011. The legislation reiterated that the ERS could not issue bonds. 3 L.P.R.A. § 779(d). In the Act's statement of motives, the Legislature stated that the ERS Bonds were "*illegally made*" and described them as "so badly structured… [they] resulted in tremendous losses that have accelerated the demise of [the] Retirement System" (emphasis added).

116.    In 2013, the Legislature amended the ERS Enabling Act again through Act 03-2013, to reduce certain pension benefits in order to relieve financial strain on the ERS. In that Act's statement of motives, the Legislature said that "the [ERS Bonds] enabled an injection of funds which extended 5 to 6 years the life of the [ERS's] assets, [but] the [ERS] is under the obligation to repay these bonds from the employer contributions it receives." The Legislature further stated that the "[ERS's] debt has a repayment term of almost 50 years, during which [the ERS] shall pay approximately $6 billion in interest, in addition to repaying its principal."[13]

---

[13] This was not a retroactive legislative ratification of the ERS Bonds. Under Puerto Rico law, any such retroactive validation or ratification would have to have been express. 31 L.P.R.A. § 3 ("Laws shall not have a retroactive effect unless they expressly so decree."); *see also Vázquez v. Morales*, 114 P.R. Dec. 822 (1983) (holding that the intention for a law to have retroactive effect must be expressly stated or clearly emerge from the statute).

### B.    The ERS Follows a Deeply Flawed Arbitrage Strategy

117.    The ERS Bonds' Official Statements said that they were pension obligation bonds ("POBs") intended "to increase the funds currently available to pay pension benefits to certain of [the ERS's] beneficiaries and reduce its unfunded actuarial pension liability" and further provided that the ERS will "invest the proceeds of the Bonds and use these investments and the earnings thereon to provide such pension benefits to its beneficiaries."

118.    As POBs, the ERS Bonds employed an arbitrage investment strategy whereby the ERS would invest bond proceeds expecting that the returns would exceed the costs of the borrowing and would fund the ERS's pension contribution obligations. Puerto Rico acknowledged that the arbitrage investment strategy was risky and might not work.

119.    In August 2007, Merrill Lynch advised Puerto Rico that, for the arbitrage strategy to succeed, the bonds needed to raise $7 billion, issued at an average interest cost of 6%, and the ERS needed to realize an 8.3% rate of return on its investments. To raise this amount the bonds would have to be sold globally, not just in Puerto Rico. Merrill Lynch further advised that failure to raise at least $7 billion would result in the ERS being unable to generate sufficient investment returns to improve the ERS's underfunding issues.

120.    Despite Merrill Lynch's advice, in September 2007, the GDB considered advising the ERS to issue an initial tranche of the ERS Bonds exclusively in Puerto Rico, believing that a local issuance could be done cheaper than a global issuance, partly because POBs are exempt from federal taxes for Puerto Rico residents. The ERS issued the ERS Series A Bonds locally on January 29, 2008, intending to issue subsequent ERS Bonds in the global market.

121.    Defendant UBS PR, who served as the lead underwriter for the ERS Bonds, had an affiliate who advised the ERS regarding its investment portfolio, and Defendant Santander (a syndicate underwriter for the ERS Bonds, and a lead underwriter on other Bonds) managed a portion

of that portfolio. UBS PR and Santander thus were incentivized to encourage—and did encourage—the issuance of the ERS Bonds, as the bond proceeds would increase the ERS's investment portfolios with those same entities.

122.    The ERS issued the ERS Series A Bonds locally in Puerto Rico "at a total interest cost of 6.39%." Merrill Lynch tried to place the ERS Bonds in the global market as early as February 2008 but could not find willing buyers outside of Puerto Rico. In contrast to Puerto Rico investors who do not pay federal income taxes, investors residing in other jurisdictions would have to pay taxes on interest income earned on their bond holdings. The same "taxable" bond (for which interest payments are taxable income) thus may be less valuable to an investor outside of Puerto Rico who, after paying taxes, will take home less interest income than a Puerto Rico investor. Merrill Lynch determined that the bonds would have to carry a 7–8% interest rate to be attractive to global investors. But issuing the ERS Bonds at a 7–8% interest rate would have greatly reduced the ERS's ability to realize positive net yields through its arbitrage strategy. By May 2008, the ERS knew it could not sell the bonds in the global market. Yet, in May 2008 and June 2008, it issued the ERS Series B Bonds and the ERS Series C Bonds, respectively, locally in Puerto Rico with UBS PR as lead underwriter for both issuances.

123.    The ERS Bonds were a prime example of questionable bond underwriting and selling practices. Not only was an affiliate of UBS PR (the lead underwriter for the ERS Bonds) providing investment consulting services to the ERS, but UBS PR also bought over half of the ERS Bonds on behalf of Puerto Rico Closed-End Funds ("Local CEFs"), managed by its affiliates, through which UBS PR earned large fees. A single bank playing multiple roles in a municipal bond issuance is ripe for conflicts of interests and undermines the confidence of public investors. Because of UBS PR's role as lead underwriter, its affiliated Local CEFs would have been

prohibited under the Investment Company Act of 1940 from purchasing any ERS bonds if they had been issued by a municipality within the fifty states.

124.    The ERS failed to exercise due care in issuing the ERS Bonds. It did not vet significant risks relating to the bonds, despite several warning signs that should have led it to postpone the issuances or conduct additional due diligence. The ERS had no basis to believe that its arbitrage investment strategy would work, much less immediately improve the ERS's funded status. Its belief that POBs would generate arbitrage opportunities was inherently flawed, as failure to raise the full $7 billion would result in negative arbitrage for ERS.

125.    By failing to raise the requisite $7 billion, the ERS's arbitrage strategy was destined to fail. POB proceeds of less than $7 billion would only serve as a stop gap measure and not the long-term solution the ERS needed. The ERS Bonds could not generate sufficient revenue to pay debt service as it came due. The ERS Series A Bonds raised approximately $1.6 billion, 91% (or $1.462 billion) of which was transferred to the ERS to fund retirement benefits—only approximately $93.7 million was put towards investment. The ERS Series B Bonds and ERS Series C Bonds collectively raised approximately $1.3 billion, all of which was transferred to the GDB and later used to pay pension obligations—none went towards investment. This failure to properly fund the arbitrage strategy contradicted assurances made in the Official Statements for the ERS Bonds, which provided that the bond proceeds would be invested accordingly.

126.    When its arbitrage strategy failed, the ERS was plunged into financial crisis. The ERS Bonds were a fundamental factor in the deterioration of ERS's financial health. They were a stop-gap measure that worsened the ERS's funding position by doing "little more than passing on, and increasing the complexity of, the burden of fixing [the ERS's] fundamental structural problems to further administrations."

**VI.     By February 2009, Puerto Rico And Its Instrumentalities Rack Up Over $1 Billion in Swap Termination Fees**

127.    By the Fall of 2008, Puerto Rico took another financial hit: interest rates plummeted, causing the Swap Issuers to owe money to the Swap Defendants under the Swap Agreements. By February 2009, the Swap Issuers owed approximately $1.32 billion.

128.    As interest rates dropped, credit rating agencies downgraded the covered bonds' credit ratings to the lowest investment grade possible, allowing the Swap Defendants to terminate the Swap Agreements and demand payment.

129.    This put the Swap Issuers between a rock and a hard place. They could either (1) post collateral (often hundreds of millions of dollars) to postpone early termination, hoping that interest rates would recover and eventually reduce their liability under the Swap Agreements; or (2) terminate the Swap Agreements early and pay the banks the difference in interest at that time. Neither option was good.

130.    Puerto Rico tried to ride out the storm. It used what little cash it had to post collateral to avoid early termination fees. It also used bond proceeds to meet collateral requirements. By the end of 2008, Puerto Rico had posted over $241 million to counterparties in collateral for GO Basis Swaps alone.

131.    In 2009, Puerto Rico reversed course and began to terminate the Swap Agreements, incurring enormous termination fees. By October 1, 2014, Puerto Rico and its instrumentalities had paid $1.32 billion in swap termination fees to the Swap Defendants; the Commonwealth, and the PBA alone had paid approximately combined $418.4 million, combined. Much of this money came from the proceeds of new bond issuances; the rest came from Puerto Rico's general fund. The Commonwealth and the PBA paid at least $252 million and $20.4 million in swap termination fees, respectively, to the Swap Defendants. On information and belief, the swap termination fees

paid to Citibank in respect of certain Swap Agreements it entered into with the HTA (*see* Exhibit 2) were made by the GDB using funds from the Commonwealth. The Swap Defendants actively enforced the termination provisions in the Swap Agreements and received swap termination fees even though they knew that the Commonwealth was insolvent and could not pay its creditors, and that default was inevitable.

**VII.   Urged on by Private Banks, Puerto Rico "Scoops and Tosses" By Issuing New Debt to Repay Old Debt**

132.   Hopelessly insolvent, and crushed by swap termination fees, Puerto Rico decided to "scoop and toss."

133.   Scooping and tossing is a budget-stretching tactic employed by strapped local governments that entails selling new long-term debt to raise funds to pay off maturing bonds, effectively extending the timetable for retiring municipal borrowings. As old bonds mature and become payable, the government issues new bonds and uses the proceeds to pay off the old bonds, extending the deadline for fully paying off its debt—at increased cost.

134.   Scooping and tossing is unsustainable, like a Ponzi scheme or a game of musical chairs, because it does not address the underlying budgetary problems that created a need for borrowing in the first place. It deepens insolvency and generates additional transaction costs. As in musical chairs, eventually the music stopped, and Puerto Rico was left standing.

135.   From 2009 to 2014, the Commonwealth issued a series of GO Bonds in an aggregate face amount of over $8.3 billion but generated less than $300 million in new revenue from those issuances. Over 95% of the bond proceeds were used to pay old debt, interest, debt issuance and professional fees, and swap termination fees, leaving a negligible amount of proceeds for public purposes.

a.   The Commonwealth issued the GO Series 2007A-4 Bonds as variable rate bonds with a face value of $96,825,000 in October 2007. The GO Series

42

2007A-4 Bonds were issued for the purpose of refunding certain outstanding improvement and public improvement refunding bonds of the Commonwealth, for debt service savings. In 2009, the GDB approved the remarketing of $93,835,000 of the GO Series 2007A-4 Bonds.[14] The co-remarketing agents were Morgan Stanley and JP Morgan. The initial remarketing fee was $651,381.26.

b.   On September 17, 2009, the Commonwealth issued GO Series 2009A Bonds with a face amount of $3,425,000. The net proceeds of the GO Series 2009A Bonds ($3,425,000) were used to (1) refund on a current basis a portion of Puerto Rico's GO Series 2007A-4 Bonds (which, in turn, refunded other Puerto Rico GO Bonds) ($2,996,976.67), (2) fund a portion of a termination payment under an interest rate swap agreement entered into in connection with the issuance of the GO Series 2007A-4 Bonds ($384,000), and (3) pay the underwriting discount and other costs of issuance of the GO Series 2009A Bonds ($44,023.33). Morgan Stanley acted as lead underwriter and JP Morgan acted as co-lead underwriter. Total underwriting fees were $24,208.43.

c.   On November 17, 2009, the Commonwealth issued the GO Series 2009B Bonds with a face amount of $372,685,000. The net proceeds of the GO Series 2009B Bonds ($371,789,773.60, after accounting for an original issue discount) were used to (1) refund interest (but not principal) on certain GO Bonds issued between 1993 and 2002 ($68,056,501.64), (2) repay certain advances made to Puerto Rico under a line of credit facility ($242,022,361.77) (3) pay capitalized interest on the GO Series 2009B Bonds ($58,702,508.89), and (4) pay the underwriting discount and other costs of issuance of the GO Series 2009B Bonds ($3,008,401.30). Morgan Stanley acted as lead underwriter and JP Morgan acted as co-lead underwriter. Total underwriting fees were $2,447,007.72.

d.   On December 16, 2009, the Commonwealth issued the GO Series 2009C Bonds with a face amount of $210,250,000. The net proceeds of the GO Series 2009C Bonds ($204,575,352.50, after accounting for an original issue discount) were used to (1) refund interest (but not principal) on certain Puerto Rico GO Bonds ($202,825,589.15), and (2) pay the underwriting

---

[14] The 2007A-4 Bonds, in conjunction with the rest of the Series 2007A Bonds, were originally issued "for the purpose of refunding certain outstanding public improvement and public improvement refunding bonds of the Commonwealth for debt service savings." Commonwealth of P.R., *Remarketing Circular for Public Improvement Refunding Bonds, Series 2007 A-4*, 2 (2009). Effective September 17, 2009, the Commonwealth elected to remarket the 2007A-4 Bonds after converting them to a new Long-Term Interest Rate. *Id.* Because remarketing entails repurchasing already-issued bonds from the current bondholder and then reselling those bonds to new purchasers, the remarketed 2007A-4 Bonds incurred new scoop and toss debt after the Commonwealth became insolvent in 2008.

discount and other costs of issuance of the GO Series 2009C Bonds ($1,749,763.35). Morgan Stanley acted as lead underwriter and Citigroup acted as co-lead underwriter. Total underwriting fees were $1,401,755.01.

e.   On February 17, 2011, the Commonwealth issued the GO Series 2011A Bonds with a face amount of $356,520,000. The net proceeds of the GO Series 2011A Bonds ($349,116,538.65 after accounting for an original issue discount) were used to: (1) refund a portion of the principal (but not the interest) payable on July 1, 2011 on certain Puerto Rico general obligation bonds and notes; (2) refund, in whole or in part, certain other Puerto Rico general obligation bonds and notes ($273,519,051.46 allocated to (1) and (2) combined); (3) repay certain GDB lines of credit used to deposit moneys in Puerto Rico's Redemption Fund to cover a portion of the principal (but not the interest) payable on July 1, 2011 on certain Puerto Rico general obligation bonds and notes ($43,479,412.59); (4) fund termination payments on certain interest rate swap agreements ($23,854,030); and (5) pay the underwriting discount and other costs of issuance of the GO Series 2011A Bonds ($8,264,044.60). Barclays acted as lead underwriter and Jefferies acted as co-lead underwriter. Total underwriting fees were $2,182,886.60.

f.   On March 17, 2011, the Commonwealth issued the GO Series 2011C Bonds with a face amount of $442,015,000. The net proceeds of the GO Series 2011C Bonds ($429,165,797.55 after accounting for an original issue discount) were used to (1) repay advances made to the Commonwealth under a GDB line of credit used to make deposits to the Commonwealth's Redemption Fund for the payment of interest due during fiscal year on certain general obligation bonds and notes ($412,500,254.91), (2) pay capitalized interest on the GO Series 2011C Bonds ($7,440,113.06), and (3) pay the cost of issuance of the GO Series 2011C Bonds ($9,225,429.58). Morgan Stanley acted as lead underwriter and Barclays acted as co-lead underwriter. Total underwriting fees were $2,648,794.69.

g.   On July 12, 2011, the Commonwealth issued the GO Series 2011 Bonds, the GO Series 2011D Bonds, and the GO Series 2011E Bonds with an aggregate face amount of $602,105,000. The net proceeds of the GO Series 2011 Bonds ($593,330,640.70, after accounting for an original issue discount) were used to (1) carry out certain capital improvements programs ($267,337,500) and (2) refund certain bond anticipation notes ($162,971.69). The net proceeds of the GO Series 2011D Bonds and the GO Series 2011E Bonds were used to (1) refund in full certain other general obligation bonds and notes of the Commonwealth ($259,957,441.67), (2) fund certain swap termination fees ($34,698,000), (3) pay capitalized interest on the GO Series 2011D Bonds and the GO Series 2011E Bonds ($25,197,444.89), and (4) pay expenses relating to the sale and issuance of the GO Series 2011D Bonds and the GO Series 2011E Bonds ($5,840,282.45). JP Morgan acted as lead underwriter and Barclays acted as co-lead underwriter. Total underwriting fees were $3,585,168.85.

44

h.  On March 29, 2012, the Commonwealth issued the GO Series 2012B Bonds with a face amount of $415,270,000. The net proceeds of the GO Series 2012B Bonds were used to (1) repay a GDB line of credit ($40,352,037), (2) refund outstanding GO bonds ($362,516,055), (3) pay capitalized interest on a portion of the GO Series 2012B Bonds ($8,559,930), and (4) pay the underwriting discount and other costs of issuance and sale of the GO Series 2012B Bonds ($3,526,954). UBS PR acted as lead underwriter and BofA acted as co-lead underwriter. Total underwriting fees were $2,333,613.00.

i.  On April 3, 2012, the Commonwealth issued the GO Series 2012A Bonds with a face amount of $2,318,190,000. The proceeds of the GO Series 2012A Bonds ($2,313,928,053 after accounting for an original issue discount) were used to (1) repay GDB lines of credit ($654,664,367), (2) refund outstanding general obligation bonds ($1,212,951,370), (3) pay capitalized interest on the GO Series 2012A Bonds through 2015 ($283,214,850), and (4) pay the underwriting discount, termination fees on interest rate swap agreements, and other costs of issuance ($163,097,466). Barclays acted as lead underwriter and JP Morgan. acted as co-lead underwriter. Total underwriting fees were $14,723,016.

j.  On March 17, 2014, Puerto Rico issued the 2014 GO Bonds with a face amount of $3,500,000,000. The net proceeds from the 2014 GO Bonds ($3,255,000,000 after accounting for an original issue discount) were used to: (1) repay the GDB's lines of credit and make a deposit to the Commonwealth's Redemption Fund ($1,896,072,196); (2) repay COFINA bond anticipation notes, which were not obligations of Puerto Rico or guaranteed by Puerto Rico's full faith, credit, and taxing power ($342,365,760); (3) refinance refunded bonds from 2003 that refunded bonds from 1987 and 1989 ($466,574,005); (4) pay fees owed to interest rate swap counterparties ($90,417,100); (5) pay interest on the bonds ($422,749,408); and (6) pay costs of issuance ($36,821,531). Barclays acted as lead left underwriter and Morgan Stanley acted as lead right underwriter. Total underwriting fees were $28,130,460.67.

136.  From 2009 to 2014, the PBA issued a series of PBA Bonds for an aggregate face amount of $2,247,742,000. Less than half that amount raised revenue. The rest were "Revenue Refunding" bonds sold for the express purpose of paying off old debt and swap termination fees.

a.  On July 1, 2009, the PBA issued the PBA Series P Bonds with a face amount of $330,935,000. The net proceeds of the PBA Series P Bonds ($330,125,233.60 after accounting for an original issue discount) were used to (1) refund certain other bonds issued by the PBA under the PBA Bond Resolution ($297,065,000.00); (2) fund swap termination payments and related fees ($28,395,000.00); and (3) pay the underwriting discount and other

costs of issuance of the PBA Series P Bonds ($4,665,233.60). Merrill Lynch acted as lead underwriter and Ramirez acted as co-lead underwriter. Total underwriting fees were $2,215,762.82.

b.  On October 28, 2009, the PBA issued the PBA Series Q Bonds with a face amount of $152,540,000. The net proceeds of the PBA Series Q Bonds ($188,685,025.20 after accounting for "other available moneys" and an original issue discount) were used to (1) refund interest (but not principal) on certain other bonds issued by the PBA under the PBA Bond Resolution and certain bonds issued by the PBA under prior bond resolutions passed in 1978 and 1970 ($71,417,527.15), (2) repay certain advances made to the PBA by the GDB under a line of credit facility ($93,131,353.82), (3) pay capitalized interest on the PBA Series Q Bonds ($22,707,321.94), and (4) pay costs of the issuance of the PBA Series Q Bonds ($1,428,822.29). Merrill Lynch acted as lead underwriter and Ramirez acted as co-lead underwriter. Total underwriting fees were $1,042,131.57.

c.  On August 24, 2011, the PBA issued the PBA Series S Bonds with a face amount of $303,945,000. The net proceeds of the PBA Series S Bonds ($305,023,865 after accounting for an original issue premium) were used to (1) repay certain advances made to the PBA by the GDB under a line of credit facilities (i) to pay interest due January 1 and July 1, 2011 on certain other bonds issued by the PBA under the PBA Bond Resolution and certain bonds issued by the PBA under its 1970 bond resolution, and (ii) pay a portion of the construction costs of certain buildings and facilities leased by the PBA to various departments, agencies, instrumentalities and municipalities of the Commonwealth ($301,937,294), and (2) pay the underwriting discount and other costs of issuance of the PBA Series S Bonds ($3,086,571). Ramirez acted as lead underwriter on the Series S issuance, and RBC Capital acted as co-lead underwriter. Total underwriting fees were $1,942,490.52.

d.  On June 21, 2012, the PBA issued the PBA Series U Bonds with a face amount of $582,345,000. The net proceeds of the PBA Series U Bonds ($585,048,064.85 after accounting for an original issue discount plus debt service account for Refunded Bonds) were used to (1) refund (i) the PBA's Series J Bonds and (ii) a portion of the principal of certain other bonds issued by the PBA under the PBA Bond Resolution ($390,343,476.14); (2) repay certain advances made to the PBA by the GDB under a line of credit ($157,923,275.05); (3) pay capitalized interest on the PBA Series U Bonds ($31,133,878.77); and (4) pay the underwriting discount and other costs of issuance of the Series U Bonds ($5,658,434.89). Goldman acted as lead underwriter and BMO acted as co-lead underwriter. Total underwriting fees were $3,808,729.45.

137.    As it scooped and tossed, Puerto Rico's total public debt expanded from $55 billion in fiscal year 2009 to $67.8 billion in fiscal year 2014. As its insolvency deepened, its total budget deficit skyrocketed from $4 billion to $6.2 billion. Puerto Rico Treasury Secretary Melba Acosta acknowledged Puerto Rico's increasing reliance on debt financing in an interview with the Wall Street Journal in December 2013: "In the past, it had been restructuring after restructuring," but she wanted Puerto Rico to "mov[e] away from that" in the future.[15]

138.    As Puerto Rico sank further into debt, the Underwriter Defendants made outsized profits. The weighted average total issuance fees for refunding bonds issued by the Commonwealth and its instrumentalities from 2000 onwards was 2.68% of the face amounts of the bonds—over 162% higher than the national weighted average of 1.02%.

## VIII.    Starting in 2012, Puerto Rico Issues Bonds in Violation of the Constitutional Debt Limit

139.    Perhaps the most important check on Puerto Rico's ability to rack up public debt is the Constitutional Debt Limit. This limit prohibits Puerto Rico from issuing bonds or notes to which it has pledged its full faith, credit, and taxing power or guaranteeing debt if the issuance or guaranty would result in debt service (cash required to cover the repayment of principal and the payment of interest) in any fiscal year on such bonds or notes plus payments made by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth exceeding 15% of the average internal revenues for the two fiscal years preceding the issuance or guaranty.

140.    The PBA Bonds are properly counted against the Constitutional Debt Limit.

---

[15] Mike Cherney, *Borrowing Maneuver Catches Flak*, WALL STREET JOURNAL (Dec. 2, 2013), https://www.wsj.com/articles/SB10001424052702304579404579234441072889918 (last visited Sept. 14, 2022).

141.    The Commonwealth supports PBA leases—the sole revenue source backing the PBA Bonds—with the Commonwealth's full faith, credit, and taxing power. The PBA Enabling Act provides that: (1) Puerto Rico pledges its full faith and credit for the payment of rent due under any PBA Lease; (2) if any rent payable under a PBA Lease is not paid when due, Puerto Rico must advance the unpaid balance to the PBA; (3) Puerto Rico pledges its full faith and credit to support such advances; and (4) the Secretary of the Treasury must make such advances from any available unencumbered funds in Puerto Rico's Treasury.

142.    Puerto Rico also pledges its full faith, credit, and taxing power to guarantee debt service due on the PBA Bonds. The PBA Enabling Act provides that, if the revenues or income and any other moneys of the PBA pledged for the payment of the principal of and interest on PBA bonds (*i.e.,* the rents payable under the PBA Leases) are ever insufficient to pay such principal and interest when due, the Secretary of the Treasury shall: (1) withdraw from any available funds in the Puerto Rico Treasury such sums as may be necessary to cover the deficiency; and (2) direct that such sums be applied to such payment.

143.    Credit rating agencies rate the PBA Bonds the same as the Commonwealth's GO bonds, which count towards the Constitutional Debt Limit, because the Commonwealth guarantees payments due under those bonds. Most disclosures in the PBA Bonds' Official Statements similarly focus on the Commonwealth's creditworthiness, not the PBA's. And, as a practical matter, Puerto Rico controls the PBA: the Governor appoints its board, and all PBA leases provide that any disputes between the PBA and its lessees will be resolved by the Governor.

144.    Puerto Rico effectively conceded that debt service on the PBA Bonds is a direct obligation of the Commonwealth that should be included in calculating the Constitutional Debt Limit: for fiscal years ending June 2011, 2012, and 2013, Puerto Rico and the PBA temporarily

48

suspended rent payment obligations under the PBA's leases in respect of debt service on the PBA

Bonds to balance the budget of its *general obligation fund*. Puerto Rico thus acknowledged that

money used to pay the interest and principal on the PBA Bonds comes from the Commonwealth.

145.    Despite this, Puerto Rico excluded debt service on the PBA Bonds from its calcu-

lation of the Constitutional Debt Limit. This was wrong. In economic substance, that debt service

is a direct obligation of the Commonwealth that counts towards the limit. From 2012 to 2014, the

Commonwealth and the PBA issued the Excessive Debt Bonds, which breached the *true* Consti-

tutional Debt Limit (including debt service on PBA bonds):

a.    The GO Series 2012B Bonds exceeded the Constitutional Debt Limit when
the Commonwealth issued them on March 29, 2012. Puerto Rico's average
internal revenues for the prior two fiscal years (2010 and 2011) was $7.6004
billion. With the GO Series 2012B Bonds, the maximum debt service in any
fiscal year (including PBA Bond debt service) was $1.2291 billion in fiscal
year 2020 (inclusive of $16.520 million of Commonwealth guaranteed debt
payments made in fiscal year 2011), which is 16.42% of Puerto Rico's av-
erage internal revenues for the prior two fiscal years—more than the per-
mitted 15%.

b.    The GO Series 2012A Bonds exceeded the Constitutional Debt Limit when
the Commonwealth issued them on April 3, 2022. As with the GO Series
2012B Bonds, Puerto Rico's average internal revenues for the prior two fis-
cal years (2010 and 2011) was $7.6004 billion. With the GO Series 2012A
Bonds, the maximum debt service in any fiscal year (including PBA Bond
debt service) was $1.2291 billion in fiscal year 2020 (inclusive of $16.520
million of Commonwealth guaranteed debt payments made in fiscal year
2011), which is 16.42% of Puerto Rico's average internal revenues for the
prior two fiscal years—more than the permitted 15%.

c.    The PBA Series U Bonds exceeded the Constitutional Debt Limit when the
PBA issued them on June 21, 2012. Puerto Rico's average internal revenues
for the prior two fiscal years (2010 and 2011) was $7.5959 billion. With the
PBA Series U Bonds, the maximum debt service in any fiscal year (includ-
ing PBA Bond debt service) was $1.2439 billion in fiscal year 2020 (inclu-
sive of $16.520 million of Commonwealth guaranteed debt payments made
in fiscal year 2011), which is 16.4% of Puerto Rico's average internal rev-
enues for the prior two fiscal years—more than the permitted 15%.

d.    The 2014 GO Bonds exceeded the Constitutional Debt Limit when the
Commonwealth issued them on March 17, 2014. Puerto Rico's average

internal revenues for the prior two fiscal years (2012 and 2013) was $8.3070 billion. With the 2014 GO Bonds, the maximum debt service in any fiscal year (including PBA Bond debt service) was $1.4533 billion in 2016 (inclusive of $17.315 million of Commonwealth guaranteed debt payments made in fiscal year 2013), which is 17.5% of Puerto Rico's average internal revenues for the prior two fiscal years—more than the permitted 15%.

## IX. Puerto Rico Issues the 2014 GO Bonds, Even After Planning to Declare Bankruptcy

146.    As early as 2013, the GDB was concerned about its own liquidity. Because the GDB's loans had been propping up Puerto Rico's operations and services for years, the GDB knew that Puerto Rico's financial health would continue to suffer if fiscal restraint measures were not implemented.

147.    On December 4, 2013, some GDB Board members and high-ranking GDB officials sent the Governor a letter demanding that he improve Puerto Rico's liquidity, balance its budget, and reduce the government deficit, by, for example, increasing Puerto Rico's gas, tax, and electricity rates. The Governor declined to act.

148.    On January 29, 2014, prompted by its liquidity concerns, the GDB hired two law firms with prominent restructuring practices: Cleary Gottlieb Steen & Hamilton LLP ("Cleary") and Proskauer Rose LLP ("Proskauer"). On February 5, 2014, the GDB hired Millco Advisors, LP ("Millco"), a prominent restructuring firm. Millco was hired to assess, among other things, the impact of various proposals on the GDB's and Puerto Rico's liquidity. This included advice on a potential restructuring.

149.    In early February 2014, Standard & Poor's, Moody's Investors Service, and Fitch Ratings each downgraded the Commonwealth's outstanding GO Bonds to non-investment-grade—to junk. Among other things, they cited Puerto Rico's high and growing debt levels, chronic budget deficits, large operating deficits, reduced liquidity and increased refinancing risk, and increased reliance on external short-term debt.

50

150.    In early March 2014, the GDB was confronted by the fact that Puerto Rico did not have enough funds on hand to show twelve months of liquidity to auditors certifying its financial statements for fiscal year 2013. If Puerto Rico could not show sufficient liquidity by May 1, 2014, it would have to issue its 2013 financial statements without a clean audit opinion and include a "going concern" qualification.

151.    Despite Puerto Rico's precarious financial condition, several Defendants advocated for yet another bond issuance—what would become the 2014 GO Bonds. Morgan Stanley told Puerto Rico that there was a deal to be done and told the GDB that the issuance would enhance Puerto Rico's bonding capacity. Morgan Stanley ultimately participated as a syndicate underwriter but refused to fix a price at which it would purchase any unsold or unsubscribed bonds.

152.    In 2014, before the Commonwealth issued the 2014 GO Bonds, Citi advised David Chafey, Chairman of the GDB Board, and other high-level GDB officials, against doing so on the basis that another GO bond issuance did not make financial sense for Puerto Rico. Instead, they proposed: (1) $2 billion in immediate liquidity improvements through securitizing property tax-backed and sales tax-backed municipal loans; (2) a Balanced Budget Act; (3) a Fiscal Control Act; and (4) a five-member oversight body including appointees of the Federal Reserve and U.S. Treasury, as well as a member with well-known bond market credentials.

153.    The Commonwealth moved ahead with the issuance anyway. Citigroup declined to participate in the 2014 GO Bonds.

154.    On March 17, 2014, the Commonwealth issued the 2014 GO Bonds with a face amount of $3.5 billion. The net proceeds from the 2014 GO Bonds were used to: (1) repay the GDB's lines of credit and make a deposit to a fund used by the GDB to service the Commonwealth's general obligation debt ($1,896,072,196); (2) repay COFINA bond anticipation notes,

which were not obligations of Puerto Rico or guaranteed by Puerto Rico's full faith, credit, and taxing power ($342,365,760); (3) refinance refunded bonds from 2003 that refunded bonds from 1987 and 1989, which were originally underwritten by eleven of the fourteen 2014 GO Bond underwriters ($466,574,005); (4) pay fees owed to interest rate swap counterparties ($90,417,100); (5) pay interest on the bonds ($422,749,408); and (6) pay costs of issuance ($36,821,531).

155.     As with prior GO Bonds, the 2014 GO Bond proceeds were used to refund and retire other bonds Puerto Rico had previously issued. They were part of Puerto Rico's scoop and toss scheme, in which Puerto Rico sold new, long-term debt to pay off older, maturing debt. This refinancing strategy wreaked financial havoc on Puerto Rico and paved the way for its default.

156.     Barclays was a lead underwriter for the 2014 GO Bonds. It had direct access to Puerto Rico's financial statements and knew that Puerto Rico was in dire financial straits. The Official Statement for the 2014 GO Bonds, which Barclays helped draft and review, stated that Puerto Rico's financial condition could further deteriorate, and that the Commonwealth was dependent on bond issuances to stay afloat: "If the Commonwealth is unable to obtain sufficient funds from this and other future debt offerings, it may not have sufficient liquidity to meet its obligations as they come due." Barclays further insisted that the Official Statement reference a Special Liquidity Update issued by the GDB on March 5, 2014. That liquidity update disclosed the GDB's hiring of Millco. By including the reference to Millco, Barclays evidently viewed the possibility of a GDB restructuring as a real and material risk that the market would find important.

157.     Barclays and Morgan Stanley violated applicable federal securities law with the issuance of the 2014 GO Bonds. 17 C.F.R. § 240.15c2-12(b)(5)(i) bars underwriters from selling bonds unless they have reasonably determined that the issuer will provide the Municipal Securities Rulemaking Board (the "MSRB") with timely annual, audited financial statements. As discussed,

*supra* ¶ 150, the Commonwealth was in jeopardy of not receiving a clean audit opinion for its financial statements for fiscal year 2013 when the 2014 GO Bonds were issued, which was approximately six weeks before the financial statements were due. On information and belief, Barclays and Morgan Stanley knew that the Commonwealth was in dire financial straits and was staring down a potential restructuring. These banks did not reasonably believe that the Commonwealth would submit timely, audited financial statements for fiscal year 2013. On April 30, 2013, the day before the financial statements were due to the MSRB, the Commonwealth announced that it would miss its disclosure obligation. Barclay's and Morgan Stanley's failure to comply with federal securities law and reasonably determine that the Commonwealth would submit its financial statements further underscores the illegal nature of the 2014 GO Bonds and the fact that Barclays and Morgan Stanley did not believe that the Commonwealth would be able to pay the debt service on those bonds as it came due.

158.    The Commonwealth's issuance of the 2014 GO Bonds violated the Constitutional Debt Limit.[16] When the 2014 GO Bonds were issued, they violated the Constitutional Debt Limit when properly accounting for the PBA Bonds. *See supra* Part VII. Even setting aside the PBA Bonds, the 2014 GO Bonds violated the limit. The Commonwealth used approximately $425 million of bond proceeds to pay interest on the 2014 GO Bonds during the first three years they were outstanding but excluded those amounts in calculating the Constitutional Debt Limit. This was legally improper. The Constitutional Debt Limit includes "the amount of principal of and interest on" bonds backed by Puerto Rico's full faith, credit, and taxing power. P.R. Const. art. VI, § 2. The interest that the Commonwealth paid on the 2014 GO Bonds from the bonds' proceeds was

---

[16] Even if the PBA Bonds were properly excluded from the Constitutional Debt Limit (which they were not), the 2014 GO Bonds violated that limit.

"interest on such bonds," whether it was paid from bond proceeds or Puerto Rico's general funds. Even without the PBA Bond debt service, the Constitutional Debt Limit was violated when including the approximately $75 million of interest that Puerto Rico planned to pay from the proceeds of the 2014 GO Bonds in fiscal year 2016. Accounting for this interest, the Commonwealth's maximum debt service was 15.1%—above the 15% limit.

## X.   Puerto Rico Passes the Recovery Act to Create a Path to Bankruptcy, but the Supreme Court of the United States Overturns the Statute

159.   After the credit rating agencies cut the Commonwealth's credit rating to "junk" status, Governor Alejandro Garcia Padilla vowed to lead Puerto Rico out of the $70 billion crisis through restructuring.

160.   Puerto Rico had no legal way to restructure. The Contracts Clause of the United States Constitution, Const. art. I, § 10, and its analog in the Puerto Rico Constitution, P.R. Const. art. II, § 7, prevented Puerto Rico and its instrumentalities from simply voiding their debt obligations. And the Commonwealth was expressly prohibited from seeking debt adjustment under Chapter 9 of the Bankruptcy Code, *see* 11 U.S.C. § 101(52), which allows only mainland municipalities to restructure.

161.   In June 2014, advised by Cleary and Proskauer, Puerto Rico unveiled proposed restructuring legislation: the Puerto Rico Public Corporation Debt Enforcement and Recovery Act (the "Recovery Act"). The Recovery Act was modeled on Chapter 9 of the Bankruptcy Code, with a stated purpose of allowing Puerto Rico's public corporations "(i) to adjust their debts in the interest of all creditors affected thereby, (ii) provide[] procedures for the orderly enforcement and, if necessary, the restructuring of debt…, and (iii) maximize[] returns to all stakeholders." Recovery Act, Stmt. Of Motives, § D. The Legislature quickly approved it, and Governor García Padilla signed it into law.

54

162.     The Recovery Act created two paths for Puerto Rico's public corporations to re-structure. Chapter 2 provided a process for out-of-court negotiations between debtor corporations and their creditors. Chapter 3 provided a restructuring process overseen by a court to break any stalemate between the public corporation and its creditors. Restructuring plans under Chapter 3 required courts to ensure that creditors received payment equal to what they would have received if they all had demanded immediate payment when the debtor entered financial distress.

163.     The day after the Recovery Act became law, hedge funds holding over $1 billion of PREPA bonds challenged its constitutionality in federal court. In February 2015, the United States District Court held that the Recovery Act was preempted by the Bankruptcy Code and so was void under the U.S. Constitution's Supremacy Clause. The court permanently enjoined the Commonwealth from enforcing the Recovery Act. *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 614 (D.P.R. 2015). The United States Supreme Court later affirmed this ruling.

## XI.     Puerto Rico Defaults

164.     By early 2015, Puerto Rico owed about $72 billion in debt, representing 66 percent of its GDP. As a percentage of Gross National Product ("GNP"), which the U.S. Department of Treasury deems to be a "more representative measure of Puerto Rico's economic activity," total public debt grew from 71 percent in fiscal year 2005 to 99 percent in fiscal year 2014.

165.     On June 28, 2015, Puerto Rico's Governor declared Puerto Rico's debt "unpaya-ble."

166.     In July 2015, the Puerto Rico Public Finance Corporation ("PFC") defaulted on approximately $57.4 million in payments due to bond holders. This was the first default in Puerto Rico's history. The succeeding months resulted in a further $177.5 million in aggregate missed payments on PFC bonds for 2016 and 2017, while further defaults followed in late 2015 and early 2016, including on $35.9 million due on Puerto Rico Infrastructure Financing Authority bonds.

55

167.    On April 6, 2016, the Puerto Rico Legislative Assembly enacted the Emergency

Moratorium and Financial Rehabilitation Act ("Moratorium Act"), which allowed the Governor

to declare a moratorium on debt service payments for a limited period for the GDB, the Common-

wealth, and the Commonwealth's instrumentalities.

168.    Despite this, Puerto Rico continued to default. On May 2, 2016, the Commonwealth

defaulted on approximately $367 million in GDB Bonds, followed by another default of approxi-

mately $779 million in GO Bonds on July 1, 2016, and yet another default of approximately $358

million in GO Bonds on January 1, 2017.

## XII. Defendants' Close Relationships with the GDB Caused Puerto Rico to Take Actions That Benefited the Banks and Sent Puerto Rico into Financial Turmoil

169.    The relationship between the GDB and Defendants was a critical factor in Puerto

Rico's financial collapse. As Puerto Rico's fiscal agent, the GDB approved all Puerto Rico bor-

rowings and bond issuances, including the Illegal Bonds. It was also responsible for evaluating

swap agreements proposed by the banks.

170.    Outwardly, the GDB was a prestigious financial institution composed of career pro-

fessionals capable of rivaling private-sector talent in both sophistication and competency. Inter-

nally, it was rife with disorganization and infected by the influences of private financiers and pol-

iticians. Defendants exploited the GDB's institutional weaknesses to push new bond issuances,

which the GDB knowingly authorized on behalf of Puerto Rico and its instrumentalities.

171.    The banks pushed the GDB to take on more and more debt. The Underwriter De-

fendants pushed for Puerto Rico and its agencies to issue more bonds, often proposing new issu-

ances before the GDB ever approached them with a liquidity or funding need. If the GDB agreed,

the proposing Underwriter Defendant was typically selected to underwrite the issuance—a lucra-

tive incentive that led Defendants to propose as many new bonds as they could. The Swap

Defendants, similarly, aggressively marketed interest rate swap agreements to the Commonwealth and its instrumentalities as a way of raising cash.

172.    The GDB's internal disorganization led it to rely heavily on the banks whose proposals it was supposed to evaluate. The GDB lacked any kind of oversight system capable of monitoring what public corporations did with their bond proceeds or holding them accountable for repaying their debts. It had no internal financial controls for monitoring operational deficits until 2009; only then, when the Commonwealth was already insolvent (*supra* Part IV), did the GDB enter into fiscal oversight agreements ("<u>FOAs</u>") with some municipal agencies. There was no plan for remediating the ballooning debt—just a cycle of more debt to delay when the balloon would ultimately pop.

173.    So too for the Swap Agreements. Employees responsible for making key decisions on the agreements did not fully appreciate or quantify the terms or risks that they posed. The GDB officials who approved the Swap Agreements failed to consistently document key transactional terms for their successors. When they left the organization, they took their knowledge of the swap terms with them. At one point in 2009 the GDB had only a single spreadsheet covering its entire interest rate swap portfolio. The GDB had no institutional knowledge or system to manage the contractually binding swap agreements.

174.    Beyond its disorganization, the GDB was close to the banks because many of its own high-level executives came from them. It was routine for political appointees to join the GDB from—or leave the GDB for—private financial institutions, some of which underwrote bonds for the Commonwealth, the PBA, and the ERS. In particular, Santander had high-level employees who had worked at the GDB:

        a.    ***Carlos García*** served as a senior executive at Banco Santander, an affiliate of Santander, from 1997–2008 while the bank advised on debt deals and

underwrote bonds for Puerto Rico and its instrumentalities. In 2009, García left Banco Santander to become the head of the GDB, which under his leadership orchestrated a massive issuance of questionable public debt, often underwritten by Santander. After his term with the GDB ended, García returned to work for other Santander affiliates.

b.   ***Juan Carlos Battle*** served as CEO of Santander Asset Management and the Managing Director of Santander for over a decade. In 2011 he joined the GDB as President, a position he held until 2012. During his tenure Santander served as a lead or syndicate underwriter for the GO Series 2011A Bonds, the GO Series 2012B Bonds, and the GO Series 2012A Bonds, collecting a steady stream of underwriting fees along the way.

175.   This left a big opening for the banks—filled with knowledgeable market professionals who tracked Puerto Rico's financial condition—to further enrich themselves by leveraging their connections with the GDB to participate in bond issuances and receive underwriting fees.

176.   The Underwriter Defendants were obligated by federal law to perform due diligence and investigate the representations included in the offering documents for each bond issuance that they underwrote, including the financial health of the issuing entities and their ability to repay the debt on its terms. They were also responsible for investigating the associated financial information and risk profile for the at-issue bonds. The Underwriting Bank Defendant teams that covered Puerto Rico continued to monitor Puerto Rico's financial health between bond offerings, as they often participated in the syndicates selling a portion of the bonds, and routinely marketed their financial services and pitched new products to the GDB. Defendants thus had actual knowledge of Puerto Rico's scoop and toss scheme and the illegal nature of the Illegal Bonds.

177.   Despite knowing that Puerto Rico was locked into this death spiral, the Underwriter Defendants used their access to the GDB and their relationships with Puerto Rico agencies to "keep the music going," pushing for more bond issuances in exchange for more lucrative underwriting fees. They also collected interest payments and principal refunds on older bonds that they or their

affiliates held and received swap termination fees paid out of bond proceeds, ensuring payment on their obligations while transferring risk of Puerto Rico's default to holders of new debt.

| REFUNDING BOND PROCEEDS | | |
|---|---|---|
| Bond Issuance | Total Funds from Issuance (including net original issue premium) | Amount Attributable to Refunding Previous Issuances & Lines of Credit |
| PBA Series P | $330,125,233.60 | $297,065,000.00 |
| PBA Series Q | $188,685,025.20 | $164,548,880.97 |
| PBA Series S | $305,023,865.00 | $301,937,294.00 |
| PBA Series U | $585,048,064.85 | $548,266,751.19 |
| GO Series 2007A-4 | $93,835,000.00 | $93,835,000.00 |
| GO Series 2009A | $3,425,000.00 | $2,996,976.67 |
| GO Series 2009B | $371,789,773.60 | $68,056,501.64 |
| GO Series 2009C | $204,575,352.50 | $202,825,589.15 |
| GO Series 2011A | $349,116,538.65 | $316,998,464.05 |
| GO Series 2011C | $429,165,797.55 | $412,500,254.91 |
| GO Series 2011, 2011D, 2011E | $593,330,640.70 | $259,957,441.67 |
| Series 2012 B GO | $414,954,976.00 | $402,868,092.00 |
| Series 2012 A GO | $2,313,928,053.00 | $1,867,615,737.00 |
| 2014 GO | $3,255,000,000.00 | $2,705,011,961.00 |



178.    At least two Underwriter Defendants, UBS PR and Santander, sold the bonds they underwrote through Local CEFs—mutual funds with publicly-traded shares that are exempt from some federal regulations, sold exclusively to Puerto Rico residents, and "triple tax exempt" from federal, state, and local taxes. UBS PR and Santander earned fees for managing the Local CEFs, additional fees for advising them, and sales commissions for selling their shares. In 2008 alone, one of UBS PR's affiliate's Local CEF business generated $94.5 million.

179.    UBS PR profited from the sale of bonds through local CEFs even though it knew that Puerto Rico's financial condition made them unsound investments. In April 2011, brokers working for UBS PR and selling shares in its local CEFs began to refrain from promoting the funds to clients. They provided UBS PR with a list of 22 reasons, including that the funds were

overwhelmingly loaded with debt issued by the Commonwealth and its instrumentalities that was underwritten by UBS PR. In response, UBS PR's then-Chairman, Miguel Ferrer, held a meeting of the bank's brokers and said that if they did not sell shares in the funds to customers, they would have to get new jobs. By October 2013, several of these funds had lost half to nearly two-thirds of their value.

180.    The Swap Defendants benefitted from the GDB's institutional weaknesses through lucrative swap termination fees. They not only induced the Commonwealth, the HTA, and the PBA to enter into the Swap Agreements, they received lucrative early termination fees to pay off those contracts, paid out of Illegal Bond proceeds. Proceeds from some bond issuances were used to pay swap termination fees to the affiliates of the same Underwriter Defendants who served as lead or co-lead underwriters for those issuances. Morgan Stanley served as a lead underwriter for the GO Series 2011, GO Series 2011C, GO Series 2011D, and 2014 GO Bonds, its affiliate, Morgan Stanley Capital, received approximately $24.8 million in swap termination fees from the proceeds of those issuances.

## XIII.   Puerto Rico's Financial Crisis Harmed Its Citizens, Including Unsecured Creditors

181.    Puerto Rico citizens who relied the most on the government's services suffered the most. As Reported in the New York Times, Puerto Rico's debt "lock[ed] up more and more of its resources to secure more and more bonds," which, "over the long term… left less and less money to provide essential government services," such as "policing, staffing the public schools and providing clean water."[17]

---

[17] M. Williams Walsh, *The Bonds That Broke Puerto Rico*, N.Y. Times (June 30, 2015), https://www.nytimes.com/2015/07/01/business/dealbook/the-bonds-that-broke-puerto-rico.html (last visited Sept. 14, 2022).

182.    In February 2014, one month before the Commonwealth issued the 2014 GO Bonds, the New York Times published an exposé of how Puerto Rico's deteriorating economy was causing an exodus from the island.[18] One local business owner said: "I don't see it improving, I see it getting worse. It's the uncertainty. What am I going to do—wait until it gets worse?"

183.    The unemployment rate shot up to an astonishing 15.4%. Per capita income sat at $15,200 (half that of Mississippi, the poorest of the 50 states). Almost 640,000 of Puerto Rico households, 37% of them, relied on food stamps (compared to Mississippi's 22%). Only about one in four Puerto Rico citizens worked in the formal economy, one of the lowest labor participation rates in the world. And a quarter of those residents worked for the flagging Commonwealth of Puerto Rico.

184.    By November 2014, Puerto Rico faced a public transportation shutdown. The Legislature failed to raise the crude oil tax—meant to repay the HTA's $2.2 billion loan to the GDB—and local instrumentalities shut down buses and trains. The shutdown interfered with around 75,000 daily riders and shut down work on road and infrastructure projects employing 2,800 HTA workers.

185.    As the debt crisis worsened, public schools became the target of austerity advocates and "debt-reducing" policies meant to reduce costs and public spending. At its peak in 2006, Puerto Rico had operated 1,515 public schools with 544,000 students; by 2018 it operated only 855 schools with 346,000 students. Once closed, Puerto Rico would sell or lease the schools to generate revenue—a questionable practice that saw only 10% of closed schools sold for a meager total revenue of $4.1 million between 2014 and 2019.

---

[18] Lizette Alvarez, *Economy and Crime Spur New Puerto Rican Exodus*, N.Y. TIMES (Feb. 8, 2014), https://www.nytimes.com/2014/02/09/us/economy-and-crime-spur-new-puerto-rican-exodus.html (last visited Sept. 14, 2022).

186.    School closures disrupted access to and continuity of education for children, who are highly vulnerable during economic shocks. This was especially true for children living in high-poverty areas, who tend to be exposed to higher crime rates and worse health options. In 2014, the U.S. Census Bureau estimated that 58% of Puerto Rico's children lived below the federal poverty line—more than double the national average of 22%. A staggering 80% of children in Puerto Rico lived in high-poverty areas, compared to only 11% on the mainland.

187.    Puerto Rico's health spending also plummeted. From 2010 to 2014, Puerto Rico's total public and private health care expenditures decreased by 10%, from $12.1 billion to $10.9 billion. Per capita, these health expenditures declined at a less drastic rate of 5% from 2010 to 2014, though likely only because of the significant population decrease happening at the same time.

188.    Decreased healthcare spending led to an exodus of healthcare providers. From 2010 to 2012 alone, more than 4,000 health professionals—about nine percent of the island's health care practitioners—decamped for the mainland. In 2014, some 2,100 additional health professionals left—another four percent of the island's total.

189.    The crisis also devastated the individuals and businesses that would become Puerto Rico's unsecured creditors. These creditors include Puerto Rico's employees, trade creditors, and service providers. They are overwhelmingly based in Puerto Rico: More than 90% of the proofs of claims that would be filed by general unsecured creditors were filed by creditors based on the island. These creditors suffered through Puerto Rico's extended recession, felt the pain of its budget cuts and population decline, and have been waiting for years to be paid the amounts that Puerto Rico owes them but never paid.

## XIV.  In 2017, Congress Passes PROMESA, Finally Permitting Puerto Rico a Path to Bankruptcy

190.    Puerto Rico languished for years without any legal way to restructure its debts.

63

191.     In June 2016, shortly after the United States Supreme Court affirmed that the Recovery Act was unconstitutional, Congress passed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"). It became law on June 30, 2016, Pub. L. No. 114-187, 130 Stat. 159 (2016), one day before Puerto Rico would have defaulted on an additional $1.9 billion worth of debt payments.

192.     Minutes after President Obama signed PROMESA into law, Governor Garcia Padilla signed several executive orders authorizing the suspension of payments on the Commonwealth's general obligation debt so that agencies could continue to fund government operations. "Under these circumstances, these executive orders protect the limited resources available to the agencies… and prevents [creditors from] leaving Puerto Ricans without basic services."[19]

193.     PROMESA established a new statutory framework for Puerto Rico and its instrumentalities to reorganize their debts in a plan of adjustment through access to the Bankruptcy Code. PROMESA incorporated many Code provisions, including 11 U.S.C. §§ 544 (avoidance of transfers under applicable non-bankruptcy law), 547 (avoidance of preferences), and 548 (avoidance of actual and constructive fraudulent transfers). 48 U.S.C. § 2161(a).

194.     Section 405 of PROMESA automatically stayed debt and liability actions against the Government of Puerto Rico upon PROMESA's enactment. 48 U.S.C. § 2194. Congress deemed that "an immediate—but temporary—stay is essential to stabilize the region for the purposes of resolving" Puerto Rico's fiscal crisis and to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits."

---

[19] Nick Brown, *Puerto Rico Authorizes Debt Payment Suspension; Obama Signs Rescue Bill*, REUTERS (June 30, 2016), https://www.reuters.com/article/us-puertorico-debt-idUSKCN0ZG09Y (last visited Sept. 14, 2022).

195.    PROMESA also established the FOMB. The seven-member FOMB is appointed by the President of the United States to "provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets." 48 U.S.C. § 2121(a). It was designed to operate as an autonomous entity outside the control of Puerto Rico's governor and legislature, with its own broad investigatory and enforcement powers, including the ability to issue subpoenas, hold hearings, compel witness testimony, and obtain information directly from any federal department of agency. 48 U.S.C. § 2124(a), (f).

196.    The FOMB also acted as a gatekeeper to PROMESA's debt restructuring tools. Only the FOMB could file a petition to commence debt restructuring on behalf of PROMESA-covered entities, such as the Commonwealth and its instrumentalities. 48 U.S.C. § 2164(a). Before filing a petition, the FOMB must first determine, in its sole discretion, that the PROMESA-covered entity has met certain statutory prerequisites, such as publishing financial statements, adopting FOMB-certified fiscal plans, and making good-faith efforts to reach consensual restructuring with creditors. 48 U.S.C. § 2146. If the statutory prerequisites are met, then the FOMB may issue a restructuring certification and commence restructuring proceedings on behalf of the covered entity.

## XV.    Puerto Rico Files Its PROMESA Petition in May 2017

197.    Following several months of "discussions with the Commonwealth and its legal and financial advisers," [20] on May 3, 2017, the FOMB formally initiated PROMESA bankruptcy proceedings on behalf of the Commonwealth.[21] Two days later, Chief Justice John Roberts assigned the case to Judge Laura Taylor Swain of the United States District Court for the Southern

---

[20] Case No. 3:17-bk-3283, Dkt. 1, at 5.

[21] The ERS filed its Title III Petition on May 21, 2017, and the PBA filed its Title III Petition on September 27, 2019.

District of New York—the same day that the Puerto Rico Department of Education announced plans to close 184 additional schools. By this time Puerto Rico's total public debt was approximately $74 billion.

198.    On May 17, 2017, the PROMESA Court held its first day of hearings in what marked the beginning of a five-year process from bankruptcy filing to confirmation of a Plan of Adjustment. According to the FOMB, more than 165,000 creditors filed proofs of claim before the Court. Creditors ranged from mutual funds and hedge funds to trade creditors, service providers, individual residents of Puerto Rico, and retirees eligible to receive government pension payments.

199.    The thousands of unsecured creditors who filed claims against the Commonwealth's estate included the United States Internal Revenue Service (the "IRS"). The IRS filed timely proofs of claim against the Commonwealth and the PBA.

## XVI.    The FOMB Retains Kobre & Kim to Investigate the Causes of the Commonwealth's Default and Ensuing Financial Crisis

200.    The FOMB used its statutory powers to create a Special Investigation Committee to "investigate the disclosure and selling practices in connection with the purchase of bonds issued by [Puerto Rico] for or on behalf of any retail investors including any underrepresentation of risk for such investors and any relationships or conflicts of interest maintained by such broker, dealer, or investment adviser[.]" 48 U.S.C. § 2124(o). The Special Investigation Committee retained Kobre & Kim LLP to investigate possible causes of action that Puerto Rico and its instrumentalities might have against financial and legal institutions that advised or encouraged the Commonwealth to exceed the Constitutional Debt Limit. Kobre & Kim LLP's investigation culminated in the publication of a 600-page report on August 20, 2018 (the "K&K Report").

201.    The K&K Report examined how much debt Puerto Rico issued and how it used the proceeds, digging deep into selling practices and how they compared to other municipalities, the

range of debt instruments, and how the debt ultimately contributed to Puerto Rico's structural budget deficit. The K&K Report covered a wide range of topics, including investigations of PREPA, the ERS, Puerto Rico's budgeting and external reporting methods, the government's calculation of the Constitutional Debt Limit, credit rating agencies, bond-selling practices, ethical frameworks, interest rate swaps, and the mechanisms for validating bonds before issuance. The investigators reviewed more than 260,000 documents—consisting of approximately 2.7 million pages—and interviewed 120 witnesses, including former and current senior government officers, underwriters, rating agencies, and outside professionals and advisors.

202.    The Report also paid special attention to the intersection between political administrations and bond issuances, including the close relationships between Puerto Rico's elected officials, private banks, and financial institutions that advised or assisted Puerto Rico in connection with the bonds, swaps, and the GDB.

## XVII.  The Trust

203.    On August 28, 2018, the FOMB appointed a Special Claims Committee ("SCC") to pursue certain claims based on the K&K Report's findings. These claims included avoidance actions against the financial institutions that underwrote many of Puerto Rico's illegal bond issuances. While PROMESA incorporated the relevant avoidance action provisions from the Federal Bankruptcy Code, it also incorporated the two-year tolling limitation for bringing such actions: Puerto Rico needed to bring its avoidance actions within two years of its PROMESA petition date—so by May 3, 2019—else the statute of limitations would begin to run. *See* 11 U.S.C. § 546(a)(1)(A) (limitations on avoiding powers).

204.    On May 2, 2019, the SCC filed an adversary complaint in this Court, seeking damages and recovery of fraudulent transfers for the Defendants' provision of professional services in connection with financial transactions of the Title III Debtors. ECF No. 1. The SCC amended the

adversary complaint in September 2021 to add the PBA as a plaintiff. ECF No. 25. The Court stayed these proceedings. ECF No. 35 ¶ 8.

205.    On January 18, 2022, the Court issued an Order and Judgment Confirming Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, The Employees Retirement System of the Government of the Commonwealth of Puerto Rico, and the Puerto Rico Public Buildings Authority (the "Confirmation Order"), Case No. 17-BK-3283, Dkt. 19813 (Jan. 18, 2022), pursuant to which it confirmed the Plan.

206.    In conjunction with the Confirmation Order and the Plan, the Court issued Findings of Fact and Conclusions of Law, noting that "[m]any residents of Puerto Rico, political leaders, and investors have called for specific auditing of the bond issues and the application of the proceeds of certain bond issues and/or prosecution of individuals or entities that may have misapplied bond proceeds." The Court made clear that "confirmation of the Plan does not preclude further investigations or law enforcement activity with respect to conduct in connection with the past issuance of debt and application of debt proceeds." [22]

207.    The Plan provided for the creation of the Trust. *See* Plan § 78. It established the Trust "for the sole purpose of Avoidance Actions and distributing its assets," and held the "sole right, authority, and standing to prosecute, settle or otherwise dispose of all Avoidance Actions." Confirmation Order, at 19; *see also* Plan § 79.1. The "net proceeds of any such litigation or settlement" would be distributed to certain holders of allowed general unsecured claims from the Title III Debtor bankruptcy proceedings. The Trust was to litigate against the entities that helped push Puerto Rico into insolvency and apply any recovery towards repaying Puerto Rico's unsecured creditors—many of whom are Puerto Rican citizens.

---

[22] Case No. 17-BK-3283, Dkt. 19812, at 29 n.14.

68

208.    On March 15, 2022, the same day that Puerto Rico officially exited bankruptcy, the Title III Debtors and the FOMB executed the Trust Agreement, creating the Trust and designating Drivetrain, LLC, as the Trustee.

209.    The Trustee now brings the following claims to recover funds that were wrongfully transferred to Defendants for the benefit of Puerto Rico and its unsecured creditors.

**FIRST CAUSE OF ACTION**
**2 L.P.R.A. § 97**
**(against the Swap Defendants)**

210.    The foregoing paragraphs are incorporated by reference.

211.    Puerto Rico's Civil Code provides: "Government and municipal entities of the Commonwealth of Puerto Rico, *with no exception whatsoever*, shall keep a registry of all contracts executed, including amendments thereto, and shall remit a copy thereof to the Office of the Comptroller within fifteen (15) days following the date of the execution or amendment of the contract." 2 L.P.R.A. § 97(a) (emphasis added).

212.    Public funds cannot lawfully be disbursed under an unregistered contract. 2 L.P.R.A. § 97(d).

213.    The Swap Agreements were never registered with the Comptroller. The Commonwealth and the PBA thus were not authorized to disburse any public funds under the Swap Agreements. The Commonwealth and the PBA nevertheless paid the Swap Defendants at least $252 million and $20.4 million in swap termination fees, respectively, under the Swap Agreements as detailed on Exhibit 2.[23] These payments were contrary to law.

---

[23] As alleged, *supra* ¶ 130, the termination fees for certain Swap Agreements between the HTA and Citibank were paid to Citibank using Commonwealth funds.

214.    Under Puerto Rico law, the government may recover funds unlawfully disbursed under unregistered public contracts through a remedy of unjust enrichment. The Trustee stands in the shoes of the Issuers for purposes of its claims under 2 L.P.R.A. § 97.

215.    The Swap Defendants were unjustly enriched by the funds they received from the Commonwealth and the PBA under the Swap Agreements. These funds should be remitted to the Trust for the benefit of Puerto Rico's unsecured creditors.

## SECOND CAUSE OF ACTION
### 31 L.P.R.A. §§ 4 and 3372
### (against all Defendants)

216.    The foregoing paragraphs are incorporated by reference.

217.    "Acts executed contrary to the provisions of law are void except when the law pre-serves their validity." 31 L.P.R.A. § 4. "[C]ontracting parties may make the agreement and estab-lish the clauses and conditions which they may deem advisable, *provided they are not in contra-vention of the law, morals, or public order*." 31 L.P.R.A. § 3372 (emphasis added).

218.    Contracts contrary to existing law are null and void *ab initio*. *See id.*

219.    The ERS Bonds were contrary to law and public order because the ERS lacked legal authority to issue them. The ERS Bonds, and their related Purchase Contracts, were thus void *ab initio*. The ERS nevertheless paid UBS PR and Santander approximately $17.8 million in under-writing fees for the ERS Bonds (detailed on Exhibits 15 and 16). These payments were contrary to law.

220.    The Excessive Debt Bonds were contrary to law and public order because each added general obligation debt in violation of the Constitutional Debt Limit. The Excessive Debt Bonds, and their related Purchase Contracts, were thus void *ab initio*. The Commonwealth and the PBA nevertheless paid UBS PR, Barclays, Morgan Stanley, BofA, JP Morgan, BMO, RBC Capi-tal, Goldman, and Santander approximately $ 78.5 million in underwriting fees for the Excessive

70

Debt Bonds (detailed on Exhibits 4, 5, 6, 8, 10, 12, 13, 15, and 16). The Commonwealth and the PBA also paid Merrill Lynch Capital, Morgan Stanley Capital, RBC, and UBS AG approximately $60.8 million in swap termination payments from the proceeds of the Excessive Debt Bonds. These payments were contrary to law.

221.    The Scoop and Toss Bonds were contrary to law and public order because each was not tied to the general welfare of all citizens and was not a scrupulous use of public funds. The Scoop and Toss Bonds, and their related Purchase Contracts, were thus void *ab initio*. The Issuers nevertheless paid Morgan Stanley, Barclays, UBS PR, Ramirez, Santander, Merrill Lynch, BofA, RBC Capital, BMO, JP Morgan, Citigroup, Jefferies, and Goldman approximately $ 84.3 million in underwriting fees for the Scoop and Toss Bonds (detailed on Exhibits 4–16). The Issuers also paid Goldman USA, Goldman Mitsui, Merrill Lynch Capital, Morgan Stanley Capital, RBC, and UBS AG approximately $273 million in swap termination payments from the proceeds of the Scoop and Toss Bonds (detailed on Exhibits 17–23). These payments were contrary to law.

222.    Under Puerto Rico law, the government may recover funds unlawfully transferred under void or illegal contracts under 31 L.P.R.A. § 3514, or, in the alternative under 3 L.P.R.A. § 7 through an equitable remedy of unjust enrichment. The Trustee stands in the shoes of the Issuers for purposes of its claims under 31 L.P.R.A. §§ 4 and 3372.[24]

223.    In the alternative, the Underwriter Defendants were unjustly enriched by the funds they received from the Issuers under the Illegal Bonds. In addition to underwriting fees and swap termination payments, these payments include any interest, principal, or other payment made to the Underwriter Defendants from Illegal Bonds proceeds. The Purchase Contracts should be

---

[24] Modified Eighth Amended Title III Joint Plan of Adjustment §§ 1.103 and 78.2.

declared *void ab initio* and the funds paid to the Underwriting Defendants in respect of such agreements should be remitted to the Trust for the benefit of Puerto Rico's unsecured creditors.

## THIRD CAUSE OF ACTION
### 11 U.S.C. §§ 548(a)(1)(A)
### (against Barclays, Citibank, Morgan Stanley, and Morgan Stanley Capital)

224.    The foregoing paragraphs are incorporated by reference.

225.    Section 548(a)(1)(A) of Title 11 of the United States Code prohibits intentional fraudulent conveyances where a debtor transfers an interest in property or incurs an obligation with actual intent to hinder, delay, or defraud any present or future creditors. Fraudulent intent can be demonstrated through "indicia of fraud" that include: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and (5) after the transfer, retention by the debtor of the property involved in the putative transfer. *In re Ed. Flash, Inc.*, 2016 WL 3638471 at *4 (Bankr. D.P.R. June 29, 2016) (citing *Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254–55 (1st Cir. 1991)).

226.    The Trustee can avoid payments fraudulently transferred under Section 548(a)(1)(A) by voiding any such transactions that took place within two years of the filing date of the bankruptcy petition.

227.    The two-year lookback period for claims under Section 548(a)(1)(A) should be equitably tolled to end on June 28, 2014, when the Recovery Act was enacted. By passing the Recovery Act, Puerto Rico began the legal process, attempting to restructure its debts, but it was prevented from doing so because the Act was challenged as unconstitutional on the same day that it became law, and the federal courts enjoined its enforcement soon thereafter. Puerto Rico could not file for bankruptcy because it did not have access to federal bankruptcy law until Congress

passed PROMESA. Once PROMESA became law, the FOMB, on behalf of Puerto Rico, moved quickly to investigate the causes of Puerto Rico's insolvency—as exemplified by the FOMB's formation of the Special Investigation Committee and its commission of the K&K Report—and promptly prepared and filed a PROMESA petition. Defendants have been on notice since at least the 2014 enactment of the Recovery Act that Puerto Rico intended to restructure its debts. It would be inequitable to end the lookback period on the date that Puerto Rico filed its petition under PROMESA, because it was legally unable to file that petition until PROMESA was enacted. Under these extraordinary circumstances, the two-year lookback period should be equitably tolled to look back from June 28, 2014, the earliest date when Puerto Rico attempted to restructure its debts, via the Recovery Act.

228.    Within the applicable lookback period of June 28, 2012, to June 28, 2014, Puerto Rico intentionally and fraudulently transferred funds to Barclays and Morgan Stanley as the lead underwriters of the 2014 GO Bonds and to Citibank as a counterparty to certain Swap Agreements with the HTA. When the Commonwealth issued the 2014 GO Bonds, it knew that they exceeded the Constitutional Debt Limit and were part of a "scoop and toss" scheme that violated the Public Funds Clause. Puerto Rico knew as well that the Commonwealth was insolvent and had to restructure its debts, having hired Cleary and Proskauer on February 5, 2014, to begin drafting the Recovery Act before it issued the 2014 GO Bonds and Citibank received the swap termination fees listed on Exhibit 17. Yet it intentionally diverted funds to Barclays and Morgan Stanley in connection with the 2014 GO Bonds and to Citibank in connection with the swap termination fees to the disadvantage of other creditors. The Commonwealth knew that these transfers were fraudulent. It knew that the swap termination fees paid to Citibank were supposed to be made with HTA, and not Commonwealth, funds. The Commonwealth also intentionally and fraudulently transferred

proceeds of the illegal 2014 GO Bonds to Defendant Morgan Stanley Capital, an affiliate of lead underwriter Morgan Stanley.

229.    The Issuers orchestrated the transfers sought to be avoided with the intent to hinder, delay, or defraud creditors. They intentionally paid underwriting and swap fees from bond proceeds knowing that the 2014 GO Bonds violated the Constitutional Debt Limit and were contrary to public order. The underwriting fees relating to the 2014 GO Bonds bear many "badges of fraud":

     a.    ***Debtor's Insolvency***: The Commonwealth was insolvent as early as 2008 and knew this when it paid swap termination fees to Citibank and issued the 2014 GO Bonds, but still paid Barclays and Morgan Stanley to secure additional financing even though it was bound to default and hinder its other creditors' ability to recover once the Commonwealth inevitably defaulted.

     b.    ***The transfers sought to be avoided were made pursuant to illegal contracts.*** The 2014 GO Bonds were illegal because they violated the Constitutional Debt Limit and because they constituted a reckless use of public funds, to the benefit of the banks rather than the public and were contrary to public order.

     c.    ***Barclays and Morgan Stanley Violated Federal Securities Law.*** Barclays' and Morgan Stanley's failure to comply with federal securities law and reasonably determine that the Commonwealth would submit its financial statements further underscores the illegal nature of the 2014 GO Bonds and the fact that Barclays and Morgan Stanley did not believe that the Commonwealth would be able to pay the debt service on those bonds as it came due. *See supra* Part VII ¶ 157.

     d.    ***Barclays and Morgan Stanley knew Debtors were bound to default.*** As the underwriters of Puerto Rico's debt, Barclays and Morgan Stanley obtained highly detailed information from Puerto Rico and its agencies that were issuing bonds and/or using their proceeds, and therefore had a very clear picture of Puerto Rico's financial state. These Defendants pushed the Commonwealth to issue additional debt, which they used to benefit themselves, knowing the Commonwealth was bound to default and the remaining creditors would not be paid.

230.    On information and belief, Barclays and Morgan Stanley and/or their affiliates also received repayment of interest and principal on bonds they held with the Commonwealth from the proceeds of the 2014 GO Bonds. These transfers bear the same badges of fraud as the underwriting

fees, were paid while the Commonwealth was insolvent, and were made with the intent to hinder, delay, or defraud creditors. Specific information about which Defendants received interest and principal payments from the proceeds of the bonds they underwrote, and in what amount, is in the unique knowledge of the Defendants.

231.    Swap Defendant Morgan Stanley Capital received approximately $24 million in swap termination fees, which were paid from the proceeds of the 2014 GO Bonds. This transfer bears the same badges of fraud as the underwriting fees, was paid while the Commonwealth was insolvent, and was made with the intent to hinder, delay, or defraud creditors.

232.    Underwriter Defendants Barclays and Morgan Stanley also knew that these transfers were fraudulent. As lead underwriters of the 2014 GO Bonds, Barclays and Morgan Stanley received diligence materials from Puerto Rico indicating that the Commonwealth was insolvent and could not repay additional debts, including the 2014 GO Bonds. Barclays and Morgan Stanley knew that any underwriting fees or other payments it received from the proceeds of the 2014 GO Bonds were made to hinder, delay, or defraud the Commonwealth's other creditors.

233.    Barclays and Morgan Stanley encouraged these transfers anyway and received these transfers in bad faith. They encouraged Puerto Rico to scoop and toss its debt. They were lead underwriters or part of the selling syndicate for a myriad of other bonds issued by Puerto Rico and its instrumentalities. In addition to the 2014 GO Bonds, Morgan Stanley served as lead underwriter of the GO Series 2007A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, and GO Series 2011C Bonds, and as a syndicate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO Series 2011A, GO Series 2011, GO Series 2011D, GO Series 2011E, and GO Series 2012A Bonds, and as co-remarketing agent on the 2009 remarketing of the GO Series 2007A-4 Bonds. Barclays also served as lead underwriter of the GO Series 2011, GO Series

2011A, GO Series 2011C, GO Series 2011D, GO Series 2011E, and GO Series 2012A Bonds, and

as a syndicate underwriter of the PBA Series P, PBA Series Q, PBA Series S, PBA Series U, GO

Series 2007 A-4, GO Series 2009A, GO Series 2009B, GO Series 2009C, and GO Series 2012B

Bonds.

234.    Morgan Stanley Capital, an affiliate of a lead underwriter on the 2014 GO Bonds,

also knew that the transfers it received as termination payments out of the 2014 GO Bond proceeds

were fraudulent. By receiving payments from the proceeds of illegal bonds issued by its affiliate,

Morgan Stanley Capital knowingly took preference over Puerto Rico's other creditors.

235.    The fraudulent transfers that the Commonwealth made to Barclays, Citibank, Mor-

gan Stanley, and Morgan Stanley Capital, detailed on Exhibits 4, 12, 17, and 21, should be voided

and remitted to the Trust for the benefit of Puerto Rico's unsecured creditors.

**FOURTH CAUSE OF ACTION**
**11 U.S.C. §§ 548(a)(1)(B)**
**(against Barclays, Citibank, Morgan Stanley, and Morgan Stanley Capital)**

236.    The foregoing paragraphs are incorporated by reference.

237.    Section 548(a)(1)(B) of Title 11 of the United States Code prohibits constructively

fraudulent transfers where a debtor receives less than reasonably equivalent value in exchange for

a transfer or obligation and the debtor: (1) was insolvent on the date that such transfer was made,

or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (2)

was engaged in business or a transaction, or was about to engage in business or a transaction, for

which any property remaining with the debtor was an unreasonably small capital; (3) intended to

incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to

pay as such debts matured; or (4) made such transfer to or for the benefit of an insider, or incurred

such obligation to or for the benefit of an insider, under an employment contract and not in the

ordinary course of business.

238.    The Trustee can avoid payments fraudulently transferred under Section 548(a)(1)(B) by voiding any such transactions that took place within two years of the filing date of the bankruptcy petition.

239.    The two-year lookback period for claims under Section 548(a)(1)(B) should be equitably tolled to end on June 28, 2014, for the reasons stated in Paragraph 227, *supra*.

240.    Within the lookback period of June 28, 2012, to June 28, 2014, the Commonwealth made constructively fraudulent transfers to Barclays and Morgan Stanley as the lead underwriters of the 2014 GO Bonds, and to Morgan Stanley Capital as recipient of payments and fees paid from the 2014 GO Bond proceeds. The Commonwealth did not receive reasonably equivalent value for these transfers. The 2014 GO Bonds were void *ab initio*, making any obligations under those bonds valueless. Barclays and Morgan Stanley knowingly advanced a "scoop and toss" scheme, *see supra* ¶ 157, propping up the Commonwealth after it was insolvent, providing no value to the Commonwealth and rather harming it. Yet the Commonwealth intentionally diverted funds, in the form of underwriting fees and swap termination fees, to Barclays, Morgan Stanley, and Morgan Stanley Capital in connection with the 2014 GO Bonds to the disadvantage of other creditors. The Commonwealth knew that these transfers were fraudulent.

241.    On information and belief, the Commonwealth also paid interest and principal on bonds that Barclays and Morgan Stanley and/or their affiliates held with the Commonwealth from the proceeds of the 2014 GO Bonds.  Specific information about which Defendants received interest and principal payments from the proceeds of the bonds they underwrote, and in what amount, is in the unique knowledge of the Defendants.

242.    Because the 2014 GO Bonds were issued when the Commonwealth was insolvent, they should never have been issued and Barclays and Morgan Stanley should never have received

any fees for underwriting those bonds or interest payments from the proceeds of issuing the bonds, or any other payments from the proceeds of the 2014 GO Bonds. Morgan Stanley Capital should never have received termination fees out of the 2014 GO Bonds' proceeds. The 2014 GO Bonds did not benefit Puerto Rico because the issuances pushed it deeper into insolvency and exacerbated its financial crisis.

243.    The Commonwealth also made constructively fraudulent transfers to Citibank in connection with certain Swap Agreements between Citibank and the HTA. By paying swap termination fees to Citibank, the Commonwealth expended funds to cover an obligation for which it was not responsible. These swap termination fees were paid at a time when the Commonwealth was insolvent.

244.    The fraudulent transfers that the Commonwealth made to Barclays, Citibank, Morgan Stanley, and Morgan Stanley Capital, detailed on Exhibits 4, 12, 17, and 21, should be voided and remitted to the Trust for the benefit of Puerto Rico's unsecured creditors.

**FIFTH CAUSE OF ACTION**
**11 U.S.C. § 544(b)**
**(against all Defendants)**

245.    The foregoing paragraphs are incorporated by reference.

246.    Section 544(b) of Title 11 of the United States Code allows the Trustee to "avoid any transfer of an interest of the [Debtors] in property or any obligation incurred by the [Debtors] that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502 or that is not allowable only under Section 502(e)." *See In re Garrido Jimenez*, 370 B.R. 878, 881 (B.A.P. 1st Cir. 2007) ("The United States Court of Appeals for the First Circuit has previously stated that 11 U.S.C. § 544 invokes state law to determine the rights of the trustee under this section.").

78

247.    The Trustee may recover payments fraudulently transferred within the meaning of Section 544(b) by avoiding any such transactions that took place within the limitations period under "applicable law."

248.    The ten-year lookback period applicable to the IRS should apply here, running backwards from May 3, 2017, the date Puerto Rico filed its bankruptcy petition. On the petition date, the IRS was a creditor of the Commonwealth and held allowable and unsecured claims against the Commonwealth and the PBA, including (1) a claim against the Commonwealth, filed on June 28, 2018, for $2,483,293.07, in return of credit payments made to issue of qualified bonds; (2) a claim against the Commonwealth, filed on May 28, 2019, for $1,816,201.24 in tax credit to bondholders or interest payments to bondholders; (3) a claim against the PBA, filed on March 17, 2020, for $4,804,764.11 in tax credits to bondholders or interest payments to bondholders; (4) a claim against the PBA filed on January 28, 2021, for $18,328,054.88 in return of credit payments made to issuer of qualified bonds; and (5) claim against the PBA filed on March 30, 2021, for $1,401,547.02 in return of credit payments made to issuer of qualified bonds.

249.    Under 26 U.S.C. § 6502(a)(1), the IRS generally has ten years from the date of assessment to bring a claim to collect an unpaid tax. Under 26 U.S.C. § 6901(a), the IRS may collect from transferees of the taxpayer "subject to the same limitations" applicable to collection from the taxpayer. The IRS thus has ten years from the date of assessment to pursue an avoidance action. Under Section 544(b)(1), the Trustee may step into the shoes of the IRS and invoke the applicable law that the IRS could use outside of bankruptcy to commence a fraudulent transfer action. The Trustee thus may avoid fraudulent transfers that took place between May 3, 2007, and May 3, 2017, when the FOMB filed a PROMESA petition on behalf of the Commonwealth.

250.     New York law applies to the Trustee's Section 544(b) avoidance claims against the Defendants based in New York or, upon information and belief, those Defendants whose relevant activity took place in New York, including all the Defendants except for UBS PR.

251.     N.Y. DCL Section 276 provides: "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." Actual intent to defraud may be demonstrated by "badges of fraud," including but not limited to: (1) a close relationship between the parties to the transfer; (2) inadequacy of the consideration; (3) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (4) the transferor's retention of control of the property after the transfer; (5) the fact that the transferred property was the only asset sufficient to pay the transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or course of conduct by the transferor after it incurred its obligation to the creditor.

252.     N.Y. DCL Section 275 provides: "Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors."

253.     Within the applicable lookback period of May 3, 2007, to May 3, 2017, the Issuers intentionally and fraudulently transferred funds to the Underwriter Defendants and Swap Defendants in connection with the Illegal Bonds, in violation of New York law. When the Issuers issued the Illegal Bonds, they knew that they were insolvent, and that the Illegal Bonds were beyond their ability to repay as those debts matured. The Issuers also knew that (1) the ERS Bonds were issued

without legal authority, (2) the Excessive Debt Bonds exceeded the Constitutional Debt Limit, and (3) the Scoop and Toss Bonds were part of a scheme that violated the Public Funds Clause.

254. The transfers should be avoided because they were replete with badges of fraud, such as:

a. ***Debtors' insolvency***. The Commonwealth was insolvent when the transfers sought to be avoided were made and continued to pay the Underwriter Defendants to secure additional financing as its insolvency deepened.

b. ***Debtors' relationship of kinship, closeness, or trust with Defendants.*** The GDB was Puerto Rico's and its instrumentalities' fiscal agent and oversaw and approved the issuance of bonds and entry into the Swap Agreements. A close relationship existed between certain of the Underwriter Defendants and the GDB whereby employees moving from banks such as Santander into and out of high-level positions at the GDB, then hired those banks to underwrite various bonds, *see supra* Part XII.

c. ***Degree of control exercised by Defendants.*** The GDB had high turnover, low institutional memory (including poor record-keeping), and increasingly did not fully understand the bonds it was issuing or the Swap Agreements it had entered. The GDB thus had to rely on the Defendants to provide the liquidity, expertise, and complex structuring of instruments that it needed. The Defendants used this close relationship to manipulate the GDB and Puerto Rico into "scoop and toss" refinancing arrangements whereby Puerto Rico used proceeds from the bonds underwritten by Defendants to pay off bonds held by the Underwriter Defendants, and swap termination fees owed to, several of those Swap Defendants.

d. ***The transfers sought to be avoided were made pursuant to illegal contracts.*** The ERS Bonds were illegal because the ERS lacked the authority to issue them. The Excessive Debt Bonds and the Scoop and Toss Bonds were illegal because they were issued in violation of the Constitutional Debt Limit and/or they violated the public order. The swap termination fees paid by Puerto Rico and its instrumentalities violated the public order.

e. ***Underwriter Defendants knew Debtors were bound to default.*** As the underwriters of Puerto Rico's debt, the Underwriter Defendants (and those Swap Defendants who also underwrote bonds) obtained highly detailed information from Puerto Rico and its agencies that were issuing bonds and/or using their proceeds, and therefore had a very clear picture of Puerto Rico's financial state. These Defendants pushed Puerto Rico to issue additional debt, which they used to benefit themselves, knowing Puerto Rico was bound to default and the remaining creditors would not be paid.

255.     Several Underwriter Defendants also received repayment of interest and principal on bonds they held with the Commonwealth and its agencies from the proceeds of bonds they underwrote. These transfers bear the same badges of fraud as the underwriting fees, were paid while the Commonwealth was insolvent, and were made with the intent to hinder, delay, or defraud creditors. Specific information about which Underwriter Defendants received such payments from the proceeds of the bonds they underwrote, and in what amount, is in the unique knowledge of the Defendants.

256.     Several Swap Defendants were affiliated with lead Underwriter Defendants on illegal bond issuances and received termination payments from the proceeds of those illegal bonds. These transfers bear the same badges of fraud as the underwriting fees, were paid while the Commonwealth was insolvent, and were made with the intent to hinder, delay, or defraud creditors. The Swap Defendants who benefitted from bond issuances underwritten by their affiliates knew they were receiving proceeds from illegal bonds and taking preference over Puerto Rico's other creditors. And Puerto Rico intentionally transferred termination fees to these Swap Defendants, using illegal bond proceeds and knowing that it would hinder and defraud Puerto Rico's other creditors.

257.     N.Y. DCL Section 273 provides: "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration." Under N.Y. DCL Section 277(1), a "person is insolvent when the present fair salable value of [its] assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured."

258.     Within the applicable lookback period of May 3, 2007, to May 3, 2017, the Issuers made constructively fraudulent transfers to the Underwriter Defendants and affiliated Swap Defendants in connection with the Scoop and Toss Bonds, in violation of New York law. When the Issuers issued the Scoop and Toss Bonds, they were insolvent. The Issuers did not receive fair consideration in exchange for transfers connected to the Scoop and Toss Bonds because those bonds were void *ab initio*, making any obligations under them valueless. The Underwriter Defendants and affiliated Swap Defendants knowingly advanced and benefited from a "scoop and toss" scheme, *see supra* Part VII, propping up Puerto Rico after it was insolvent, providing no value to Puerto Rico and rather harming it. Yet the Issuers intentionally diverted funds to the Underwriter Defendants and Swap Defendants in connection with the Scoop and Toss Bonds to the disadvantage of other creditors. The Issuers and the Underwriter Defendants could not have consummated the fraudulent transfers in good faith, and the affiliated Swap Defendants could not have received termination fees from these issuances in good faith.

259.     Puerto Rico law applies to the Trustee's avoidance claims against the Underwriting Defendants based in Puerto Rico: UBS PR and, alternatively, to all Defendants.

260.     Puerto Rico's Civil Code provides that contracts "Executed in fraud of creditors" may be rescinded. 31 L.P.R.A. § 3492(3). To bring a rescission claim, a plaintiff must allege: (1) the plaintiff is a creditor of the debtor; (2) the debtor alienated property in fraud of the plaintiff; (3) the plaintiff was injured by such alienation; and (4) the plaintiff has no other remedy to recover its credit. "In evaluating the potential existence of fraud, the following elements must be considered: Haste in the alienation, the debtor's insolvency, the relationship of kinship, closeness or trust with the acquirer, the state of the business of the conveyor owner and of the judicial claims against him." *U.S. Fidelity and Guar. Co. v. Guzman*, 2012 WL 4790314, at *6 (D.P.R. Sept. 20, 2012).

261.     Under Puerto Rico law, fraud "does not require that the debtor intended to harm his creditors, it merely requires that he knew of the results of his action, *i.e.,* insolvency." *In re Sepulveda Figueras*, 193 B.R. 118, 120 (Bankr. D.P.R. 1996) (citing *De Jesus Diaz v. Carrero*, 1982 WL 210626, 112 P.R.R. 789, 796 (1982)). In addition, "[c]ontracts by virtue of which the debtor alienates property, for [inadequate] consideration, are presumed to be executed in fraud of creditors." 31 L.P.R.A. § 3498.

262.     The Underwriter Defendants and affiliated Swap Defendants knowingly advanced a "scoop and toss" scheme, *see supra* Part VII, propping up Puerto Rico after the Commonwealth had become insolvent, providing no value to the Commonwealth and rather harming it. The Issuers' transfers to the Underwriter Defendants and their affiliated Swap Defendants in connection with the Scoop and Toss Bonds were fraudulent under Puerto Rico law. When the Issuers issued the Scoop and Toss Bonds, they knew that they were insolvent. The Issuers also knew that (1) the Excessive Debt Bonds exceeded the Constitutional Debt Limit; and (2) the Scoop and Toss Bonds were part of a scheme that violated the Public Funds Clause. Yet the Issuers intentionally diverted funds to the Underwriter Defendants and affiliated Swap Defendants in connection with the Scoop and Toss Bonds to the disadvantage of other creditors. The Issuers knew that these transfers were fraudulent and that they would deepen its insolvency. These transfers harmed the Issuers' unsecured creditors, who have no legal remedy against the Underwriter Defendants or Swap Defendants other than claims brought by the Trustee in this action.

263.     The fraudulent transfers that the Issuers made to the Underwriter Defendants and Swap Defendants, detailed on Exhibits 4–23, should be voided and remitted to the Trustee for the benefit of Puerto Rico's unsecured creditors.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief as follows:

A.      Award the Trustee all payments and fees paid to the Swap Defendants under the Swap Agreements;

B.      Award the Trustee all payments and fees paid to the Defendants in connection with the ERS Bonds, the Excessive Debt Bonds, and the Scoop and Toss Bonds;

C.      Avoid all fraudulent transfers to the Underwriter Defendants;

D.      Award the Trustee prejudgment interest;

E.      Award the Trustee disgorgement of all fees and profits the Underwriter Defendants earned from marketing and selling the Illegal Bonds;

F.      Award the Trustee all attorneys' fees and costs incurred in bringing this action; and

G.      Award the Trustee other relief that the Court deems just and proper.

Dated:    San Juan, Puerto Rico                Respectfully submitted,
          September 15, 2022
                                               CASILLAS, SANTIAGO & TORRES, LLC


                                         By:   /s/          *Juan J. Casillas*
                                               CASILLAS, SANTIAGO & TORRES, LLC
                                               Juan J. Casillas Ayala USDC – PR 218312
                                               Luis F. Llach Zúñiga USDC – PR 2231112
                                               El Caribe Office Building
                                               53 Palmeras Street, Suite 1601
                                               San Juan, Puerto Rico 00901-2419
                                               (787) 523-3434
                                               jcasillas@cstlawpr.com
                                               lllach@cstlawpr.com

                                               SELENDY GAY ELSBERG PLLC
                                               Maria Ginzburg *(Pro Hac Vice)*
                                               Andrew R. Dunlap *(Pro Hac Vice)*
                                               David S. Flugman *(Pro Hac Vice)*
                                               1290 Avenue of the Americas
                                               New York, New York 10104
                                               (212) 390-9000
                                               mginzburg@selendygay.com
                                               adunlap@selendygay.com
                                               dflugman@selendygay.com

                                               CONTINENTAL PLLC
                                               John Arrastia (*Pro Hac Vice*)
                                               Jesus Suarez (*Pro Hac Vice*)
                                               Angelo Castaldi (*Pro Hac Vice*)
                                               255 Alhambra Circle, Suite 640
                                               Coral Gables, Florida 33134
                                               (305) 677-2707
                                               jarrastia@continentalpllc.com
                                               jsuarez@continentalpllc.com
                                               Acastaldi@continentalpll.com


                                               *Attorneys for Plaintiff Drivetrain, L.L.C., in its*
                                               *capacity as the Trustee of the Commonwealth*
                                               *Avoidance Actions Trust*