# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,
as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,
Debtors.[1]

_____

DRIVETRAIN, LLC, in its capacity as the Trustee of the
Commonwealth Avoidance Actions Trust,
Plaintiff,

v.

BARCLAYS CAPITAL, INC. *et al.*,
Defendants.

PROMESA
Title III

Case No. 17-BK-3283 (LTS)

(Jointly Administered)

Adv. Proc. No. 19-280 (LTS)

## JOINT MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS WITH PREJUDICE

---

[1] The debtors in these Title III Cases, along with each debtor's respective Title III case number and the last four (4) digits of each debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747); and (vi) Puerto Rico Public Buildings Authority ("PBA") (Bankruptcy Case No. 19-BK-5523- LTS) (Last Four Digits of Federal Tax ID: 3801) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .................................................................................. iv

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................. 8

    I.      PUERTO RICO AND ITS FISCAL AFFAIRS ...................................... 8

    II.     PUERTO RICO'S EFFORTS TO STAVE OFF A FINANCIAL CRISIS ............ 9

          A.     Partially Funding Government Services Through Bond Issuances ............ 9

          B.     Refinancing Strategy .......................................................... 10

          C.     Bonds Issued In Furtherance Of The Refinancing Strategy ...................... 11

          D.     The ERS Bonds .................................................................. 12

          E.     The Swap Agreements .......................................................... 13

    III.    THE GDB'S ROLE IN SUPPOSEDLY FOSTERING PUERTO RICO'S
         FISCAL CRISIS .................................................................. 15

    IV.    COMMENCEMENT OF PUERTO RICO'S TITLE III CASES ......................... 16

PROCEDURAL HISTORY .................................................................... 16

    I.      THE SCC FILES THE ADVERSARY PROCEEDING ....................................... 16

STANDARD OF REVIEW ...................................................................... 17

ARGUMENT ....................................................................................... 18

    I.      THE TRANSFERS THE TRUSTEE SEEKS TO AVOID IN COUNTS
         IV-V ARE PROTECTED BY THE BANKRUPTCY CODE'S SAFE
         HARBORS .......................................................................... 18

          A.     Section 546(e) Bars The Claims In Counts IV-V Seeking To Avoid
              Underwriting Fees And Principal And Interest Payments ......................... 19

          B.     Section 546(g) Bars The Claims In Counts IV-V Seeking To Avoid
              Swap Payments .................................................................. 25

    II.     THE PUERTO RICO LAW CLAIMS (COUNTS I-II) SHOULD BE
         DISMISSED BECAUSE THEY ARE PREEMPTED BY SECTION 546
         OF THE BANKRUPTCY CODE .................................................... 26

III.   COUNTS III-IV SHOULD BE DISMISSED BECAUSE ALL OF THE
       CHALLENGED TRANSFERS OCCURRED MORE THAN TWO
       YEARS BEFORE DEBTORS' FILED THEIR TITLE III PETITIONS .............29

       A.   The Trustee Fails To Allege Any Transfers Within The Two-Year
            Lookback Period .................................................................................29

       B.   Section 548 Is A Statute Of Repose That Cannot Be Tolled ....................30

       C.   Even If Tolling Could Apply, The Trustee  Fails To Allege Any
            Plausible Basis To Do So Here .................................................................31

IV.    COUNTS III-V SHOULD BE DISMISSED BECAUSE THE TRUSTEE
       FAILED TO ALLEGE ADEQUATELY THAT ANY OF THE
       CHALLENGED TRANSFERS WERE FRAUDULENT ....................................32

       A.   The Trustee Fails To Plead Adequately Its Intentional Fraudulent
            Transfer Claims ........................................................................................32

       B.   The Trustee Fails To Allege That The Debtors Made The
            Challenged Transfers With The Actual Intent To Defraud Their
            Creditors ...................................................................................................33

       C.   The Constructive Fraudulent Transfer Claims In Counts IV-V
            Should Be Dismissed Because They Fail To Allege That The
            Debtors Did Not Receive Reasonably Equivalent Value .........................41

       D.   The Claims Under Puerto Rico's Fraudulent Transfer Law Should
            Be Dismissed For Substantially The Same Reasons As Under
            Federal and New York Law ......................................................................45

V.     COUNTS I-II SHOULD BE DISMISSED BECAUSE THE
       RECOVERIES THE TRUSTEE SEEKS ARE BARRED BY PUERTO
       RICO LAW ......................................................................................................46

       A.   Section 97(d) Bars Count I .......................................................................47

       B.   Puerto Rico Law Precludes The Recovery Of Funds Transferred
            Under Void Or Illegal Contracts When Both Parties Are Allegedly
            At Fault .....................................................................................................49

       C.   Unjust Enrichment Is Unavailable As A Remedy For Counts I-II ...........51

VI.    COUNT II SHOULD BE DISMISSED BECAUSE THE CHALLENGED
       BONDS WERE LAWFULLY ISSUED ...........................................................55

       A.   The SAC's Challenge To The Refinancing Bonds Is Meritless ...............56

B.      The Commonwealth Did Not Exceed The Constitutional Debt
Limit ........................................................................................... 58

C.      The ERS Was Authorized To Issue The ERS Bonds ............................... 69

VII.   ALMOST ALL OF THE CLAIMS ASSERTED IN COUNTS I, II, AND
V ARE TIME-BARRED ............................................................................ 78

A.      Nearly All Of The Claims Asserted In Counts I And II Are
Untimely ................................................................................... 78

B.      The Majority Of The Claims Asserted In Count V Are Time-
Barred ........................................................................................ 80

VIII.  THE COURT SHOULD DISMISS THE SAC WITH PREJUDICE ................... 88

CONCLUSION ............................................................................................ 88

## <u>TABLE OF AUTHORITIES</u>

Page(s)

### CASES

*A&M Global Management Corp. v. Northtown Urology Associates, P.C.*,
    115 A.D.3d 1283 (4th Dep't 2014) .................................................................36

*In re Abell*,
    549 B.R. 631 (Bankr. D. Md. 2016) ................................................29, 30, 31

*Alco Corp. v. Municipio de Toa Alta*,
    183 P.R. Dec. 530 (2011) ................................................................................48

*Alden v. Maine*,
    527 U.S. 706 (1999) ........................................................................................64

*In re Allou Distributors, Inc.*,
    392 B.R. 24 (Bankr. E.D.N.Y. 2008) .............................................................86

*In re American Home Mortgage Holdings, Inc.*,
    388 B.R. 69 (Bankr. D. Del. 2008) .................................................................24

*AP Services LLP v. Silva*,
    483 B.R. 63 (S.D.N.Y. 2012) .........................................................................28

*Aponte Rosario v. Presidente de la Comisión Estatal de Elecciones*,
    205 P.R. Dec. 407, 105 P.R. Offic. Trans. 17 (2020) ..............................56, 58

*In re AppliedTheory Corp.*,
    323 B.R. 838 (Bankr. S.D.N.Y. 2005), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005) .................41

*Arrieta Gimenez v. Arrieta Negron*,
    672 F. Supp. 46 (D.P.R. 1987) .......................................................................79

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................17

*Atlanta Shipping Corp., Inc. v. Chemical Bank*,
    818 F.2d 240 (2d Cir. 1987) ......................................................................41, 42

*Auer v. Robbins*,
    519 U.S. 452 (1997) ........................................................................................66

*Autoridad de Energía Eléctrica v. Partido Nuevo Progresista*,
    128 P.R. Dec. 294 (1991) ................................................................................57

*In re Baker & Getty Financial Services, Inc.*,
      106 F.3d 1255 (6th Cir. 1997) ...................................................................23

*Beddall v. State Street Bank & Trust Co.*,
      137 F.3d 12 (1st Cir. 1998)..........................................................8, 9, 10

*Bell Atlantic Corp. v. Twombly*,
      550 U.S. 544 (2007)..........................................................................17

*Benton, Benton & Benton v. La. Public Facilities Authority*,
      897 F.2d 198 (5th Cir. 1990) ............................................................71

*In re Bernard L. Madoff Investment Securities LLC*,
      773 F.3d 411 (2d Cir. 2014)..............................................................20

*Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*,
      563 U.S. 776 (2011).........................................................................86

*In re Bob's Sea Ray Boats, Inc.*,
      144 B.R. 451 (Bankr. D.N.D. 1992) ...................................................37

*In re Boston Generating LLC*,
      617 B.R. 442 (Bankr. S.D.N.Y. 202*0), aff'd sub nom. Holliday v. Credit Suisse
      Securities (USA) LLC*, 20-CV-5404 (GBD), 2021 WL 4150523 (S.D.N.Y.
      Sept. 13, 2021) .....................................................................20, 22, 27, 28

*Boston Trading Group, Inc. v. Burnazos*,
      835 F.2d 1504 (1st Cir. 1987) ................................................. *passim*

*Bostock v. Clayton County, Ga.*,
      140 S. Ct. 1731 (2020)......................................................................77

*Brandon v. Musoff*,
      No. 10-cv-9017(KBF), 2012 WL 135592 (S.D.N.Y. Jan. 17, 2012)................88

*Briggs v. Greenville County*,
      135 S.E. 153 (S.C. 1926) ..................................................................67

*In re Brooke Corp.*,
      485 B.R. 650 (Bankr. D. Kan. 2013) ..................................................85

*Caribbean Insurance Services, Inc. v. American Bankers Life Assurance Co. of Fla.*,
      754 F.2d 2 (1st Cir. 1985)..................................................................51

*Cecort Realty Development Inc. v. Llompart-Zeno*,
      100 F. Supp. 3d 145 (D.P.R. 2015).....................................................57

v

*In re Churchill Mortgage Investment Corp.*,
    256 B.R. 664 (Bankr. S.D.N.Y. 2000) ................................................................43, 44, 45

*City of Brenham v. German American Bank*,
    144 U.S. 549 (1892)........................................................................................................78

*City of Brenham v. German-American Bank*,
    144 U.S. 173 (1892), *judgment vacated on rehearing*, 144 U.S. 549 (1892).............76, 77

*City of Eau Claire v. Eau Claire Water Co.*,
    119 N.W. 555 (Wis. 1909)...............................................................................................67

*City of Hartford v. Kirley*,
    493 N.W.2d 45 (Wis. 1992)..............................................................................................68

*City of Jackson v. First National Bank of Jackson*,
    157 S.W.2d 321 (Ky. 1941) .............................................................................................67

*City of Miami Fire Fighters' & Police Officers' Retirement Trust v. CVS Health Corp.*,
    46 F.4th 22 (1st Cir. 2022)..........................................................................................8, 10

*CLC Creditors' Grantor Trust v. Howard Savings Bank*,
    396 B.R. 730 (Bankr. N.D. Ill. 2008) .............................................................................36

*Colón Colón v. Municipio Arecibo*,
    170 P.R. Dec. 718, 70 P.R. Offic. Trans. 45 (2007) ........................................................49

*Commonwealth v. Crespo Torres*,
    180 P.R. Dec. 776 (2011)…………………………………………………………………..80

*In re Comprehensive Power, Inc.*,
    578 B.R. 14 (Bankr. D. Mass. 2017) ...............................................................................33

*Connolly Geaney Ablitt & Willard, PC*,
    614 B.R. 133 (B.A.P. 1st Cir. 2020) ...............................................................................41

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000)........................................................................................................26

*CTS Corp. v. Waldburger*,
    573 U.S. 1 (2014)............................................................................................................30

*Cutler v. Board of Education of Beaver County School District*,
    192 P. 621 (Utah 1920)...................................................................................................67

*Dantzer, Inc. v. Sucesión de José A. Meléndez Castro*,
    No. FAC2008-2014, 2019 WL 4039824 (P.R. Cir. May 31, 2019) ..................................46

*In re DBSI, Inc.*,
    869 F.3d 1004 (9th Cir. 2017) ........................................................................84

*De Aragon v. Chase Manhattan Bank*,
    457 F.2d 263 (1st Cir. 1972) ...........................................................................42

*De Jesús González v. Autoridad de Carreteras*,
    148 P.R. Dec. 255 (1999)...........................................................................56, 57

*DiVittorio v. Equidyne Extractive Industries, Inc.*,
    822 F.2d 1242 (2d Cir. 1987)......................................................................33, 38

*Dole v. Local 427, International Union of Electrical Workers*,
    894 F.2d 607 (3d Cir. 1990).............................................................................84

*Dopp v. HTP Corp.*,
    947 F.2d 506 (1st Cir. 1991) ...........................................................................80

*Eagerton v. Second Economic Development Co-op. District of Lowndes County*,
    909 So. 2d 783 (Ala. 2005) ..............................................................................68

*In re Editorial Flash, Inc.*,
    No. 13-08014 BKT, 2016 WL 3638471 (Bankr. D.P.R. June 29, 2016)...........................32

*In re El Mundo Corp.*,
    208 B.R. 781 (D.P.R. 1997)..............................................................................39

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
    651 F.3d 329 (2d Cir. 2011)...................................................................20, 21, 22

*Farrar v. Britton Independent School District of Marshall County*,
    32 N.W.2d 627 (S.D. 1948) ..............................................................................67

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012)........................................................................................55

*FDIC v. Elio*,
    39 F.3d 1239 (1st Cir. 1994) ............................................................................38

*FDIC v. Martinez Almodovar*,
    671 F. Supp. 851 (D.P.R. 1987)....................................................................45, 82

*In re Fedders North America, Inc.*,
    405 B.R. 527 (Bankr. D. Del. 2009) .........................................................36, 39, 40

*In re Fidelity Erisa Fee Litigation*,
    990 F.3d 50 (1st Cir. 2021).............................................................................8, 9

*In re Financial Federated Title & Trust, Inc.*,
309 F.3d 1325 (11th Cir. 2002) ...................................................................45

*In re Financial Oversight & Management Board for Puerto Rico*,
578 F. Supp. 3d 267 (D.P.R. 2021), *aff'd*, 54 F.4th 42 (1st Cir. 2022) ...............52, 53

*In re Financial Oversight & Management. Board for Puerto Rico*,
637 B.R. 223 (D.P.R. 2022)...........................................................................8

*In re Financial Oversight and Management Board for Puerto Rico*,
636 B.R. 1 (D.P.R. 2022)...............................................................................17

*First American National Bank-E. v. FDIC*,
782 F.2d 633 (6th Cir. 1986) .......................................................................67

*Fisher v. Offerman & Co., Inc.*,
No. 95-CV-2566 (JGK), 1996 WL 563141 (S.D.N.Y. Oct. 2, 1996)................37

*Food Marketing Institute v. Argus Leader Media*,
139 S. Ct. 2356 (2019)..................................................................................76

*Forrest City v. Bank of Forrest City*,
172 S.W. 1148 (Ark. 1915)............................................................................78

*Frank Sawyer Trust of May 1992 v. Commissioner.*,
712 F.3d 597 (1st Cir. 2013)..........................................................................44

*Freeland v. Enodis Corp.*,
540 F.3d 721 (7th Cir. 2008) .........................................................................42

*Fults v. City of Coralville*,
666 N.W.2d 548 (Iowa 2003) .........................................................................68

*Garcia Zaragoza v. Garcia Ortiz*,
83 P.R. Dec. 594, 1961 WL 13785 (P.R. Sept. 29, 1961) ................................46

*Gray & Associates, LLC v. Speltz & Weis LLC*,
22 Misc. 3d 1124(A), 2009 N.Y. Slip Op. 50275(U) (Sup. Ct. 2009).............37

*In re Greater Southeastern Community Hospital Corp. I*,
365 B.R. 293 (Bankr. D. D.C. 2006) ............................................................83

*Gross v. Summa Four, Inc.*,
93 F.3d 987 (1st Cir. 1996)............................................................................33

*In re GSE Bonds Antitrust Litigation*,
396 F. Supp. 3d 354 (S.D.N.Y. 2019)............................................................43

*In re Hechinger Investment Co. of Del.*,
    274 B.R. 71 (D. Del. 2002) ................................................................27

*In re Hedged-Investments Associates, Inc.*,
    84 F.3d 1286 (10th Cir. 1996) ..........................................................42

*Hendricks v. School District No. 1*,
    10 P.2d 970 (Wyo. 1932) ...................................................................67

*Herman v. Fabri-Centers of America, Inc.*,
    308 F.3d 580 (6th Cir. 2002) .............................................................67

*In re Indrescom Security Technology Inc.*,
    559 B.R. 305 (Bankr. D.P.R. 2016) .............................................34, 36

*Iravedra v. Public Building Authority*,
    196 F. Supp. 2d 104 (D.P.R. 2002) ............................................65, 66

*In re Kaiser Steel Corp.*,
    952 F.2d 1230 (10th Cir. 1991) .........................................................23

*Katz v. Liberty Power Corp.*, LLC,
    No. 18-CV-10506 (ADB), 2019 WL 4645524 (D. Mass. Sept. 24, 2019) .......................17

*Keel v. Pulte*,
    10 S.W.2d 694 (Tex. Comm'n App. 1928) .......................................78

*In re Kittery Point Partners, LLC*,
    No. 17-20316, 2018 WL 1613573 (Bankr. D. Me. Mar. 12, 2018) ..................86

*In re Knight*,
    473 B.R. 847 (Bankr. N.D. Ga. 2012) ...............................................43

*Las Marías Reference Lab. Corp.v. Municipio San Juan*,
    159 P.R. Dec. 868 (2003)...................................................................47

*In re Lancelot Investors Fund, L.P.*,
    467 B.R. 643 (Bankr. N.D. Ill. 2012), *aff'd sub nom. Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013) ....................................................25

*In re Lehman Bros. Holdings Inc.*,
    469 B.R. 415 (Bankr. S.D.N.Y. 2012) ..............................................25

*Lugo Ortiz v. Municipio Guayama*,
    163 P.R. Dec. 208, 63 P.R. Offic. Trans. 19 (P.R. Oct. 29, 2004) .......................48, 49, 54

*In re M. Fabrikant & Sons, Inc.*,
    394 B.R. 721 (Bankr. S.D.N.Y. 2008) ..............................................33

*Mandala v. NTT Data, Inc.*,
   975 F.3d 202 (2d Cir. 2020)..................................................................................43

*Marina v. Comision*,
   170 P.R. Dec. 847 .................................................................................................57

*In re MarketXT Holdings Corp.*,
   361 B.R. 369, 396-97 (Bankr. S.D.N.Y. 2007)....................................................36

*Max Sugarman Funeral Home, Inc. v. A.D.B. Investors*,
   926 F.2d 1248 (1st Cir. 1991).........................................................................34, 39

*In re Miles*,
   430 F.3d 1083 (9th Cir. 2005) ..............................................................................27

*Millán Soto v. Caribe Motors Corp.*,
   83 P.R.R. 474, 1961 WL 13796 (P.R. Sept. 19, 1961) .......................................79

*In re National Gas Distributors, LLC*,
   556 F.3d 247 (4th Cir. 2009) ................................................................................26

*In re Nine West LBO Securities Litigation*,
   482 F. Supp. 3d 187 (S.D.N.Y 2020).......................................................... *passim*

*In re NM Holdings Co., LLC*,
   407 B.R. 232 (Bankr. E.D. Mich. 2009) ...............................................................32

*In re Old CarCo LLC*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010)..............................................................34, 39

*Ortiz Andújar v. Commonwealth of Puerto Rico*,
   122 P.R. Dec. 817, 22 P.R. Offic. Trans. 774 (1988) ..........................................53

*Pacific Improvement Co. v. City of Clarksdale*,
   74 F. 528 (5th Cir. 1896) ......................................................................................78

*Partido Independentista Puertorriqueño v. Comisión Estatal de Elecciones y Otros*,
   120 P.R. Dec. 580, 20 P.R. Offic. Trans. 607 (1988) ..........................................56

*Partido Popular Democrático v. Rosselló González*,
   139 P.R. Dec. 643 (1995).....................................................................................55

*In re Pitt Penn Holding Co., Inc.*,
   No. 09-CV-11475 (BLS), 2012 WL 204095 (Bankr. D. Del. Jan. 24, 2012)..................30

*Police Jury of Parish of Tensas v. Britton*,
   82 U.S. 566 (1872)................................................................................................77

*Port of Palm Beach District v. Goethals*,
   104 F.2d 706 (5th Cir. 1939) .........................................................................78

*In re PSN USA, Inc.*,
   615 F. App'x 925 (11th Cir. 2015) ...............................................................42

*Puerto Rico v. Sánchez Valle*,
   579 U.S. 59 (2016)..........................................................................................63

*Ray v. Ray*,
   108 A.D.3d 449 (1st Dep't 2013) ..................................................................38

*Ray v. Ray*,
   799 F. App'x 29 (2d Cir. 2020) .....................................................................32

*Rivera Torres v. Junta de Retiro para Maestros*,
   502 F. Supp. 2d 242 (D.P.R. 2007)..........................................................68, 70

*Rodríguez v. American Airlines, Inc.*,
   886 F. Supp. 967 (D.P.R. 1995)....................................................................81

*Rodríguez-Miranda v. Benin*,
   829 F.3d 29 (1st Cir. 2016) ...........................................................................81

*Rodríguez Ramos v. E.L.A.*,
   190 P.R. Dec. 448 (2014)...............................................................................57

*Rodríguez Torres v. Autoridad de Edificios Públicos*,
   141 P.R. Dec. 362, 370 (1996).......................................................................65

*Rubin v. Manufacturers Hanover Trust Co.*,
   661 F.2d 979 (2d Cir. 1981)...........................................................................43

*Rubio Sacarello v. Roig*,
   84 P.R. Dec. 344 (1962).................................................................................50

*Ruiz v. Ambush*,
   25 F. Supp. 3d 211 (D.P.R. 2014)..................................................................78

*Russell v. Middletown City School District*,
   125 A. 641 (Conn. 1924) ...............................................................................75

*Russello v. United States*,
   464 U.S. 16 (1983)..........................................................................................70

*S & M Heating Corp. v. Macaluso*,
   37 Misc. 3d 1231(A), 2012 N.Y. Slip Op. 52256(U) (Sup. Ct. 2012)..............38

*In re Samson Resources Corp.*,
    625 B.R. 291 (Bankr. D. Del. 2020) ............................................................25

*Sánchez Rodríguez v. López Jimenez,*
    116 P.R. Dec. 172, 16 P.R. Offic. Trans. 214 (P.R. Mar. 11, 1985)................................50

*In re Sandburg Mall Realty Management LLC*,
    563 B.R. 875 (Bankr. C.D. Ill. 2017)........................................................29, 30

*Securities Investor Protection Corp. v. Bernard L. Madoff Investment Securities LLC,*
    476 B.R. 715 (S.D.N.Y. 2012), *aff'd sub nom. In re Bernard L. Madoff Investment
    Securities LLC*, 773 F.3d 411 (2d Cir. 2014)..................................................23

*In re Sharp International Corp.*,
    403 F.3d 43 (2d Cir. 2005)..........................................................36, 41, 82

*Shelley v. Trafalgar House Public Ltd.*,
    918 F. Supp. 515 (D.P.R. 1996).......................................................81

*Shelly v. Doe*,
    249 A.D.2d 756 (3d Dep't 1998) ..................................................39

*Smith v. Town of Guin*,
    155 So. 865 (Ala. 1934)............................................................68

*Soto-Padró v. Public Buildings Authority*,
    675 F.3d 1 (1st Cir. 2012)..........................................................66

*In re Stewart Finance Co.*,
    367 B.R. 909 (Bankr. M.D. Ga. 2007).............................................23

*In re Sun Edison Inc.*,
    620 B.R. 505 (Bankr. S.D.N.Y. 2020)..........................................18, 24

*In re Taylor, Bean & Whitaker Mortgage Corp.*,
    Nos. 09-bk-07047 (JAF), et al., 2018 WL 6721987 (Bankr. M.D. Fla. Sept. 28,
    2018) ...............................................................................87

*TC Investments Corp. v. Becker*,
    733 F. Supp. 2d 266 (D.P.R. 2010)..............................................81

*Thao v. LH Housing, LLC*,
    No. 21-CV-00240 (JDL), 2022 WL 3227130 (D. Me. Aug. 10, 2022)...........................17

*Transystems Corp. v. Autoridad de los Puertos de Puerto Rico*,
    No. KCD2004-0487(807), 2009 WL 5736703 (P.R. Cir. Oct. 30, 2009)...................50, 53

*In re Tribune Co. Fraudulent Conveyance Litigation*,
No. 12-CV-2652 (DLC), 2019 WL 1771786 (S.D.N.Y. Apr. 23, 2019), *aff'd*, 10
F.4th 147 (2d Cir. 2021) .................................................................................18, 21, 88

*In re Tribune Co. Fraudulent Conveyance Litigation*,
10 F.4th 147 (2d Cir. 2021) .................................................................................41, 42

*In re Tribune Co. Fraudulent Conveyance Litigation*,
946 F.3d 66 (2d Cir. 2019)...................................................................................18, 21, 27

*U.S. Bank National Ass'n v. Barclays Bank PLC*,
No. 11-CV-9199 (WHP), 2013 WL 1180414 (S.D.N.Y. Mar. 12, 2013) .......................67

*In re U.S. Mortgage Corp.*,
492 B.R. 784 (Bankr. D.N.J. 2013) .................................................................22, 23, 27

*U.S.I. Properties Corp. v. M.D. Construction Co.*,
860 F.2d 1 (1st Cir. 1988)...................................................................................74, 75

*University of P.R. v. Bonafide Union of Officers of the University of P.R.*,
206 P.R. Dec. 140 (2021)...................................................................................77

*Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A.*,
191 A.D.2d 86 (1st Dep't 1993) .........................................................................40

*In re United Energy*,
944 F.2d 589 (9th Cir. 1991) ...........................................................................42

*United States v. Beebe*,
127 U.S. 338 (1888)...........................................................................................84

*United States v. Marston*,
694 F.3d 131 (1st Cir. 2012)...........................................................................42

*United States v. Summerlin*,
310 U.S. 414 (1940).........................................................................................83

*United States ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016)...........................................................................65

*United Surety & Indemnity Co. v. López-Muñoz*,
553 B.R. 179 (B.A.P. 1st Cir. 2016) ...............................................................45, 46

*In re Vaughan Co.*,
498 B.R. 297 (Bankr. D.N.M. 2013) ...............................................................84, 85

*Vélez v. Superior Court of P.R.*,
75 P.R. Dec. 585 (1953)...................................................................................64

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ........................................................................65

*In re Webster*,
  629 B.R. 654 (Bankr. N.D. Ga. 2021) ......................................................87

*Westernbank P.R. v. Kachkar*,
  No. 07-1606 (ADC), 2010 WL 11545590 (D.P.R. Sept. 27, 2010) ................81

*Whyte v. Barclays Bank PLC*,
  494 B.R. 196 (S.D.N.Y. 2013), *aff'd*, 644 F. App'x 60 (2d Cir. 2016)...........25

*Whyte v. Barclays Bank PLC*,
  644 F. App'x 60 (2d Cir. 2016) .................................................................27

*In re Yahweh Center, Inc.*,
  27 F.4th 960 (4th Cir. 2022) ....................................................................84

## STATUTES

Bankruptcy Code § 101 ................................................................... *passim*

Bankruptcy Code § 106 ......................................................................84

Bankruptcy Code § 544 ...................................................................2, 83

Bankruptcy Code § 546 ........................................................18, 22, 25

Bankruptcy Code § 547 ......................................................................41

Bankruptcy Code § 548 ................................................................... *passim*

Bankruptcy Code § 741 ......................................................................21

15 U.S.C. 78c ......................................................................................24

26 U.S.C. § 6502........................................................................83, 86

Puerto Rico Oversight, Management, and Economic Stability Act  48 U.S.C. § 2101......1, 16, 26,

48 U.S.C. § 2161 ................................................................................84

48 U.S.C. § 2194 ................................................................................16

Jones Act of Puerto Rico, Pub. L. No. 64–368, § 3, 39 Stat. 951 (1917) ......................62

N.Y. Debt. & Cred. Law, § 273 .......................................................36

Ohio Const. art. VIII, § 17 ...............................................................63

P.R. Const. art. VI, § 2 .........................................................................58, 59, 60, 62, 63, 65

P.R. Laws Ann. tit. 2, § 97 ............................................................................... *passim*

P.R. Laws Ann. tit. 2, § 916 .....................................................................................64

P.R. Laws Ann. tit. 3, § 779 .............................................................................. *passim*

P.R. Laws Ann. tit. 22, § 906 ...................................................................................65

P.R. Laws Ann. tit. 22, § 907a ...........................................................................10, 61

P.R. Laws Ann. tit. 22, § 911 ...................................................................................65

P.R. Laws Ann. tit. 22, § 916 ...................................................................................11

P.R. Laws Ann. tit. 31, § 4 .........................................................................................2

P.R. Laws Ann. tit. 31, § 7 .......................................................................................55

P.R. Laws Ann. tit. 31, § 3372 .................................................................................56

P.R. Laws Ann. tit. 31, § 3405 .................................................................................80

 P.R. Laws Ann. tit. 31, § 3495 ................................................................................46

P.R. Laws Ann. tit. 31, § 3512 ...........................................................................78, 82

P.R. Laws Ann. tit. 31, § 3514 ...........................................................................50, 79

P.R. Laws Ann. tit. 31, § 3517 .............................................................................6, 50

P.R. Leyes An. tit. 3, § 779 ......................................................................................69

1962 P.R. Laws 112 ..................................................................................................63

1964 P.R. Laws 76 ....................................................................................................63

1968 P.R. Laws 27 ....................................................................................................63

1988 P.R. Laws 203 .............................................................................................69, 71

2004 P.R. Laws 497 ..................................................................................................48

2007 P.R. Laws 103 ..................................................................................................72

2011 P.R. Laws 1411 ................................................................................................13

2011 P.R. Laws 1431 ...........................................................................................72, 74

2013 P.R. Laws 39 ...................................................................................54, 73

2014 P.R. Laws 76 ........................................................................................44

 64–368, § 3, 39 Stat. 951 (1917)...................................................................60

UCC § 8-202 .................................................................................................77

## CONSTITUTIONS

U.S. Const. art. VI, § 2.................................................................................27

Pa. Const. art.  VIII, § 7(c)...........................................................................61

P.R. Const. art.  VI, § 2 ........................................................................ *passim*

P.R. Const. art. VI, § 9 .................................................................................56

Wash. Const. art. VIII, § 9 ............................................................................63

## OTHER AUTHORITIES

*Black's Law Dictionary (11th ed. 2019)*........................................................67

*Fletcher Cyclopedia of the Law of Corporations* § 2732 (2014) ..................12

*What Is a Broker Dealer (B-D), and How Does It Work?*, Investopedia (May 29, 2021),
    https://www.investopedia.com/terms/b/broker-dealer.asp .................................23

5 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* (16th ed. 2022)..................31,85

Public Buildings Authority, *Independent Auditors' Report and Basic Financial
    Statements and other Supplementary Information for the Fiscal Years Ended June
    30, 2016, and 2015*, https://emma.msrb.org/ES1388910.pdf ............................65

Trent Collier, *Revenue Bonds and Religious Education: The Constitutionality of Conduit
    Financing Involving Pervasively Sectarian Institutions*,
    100 Mich. L. Rev. 1108 (2002).........................................................................71

## PRELIMINARY STATEMENT

For decades, successive governments of the Commonwealth of Puerto Rico ("Puerto Rico") and its instrumentalities turned to Defendants and other financial institutions to help them raise funds in municipal debt markets to manage their finances.[2] According to the Second Amended Complaint ("SAC"), those funds allowed Puerto Rico to "pay off maturing bonds" and "extend[] the timetable for retiring municipal borrowings," while it searched for other ways to address its budgetary deficits. (SAC ¶ 133.) To hedge the interest rate risk of its debt, Puerto Rico also entered into swap agreements with certain Defendants. According to the SAC, on June 28, 2015, Puerto Rico's governor declared Puerto Rico's debt unpayable, and in June 2016, Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA") to provide Puerto Rico with a mechanism to restructure its debts.

Drivetrain, LLC (the "Trustee") now seeks to avoid or unwind payments of underwriting fees, swap termination payments, and principal and interest payments on refunded Puerto Rico bonds made to Defendants between 2007 and 2014. In support, the SAC asserts overlapping claims for (1) intentional and constructive fraudulent transfer under the Bankruptcy Code and (2) violations of Puerto Rico statutes/unjust enrichment:

- Count I seeks to recover, under a theory of unjust enrichment, swap termination payments made to the Swap Defendants under swap agreements that allegedly were not registered with the Office of the Comptroller, as required by Puerto Rico statutory law (P.R. Laws Ann. tit. 2, § 97) (SAC ¶¶ 210-15);[3]

---

[2] Unless otherwise noted, references to "Puerto Rico" include the Commonwealth and its instrumentalities. For purposes of this motion, the Commonwealth, Employee Retirement System of the Government of the Commonwealth of Puerto Rico (the "ERS"), and the Puerto Rico Public Buildings Authority (the "PBA") are collectively defined as "Debtors."

[3] The Swap Defendants are: Morgan Stanley Capital Services, LLC f/k/a Morgan Stanley Capital Services Inc. ("Morgan Stanley Capital"), Citibank, N.A. ("Citibank") UBS AG, Goldman Sachs Bank USA f/k/a Goldman Sachs Capital Markets, L.P. ("GS Bank"); Goldman Sachs Mitsui Marine Derivative Products,

*(cont'd)*

- Count II seeks to nullify the Challenged Bonds[4] (and correspondingly avoid various payments made to all Defendants from the proceeds of the Challenged Bonds) on the ground that the Challenged Bonds allegedly were contrary to Puerto Rico constitutional and statutory law (P.R. Laws Ann. tit. 31, §§ 4 and 3372) (SAC ¶¶ 216-23);

- Counts III and IV seek to avoid underwriting fees paid to Barclays Capital, Inc. ("Barclays") and Morgan Stanley & Co. LLC ("Morgan Stanley") in connection with the Commonwealth's 2014 General Obligation Bonds issuance, as well as swap termination payments made to Citibank and Morgan Stanley Capital and principal and interest paid to Barclays and Morgan Stanley from the proceeds of that bond issuance, as either intentional or constructive fraudulent transfers under Bankruptcy Code § 548(a) (SAC ¶¶ 224-44); and

- Count V seeks to avoid underwriting fees paid to the Underwriter Defendants in connection with the Challenged Bonds, as well as swap termination payments and principal and interest paid to Defendants from the proceeds of certain of those bond issuances, as either intentional or constructive fraudulent transfers under New York law or Puerto Rico law through Bankruptcy Code § 544(b) (SAC ¶¶ 256-63).[5]

---

L.P. ("GS Mitsui"), RBC Capital, and Merrill Lynch Capital Services, Inc. ("Merrill Lynch Capital"). (SAC ¶ 4.)

[4] The Challenged Bonds include the Refinancing Bonds, the so-called Excessive Debt Bonds and the ERS Bonds, which are defined on pages 10-13, *infra*. The Trustee alleges the Challenged Bonds were void *ab initio* because they transgressed Puerto Rico law: the Refinancing Bonds allegedly violated the Puerto Rico Constitution's provision requiring expenditures to be "scrupulous," the so-called Excessive Debt Bonds allegedly violated the Puerto Rico Constitution's debt limit provision applicable to direct obligations, and the ERS Bonds allegedly were issued without authorization. (SAC ¶¶ 219-221.)

[5] The SAC lists UBS Financial Services, Inc. of Puerto Rico ("UBS PR"); Santander Securities LLC ("Santander"); BofA Securities, Inc., a/k/a Banc of America Securities LLC, a/k/a BofA Merrill Lynch ("BofA Securities"); Merrill, Lynch, Pierce, Fenner, & Smith Inc.; Barclays; Samuel A. Ramirez & Co., Inc. ("Ramirez"); RBC Capital Markets, LLC ("RBC Capital"); BMO Capital Markets Corp. ("BMO"); Goldman Sachs & Co. LLC ("Goldman"); Morgan Stanley; J.P. Morgan Securities LLC ("JP Morgan"); Citigroup Global Markets; and Jefferies Group LLC. (SAC ¶¶ 1, 4.) Effective July 17, 2021, UBS PR was merged into UBS Financial Services Inc. Pursuant to the Order Granting Motion to Remove and Join Defendants, BMO Capital Markets Corp.; Jefferies Group LLC; and Merrill Lynch, Pierce, Fenner & Smith Inc. were removed as defendants in this adversary proceeding and replaced by BMO Capital Markets GKST Inc.; Jefferies LLC; and Bank of America Corporation, respectively, and all references to the former shall be construed to refer to the latter. (*Id.*) However, as noted in the Notice filed by BofA Securities on December 27, 2022 (ECF No. 90) and the motion to remove Bank of America filed by the Trustee on December 28, 2022 (ECF No. 121), Merrill Lynch, Pierce, Fenner & Smith, Inc., which was succeeded in interest by BofA Securities, was the underwriter of the bonds the SAC attributes to BofA Securities and Bank of America Corporation. On December 29, 2022, the Court granted the Trustee's motion to remove Bank of America Corporation and attribute the allegations and counts the SAC asserts against Bank of America Corporation solely to BofA Securities, as successor entity to the relevant underwriter. (ECF No. 125.)

But all of the challenged transfers were ordinary course transactions made under valid and enforceable agreements. Accordingly, as detailed further herein, each of the claims is barred as a matter of law, even had each been sufficiently pled. Specifically, the SAC should be dismissed with prejudice for the following reasons.[6]

**Dismissal Based Upon The Bankruptcy Code (All Counts)**

*First*, the statutory safe harbors provided in Bankruptcy Code § 546(e) and 546(g) bar the Trustee's constructive fraudulent transfer claims under Bankruptcy Code § 548(a)(i)(1)(B) alleged in Count IV and the constructive and intentional fraudulent transfer claims under Bankruptcy Code § 544(b) alleged in Count V. The challenged transfers—payments made in connection with securities and swap transactions—are those protected under the Bankruptcy Code, and each element of the safe harbors is readily met here. Specifically, the underwriting fees and principal and interest payments on refunded bonds allegedly paid to the Underwriter Defendants are protected by the safe harbor in § 546(e) because they were settlement payments and transfers made in connection with securities contracts to stockbrokers and financial participants, i.e., the Underwriter Defendants. Likewise, the swap termination payments are protected by the safe harbor in § 546(g) because they were made in connection with swap agreements to and from swap participants, i.e., the Swap Defendants and the Commonwealth and PBA.

In addition, the PROMESA statute expressly incorporates the § 546 safe harbors and provides that its provisions "shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act." The remedies that the Trustee seeks

---

[6] Given the many reasons for dismissing the SAC, as well as the number of counterparties and transactions, Defendants attach a chart summarizing the bases for dismissing each Count. *See* App'x A.

under Puerto Rico law are irreconcilable with the protections provided for securities and swap transactions in § 546(e) and (g), and allowing the Trustee to recharacterize its claims under state law would defeat the safe harbors' purpose of preserving certainty in securities markets. Thus, application of the statutory safe harbors requires dismissal of four of the five Counts in the SAC (Counts I, II, IV and V), and the Court need not consider Puerto Rico law to dismiss all of the Puerto Rico law claims.

*Second*, the Trustee's fraudulent transfer claims—whether grounded in intentional fraud under Bankruptcy Code § 548(a)(1)(A) in Count III or constructive fraud under § 548(a)(1)(B) in Count IV—should be dismissed because the SAC does not allege any transfers within the two-year statutory lookback period, the application of which forecloses avoidance of transfers pre-dating May 3, 2015. Alleging a transfer within the two-year lookback period is a substantive element of a § 548(a) claim, and the two-year lookback period is a statute of repose that extinguishes the cause of action. Because none of the challenged transfers were made within the two-year statutory lookback period, and because equitable tolling does not apply to § 548(a) claims, the Court should dismiss Counts III and IV. Thus, federal law (the Bankruptcy Code and preemption) requires dismissal of each Count in the SAC, and ***the Court need not consider any aspect of Puerto Rico law to dismiss the SAC in its entirety.***

*Third*, the intentional fraudulent transfer claims in Counts III and V should be dismissed because the SAC's theory is facially implausible and unsupported by any factual allegations. There is no precedent for holding that these Debtors—part of democratically elected governments—intended to defraud their creditors when they made the challenged transfers in connection with managing their budgets. Nor are the SAC's alleged "badges of fraud" sufficient to overcome the claims' facial implausibility. Most of those "badges" have nothing to do with

the Debtors' intent when making the challenged transfers. The intentional fraudulent transfer claims also fail because alleging, as the Trustee does, that certain transfers preferred Defendants over other creditors does not state an actionable fraudulent conveyance claim under settled precedent. In any event, the intentional fraudulent transfer claims are deficient because they rest on conclusory allegations and group pleading.

*Fourth*, the constructive fraudulent transfer claims in Counts IV and V should be dismissed. Those claims require sufficient allegations that the Debtors received less than reasonably equivalent value. Instead, the SAC merely posits that the Debtors must not have received reasonably equivalent value because the bond issuances and swap agreements did not create sustained economic prosperity for Puerto Rico. That type of speculation and hindsight bias does not suffice, and where, as here, the challenged transfers satisfied antecedent contractual obligations, they, as a matter of law, were made in exchange for reasonably equivalent value.

## Dismissal Based Upon Puerto Rico Law (Counts I and II)

Even if the claims in Counts I and II were not preempted by the Bankruptcy Code, the SAC's claims seeking to recover underwriting fees, swap termination payments, and payments of principal and interest on refunded bonds issued by Puerto Rico to Defendants under Puerto Rico law based on either a theory of unjust enrichment or a theory that the underlying securities and swap contracts were void fare no better than its fraudulent transfer claims.

*First,* Count I seeks a declaration that the payments made pursuant to the swap agreements were "unlawful" (SAC ¶ 214) solely because the Commonwealth and the PBA failed to register them with the Office of the Comptroller. Those allegations fail. Legislation enacted by the Puerto Rico Legislative Assembly—P.R. Laws Ann. tit. 2, § 97(d)—prevents the government from avoiding payments for services provided only because the government failed to register the

contracts with the Office of the Comptroller. The Puerto Rico Supreme Court has held that the appropriate remedy in the case of written, unregistered contracts is to direct the government to register the contract, and no court has permitted the government to avoid payments for services provided under such contracts.

*Second,* the claims in Counts I and II should be dismissed because they are barred by Title 31, § 3517, which prohibits a party from recovering funds paid pursuant to alleged illegal contracts when that party is at least partially responsible for the illegality. *See* P.R. Laws Ann. tit. 31, § 3517. Here, the Trustee alleges that the Commonwealth and PBA were required to register the swap agreements, and that the Debtors "knew" that the bonds were illegal. (SAC ¶¶ 9, 78-82.) Because the Debtors were responsible for those transactions' alleged illegalities, and because the Trustee alleges it stands in the shoes of the Debtors, § 3517 prohibits the Trustee from recovering payments the Debtors made to Defendants pursuant to the challenged swap and bond agreements.

*Third*, the Trustee's attempts to invoke unjust enrichment as a remedy for Counts I and II should also be rejected. Unjust enrichment is unavailable for two reasons: Puerto Rico law provides remedies for the purported conduct, and the Debtors received equivalent value for the transfers they made under their securities contracts and swap agreements with Defendants. Any claims of unjust enrichment thus are squarely foreclosed as a matter of law.

*Fourth,* Count II should be dismissed for another independent reason: the plain text of Puerto Rico's Constitution and laws establish that the challenged bonds were lawful—as the Debtors represented to the Underwriter Defendants and to the public when those bonds were sold. For instance, the Trustee claims that bonds issued by the PBA should have been included in the calculation of the direct obligation constitutional debt limit, but Puerto Rico's Constitution

states that the relevant debt limit only includes debts directly incurred by the Commonwealth and actual payments on the Commonwealth's guarantees of agency debts. And the Commonwealth was not directly obligated for bonds issued by the PBA as the PBA is a separate entity, and the Commonwealth had not made any payments on its guarantees of the PBA bonds. The Trustee's challenges to the legality of the other bonds fare no better because those challenges are either non-justiciable political questions or are otherwise contravened by the plain text of the statute authorizing the bond issuances.

**<u>Untimely Claims</u>**

Even if the claims grounded in Puerto Rico law (Counts I, II, and V) were actionable, the majority of them would be barred by the applicable four-year statute of repose. The Trustee, apparently aware of this limitation, invokes unjust enrichment to avoid the time-bar for its claims in Counts I-II, but that effort fails under Puerto Rico law. Likewise, the majority of the Puerto Rico law claims for fraudulent transfer in Count V are barred by that same statute of repose, which the Trustee implicitly acknowledges by asserting that it can step into the shoes of the Internal Revenue Service ("IRS") and assert the "*nullum tempus*" doctrine to avoid transfers going back a decade before the Commonwealth filed its Title III petition. But that allegation is foreclosed by the text and structure of the Bankruptcy Code.

\* \* \*

Given the SAC's uncurable flaws, any attempt to amend the SAC would be futile because no set of allegations can overcome the serious deficiencies of the SAC. For those reasons, the Court should dismiss the SAC with prejudice.

## BACKGROUND[7]

The Trustee asserts five claims arising out of Puerto Rico's fiscal policy decisions, subsequent insolvency, and eventual bankruptcy. The Trustee relies on the allegations below to support those claims, and information within the SAC from external sources that provide further context to the Trustee's claims.

## I.    PUERTO RICO AND ITS FISCAL AFFAIRS

The origins of Puerto Rico's financial crisis can allegedly be traced back to 1996 when Congress repealed the Possession Tax Credit. (SAC ¶ 64.) That credit had previously made Puerto Rico "the most attractive locale in the world for American companies to operate in" because it allowed corporations to reduce their tax bills by establishing operations there. (Ex. 1, K&K Rep. at 37 (citation omitted).)[8] Congress' repeal of the Possession Tax Credit allegedly

---

[7] This section summarizes allegations contained in the SAC. For purposes of this motion to dismiss, Defendants accept as true the SAC's well-pleaded factual allegations, and are entitled to rely on those materials referenced or incorporated by reference in the SAC, including (i) Kobre & Kim LLP's Final Investigative Report, dated August 20, 2018, ("K&K Report" or "K&K Rep.") (Declaration of Julie E. Cohen, Exhibit 1), which was commissioned by the Financial Oversight and Management Board ("FOMB") (*see, e.g.*, ¶¶ 200-03), (ii) the Purchase Contracts (*see, e.g.*, SAC ¶¶ 57, 60, 63 & Ex. 3), and (iii) the Official Statements (*see, e.g.*, SAC ¶ 156). *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."). *See also In re Fid. Erisa Fee Litig.*, 990 F.3d 50, 53-54 (1st Cir. 2021) ("When a complaint expressly cites and relies upon a written contract in support of a claim, the drafter of the complaint cannot prevent the court from considering the written contract in ruling on a motion under Rule 12(b)(6)."); *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 26 (1st Cir. 2022) (considering documents filed with the SEC on a motion to dismiss). References to "Ex." refer to exhibits to the declaration of Julie E. Cohen filed herewith.

[8] "Consistent with the investigative authority granted to the Oversight Board by section 104 of PROMESA, the Oversight Board commissioned a report on the origins of the Commonwealth's financial crisis. The report was prepared by Kobre & Kim LLP, and it was published on the Oversight Board's website on August 20, 2018." *In re Fin. Oversight & Mgt. Bd. for Puerto Rico*, 637 B.R. 223, 249 n.14 (D.P.R. 2022). The SAC's "factual allegations are expressly linked to—and admittedly dependent upon"—the report. *Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). The SAC has an entire section dedicated to the K&K Report. (SAC ¶¶ 200-02.) And the SAC states that its claims are "based on the K&K Report's findings." (*Id.* ¶¶ 203-09.) Therefore, the K&K Report "effectively merges

*(cont'd)*

cost Puerto Rico 80,000 jobs and contributed to Puerto Rico's population declining by nine

percent. (SAC ¶ 65.)

## II.     PUERTO RICO'S EFFORTS TO STAVE OFF A FINANCIAL CRISIS

### A.     Partially Funding Government Services Through Bond Issuances

According to the SAC, Puerto Rico was in "financial trouble" by the "early 2000s." (SAC

¶ 5.) To avoid "crippling cuts to essential services," Puerto Rico began funding those services, in

part, by issuing debt. (*Id*. ¶¶ 6-7.) Puerto Rico's financial advisor, the Government Development

Bank for Puerto Rico ("GDB") "oversaw and approved bond issuances" (*id*. ¶ 254), turning to

financial institutions that were "qualified" and "familiar with relevant aspects of Puerto Rico-

related Bond Issuances" to underwrite and market the bonds to investors. (Ex. 1, K&K Rep. at

76.) The issuers pertinent to this motion are the Commonwealth, ERS and PBA.

For each bond issuance, the Debtor entered into contracts with one or more of the

Underwriter Defendants (the "Purchase Contracts"), under which the Debtor agreed to deliver all

of the bonds in a given issuance in exchange for the Underwriter Defendants' payment of the full

purchase price of those bonds, less a purchase price discount at the time of closing and

settlement of the offering. (*See, e.g.*, Purchase Contract for the Commonwealth of Puerto Rico

General Obligation Bonds of 2014, Series A (Mar. 11, 2014), at 1-2 ("2014 GO Bonds Purchase

Contract") (Ex. 2); Purchase Contract for the Employees Retirement System of the Government

of the Commonwealth of Puerto Rico Bonds, Series A (Jan. 30, 2008), at 1-2 ("ERS Bonds

Purchase Contract") (Ex. 3).)[9] The purchase price discount compensated the Underwriter

---

into the pleadings" and this Court "can review it in deciding a motion to dismiss under Rule 12(b)(6)."
*Beddall*, 137 F.3d at 17.

[9] The SAC relies on the Purchase Contracts (*see, e.g.*, SAC ¶¶ 57, 60, 63; SAC Ex. 3), thereby adopting
them by reference. *See In re Fid. Erisa Fee Litig.*, 990 F.3d 50, 53-54 (1st Cir. 2021) ("When a complaint
*(cont'd)*

Defendants for the risk they bore in purchasing all of the bonds, as well as their efforts to market the bonds to investors. (*See* Ex. 2, 2014 GO Bonds Purchase Contract at 1-2, 8-13.)

The Debtors also represented to the Underwriter Defendants that they had the "full legal right, power and authority" to issue the bonds (*id*. at 4), and delivered legal opinions, including from Puerto Rico's Secretary of Justice stating that the bonds "constitute valid and binding" obligations (Ex. 1, K&K Rep. at 257). The official statements used to sell the bonds also included disclosures by the Debtors of the amount borrowed, the planned uses of the borrowing, the repayment schedule and the fees that would be paid to the Underwriter Defendants. (*See* Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A (Mar. 11, 2014), at 1 ("2014 GO Official Statement") (Ex. 4).)[10] Indeed, the 2014 GO Official Statement disclosed Puerto Rico's public debt (*id*. at 32-33), the underwriting fee earned by certain of the Underwriter Defendants (*id*. at 38), and how the Commonwealth intended to use the proceeds of the issuance, including "paying . . . termination amounts under certain interest rate" swap agreements (*id*. at 24). The 2014 GO Official Statement also discussed the Secretary of Justice's opinion that the bonds were lawful and consistent with the Commonwealth's constitutional debt limit. (*Id*. at 10.)

## B.    Refinancing Strategy

In 2008, to avoid having to impose tax hikes and spending cuts, the Commonwealth and

---

expressly cites and relies upon a written contract in support of a claim, the drafter of the complaint cannot prevent the court from considering the written contract in ruling on a motion under Rule 12(b)(6).").

[10] Like the Purchase Contracts, the SAC quotes from and relies on the Official Statements (SAC ¶ 156), thereby adopting them by reference. *See Beddall*, 137 F.3d at 17 ("When . . . a complaint's factual allegations are expressly linked to — and admittedly dependent upon — a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."); *see also City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 26 (1st Cir. 2022) (considering documents filed with the SEC on a motion to dismiss).

PBA allegedly adopted "refinancing" strategies "that entail[ed] selling new long-term debt to raise funds to pay off maturing bonds." (SAC ¶¶ 91-109, 132-33, 155.) This strategy of refinancing municipal bonds, "which has been around for decades, help[ed] cities, states and other local entities to stay current on their obligations as they tr[ied] to claw out of one of the deepest economic downturns since the Great Depression."[11] From 2009 to 2014, the PBA and the Commonwealth issued bonds with an aggregate face amount of approximately $10 billion as part of their refinancing strategy. (SAC ¶¶ 135-36.)

### C.    Bonds Issued In Furtherance Of The Refinancing Strategy

The SAC alleges that Puerto Rico used two types of bonds in furtherance of its refinancing strategy: Public Building Authority Bonds ("PBA Bonds") and General Obligation Bonds ("GO Bonds") (collectively, "Refinancing Bonds"). (SAC ¶ 15 n.6.) The PBA is a public corporation created to "design, construct, administer, and maintain Puerto Rico's public buildings . . . ." (SAC ¶ 58.) As part of its mandate, the PBA leases certain buildings, and is authorized to issue bonds such that the lease payments cover the principal and interest due on the PBA Bonds. (*Id.*)

The PBA allegedly issued four series of PBA Bonds between 2009 and 2012 as part of its refinancing strategy. (*Id.* ¶ 59.) These bonds "raised revenue" and paid "off old debt and swap termination" payments. (*Id.* ¶ 136.) The Commonwealth guaranteed payment on the PBA Bonds and pledged its "full faith, credit, and the taxing power" to satisfying that guarantee. P.R. Laws Ann. tit. 22, § 907a. The Commonwealth also indirectly supported PBA's leases—the revenue source underlying the PBA Bonds—by, among other things, pledging "its good faith and credit"

---

[11] Mike Cherney, *Borrowing Maneuver Catches Flak*, Wall St. J. (Dec. 2, 2013 8:40 PM), https://www.wsj.com/articles/SB10001424052702304579404579234441072889918 (last visited Dec. 13, 2022), quoted in SAC ¶ 137 & n.15.

for the payment of rent due under any PBA lease. *Id.* § 916. The Commonwealth did not include
its guarantee of PBA's debt service payments on the PBA Bonds in its calculation of the direct
obligation debt limit found in Article VI, § 2 of Puerto Rico's Constitution. (Ex. 1, K&K Rep. at
261.) The SAC does not allege that the Commonwealth satisfied its guarantees of the PBA
Bonds or leases.

The Commonwealth's refinancing strategy allegedly included twelve series of GO Bonds
it issued between 2009 and 2014, which the Commonwealth included in its calculations of the
constitutional debt limit on direct obligations. (SAC ¶¶ 55-56, 135-36.) When the
Commonwealth issued the 2014 GO Bonds, it placed $422,749,408 of the bonds' proceeds in a
sinking fund to pay interest on the bonds during fiscal years 2014-2016. (Ex. 4, 2014 GO
Official Statement at 24, 30-31.)[12] The Commonwealth did not include this capitalized interest in
its calculation of the constitutional debt limit. Despite the consensus that the bonds were lawful
when they were issued (Ex. 1, K&K Rep. at 253-54), the Trustee alleges that three series of GO
Bonds and one series of PBA Bonds issued between 2012 and 2014 violated Puerto Rico's
constitutional debt limit on direct obligations (the so-called "Excessive Debt Bonds") (SAC ¶ 14
& n.5).[13]

### D.    The ERS Bonds

The SAC also challenges a third category of bonds issued by the ERS in 2008 as part of a
financial arbitrage strategy designed to improve the financial condition of the ERS. The ERS

---

[12] "The term 'sinking fund' merely signifies a fund created for extinguishing or paying a funded debt." 6A
William Meade Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 2732 (2014). A sinking fund
"may be provided by provisions in the bonds themselves." *Id.*

[13] The various alleged Excessive Debt Bonds were underwritten by one or more of Barclays, Morgan
Stanley, JP Morgan, BofA Securities, UBS PR, Goldman, Santander, RBC Capital and BMO. (SAC ¶
14.)

intended to invest the proceeds of these bonds at a rate of return in excess of their borrowing

costs in order to create positive cash flows for the ERS over time. To enact its plan, the ERS

decided to issue bonds directly and pledge its right to receive future employer contributions as

the repayment source. (Ex. 1, K&K Rep. at 206.) In so doing, the ERS relied on language added

to the ERS's Enabling Act in 1988 providing that the ERS could "incur debts . . . through the

direct placement of debts, securing said debt with the assets of the System." P.R. Laws Ann. tit.

3, § 779(d) (2008).

Using that authorization, the ERS issued three series of bonds ("ERS Bonds").[14] (SAC

¶¶ 13, 114; K&K Rep. at 210-13.) In a letter included in the Official Statement for each series,

bond counsel opined that the ERS had the authority to issue the bonds. (K&K Rep. at 199.)

ERS's General Counsel, the Secretary of Justice, and the Official Statements themselves also

affirmed the legality of the bonds. (*See* Ex. 5 (compiling General Counsel Opinions); Ex. 6

(compiling Secretary of Justice Opinions); Ex. 7 (compiling Art. VII, § 709(3) of the Official

Statements).)

Shortly after the ERS's issuance of the ERS Bonds, the 2008 financial crisis dramatically

changed market conditions, which caused an incoming administration in Puerto Rico to disfavor

the GDB's arbitrage strategy. (Ex. 1, K&K Rep. at 199.) Consistent with this change in political

views, a subsequently elected Legislative Assembly amended the ERS Enabling Act, stating that

"the Retirement System should not be allowed to issue debt . . . to be secured with its assets."

2011 P.R. Laws 1411, 1436-37 (Act No. 116, Statement of Motives) (Ex. 8).

### E.   The Swap Agreements

Interest rate swaps are agreements which a bond issuer may enter into in order to transfer

---

[14] The lead underwriters for the ERS Bonds were allegedly UBS PR and Santander. (SAC ¶ 121.)

the risk of interest rate fluctuations to a bank counterparty. (Ex. 1, K&K Rep. at 413.) From 2004 to 2008, the Commonwealth and PBA allegedly entered into certain swap agreements with the Swap Defendants (the "Swap Agreements") (SAC ¶ 79), "for sensible and financially sound reasons," i.e., to hedge risks relating to interest rates. (Ex. 1, K&K Rep. at 413-15; SAC ¶ 69.) Most of the Swap Agreements were structured so that the Swap Defendants would pay the Commonwealth and PBA if interest rates increased and would receive money from those entities if rates decreased. (SAC ¶ 72.) Although Puerto Rico law requires the Commonwealth and PBA to register the Swap Agreements with the Office of the Comptroller, they allegedly never did so. (*Id*. ¶¶ 50, 74.)

During the Great Recession in 2008, interest rates fell and the Commonwealth and PBA owed money under the Swap Agreements. (*Id.* ¶ 127.) They allegedly considered two options in response: (1) post collateral to avoid the early termination of the Swap Agreements, or (2) terminate the Swap Agreements and pay the difference in interest rates at that time. (*Id.* ¶ 129.) While the Commonwealth and PBA initially posted collateral, in part by using bond proceeds (*id.* ¶ 130), they later changed course and began terminating the Swap Agreements. (*Id.*) By the time the last swap termination payment was made in 2014, Puerto Rico's swap termination payments amounted to approximately $1 billion. (*Id.* ¶ 131.)

In some instances, the Swap Agreements benefited Puerto Rico. For instance, in 2006, the Commonwealth entered into "the GO Basis Swaps" with GS Bank and Morgan Stanley, with those banks paying the Commonwealth approximately $100 million upfront. (Ex. 1, K&K Rep. at 427.) In addition, between fiscal year 2010 and the first six months of fiscal year 2014, the Commonwealth received at least $34.3 million in net payments under that basis swap. (*See infra* footnote 39.) The Commonwealth was able to terminate "the remaining portions of GO Basis

14

Swaps for about $26.2 million," paying "far less than the $100 million [it] received up front."

(Ex. 1, K&K Rep. at 427.)

## III. THE GDB'S ROLE IN SUPPOSEDLY FOSTERING PUERTO RICO'S FISCAL CRISIS

The SAC places much of the blame for Puerto Rico's financial issues on the GDB because it was "responsible for overseeing and approving bond issuances and interest rate swap agreements." (SAC ¶ 8.) While the GDB was supposed to provide prudent financial advice to Puerto Rico, the Trustee alleges that it instead "encouraged" Puerto Rico's financial crisis. (*Id.* ¶ 9.) The GDB supposedly failed to document key terms of the Swap Agreements and keep track of Puerto Rico's swap exposure. (*Id.* ¶¶ 78-82.) The GDB purportedly consulted Defendants when considering whether to issue bonds or enter into swaps. (*Id.* ¶ 172.) According to the SAC, "the GDB was close to the banks because many of its own high-level executives came from them." (*Id.* ¶ 174.) Only two executives are identified in the SAC: Carlos García joined the GDB as its head in 2009 from a Santander affiliate and returned to other Santander affiliates after his term ended,[15] and Juan Carlos Battle left a Santander affiliate in 2011 and joined the GDB as its President. (*Id.*) The SAC does not identify any individuals associated with any other Defendant who ever worked at the GDB.

The Underwriter Defendants allegedly encouraged issuances of new bonds because, if the GDB agreed, the proposing Underwriter Defendant was usually selected to underwrite the issuance. (*Id.* ¶ 171.) But there is no "evidence" (or allegation in the SAC) "that [the] GDB selected any of [the] underwriters for improper reasons." (Ex. 1, K&K Rep. at 78.) Nor are there

---

[15] After leaving the Santander affiliate, from 2016 to 2020, Mr. García was a member of the Financial Oversight and Management Board ("FOMB"). *See FOMB, Carlos M. García,* https://oversightboard.pr.gov/carlos-m-garcia/ (last visited Dec. 20, 2022).

15

well-pleaded allegations that Defendants controlled the GDB; instead, the GDB often rejected

Defendants' proposals. (*Id*.)

## IV.    COMMENCEMENT OF PUERTO RICO'S TITLE III CASES

As "Puerto Rico had no legal way to restructure," Puerto Rico passed a restructuring

statute—the Recovery Act in 2014. (SAC ¶¶ 160-61.) This legislation was quickly enjoined and

the United States Supreme Court declared it preempted by the federal Bankruptcy Code. (*Id*. ¶

163.) Starting in 2015, Puerto Rico began to default on some of its obligations. (*Id*. ¶ 166.)

Puerto Rico's financial crisis allegedly harmed Puerto Rico residents, including its unsecured

creditors. (*Id*. ¶¶ 181, 189.)

In June 2016, Congress passed PROMESA, providing Puerto Rico with a way to enter

quasi-bankruptcy proceedings and restructure its debts. 48 U.S.C. §§ 2161 to 2178. PROMESA

established the FOMB "to assist the Government of Puerto Rico in reforming its fiscal

governance and support the implementation of potential debt restructuring." 48 U.S.C.

§ 2194(n)(3). On May 3, 2017, the FOMB initiated Title III bankruptcy proceedings on behalf of

Puerto Rico. (SAC ¶ 197.) It also used its statutory powers to create a Special Investigation

Committee (the "SCC"), to investigate the causes of the crisis and the Special Investigation

Committee appointed Kobre & Kim LLP to conduct the investigation. (Ex. 1, K&K Rep. at 18-

19.) The ERS filed its Title III petition on May 21, 2017 and the PBA filed its Title III petition

on September 27, 2019. (SAC ¶ 197.)

## **PROCEDURAL HISTORY**

## I.    THE SCC FILES THE ADVERSARY PROCEEDING

On May 2, 2019, the SCC filed an adversary complaint, largely premised on common law

tort theories such as aiding and abetting breaches of fiduciary duty by the GDB and unjust

enrichment. (ECF No. 1.)[16] The Court stayed this action pending confirmation of the Title III

Plan of Adjustment (ECF Nos. 13, 22), which occurred on January 18, 2022, *In re Fin. Oversight*

*and Mgt. Bd. for Puerto Rico*, 636 B.R. 1 (D.P.R. 2022). That Plan of Adjustment called for the

appointment of the Avoidance Action Trustee and provided the Trustee with "the exclusive right

and power to . . . litigate any and all of the Avoidance Actions." *Id.* at 48. Drivetrain, LLC was

later appointed as Avoidance Action Trustee and substituted as the plaintiff in this action. (ECF

No. 39.)

On September 15, 2022, the Trustee filed the SAC, asserting five causes of action bearing

little resemblance to the initial pleading. (ECF No. 49.)

## **STANDARD OF REVIEW**

The Trustee's intentional fraudulent transfer claims must satisfy the heightened pleading

requirements of Federal Rule of Civil Procedure 9(b), *see Katz v. Liberty Power Corp.*, LLC, No.

18-CV-10506 (ADB), 2019 WL 4645524, at *8-9 (D. Mass. Sept. 24, 2019) (citation omitted)*,*

which obligates the Trustee to allege, at a minimum, the "who, what, where, and when of the

allegedly fraudulent transfers" *Thao v. LH Housing, LLC*, No. 21-CV-00240 (JDL), 2022 WL

3227130, at *8 (D. Me. Aug. 10, 2022). All of the SAC's claims must satisfy the pleading

requirements of Federal Rule of Civil Procedure 8, which requires the Trustee to allege a

"plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To determine whether

the SAC satisfies Rule 8, the Court can discard "legal conclusions," as well as "[t]hreadbare

recitals of the elements of a cause of action, supported by mere conclusory statements." *Id*.

Where "obvious alternative explanation[s]" exist in light of the context, *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555-57 (2007), the Court can decline to "draw [a] reasonable inference

---

[16] "ECF No." refers to docket entries in this adversary proceeding.

that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

## ARGUMENT

## I.  THE TRANSFERS THE TRUSTEE SEEKS TO AVOID IN COUNTS
IV-V ARE PROTECTED BY THE BANKRUPTCY CODE'S SAFE HARBORS

Two of the Trustee's fraudulent transfer claims seek to avoid underwriting fees paid in

connection with the Challenged Bonds, as well as swap termination payments and principal and

interest paid from the proceeds of the Challenged Bonds, under § 548(a)(1)(B) (Count IV) and

§ 544(b) (Count V) of the Bankruptcy Code. However, those challenged transfers are protected

by the safe harbors at §§ 546(e) and (g) of the Bankruptcy Code, which squarely prohibit trustees

from using avoidance claims to claw back payments made in connection with securities

contracts, settlement payments, and payments made in connection with swap agreements.

Sections 546(e) and (g) broadly prohibit constructive fraudulent transfer claims asserted

under § 548(a)(1)(B) and "constructive and intentional fraudulent conveyance claims [asserted

pursuant to § 544(b)]." *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 193, 203 (S.D.N.Y

2020) (dismissing plaintiff's constructive and intentional fraudulent transfer claims brought

under §544(b) because they were barred by the safe harbor of § 546(e)); *In re Sun Edison Inc.*,

620 B.R. 505 (Bankr. S.D.N.Y. 2020) (dismissing constructive fraudulent transfer claims

brought under § 544(b) and § 548(a)(1)(B) as barred by § 546(e)'s safe harbor; *see also In re

Tribune Co. Fraudulent Conveyance Litig.*, 946 F.3d 66, 94 (2d Cir. 2019) (holding that state

law constructive fraudulent transfer claims are barred by § 546(e)'s safe harbor). The safe

harbors' "purpose is to protect a national, heavily regulated market by 'limiting the

circumstances . . . under which securities transactions could be unwound.'" *In re Tribune*, 946

F.3d at 92. To promote that purpose, "[t]he application of [the safe harbors] . . . is appropriately

resolved on the pleadings." *In re Tribune Co. Fraudulent Conv. Litig.*, No. 12-CV-2652 (DLC),

2019 WL 1771786, at *7 (S.D.N.Y. Apr. 23, 2019), *aff'd* 10 F.4th 147 (2d Cir. 2021).

### A. Section 546(e) Bars The Claims In Counts IV-V Seeking To Avoid Underwriting Fees And Principal And Interest Payments

Pursuant to § 546(e), "the trustee may not avoid a transfer that is a . . . settlement payment . . . made by or to (or for the benefit of) a . . . stockbroker [or] financial participant . . . or that is a transfer made by or to (or for the benefit of) a . . . stockbroker [or] financial participant . . . in connection with a securities contract . . . ." 11 U.S.C. § 546(e). Section 546(e) applies "where two requirements are met: (1) there is a *qualifying transaction* . . . and (2) there is a *qualifying participant* . . . ." *In re Nine*, 482 F. Supp. 3d at 197 (citation omitted). Here, the Trustee cannot avoid the Debtors' payment of underwriting fees and their "repayment of interest and principal" on certain bonds held by Defendants (SAC ¶¶ 236-58), because these payments fall squarely within § 546(e)'s safe harbor.

#### 1. The challenged payments are qualifying transactions

Both the underwriting fees paid under the Purchase Contracts and the repayment of principal and interest pursuant to bonds issued by the Debtors are qualifying transactions because they were both (i) transfers made in connection with securities contracts and (ii) settlement payments.

##### (a) The alleged transfers were made in connection with securities contracts

The challenged underwriting fees are textbook examples of transfers made in connection with a securities contract. The term "securities contract" is defined "capaciously to include . . . a 'contract for the purchase [or] sale . . . of a security, . . . including *any repurchase* . . . transaction on any such security.'" *In re Tribune*, 946 F.3d at 81 (emphasis in original) (quoting 11 U.S.C. § 741(7)(A)(i)). And bonds are "securities" under the Bankruptcy Code. 11 U.S.C. § 101(49)(A)(iv) (including "bond[s]" within the definition of "security"); *see also Enron*

*Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 335 (2d Cir. 2011) (concluding that various debt securities are "securities" within the Bankruptcy Code).

Here, there is no doubt that the Debtors entered securities contracts with the Underwriter Defendants. The Trustee affirmatively alleges that the "Commonwealth entered purchase contracts for each . . . Bond, under which it agreed to pay fees" to the Underwriter Defendants. (SAC ¶¶ 57, 60, 63; *see also, e.g.*, Ex. 4, 2014 GO Official Statement at 38 ("[T]he Underwriters will . . . purchase the Bonds from the Commonwealth at an aggregate discount of $28,130,460.67 from the initial offering price of the Bonds.").) The Trustee even collectively defines the bond contracts as "Purchase Contracts." (SAC ¶ 63 n.8.) The Purchase Contracts were contracts for the purchase of debt securities, and accordingly, are indisputably "securities contracts" under § 546(e). *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 418 (2d Cir. 2014). ("[T]he term 'securities contract' expansively includes contracts for the purchase or sale of securities, as well as any agreements that are similar . . . .").

The SAC further admits that the Debtors "agreed to pay" the underwriting fees to the Underwriter Defendants "under" the Purchase Contracts. (SAC ¶¶ 57, 60, 63.) Specifically, the SAC alleges that the Debtors paid the underwriting fees to the Underwriter Defendants in the form of a discount to the price of the bonds that the Underwriter Defendants bought from the Debtors at the time of closing and settlement pursuant to the Purchase Contracts. (SAC ¶¶ 135-136; *see also e.g.*, Ex. 4, 2014 GO Official Statement at 38 ("[T]he Underwriters will . . . purchase the Bonds from the Commonwealth at an aggregate discount of $28,130,460.67 from the initial offering price of the Bonds.").) Accordingly, the underwriting fees were indisputably transferred "in connection with" those "securities contracts." *See Madoff Inv. Sec.*, 773 F.3d at 421 (holding that § 546(e) requires only that the transfer be "related to" or "associated with" the

20

securities contract).

The alleged payments of principal and interest to certain Defendants from proceeds of the Challenged Bonds were also "transfers in connection with" a securities contract because Puerto Rico "and its agencies" allegedly made those payments to refund principal and/or interest on bonds that those unspecified entities had previously issued. (SAC ¶¶ 135-36, 155, 177); *cf. In re Nine*, 482 F. Supp. 3d at 198 (holding that the safe harbor's "plain language" protected payments to shareholders). Indeed, the only payments of principal and interest that the SAC specifically identifies were to redeem bonds the Commonwealth had previously issued—redemption payments that courts have held "easily" meet the "low bar" of payments made in connection with securities contracts. *In re Bos. Generating LLC*, 617 B.R. 442, 493 (Bankr. S.D.N.Y. 2020), *aff'd sub nom. Holliday v. Credit Suisse Securities (USA) LLC*, 20-CV-5404 (GBD), 2021 WL 4150523 (S.D.N.Y. Sept. 13, 2021); *see also In re Tribune*, 946 F.3d at 81 (holding that payments "connected to a redemption of shares were 'in connection with a securities contract'" because "securities contract" is defined to include a "repurchase" transaction).

(b)      The alleged transfers were settlement payments

Both the underwriting fees and the payments of principal and interest made in connection with unspecified bonds were also "settlement payments." "Settlement payment" includes a "preliminary," "interim," "partial" or "final" "settlement payment," or any "other similar payment commonly used in the securities trade." 11 U.S.C. § 741(8). Emphasizing the "breadth" of this definition, courts have construed a "settlement payment" to include any "transfer of cash or securities made to complete [a] securities transaction." *Enron Creditors*, 651 F.3d at 334-35 (alteration in original).

The challenged underwriting fees were plainly "transfer[s] of cash . . . made to complete

21

[a] securities transaction," *id.*—namely, purchases of bonds from the Debtors at discounted prices in exchange for the underwriting services that were provided. *See In re Tribune Co.*, 2019 WL 1771786, at *8 ("There is no dispute that the transfers at issue here [to repurchase equity securities] are both 'settlement payments' and 'in connection with a securities contract.'"); *see also In re Nine*, 482 F. Supp. 3d at 199 ("In light of the Second Circuit's capacious interpretation of § 741(8), the Court holds . . . that the payments made to the shareholder defendants were 'settlement payments.'"). As reflected in the Purchase Contracts, the Underwriter Defendants' fees were paid in the form of purchase price discounts when the Underwriter Defendants completed their purchase of the bonds from the Debtors. (Ex. 2, 2014 GO Bonds Purchase Contract at 1-2, 8-9; Ex. 4, 2014 GO Official Statement, at 24-25, 38; *accord* SAC ¶¶ 135(a)-(j), 136(a)-(d).) The underwriting fees were therefore settlement payments as a matter of law.

Likewise, all of the challenged payments of principal and interest from proceeds of the Challenged Bonds were settlement payments because Puerto Rico "and its agencies" allegedly made those payments to refund principal and/or interest on bonds that those unspecified entities had previously issued. (SAC ¶¶ 135-36, 155, 177.) *Cf. In re Nine*, 482 F. Supp. 3d at 198 (holding that the "plain language" of the safe harbor protected payments to shareholders). Moreover, the only alleged transfers of principal and interest that the SAC specifically identifies—to Barclays and Morgan Stanley—(SAC ¶ 230)— in order to redeem debt securities that it had previously issued (Ex. 4, 2014 GO Official Statement at 24), are "settlement payments . . . [b]ecause [the Commonwealth's] redemption payments completed a transaction in securities." *Enron Creditors*, 651 F.3d at 336; *cf. In re Bos. Generating*, 617 B.R. at 493 (holding that dividend payments qualify as "settlement payments" when they are made in "exchange for the holder's equity interest"); *In re U.S. Mortg. Corp.*, 492 B.R. 784, 820 (Bankr. D.N.J. 2013)

22

(holding that "payments made by the Debtors to the Defendant [that] were used . . . to reimburse the Defendant for securities previously purchased" were protected by § 546(e)).

### 2. The challenged transfers were made to qualifying participants

Defendants are entities entitled to invoke safe harbor protection because they are qualifying participants under § 546(e). Qualifying participants include "stockbroker[s]" and "financial participant[s]." 11 U.S.C. § 546(e). Section 101(53A) defines "stockbroker" to include a "person . . . with respect to which there is a customer" and "that is engaged in the business of effecting transactions in securities . . . (i) for the account of others; or (ii) with members of the general public, from or for such person's own account." 11 U.S.C. § 101(53A).[17] In other words, "[a] stockbroker is a person that has customers and engages in the business of effecting transactions in securities," and there is "no requirement in the Code . . . that require[s] the transferor . . . to be a 'customer' of the 'stockbroker' for purposes of the transfers in question." *In re Stewart Fin. Co.*, 367 B.R. 909, 919 (Bankr. M.D. Ga. 2007) (emphasis omitted).

Here, the SAC concedes that the Underwriter Defendants are "stockbrokers" by alleging that each of the Underwriter Defendants are "broker dealers." (SAC ¶¶ 18-37.)[18] Moreover, each of these entities was registered as a broker dealer with the Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority ("FINRA"), and was "engaged in the

---

[17] "'[C]ustomer,' as used in the Code is a term of art . . . to 'include anybody that interacts with the [broker] in a capacity that concerns securities transactions.'" *In re Kaiser Steel Corp.*, 952 F.2d 1230, 1240 n.11 (10th Cir. 1991) (second alteration in original) (citation omitted), *abrogated on other grounds by Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 138 S. Ct. 883 (2018).

[18] *See also Investopedia, What Is a Broker Dealer (B-D), and How Does It Work?*, Investopedia (May 29, 2021), https://www.investopedia.com/terms/b/broker-dealer.asp (defining broker-dealer as "a person or firm in the business of buying and selling securities for its own account or on behalf of its customers"); *In re Baker & Getty Fin. Servs., Inc.*, 106 F.3d 1255, 1261 (6th Cir. 1997) ("Section 101(53A), however, does not require that one be a licensed broker-dealer before becoming a stockbroker, and nothing in the legislative history suggests that the legislature intended that licensed broker-dealers alone qualify for stockbroker status.").

business of effecting transactions in securities."[19] 11 U.S.C. § 101(53A); *see also In re U.S. Mortg. Corp.*, 492 B.R. at 807, 820 (holding that "[t]here is no question . . . that Vining Sparks is a stockbroker" because "Vining Sparks is a registered securities broker-dealer with FINRA and the SEC"); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 476 B.R. 715, 719 (S.D.N.Y. 2012) ("[E]ven assuming the truth of the allegation that Madoff Securities' investment advisory division never traded securities on behalf of clients, Madoff Securities nonetheless qualifies as a stockbroker by virtue of the trading conducted by its market making and proprietary trading divisions."), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014).[20]

In addition, Defendants also qualify as "financial participants." The term "financial participant" includes an entity that is party to one or more securities, commodity, swap, repurchase, or forward contracts totaling at least $1 billion in gross notional or actual principal dollar amount. 11 U.S.C. § 101(22A)(A). Here, Defendants clearly satisfy that definition. *See* (SAC ¶¶ 135-36 (alleging the Underwriter Defendants underwrote bonds totaling over $10

---

[19] *See* Ex. 9 (PDFs containing lists from relevant periods of all broker-dealers registered with the SEC, published at https://www.sec.gov/help/foiadocsbdfoia); Ex. 10 (Screenshots from FINRA's BrokerCheck website showing currently registered and previously registered brokerage firms, published at https://brokercheck.finra.org/). *See In re Sun Edison*, 620 B.R. at 516 (taking judicial notice of an entity's status as a financial institution).

[20] Indeed, the Bankruptcy Code's definition of "stockbroker" mirrors the definitions of "broker" and "dealer" provided by the Exchange Act. To illustrate, § 3(a)(4)(A) of the Exchange Act defines "broker" as "any person engaged in the business of effecting transactions in securities for the account of others," 15 U.S.C. 78c(a)(4)(A), while § 3(a)(5)(A) defines "dealer" as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. 78c(a)(5)(A). Applying those definitions, courts have concluded that entities are stockbrokers when they meet both of the elements that the Underwriter Defendants meet here as broker-dealers. *See In re Am. Home Mortg. Holdings, Inc.*, 388 B.R. 69, 86-87 (Bankr. D. Del. 2008) ("As a registered broker-dealer, Lehman Brothers in the ordinary course of its business engages in effectuating transactions in securities for the account of others, with the general public, and for its own account. Thus, Lehman Brothers meets the first element of a 'stockbroker' . . . . As a registered broker-dealer, by definition, Lehman Brothers has 'customers.' Therefore, Lehman Brothers meets the second element of the definition of 'stockbroker.'").

billion in this action alone)). They are some of the largest financial institutions in the world and

the Court can take notice of such facts. (SAC ¶ 1 ("The thirteen major banks named as

Defendants in this action . . .").) *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 437

(Bankr. S.D.N.Y. 2012) (noting that JPMorgan Chase, "as one of the leading financial

institutions in the world, quite obviously is . . . a 'financial participant' . . . because it is a party to

outstanding safe harbor contracts totaling at least $1 billion in gross notional or principal dollar

amount," which was not in dispute).[21]

### B.    Section 546(g) Bars The Claims In Counts IV-V Seeking To Avoid Swap Payments

The remainder of the fraudulent transfer claims in Counts IV-V relate to payments made

pursuant to the Swap Agreements, which are similarly barred by 11 U.S.C. § 546(g)'s safe

harbor. Congress adopted a broad definition of "swap agreement," which specifically includes

"interest rate swap[s] . . . and basis swap[s]." 11 U.S.C. § 101(53B)(A)(i)(A)(I); *see also Whyte

v. Barclays Bank PLC*, 494 B.R. 196, 200 (S.D.N.Y. 2013), *aff'd*, 644 F. App'x 60 (2d Cir.

2016). Similarly, "[t]he term 'in connection with' is by its own terms very broad; in the context

of avoidance of transfers it has been interpreted to mean 'related to an agreement.'" *In re

Lancelot Invs. Fund, L.P.*, 467 B.R. 643, 656 (Bankr. N.D. Ill. 2012), *aff'd sub nom. Peterson v.

Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013).

---

[21] Moreover, even if the Underwriter Defendants did not already qualify as stockbrokers or financial participants (which they do), the challenged transfers would still be barred because each of the Debtors that made the challenged payments is also a "financial participant" within the meaning of § 546(e) because each of the Debtors held over $1 billion in gross notional or actual principal dollar amount in bond-related claims at the time of the Title III filings. *See* Disclosure Statement for the Seventh Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03283-LTS, Doc. 17628, at 18-24 (D.P.R. July 30, 2021) (*see also* SAC ¶¶ 135-36.) Thus, the challenged payments to the Underwriter Defendants were settlement payments that were also made *by* financial participants, and such payments are therefore excepted from any fraudulent transfer cause of action under § 546(e). *See In re Samson Res. Corp.*, 625 B.R. 291, 301 (Bankr. D. Del. 2020) ("[T]he Court concludes that the plain text and structure of the Code's definition of financial participant does not exclude debtors.").

Here, the SAC demonstrates that the swap-related claims asserted in Counts IV-V are barred by § 546(g). First, the Trustee seeks to recover payments the Commonwealth and PBA paid to Swap Defendants in connection with the Swap Agreements (*see* SAC ¶¶ 240, 243, 256), which the SAC itself defines as interest rate swap and basis swap agreements (*see, e.g.*, *id.* ¶¶ 69 (referring to "interest rate swaps"), 72 (referring to "Basis Swaps")). Indeed, the Trustee concedes that the Commonwealth and PBA "entered" into interest rate swap agreements, as that term is defined in 11 U.S.C. § 101, with Swap Defendants to "hedge the interest rate of [their] debt." (SAC ¶ 69.) These agreements, from which "the benefit or detriment from the contract depend[ed] on future fluctuations in the market" *In re Nat'l Gas Distribs., LLC*, 556 F.3d 247, 260 (4th Cir. 2009), are exactly the types of swap agreements protected by § 546(g), *see* 11 U.S.C. § 101(53)(B)(A)(i)(I).

Second, the Swap Defendants are also "swap participant[s]." "[S]wap participant means an entity that, at any time before the filing of the petition, ha[d] an outstanding swap agreement with the debtor." 11 U.S.C. § 101(53C). As alleged parties to the Swap Agreements with the Commonwealth and PBA, the Swap Defendants are indisputably "swap participant[s]." (*See* SAC ¶ 4.) Accordingly, Counts IV-V are barred by the § 546(e) and (g) safe harbors.

## II.     THE PUERTO RICO LAW CLAIMS (COUNTS I-II) SHOULD BE DISMISSED BECAUSE THEY ARE PREEMPTED BY SECTION 546 OF THE BANKRUPTCY CODE

Counts I-II attempt to use Puerto Rico law to claw back the same payments protected by § 546's safe harbors, but those claims are preempted by federal law. Under the Supremacy Clause, state laws that interfere with or are contrary to federal law are preempted. *See* U.S.

Const. art. VI, § 2.[22] "If the purpose of the [federal] act cannot otherwise be accomplished—if its

operation within its chosen field . . . must be frustrated and its provisions be refused their natural

effect—the state law must yield . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373

(2000) (citations omitted); *see also* PROMESA § 4 ("The provisions of this Act shall prevail any

general or specific provisions of territory law, State law, or regulation that is inconsistent with

this Act"); PROMESA § 301(a) (stating that certain provisions of Title 11 of the Bankruptcy

Code, including §§ 544, 546, 548, apply to a case brought under PROMESA).[23]

Section 546 preempts state law claims seeking to unwind securities and swap transactions

that would otherwise be protected by § 546's safe harbors. *See In re Tribune*, 946 F.3d at 94

(holding that state law constructive transfer claims are preempted by § 546(e)'s safe harbors); *In*

*re Bos. Generating*, 617 B.R. at 480 (holding that § 546(e) preempts unjust enrichment claims);

*see also Whyte*, 644 F. App'x 60 (affirming district court's holding that "the [Bankruptcy

Code's] section 546(g) 'safe harbor' impliedly preempts state-law fraudulent conveyance actions

seeking to avoid 'swap transactions' as defined by the Code") (alteration in original) (citation

omitted). The reason that these types of claims are preempted is simple: "the exemption[s] set

forth in section 546[] would be rendered useless" if the safe harbors could be "avoided by simply

re-labeling avoidance claims as [state law] claims." *In re Hechinger Inv. Co. of Del.*, 274 B.R.

---

[22] "Although the Commonwealth of Puerto Rico is a territory of the United States rather than a state, the
test for preemption is the same." *Telecommunications Regul. Bd. of Puerto Rico v. CTIA-Wireless Ass'n*,
752 F.3d 60, 63 (1st Cir. 2014) (citing *P.R. Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S.
495, 499 (1988)).

[23] Even without the express provisions within PROMESA providing for preemption, "the regulation of
creditors' rights has a history of significant federal presence" as "Congress's power to enact bankruptcy
laws was made explicit in the Constitution as originally enacted." *In re Bos. Generating*, 617 B.R. at 478
(citation omitted). As such, "[o]nce a party enters bankruptcy, the Bankruptcy Code constitutes a
wholesale preemption of state laws . . . ." *Id.*; *see also In re Miles*, 430 F.3d 1083, 1091 (9th Cir. 2005)
("Congress intended the Bankruptcy Code to create a whole scheme under federal control that would
adjust all of the rights and duties of creditors and debtors alike . . . ." (emphasis omitted)).

71, 96 (D. Del. 2002).

Accordingly, in considering preemption, courts focus on whether the trustee seeks to recover the same payments that are safe-harbored by § 546. *See, e.g.*, *In re Bos. Generating*, 617 B.R. at 480 (unjust enrichment claim preempted because it sought to unwind a securities transaction); *In re U.S. Mortg. Corp.*, 492 B.R. at 810 ("[State] law claims for damages that are merely 're-labeled' avoidance actions are preempted by the Code so as not to render § 546(e) 'useless.'"). As Judge Rakoff held in *In re Nine*, "it is the remedy sought, rather than the allegations pled, that determines whether § 546(e) preempts a state law claim." 482 F. Supp. 3d at 207. Applying that analysis, the court dismissed unjust enrichment claims seeking disgorgement and restitution of payments that were protected by the statutory safe harbor. *Id*. at 207-09.

Here, Counts I-II are preempted by § 546(e) and (g) because they "seek[] to recover the same payments" as Counts IV-V, which are "unavoidable under § 546[]." *AP Servs. LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (citation omitted). Count I seeks to recover "the funds [Swap Defendants] received from the Commonwealth and PBA under the Swap Agreements," (SAC ¶¶ 210-15)—the same remedy the SAC seeks in Counts IV-V. And Count II seeks to recover the same underwriting fees and principal and interest payments in connection with the Bond Purchase Contracts and Challenged Bonds, as well as certain swap termination payments made with the proceeds of the Challenged Bonds. (*Compare* SAC ¶¶ 219-222 (Count II seeking recovery of payments listed on SAC Exs. 4-23) *with* SAC ¶ 244 (Count IV seeking recovery of payments listed on SAC Exs. 4, 12, 17 and 21) *and* SAC ¶ 263 (Count V seeking recovery of payments listed on SAC Exs. 4-23).) The Trustee's unjust enrichment claims in Counts I-II are similarly preempted because they "implicate the same concerns regarding the unraveling of

28

settled securities transactions . . . which is precisely the result that § 546[] precludes." *AP Servs.*,

483 B.R. at 71 (citation omitted); *see also In re Bos. Generating*, 617 B.R. at 480 (unjust

enrichment claim preempted); *accord In re Nine*, 482 F. Supp. 3d at 207.

The Trustee cannot circumvent § 546's strictures by seeking the same recoveries under

state law that are specifically foreclosed by those statutory safe harbors. Accordingly, Counts I-II

should be dismissed.

## III.   COUNTS III-IV SHOULD BE DISMISSED BECAUSE ALL OF THE CHALLENGED TRANSFERS OCCURRED MORE THAN TWO YEARS BEFORE DEBTORS' FILED THEIR TITLE III PETITIONS

Counts III-IV should be dismissed because none of the challenged transfers occurred

during the two-year lookback period established in § 548(a) of the Bankruptcy Code. That

lookback period is not subject to equitable tolling, and, in any event, the Trustee has failed to

allege any plausible basis for equitable tolling.

### A.   The Trustee Fails To Allege Any Transfers Within The Two-Year Lookback Period

Counts III-IV, asserted under § 548(a)(1)(A)-(B) of the Bankruptcy Code, require the

Trustee to allege that the "transfer[s] . . . w[ere] made or incurred on or within 2 years before the

date of the filing of the petition" in order to "avoid" those transfers. 11 U.S.C. § 548(a)(1). The

"two-year lookback period established by section 548(a)(1) is a substantive element of a section

548 avoidance action." *In re Sandburg Mall Realty Mgmt. LLC*, 563 B.R. 875, 895-96 (Bankr.

C.D. Ill. 2017); *accord In re Abell*, 549 B.R. 631, 658 (Bankr. D. Md. 2016) ("[T]he two-year

period is a substantive element of the trustee's claim.").

None of the alleged transfers occurred within the two-year lookback period that began

here at the earliest on May 3, 2017—the date on which Puerto Rico filed its Title III petition

(SAC ¶ 203)—and ended on May 3, 2015. Instead, the last challenged transfer allegedly

occurred in 2014 (*id*. ¶ 229)—nearly a year outside the statutory lookback period.[24] For this reason alone, Counts III-IV should be dismissed. *See, e.g.*, *In re Sandburg Mall*, 563 B.R. at 896 ("Since all of the challenged transfers were made prior to the two-year window for avoidance, none of the transfers are actionable.").

### B.      Section 548 Is A Statute Of Repose That Cannot Be Tolled

Conceding that none of the challenged transfers occurred during the two-year lookback period, the SAC asserts that it would "be inequitable to end the lookback period on the date that Puerto Rico filed its petition . . . because it was legally unable to file [its] petition until PROMESA was enacted." (SAC ¶ 228.) But that allegation fails because by limiting avoidance actions to transfers "made or incurred on or within 2 years before the date of the filing of the petition," § 548(a) creates a statute of repose that, unlike a statute of limitations, cannot be tolled. Statutes of repose put an outer limit on the right to bring a civil action measured from the date of the last culpable act or omission of the defendant. *See CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014). Consequently, equitable tolling does not apply to statutes of repose because their "very purpose is to set a cutoff point without regard to the plaintiff's knowledge." *In re Sandburg Mall*, 563 B.R. at 895.[25] Not surprisingly, given § 548(a)'s clear text, of the "bankruptcy courts that have addressed whether the lookback period under section 548 is a statute of limitations that is subject to equitable tolling, the clear majority hold that it is not." *Id*. at 896 (collecting cases); *see also In re Abell*, 549 B.R. at 657 ("Many courts have confronted this issue and rejected the idea

---

[24] The alleged transfers also did not occur within the two-year lookback periods that began on May 21, 2017, when ERS filed Title III, and September 27, 2019, when the PBA filed Title III. (SAC ¶ 197.)

[25] By contrast, statutes of limitations "regulate secondary conduct, i.e., the filing of a suit, not primary conduct, i.e., the actions that gave rise to the suit." *In re Pitt Penn Holding Co., Inc.*, No. 09-CV-11475 (BLS), 2012 WL 204095, at *3 (Bankr. D. Del. Jan. 24, 2012) (citation omitted).

that § 548(a)(1) is a statute of limitations subject to equitable tolling.").

The fact that § 548(a)'s two-year lookback period is a statute of repose is further confirmed by § 548(d), which separately provides for a limited exception to the two-year lookback period. Specifically, trustees can seek to avoid secret transfers under § 548(d) that occurred beyond the two-year lookback period "without resort to equitable tolling principles." *In re Abell*, 549 B.R. at 659. Here, because the SAC does not allege that the transfers were secret, but does allege that they were made well beyond "two years [before] the date of the filing of the petition, the transfer[s] [are] invulnerable under section 548(a) . . . ." 5 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* ¶ 548.09[1][a] (16th ed. 2022).

### C.     Even If Tolling Could Apply, The Trustee Fails To Allege Any Plausible Basis To Do So Here

The Trustee's argument that Puerto Rico's enactment of the Recovery Act in 2014 tolls the two-year lookback period (SAC ¶ 227), fails because the SAC does not allege that the Recovery Act had any equitable impact on the Trustee's claims under the Bankruptcy Code. Nor could the SAC make those allegations because Puerto Rico has no ability to "amend" a Congressional statute. Therefore, a statute that had no effect on claims under the Bankruptcy Code cannot provide the basis to toll the statute of repose for the SAC's claims asserted under the Bankruptcy Code. Moreover, in enacting PROMESA, Congress could have provided for equitable tolling or provided a longer lookback period tailored to Puerto Rico's insolvency, but Congress opted not to do so. *See Tx. Dep't of Hous. & Cmty. Affs. v. Inclusive Comms. Project, Inc.*, 576 U.S. 519, 536 (2015) (declining to provide an statutory exception because when adopting an amendment, Congress "made a considered judgment to retain the relevant statutory text"). Accordingly, this Court should not provide a statutory exception that Congress declined.

IV.     **COUNTS III-V SHOULD BE DISMISSED**
        **BECAUSE THE TRUSTEE FAILED TO ALLEGE ADEQUATELY**
        <u>**THAT ANY OF THE CHALLENGED TRANSFERS WERE FRAUDULENT**</u>

Each of the SAC's fraudulent transfer claims asserted in Counts III-IV should be dismissed because those claims are defective as a matter of law. The Trustee's fraudulent transfer claims in Counts III-V, whether framed as intentionally or constructively fraudulent, seek to avoid the: (1) underwriting fees paid on the Challenged Bonds; (2) swap termination payments; and (3) repayments of principal and interest on unnamed bonds held by the Underwriter Defendants from the proceeds of the Challenged Bonds. Those claims, whether under the federal Bankruptcy Code, New York law, or Puerto Rico law, are inadequately pled.

A.      **The Trustee Fails To Plead Adequately**
        **Its Intentional Fraudulent Transfer Claims**

The intentional fraudulent transfer claims alleged in Counts III and V fail because the Trustee relies upon threadbare allegations and group pleading. The Trustee alleges that the Debtors "intentionally and fraudulently transferred funds" and that the Debtors should not have paid the underwriting fees or used the proceeds from the Challenged Bonds because Puerto Rico "knew" that those Bonds were illegal. (SAC ¶¶ 16, 228.) But the SAC's conclusory allegations that the Debtors "knew" about or "intended" the supposed illegality are insufficient. *See, e.g.*, *In re Ed. Flash, Inc.*, No. 13-08014 BKT, 2016 WL 3638471, at *5 (Bankr. D.P.R. June 29, 2016) ("Plaintiff recites § 548 statutory language; and thus, falls short to meet § 548 burden of proof."); *see also In re NM Holdings Co., LLC*, 407 B.R. 232, 262-63 (Bankr. E.D. Mich. 2009) (dismissing claim because "the identity of a transferor is pled as being 'the Debtors' or 'one or more of the Debtors,' (there are eleven 'Debtors')").

Second, to meet Rule 9(b)'s strictures, where, as here, "multiple defendants are asked to respond to [multiple] allegations of fraud, the complaint should inform each defendant of the

nature of his alleged participation in the fraud." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). The Trustee asserts an intentional fraudulent transfer claim against "[s]everal Underwriter Defendants [that] received repayment of interest and principal on bonds they held with the Commonwealth and its agencies from the proceeds of bonds they underwrote" (SAC ¶ 255), but offers no clues about which of those Underwriter Defendants received principal and interest payments or when those payments were made, let alone the bonds under which those alleged payments were made. *See Gross v. Summa Four, Inc.*, 93 F.3d 987, 991-92 (1st Cir. 1996) ("[T]he heightened pleading requirement of Rule 9(b) applies even when the fraud relates to matters peculiarly within the defendant's knowledge."); *see also In re NM Holdings*, 407 B.R. at 262-63 (dismissing claim where "the Complaint fails to state the specific name of the transferor, the transfer date(s), and each of the transfer amount(s)"); *accord In re M. Fabrikant & Sons, Inc.*, 394 B.R. 721, 734 (Bankr. S.D.N.Y. 2008) (collecting cases). Thus, Count V's intentional fraudulent transfer claim against unspecified Defendants for unspecified transfers is plainly deficient because it rests on improper group pleading.

### B.     The Trustee Fails To Allege That The Debtors Made The Challenged Transfers With The Actual Intent To Defraud Their Creditors

To plead its claims for intentional fraudulent transfer under § 548(a)(1)(A) of the Bankruptcy Code, the Trustee must allege that the "debtor voluntarily . . . made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud" creditors. 11 U.S.C. § 548(a)(1)(A). Similarly, if New York law applies to Count V through § 544(b), which it does not, *see infra* § VII.B.1, the SAC must allege the same: that the debtor made the challenged transfer "with actual intent . . . to hinder, delay, or defraud either present or future creditors." *Ray*

*v. Ray*, 799 F. App'x 29, 31 (2d Cir. 2020) (quoting N.Y. Debt. & Cred. Law, § 276 ("DCL")).[26]

Claims for intentional fraudulent transfers "turn on the intent of a debtor." *In re Comprehensive

Power, Inc.*, 578 B.R. 14, 30 (Bankr. D. Mass. 2017). Specifically, a trustee must show "that the

debtor had an intent to interfere with creditors' normal collection processes . . . for . . . malign

ends." *In re Indrescom Sec. Tech. Inc.*, 559 B.R. 305, 317 (Bankr. D.P.R. 2016) (citation

omitted); *accord Max Sugarman Funeral Home, Inc. v. A.D.B. Invs.*, 926 F.2d 1248, 1254 (1st

Cir. 1991). The Trustee's allegations here fall well short of demonstrating that the Debtors

intended to defraud their creditors when making the challenged transfers for several reasons.

### 1.      The SAC's intentional fraudulent transfer claims are implausible

#### (a)      <u>The Trustee's claims are facially implausible</u>

Puerto Rico's fiscal problems, at this juncture, have been well-documented. The

Trustee's effort to equate what it now characterizes as imprudence or mismanagement by Puerto

Rico of its finances with purposeful defrauding of creditors falls short of what is required and

makes no sense. For one, the Trustee seeks a finding that no court has ever made—that a

democratically elected government and its agencies made transfers to underwriter banks with the

actual intent to defraud the government's creditors. Nor does that theory make any sense in the

context of public bond offerings by these governmental entities. *See In re Old CarCo LLC*, 435

B.R. 169, 192 (Bankr. S.D.N.Y. 2010) (dismissing claims as implausible where the transfers

were "part of a business plan that was fully developed by financial advisors, and that plan played

out over the course of several months"). Indeed, the alleged transfers were made in plain sight as

---

[26] "[A]ll sections of the NYDCL relevant to this [case] have been repealed and replaced—effective April 4, 2020." *Ray*, 799 F. App'x at 31 n.1 (quoting 2019 N.Y. Sess. Laws Ch. 580). "The new provisions, however, will 'not apply to a transfer made or obligation incurred before' the act's effective date, 'nor shall [they] apply to a right of action that has accrued before [that] effective date." *Id.* (quoting 2019 N.Y. Sess. Laws Ch. 580).

part of publicly disclosed commercial relationships for the purpose of helping the government

raise "revenue" (SAC ¶ 136), not to defraud creditors.

In addition, as the SAC alleges, the GO Bonds were authorized by resolutions adopted by

Puerto Rico's Department of the Treasury and approved by its Governor (SAC ¶ 55), and the

Challenged Bonds were supported by validity opinions from Puerto Rico's Secretary of Justice

(Ex. 1, K&K Rep. at 257). With no support and no details, the Trustee implausibly supposes that

these government officials conspired, in broad daylight, to intentionally defraud Puerto Rico's

creditors, even though the SAC fails to identify any plausible motive for Puerto Rico to do so.

*See Bos. Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987) (Breyer, J.)

(dismissing claim where the plaintiff failed to plead that the debtor "convey[ed] property to a

friend whom he expect[ed] will use the property in a way that benefits the debtor"). Perhaps

most glaringly, the SAC implicitly concedes that the transfers could not have furthered a plot to

hide assets until Puerto Rico exited bankruptcy because, at the time of each of the alleged

transfers, Puerto Rico was unable to invoke federal bankruptcy law. (SAC ¶ 190.)

    (b)   <u>The "badges of fraud" on which</u>
<br>           <u>the Trustee relies are insufficient</u>

Notwithstanding its claims' facial implausibility, the Trustee identifies "badges" it claim

suffice to plead intentional fraud: (1) the "Debtors' Insolvency"; (2) "[t]he transfers sought to be

avoided were made pursuant to illegal contracts"; (3) "Barclays and Morgan Stanley Violated

Federal Securities Law"; (4) Defendants "knew Debtors were bound to default"; (5) "Degree of

control exercised by Defendants"; and (6) the "Debtors' relationship of kinship, closeness, or

trust with Defendants." (SAC ¶¶ 229, 254.) First, even assuming *arguendo* that the Trustee has

adequately alleged that each Debtor was insolvent at the time of the alleged transfers (which it

has not because the SAC contains no allegations relating to the ERS's and PBA's respective

35

financial conditions), merely alleging a debtor's insolvency is insufficient to escape dismissal. *In re Fedders N. Am., Inc.*, 405 B.R. 527, 545, 554-55 (Bankr. D. Del. 2009) (dismissing complaint that alleged debtors' "insolvency at a time shortly before it arranged to borrow from Lenders and granted Lenders a security interest in return"); *see also A&M Global Mgmt. Corp. v. Northtown Urology Assocs., P.C.*, 115 A.D.3d 1283, 1288-89 (4th Dep't 2014) ("[T]he presence of one or more badges of fraud does not necessarily compel the conclusion that a conveyance is fraudulent."). Moreover, this "badge" cannot be sufficient as a matter of law because it merely recites an element of the Trustee's constructive fraudulent transfer claims alleged in Counts IV-V, *see* 11 U.S.C. § 548(a)(1)(B); DCL § 273, and intentional fraudulent transfer claims require more: "actual intent" to defraud. 11 U.S.C. § 548(a)(1)(A); DCL § 276. *See In re MarketXT Holdings Corp.*, 361 B.R. 369, 396-97 (Bankr. S.D.N.Y. 2007) (dismissing claim despite allegations of insolvency and lack of "adequate consideration"); *see also CLC Creditors' Grantor Trust v. Howard Sav. Bank*, 396 B.R. 730, 747 (Bankr. N.D. Ill. 2008) ("If the elements of constructive fraud were enough to demonstrate actual fraud, the constructive fraud provisions of [the fraudulent transfer statute] would be superfluous.").

Second, the Challenged Bonds were not illegal. *See infra* § VI. But even assuming that the Challenged Bonds were illegal, that allegation is irrelevant because "[f]raudulent conveyance law is basically concerned with transfers that . . . 'defraud' creditors; it is not ordinarily concerned with how such debts were created." *Bos. Trading Grp.*, 835 F.2d at 1510; *accord In re Sharp Intern. Corp.*, 403 F.3d 43, 55-56 (2d Cir. 2005). Indeed, the First Circuit has concluded that "no modern case . . . has found a fraudulent conveyance" where the intentional fraudulent transfer claim was premised solely upon the allegation that the funds transferred were "obtain[ed] . . . through dishonest means." *Bos. Trading Grp.*, 835 F.2d at 1510. Therefore, the

36

Court should discard the SAC's reliance upon the alleged illegality of the Challenged Bonds.

Third, the Trustee alleges that "Barclays and Morgan Stanley [v]iolated [f]ederal [s]ecurities [l]aw" and that Defendants "knew Debtors were bound to default," but those allegations—in addition to being untrue and alleged inadequately—are irrelevant as matter of law because each of them relates to Defendants' supposed intent. *See In re Indrescom*, 559 B.R. at 317 (noting that defendants' intent as "transferee[s] . . . is irrelevant") (citation omitted). And, even if Defendants' intent was relevant, the SAC advances only the insufficient claim that Defendants intended to earn the "lucrative incentive[s]" for being selected as underwriters (SAC ¶ 171)—not to defraud the Debtors' creditors. *Cf. Fisher v. Offerman & Co., Inc.*, No. 95-CV-2566 (JGK), 1996 WL 563141, at *7 (S.D.N.Y. Oct. 2, 1996) (holding that "an underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a strong inference of fraudulent intent").

Fourth, the SAC claims that Defendants somehow controlled democratically elected governments and their instrumentalities by alleging that the GDB "had to rely on the Defendants to provide the liquidity, expertise, and complex structuring of instruments that it needed" because the GDB was inept. (SAC ¶ 254.) But such alleged "reliance" is not the same as actual "control." To be considered a relevant "badge of fraud," the complaint must allege "near[] total control of a debtor by a transferee." *In re Bob's Sea Ray Boats, Inc.*, 144 B.R. 451, 459 (Bankr. D.N.D. 1992) ("The cases are careful to point out that vicarious intent is an extreme situation that is dependent upon nearly total control of a debtor by a transferee."); *accord Gray & Assocs., LLC v. Speltz & Weis LLC*, 22 Misc. 3d 1124(A), 2009 N.Y. Slip Op. 50275(U), at *13 (Sup. Ct. 2009). There is nothing in the SAC that alleges or even suggests the required "total control." Indeed, the K&K Report undercuts the SAC's conclusory claim that Defendants controlled

37

Puerto Rico because it states that the GDB declined to adopt some of Defendants' proposals.[27]
(Ex. 1, K&K Rep. at 78.)

Finally, the allegations relating to the "Debtors' relationship of kinship, closeness, or trust with Defendants" are utterly insufficient. In support, the Trustee alleges that two senior executives at Santander affiliates left those affiliates to work for the GDB and that one of them returned to a Santander affiliate after leaving the GDB.[28] (SAC ¶ 174.) But there is no precedent holding that a few employees switching employment between an advisor to the Debtors and a transferee is akin to the required relationship of a "friend, relative, or other person 'specially connected.'" *Bos. Trading Grp.*, 835 F.2d at 1511; *cf. FDIC v. Elio*, 39 F.3d 1239, 1246 (1st Cir. 1994) (finding a "special relationship" because the transferee trusts were "both created by [the transferor]; family members served as the trustees of both . . . ."). Moreover, the supposed "closeness" between the GDB and Defendants is irrelevant because the Trustee concedes that all bond offerings obtained independent approvals by the Department of the Treasury and the Governor. (SAC ¶ 55.) Thus, the relationship the GDB allegedly had with one Defendant does not raise an inference of an intent to defraud. *Cf. Ray v. Ray*, 108 A.D.3d 449, 451-52 (1st Dep't 2013) (rejecting purported "badges" because they did "not demonstrate circumstances so commonly associated with fraudulent transfers").

(c)   The Trustee fails to allege many of the badges of fraud on which courts typically rely

The Trustee's failure to attempt to allege many of the badges that courts typically credit

---

[27] Moreover, the Trustee's failure to allege which Defendants or which individuals exercised any supposed the control over the GDB further demonstrates that the clam is insufficient. *See DiVittorio*, 822 F.2d at 1247-48.

[28] The allegations that the GDB had a close relationship with unidentified employees from other Defendants is plainly insufficient under Rule 9(b).

38

"constitutes evidence that there was no intent to defraud." *S & M Heating Corp. v. Macaluso*, 37

Misc. 3d 1231(A), 2012 N.Y. Slip Op. 52256(U), at *2 (Sup. Ct. 2012); *see also Bos. Trading

Grp.*, 835 F.2d at 1511 ("find[ing] it significant" that the case lacked well-recognized indicia of

fraud). Courts long have recognized that secrecy is often the key indication of a debtor's intent to

defraud its creditors. *See Bos. Trading Grp.* 835 F.2d 1504, 1511 (concluding that plaintiff failed

to plead intentional fraudulent transfer claims because the plaintiff failed to allege that the

transfers were "hidden" from creditors); *see also, e.g.*, *In re Fedders*, 405 B.R. 527, 545-46

(Bankr. D. Del. 2009) (dismissing claim because debtors' "dealings with Lenders were anything

but concealed"). Here, however, the challenged underwriting fees—as well as the use of some of

the proceeds from the Challenged Bonds to repay obligations in connection with the Swap

Agreements—were disclosed publicly in the bonds' Official Statements. (*See, e.g.*, Ex. 4, 2014

GO Official Statement at 1, 24, 38.) *See In re Fedders*, 405 B.R. at 545-46 (dismissing claim

because the transfer "was disclosed in a public filing with the SEC").

"In addition to not being a secret," the Trustee's claim that the alleged transfers were

made with intent to defraud is implausible because they "also w[ere] not hasty." *In re Old

CarCo*, 435 B.R. at 191; *see also In re El Mundo Corp.*, 208 B.R. 781, 783-84 (D.P.R. 1997)

(dismissing claim because, among other things, "there was no haste whatsoever . . . in the

[transfers]"). Any possible inference of fraud is further dispelled by the absence of several other

recognized badges, including that there are no allegations of "actual or threatened litigation" by

creditors, no allegations that transfers constituted "all or substantially all of the [Debtor's]

property," *Max Sugarman*, 926 F.2d at 1254, and no allegations that the Debtors "use[d]

dummies or fictitious parties," *Shelly v. Doe*, 249 A.D.2d 756, 758 (3d Dep't 1998).

"In sum, the Trustee's highlighted badges of fraud fail to raise a strong inference of

fraudulent intent," and "the absence of other common badges of fraud" demonstrates that "the

Trustee has not satisfied the heightened pleading standard for demonstrating an actual fraudulent

conveyance." *In re Tribune Co. Fraudulent Conveyance Litig.*, 10 F.4th 147, 171 (2d Cir. 2021).

Indeed, as the SAC alleges, the challenged transfers were made as part of the Debtors' strategies

to raise revenues and pay off existing obligations. (SAC ¶¶ 117, 127-31, 133.) Accordingly, the

Court should dismiss the intentional fraudulent transfer claims alleged in Count III, and those in

Count V to the extent New York law applies to that claim.

### 2. Blackletter law bars the Trustee's claims that the Debtors improperly preferred certain creditors

Counts III and V's claims to avoid swap termination payments and the repayment of

interest and principal as intentional fraudulent transfers should be dismissed for a separate and

independent reason: the SAC alleges that these challenged transfers were mere preferences. The

First Circuit has "specifically held" that "fraudulent conveyance law does not seek to void

transfers . . . known as a 'preference.'" *Bos. Trading Grp.*, 835 F.2d at 1508; *accord Ultramar*

*Energy Ltd. v. Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (1st Dep't 1993). As then-

Judge Breyer explained:

> Suppose a debtor owes A $10,000 and B $20,000. He has only $8000, which he
> uses to satisfy his debt to A. This conveyance may be unfair to B, <u>but it is not a</u>
> <u>"fraudulent conveyance"</u> because it satisfies a debt owed to a person who is, at
> least, a legitimate creditor.

*Bos. Trading Grp.*, 835 F.2d at 1508 (emphasis added). This rule applies even when the

preference is paid using money allegedly obtained "through dishonest means (larceny, fraud,

etc.)." *Id.* at 1510.

Here, the Trustee alleges that certain swap termination payments paid from the proceeds

of the Challenged Bonds were fraudulent transfers because Defendants took "<u>preference</u> over

Puerto Rico's other creditors." (SAC ¶¶ 234, 256 (emphasis added).) Likewise, the Trustee

40

alleges that the repayment of principal and interest from the proceeds of the Challenged Bonds
was fraudulent because the payments preferred Defendants over other creditors. (SAC ¶¶ 230,
255.) Those are preferences, not fraudulent transfers, and thus cannot be avoided pursuant to
§ 548(a)(1)(A) or § 544(b). *See Bos. Trading Grp.*, 835 F.2d at 1508.[29] These claims should
therefore be dismissed.

### C. The Constructive Fraudulent Transfer Claims In Counts IV-V Should Be Dismissed Because They Fail To Allege That The Debtors Did Not Receive Reasonably Equivalent Value

To plead its claims in Count IV for constructive fraudulent transfer, the SAC must allege
that the Debtors "received less than a reasonably equivalent value." 11 U.S.C. § 548(a)(1)(B)(i).
Similarly, to the extent New York law applies in Count V, which it does not, *see infra* § VII.B.1,
"[a]n essential element of a claim pursuant to DCL §§ 273, 273–a, 274, 275 is lack of fair
consideration." *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 248 (2d Cir. 1987).[30]
"Courts . . . do not usually make a distinction between the standard required for reasonably
equivalent value, on the one hand, and fair consideration, on the other." *In re AppliedTheory
Corp.*, 323 B.R. 838, 840 (Bankr. S.D.N.Y. 2005), *aff'd*, 330 B.R. 362 (S.D.N.Y. 2005). Nor do
courts hesitate to dismiss constructive fraudulent transfer claims "where the complaint does not
plausibly allege that the debtor received less than reasonably equivalent value." *In re Tribune*, 10
F.4th at 172-73 (collecting cases).

---

[29] Preferential transfers can only be avoided pursuant to 11 U.S.C. § 547 if they were made within 90 days of the bankruptcy petition. The SAC does not allege any such transfers.

[30] Moreover, the "good faith" element in DCL § 272 does not change the analysis here. The Trustee's only invocation of "good faith" is that "the Issuers intentionally diverted funds to the Underwriter Defendants and Swap Defendants in connection with the Scoop and Toss bonds to the disadvantage of other creditors" and thus such transfers were not made in good faith. (SAC ¶ 258.) But the Second Circuit has repeatedly held that "a mere preference between creditors does not constitute bad faith." *In re Sharp*, 403 F.3d at 54; *see also Atlanta Shipping*, 818 F.2d at 249 (holding that the repayment of a loan was not in bad faith).

41

'"Determination of reasonably equivalent value . . . is a two-step process,' requiring the court to 'first determine whether the debtor received value, and then examine whether the value is reasonably equivalent to what the debtor gave.'" *Connolly Geaney Ablitt & Willard, PC*, 614 B.R. 133, 153 (B.A.P. 1st Cir. 2020) (quoting *In re Feeley*, 429 B.R. 56, 63 (Bankr. D. Mass. 2010)). "[I]n determining whether the debtor received 'reasonably equivalent value,' this Court 'need not strive for mathematical precision'" but instead look for whether there was a "significant disparity between the value received and the obligation assumed.'" *In re Tribune*, 10 F.4th at 172 (citation omitted).

The Bankruptcy Code's definition of "value" includes "property" or the "satisfaction or securing of a present or antecedent debt of the debtor," 11 U.S.C. § 548(d)(2)(A); *see also Atlanta Shipping*, 818 F.2d at 248-49, and "debt" includes "liability on a claim," 11 U.S.C. § 101(12). "Thus, a debtor receives 'value' for a transfer if the transfer satisfies a 'claim' the transferee-creditor has against the debtor," *In re Hedged-Investments Associates, Inc.*, 84 F.3d 1286, 1289 (10th Cir. 1996); *Atlanta Shipping*, 818 F.2d at 249, including a 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured,'" *United States v. Marston*, 694 F.3d 131, 137-38 (1st Cir. 2012) (quoting 11 U.S.C. § 101(5)).

Here, the SAC demonstrates that the Debtors received reasonably equivalent value for the challenged transfers:

- For the underwriting fees, the Debtors' received value because those fees satisfied the Underwriter Defendants' claim and right to payment pursuant to the Purchase Contracts. *See In re PSN USA, Inc.*, 615 F. App'x 925, 930 (11th Cir. 2015) ("This Court has held that the rendition of a service can constitute value under § 548."); *cf. In re United Energy*, 944 F.2d 589, 596-97 (9th Cir. 1991) (holding that even payment to investors who lacked a contractual right, but had claims for rescission, was for value).

42

- For the principal and interest payments made on prior bonds issued by the Debtors, the Debtors received value because those payments satisfied the claims that bondholders had against the Debtors for the antecedent debts of the bonds themselves. *See Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008) (holding that payment of accrued interest was for value); *De Aragon v. Chase Manhattan Bank*, 457 F.2d 263, 265-67 (1st Cir. 1972) (holding that payment to satisfy a contractual liability "constituted payment of an antecedent debt").

- For the swap termination payments, the Debtors received value because the Bankruptcy Code explicitly provides that "a swap participant or financial participant that receives a transfer in connection with a swap agreement takes for value to the extent of such transfer." 11 U.S.C. § 548(d)(2)(D); *see also supra* §§ I.A.2, I.B; *cf. In re Knight*, 473 B.R. 847, 850 (Bankr. N.D. Ga. 2012) (holding that even a transfer to satisfy an unmatured debt was made "to satisfy a present or antecedent debt"). Indeed, for some of the Swap Agreements, the Commonwealth netted tens of millions of dollars that it did not repay. (Ex. 1, K&K Rep. at 427.)

Nor has the Trustee alleged that the value received by the Debtors was not reasonably equivalent to what they gave as part of the challenged transfers. The SAC does not allege that the underwriting fees, the principal and interest paid on the unnamed bond securities, or the swap termination payments constituted anything other than ordinary course, arm's-length negotiated payments or even departed materially from other comparable transactions. *See Rubin v. Mfrs. Hanover Tr. Co.*, 661 F.2d 979, 994 (2d Cir. 1981) ("a penny-for-penny exchange" is unnecessary).[31]

---

[31] The Trustee's generic allegation that "the Underwriter Defendants made outsized profits" because the underwriting fees exceeded "the national weighted average of 1.02%" (SAC ¶ 138), is inconsistent with the specific allegations in the SAC and, in any event, does not sufficiently allege a lack of reasonably equivalent value. For example, the SAC alleges the total underwriting fees were 0.64% of the face value for the 2012A GO Bonds (*id.* ¶ 135(i)), 0.80% of the face value for the 2014 GO Bonds (*id.* ¶ 135(j)), and 0.65% of the face value of the 2012 PBA Bonds (*id.* ¶ 136(d)), all of which were well below what the Trustee alleges was the "national weighted average of 1.02%" (*id.* ¶ 138). Moreover, courts have rejected plaintiffs' attempts to plead their claims by relying upon bare averages because averages "can flatten or hide trends that might tell a different story, and one can manipulate an average" by including incomparable data points. *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 364 (S.D.N.Y. 2019) (Rakoff, J.); *see also Mandala v. NTT Data, Inc.*, 975 F.3d 202, 205 (2d Cir. 2020) ("As Mark Twain's saying suggests . . . statistics . . . must be consulted cautiously" because averages can be manipulated by, for example, "apply[ing] national height averages to certain subgroups of the population, say NBA players or horse-racing jockeys." (dismissing complaint because it failed to allege that averages being compared had the same characteristics).)

43

None of the SAC's factual allegations supports a conclusion that the Debtors did not receive reasonably equivalent value for the transfers. First, even assuming that the Challenged Bonds "were void *ab initio*" (SAC ¶¶ 240, 258), there is no allegation that the Debtors made more than ordinary course payments for the underwriting services provided by the Underwriter Defendants under these circumstances. *In re Churchill Mortg. Inv. Corp.*, 256 B.R. 664, 680-82 (Bankr. S.D.N.Y. 2000). And the Debtors received billions of dollars in proceeds from the Challenged Bonds—which they used to meet their short-term obligations.[32]

Equally baseless are the allegations that the Refinancing Bonds were valueless because they "propp[ed] up Puerto Rico after it was insolvent," and that "[t]he 2014 GO bonds did not benefit Puerto Rico because the issuances pushed it deeper into insolvency and exacerbated its financial crisis." (SAC ¶¶ 240, 242, 258.) As an initial matter, the Commonwealth and PBA received value from the Refinancing Bonds because they "help[ed] . . .[them] to stay current on their obligations as they tr[ied] to claw out of one of the deepest economic downturns since the Great Depression," Cherney, *supra* n.9, and the 2014 GO Bonds because they provided the Commonwealth with needed liquidity. (SAC ¶¶ 150-51; 2014 P.R. Laws 76, 78 (Act No. 34, Statement of Motives) (Ex. 11).) Indeed, the Trustee's allegations, which measure reasonably equivalent value based upon Puerto Rico's inability to avert a financial crisis by issuing the Refinancing Bonds, are the type of "fraud by hindsight" allegations that numerous courts have rejected. *See, e.g.*, *Frank Sawyer Tr. of May 1992 v. Comm'r.*, 712 F.3d 597, 608-09 (1st Cir. 2013). "The focus of the inquiry in both [§ 548(a)(1)(b) and the DCL] is the specific transaction

---

[32] Even assuming that the fees paid for underwriting services were somehow not for reasonably equivalent value because the Challenged Bonds were void, there is no basis to hold that the transfers of the proceeds of those bonds to pay for unrelated obligations—the swap termination payments and payments to repay principal and interest—were fraudulent.

the trustee seeks to avoid, i.e., the *quid pro quo* exchange between the debtor and transferee,
rather than an analysis of the transaction's overall value to a debtor as it relates to the welfare of
the debtor's business." *Churchill*, 256 B.R. at 677-78. Thus, courts specifically reject the
Trustee's suggestion that this avoidance actions is permissible where the alleged transactions
"only exacerbate[] the harm to creditors by increasing the amount of claims while diminishing
the debtor's estate" because "the statutes and case law do not call for the court to assess the
impact of an alleged fraudulent transfer [o]n a debtor's overall business." *Id.* at 680; *see also In
re Fin. Federated Title & Tr., Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002) (collecting cases). In
addition, to the extent the Trustee alleges that the transfers were fraudulent because they
"intentionally diverted funds . . . to the disadvantage of other creditors" (SAC ¶ 240), as
explained above, the First Circuit has "specifically" held that those allegations fail to state a
fraudulent transfer claim. For these reasons, the constructive fraudulent transfer claims asserted
in Counts IV-V should be dismissed.

> **D.** **The Claims Under Puerto Rico's Fraudulent Transfer Law Should Be
> Dismissed For Substantially The Same Reasons As Under Federal and New
> York Law**

The Trustee's claims in Count V for fraudulent transfer under Puerto Rico law against
UBS PR and, in the alternative, against the remaining Defendants (SAC ¶ 259), should be
dismissed for substantially the same reasons that the claims for fraudulent transfer under federal
(and New York law) should be dismissed. There are two ways to establish creditor fraud under
Puerto Rico law. First, the Trustee attempts to rely on one rebuttable presumption (SAC ¶ 261),
that "[c]ontracts by virtue of which the debtor alienates property, for [inadequate] consideration,
are presumed to be executed in fraud of creditors" *United Sur. & Indem. Co. v. López-Muñoz*,
553 B.R. 179, 191 n.5 (B.A.P. 1st Cir. 2016) (second alteration in original) (quoting P.R. Laws

Ann. tit. 31, § 3498). Second, in the absence of legislatively created presumptions of fraud,

courts "weigh the most obvious signs of fraud." *FDIC v. Martinez Almodovar*, 671 F. Supp. 851,

879 (D.P.R. 1987).

The Trustee meets neither. As explained above, the SAC fails to allege sufficiently that

the consideration for the transfers was inadequate. *See supra* § IV.C. But even if the Trustee

could clear that hurdle, the suggestion that the Debtors sought to defraud their creditors is

implausible, *see supra* § IV.B.1(a), as the SAC itself shows the nonfraudulent "reasons for the

transfers" that rebut any such presumption. *Lopez-Muñoz*, 553 B.R. at 191-92. In addition,

because the "most obvious signs of fraud" recognized under Puerto Rico mirror the "badges of

fraud" discussed above, the Trustee's allegations fail under Puerto Rico law for the same

reasons.[33] Thus, Counts III-V should be dismissed because the SAC fails to allege fraudulent

transfer claims under the Bankruptcy Code, New York law, and Puerto Rico law.

## V. COUNTS I-II SHOULD BE DISMISSED BECAUSE THE RECOVERIES THE TRUSTEE SEEKS ARE BARRED BY PUERTO RICO LAW

Even if the Trustee's Puerto Rico law claims in Counts I-II were not preempted by the

Bankruptcy Code's safe harbor provisions in § 546(e) and (g), those claims face insurmountable

hurdles under Puerto Rico law. First, Puerto Rico law bars the return of consideration for

unregistered contracts—the relief sought in Count I. Second, Puerto Rico law also bars the

---

[33] In addition, the Trustee's failure to allege that there is no alternative way besides rescission for Puerto Rico creditors like the IRS to ensure that the Commonwealth fulfills its obligations is an independent ground for dismissal. P.R. Laws Ann. tit. 31, § 3495; *see Garcia Zaragoza v. Garcia Ortiz*, 83 P.R. Dec. 594, 595-96, 1961 WL 13785, at *1 (P.R. Sept. 29, 1961) (Ex. 12) (dismissing action seeking rescission of contract because the creditor failed "to argue and prove, among other things, that the plaintiff has no other legal remedy to obtain relief for the damage suffered except to seek the rescission of the purchase and sale agreement"); *see also Dantzer, Inc. v. Sucesión de José A. Meléndez Castro*, No. FAC2008-2014, 2019 WL 4039824, at *4 (P.R. Cir. May 31, 2019) (Ex. 13) ("A prior persecution of the debtor's assets is required.").

46

recovery sought in Counts I-II because the Trustee alleges that the Debtors were responsible for

the supposed illegality. Third, unjust enrichment is unavailable as a basis for recovery under

either Count I or II because there is a statutory framework governing the remedies for the alleged

violations in Counts I-II and because the Debtors received equivalent value for each of the

challenged Swap Agreements and Purchase Contracts.

### A.    Section 97(d) Bars Count I

Count I asserts that the Commonwealth and PBA's failure to register the Swap

Agreements with the Office of the Comptroller, as purportedly required by title 2, § 97(a) of the

Laws of Puerto Rico, allows the Trustee to recover for the payments that the Commonwealth and

PBA made to the Swap Defendants. Citing no authority, Count I claims that, "[u]nder Puerto

Rico law, the government may recover funds unlawfully disbursed under unregistered public

contracts through the remedy of unjust enrichment." (SAC ¶ 214.) This is not a remedy allowed

by the statute as the Supreme Court of Puerto Rico has confirmed.

Section 97(d) provides only limited relief to the government (and its counterparties) if the

government fails to register contracts. The statute is explicit that "[n]oncompliance with the

provisions of this section . . . shall not in itself be cause for a competent court to declare any

legally valid contract or juridical business null."[34] P.R. Laws Ann. tit 2, § 97(d) (2004). The

Legislative Assembly added § 97(d) to the statute in response to a Supreme Court of Puerto Rico

decision holding that, under § 97(a), "the failure to remit a municipal contract to the Office of the

---

[34] The statute also provides that "no provision or consideration of services object of a contract may be demanded until the provisions of this section have been complied with." P.R. Laws Ann. tit 2, § 97(d) (2004). This provision does not provide that any payment made under an unregistered contract shall be subject to claw back on a theory of unjust enrichment or otherwise; it only requires registration before performance can be demanded. Here, the Trustee is not demanding performance of any of the unregistered Swap Agreements.

Comptroller . . . renders said contract ineffective and unenforceable." *Las Marías Reference Lab. Corp. v. Municipio San Juan*, 159 P.R. Dec. 868, 868 (2003). In other words, a decision providing the relief that the Trustee seeks in Count I.

However, recognizing that permitting the government to avoid its contractual obligations because of its own failure to register contracts posed tremendous risk to private parties' willingness to contract with the government, the Legislative Assembly enacted "subsection[] (d)" to § 97 in order to "establish that noncompliance with the provisions of this Section <u>does not entail the annulment of the contracts</u>, but the prohibition of making disbursements or requiring services until the contracts have been registered . . . ." 2004 P.R. Laws 497, 497 (Act No. 127, Preamble) (emphasis added) (Ex. 14). Consistent with the statute's text, the legislative history makes clear that the purpose of the 2004 amendment to § 97(d) was to ensure that "the government . . . maintain[s] its credibility with the private sector" by not seeking to avoid contractual obligations merely because it failed to register the contract. 2004 P.R. Laws 497, 498 (Act No. 127, Statement of Motives). As the Supreme Court put it, the Legislative Assembly "considered it unjust to penalize [a party to a government contract] for something that does not depend on his will." *Alco Corp. v. Mun. de Toa Alta*, 183 P.R. Dec. 530, 546 (2011) (Ex. 15).

Unsurprisingly, consistent with § 97(d), no court has ordered a counterparty to the government to repay funds received on unregistered written contracts in the nearly 20 years since the Legislative Assembly enacted § 97(d). Instead, the Supreme Court of Puerto Rico has held that the remedy for the government's registration failures when the counterparty has performed its contractual obligations is to order the government to register the contract. *See Lugo Ortiz v. Municipio Guayama*, 163 P.R. Dec. 208, 63 P.R. Offic. Trans. 19, at 8 (P.R. Oct. 29, 2004) (Ex. 16). In *Lugo Ortiz*, the plaintiff sought payment for work performed pursuant to an unregistered

48

contract with a municipality, but the municipality argued that its payment obligation was

obviated by the fact that the contract was never registered. *Id.* at 3-4. The court rejected the

municipality's argument, holding that "noncompliance" with § 97(a) "does not have the effect of

rendering the contract in question ineffective . . . ," and instead ordered the municipality to

register the contract "so that [the plaintiff] may be able to demand the accorded payment." *Id.* at

9; *see also Colón Colón v. Mun. Arecibo*, 170 P.R. Dec. 718, 70 P.R. Offic. Trans. 45, at 8

(2007) (Ex. 17) ("[T]he Legislative Assembly provided that the procedural requirement (the

registry and remittance of the municipal contract to the Office of the Comptroller of Puerto Rico)

may be cured.").[35]

Here, the Trustee's efforts to recover the Commonwealth and PBA's payments under the

allegedly unregistered Swap Agreements is irreconcilable with the text of § 97(d) and the

holding of *Lugo Ortiz*. The municipality in *Lugo Ortiz* could not wield its failure to register the

contract as a basis to refuse to make payment for services provided, *see* Ex. 16, 63 P.R. Offic.

Trans. 19, at 9, and the Trustee similarly cannot claw back the Commonwealth and PBA's

payments pursuant to the Swap Agreements.

    **B.**    **Puerto Rico Law Precludes The Recovery Of Funds Transferred
Under Void Or Illegal Contracts When Both Parties Are Allegedly At Fault**

Blackletter law also forecloses the remedy sought by the Trustee in Counts I-II because

the SAC alleges that the Debtors are at least partially responsible for the purported nullity and

voidability of the Swap Agreements and Challenged Bonds. Count II asserts that because the

Challenged Bonds were illegally issued, "the government may recover funds unlawfully

---

[35] In 2015, the Legislative Assembly amended § 97(d) to affirm the holding in *Colón Colón* that unwritten contracts with municipalities are void, *see* Ex. 17, 70 P.R. Offic. Trans. 45, at 9, by adding the final three sentences that are currently in § 97(d).

transferred under void or illegal contracts under 31 L.P.R.A. § 3514." (SAC ¶ 222.) Although

styled otherwise, Count I is, as explained below, an action for nullity under that same provision.

*See infra* § VII.A.

These nullity claims asserted under § 3514 are barred by title 31, § 3517(1) of the Laws

of Puerto Rico. Section 3514 states that it applies "without prejudice to the provisions contained

in the following sections." P.R. Laws Ann. Tit. 31, § 3514. And § 3517 thereafter provides: "If

the fact of which the illicit consideration consists does not constitute either a crime or

misdemeanor . . . [w]hen both parties are guilty, neither of them can recover what he may have

given by virtue of the contract, nor claim the fulfilment of what the other party may have

offered." P.R. Laws Ann. Tit. 31, § 3517(1).[36] The Supreme Court of Puerto Rico has

accordingly held that a party cannot recover under § 3514 when she "knows or should know the

circumstances from which the illegality stems, or the illegality itself." *Sánchez Rodríguez v.*

*López Jimenez*, 116 P.R. Dec. 172, 16 P.R. Offic. Trans. 214, 228 (P.R. Mar. 11, 1985); *see also*

*Rubio Sacarello v. Roig*, 84 P.R. Dec. 344, 350 (1962) (Ex. 18) ("[T]he author or participant of

the illegal act cannot appeal to the judge to demand its annulment . . . A similar prohibition

applies to the successors and heirs of such author or participant.").

The Puerto Rico Court of Appeals' decision in *Transystems Corp. v. Autoridad de los*

*Puertos de Puerto Rico*, No. KCD2004-0487(807), 2009 WL 5736703 (P.R. Cir. Oct. 30, 2009)

(Ex. 19), is illustrative. There, the Puerto Rico Port Authority attempted to escape paying

Transystems based upon its own failure to obtain board approval of the contract on which

Transystems sought payment. 2009 WL 5736703 at *1. When Transystems sued, the Port

---

[36] There is no allegation in the SAC that there was any crime or misdemeanour committed in connection
with the conduct on which Counts I-II are premised.

Authority denied liability, and counterclaimed seeking the return of almost $800,000 it had already paid for work performed. *Id.* at *2. The *Transystems* court noted that, while the general rule set forth in § 3514 provides that "contracting parties who have signed an agreement contrary to the law are obligated to 'reciprocally restore any things that would have been part of the subject of the contract,'" under § 3517(1), "neither" party has a claim when both parties are allegedly at fault. *Id.* at *5; *see also id.* at *3. Because the court concluded that "the fault for the nullity of the contract is shared," it held that "Transystems is not entitled to collect the amounts owed under the defective contract, but neither is it obligated to return what it has already been paid by Ports Authority." *Id.* at *5.

Here, § 3517(1) and *Transystems* squarely foreclose Counts I-II because the SAC indisputably alleges that the Debtors were responsible for the alleged illegalities. Indeed, the Trustee claims that "Puerto Rico knew that the [Challenged] Bonds were illegal." (SAC ¶ 16.) And there can be no dispute that the Commonwealth and PBA knew of their alleged respective failures to register the Swap Agreements. Thus, the Trustee—standing in the shoes of Puerto Rico to assert these claims—cannot recover payments to Defendants pursuant to the Purchase Contracts or Swap Agreements.[37]

### C.     Unjust Enrichment Is Unavailable As A Remedy For Counts I-II

Perhaps recognizing that the statutory frameworks bar its claims, the Trustee invokes unjust enrichment in both Counts I-II. (SAC ¶¶ 214, 223.) But unjust enrichment is unavailable

---

[37] The Trustee has also failed to adequately allege a claim in Count II because the remedy under § 3514 for a services contract is that "the other party is obligated to compensate it, paying the equivalent value of these services." *Caribbean Ins. Servs., Inc. v. Am. Bankers Life Assur. Co. of Fla.*, 754 F.2d 2, 9 (1st Cir. 1985). But the Trustee has failed to allege that the Debtors did not receive reasonably equivalent value for the services provided by Defendants. *See supra* § IV.C. Therefore, even setting aside § 3517, the Trustee has no remedy under § 3514.

for two reasons: (1) the law provides remedies for the alleged conduct; and (2) equivalent value was exchanged.

First, "claims 'for unjust enrichment are subsidiary to other remedies provided by law and [are] unavailable if the plaintiff may seek other forms of relief.'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 578 F. Supp. 3d 267, 296 (D.P.R. 2021) (citation omitted), *aff'd*, 54 F.4th 42 (1st Cir. 2022). This Court has therefore held: "When plaintiffs allege conduct that is covered by an applicable statute, even if plaintiffs have failed to sufficiently allege that claim or if the claim is time-barred, it is inappropriate to allow a claim for unjust enrichment." *Id.* (citing *Ocaso, S.A., Compañia de Seguros y Reaseguros v. P.R. Mar. Shipping Auth.*, 915 F. Supp. 1244, 1263 n.15 (D.P.R. 1996)).

This Court's reasoning squarely forecloses Counts I-II's claims for unjust enrichment. As to Count I, as explained above, the Legislative Assembly has established a comprehensive framework governing the available remedies for failures to register government contracts. The Legislative Assembly expressly declared that the government's failure to register a contract does not permit a court to either declare an otherwise legal contract null—the actual remedy sought here—or order performance prior to registration. P.R. Laws Ann. tit. 2, § 97(d) (2004). Under the statutory framework, the only remedy available is for this Court to order the Commonwealth and PBA to register the contracts. *See supra* § V.A.

As to both Counts I-II, moreover, the Trustee's claims are for nullity under § 3514, but § 3514 is contained within Chapter 263 of the Civil Code, which provides a comprehensive framework governing such claims, including the bar on recovery set forth in § 3517(1) (and the statute of repose in § 3512, *see infra* § VII.A). To be sure, based on the Trustee's allegations and § 3517(1), the Trustee cannot recover under § 3514 even if the contracts are declared null. *See*

52

*supra* § V.B. But the existence of this statutory framework nevertheless prohibits the Trustee's

unjust enrichment claims, even though the Trustee has "failed to sufficiently allege" those

claims. *In re Fin. Oversight & Mgt. Bd. for Puerto Rico*, 578 F. Supp. 3d at 296 (quoting *Ocaso*,

915 F. Supp. at 1263 n.15); *see also* Ex. 19, *Transystems*, 2009 WL 5736703, at *5 ("The unjust

enrichment doctrine does not apply in cases where a law or regulation providing remedies for the

alleged wrong already exists.").

Second, unjust enrichment is unavailable because the Trustee failed to plead the requisite

"absence of a cause to justify the enrichment." *Ortiz Andújar v. Commonwealth of Puerto Rico*,

122 P.R. Dec. 817, 22 P.R. Offic. Trans. 774, 780 (1988) (reciting elements). The word

"'cause' . . . is understood to be a legal act that explains and justifies the acquisition of a

benefit." *Id.* at 786 (citation omitted). Simply put, a claim for unjust "[e]nrichment should not

arise from a legal act which validates its acquisition" of the challenged benefit. *Id.* (citation

omitted). Thus, "enrichment is not unjustified as long as there is an equivalent contractual

obligation . . . or is the result of a legal or natural obligation." *Id.* (emphasis omitted) (citation

omitted).

Here, even assuming that the Swap Agreements were unregistered and the Purchase

Contracts were illegal, the payments made by the Debtors pursuant to the contracts were all for

cause.[38] The Trustee has not alleged adequately that the payments received by Defendants were

---

[38] The Trustee's argument that the Debtors' payments under the Purchase Contracts were contrary to law is directly contrary to the Debtors' earlier decisions before the Title III court to pay billions of dollars on the Challenged Bonds and to obtain confirmation of a Title III plan that provided substantial payments to holders of each challenged bond. *See* Modified Eighth Amended Title III Joint Plan of Adjustment of the Commonwealth of Puerto Rico, et al., Case No. 17-03283-LTS, Doc. 19784, at 70-111 (D.P.R. Jan. 18, 2022). The beneficiaries of the Avoidance Action Trust, for whom the Trustee serves, received those substantial payments on the bonds that the Trustee now asserts were unlawful and void *ab initio*. The Trustee, and its beneficiaries, cannot have it both ways.

not equivalent exchanges for the obligations undertaken by them. To the contrary, as to the Swap

Agreements, the Commonwealth and PBA's alleged failure to register those contracts—the basis

for the Trustee's claim for unjust enrichment—does not mean that the Commonwealth and PBA

did not receive benefits under those agreements. *See* Ex. 16, *Lugo Ortiz*, 63 P.R. Offic. Trans.

19, at 9. And the FOMB's counsel opined that the Swap Agreements were "often for sensible

and financially sound reasons." (Ex. 1, K&K Rep. at 413.)[39]

The Purchase Contracts also provided benefits to the Debtors. The Trustee does not

allege that the Debtors paid commercially unreasonable fees to Defendants compared to similar

transactions. *See supra* IV.C. Rather, the Trustee argues that it is entitled to the remedy of unjust

enrichment because the Challenged Bonds were illegally issued. But even assuming that those

Bonds were illegally issued—which Defendants dispute, *see infra* § VI—the Commonwealth and

PBA received value in the form of proceeds of the various bonds that allowed them try to "claw

out of one of the deepest economic downturns since the Great Depression." Cherney, *supra* n.9.

The ERS Bonds "enabled an injection of funds which extended 5 to 6 years the life of the

System's assets." 2013 P.R. Laws 39, 50 (Act No. 3, Statement of Motives) (Ex. 22). And the

---

[39] Indeed, while the Trustee tries to recover $26.2 million from Morgan Stanley Capital and Goldman USA in unjust enrichment based on the January 21, 2006, basis swap, the K&K Report makes clear that the Commonwealth received more than it paid under that swap. According to the K&K Report, the Commonwealth received an upfront payment of $100 million in connection with that basis swap and only paid $26.2 million in termination payments. (Ex. 1, K&K Rep. at 427.) Furthermore, between fiscal year 2010 and the first six months of fiscal year 2014, the Commonwealth received at least $34.3 million in net payments under that basis swap. (*See* Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2011, Series A (Feb. 10, 2011), at I-53 ($6.9 million in net payments in fiscal year 2010) (Ex. 20); Official Statement for Commonwealth of Puerto Rico General Obligation Bonds of 2012, Series A (Mar. 7, 2012), at I-59 ($7.3 million in net payments in fiscal year 2011) (Ex. 21); Ex. 4, 2014 GO Official Statement, at I-31, II-64 ($9.8 million, $7.5 million, and $3.6 million in net payments in fiscal years 2012 and 2013 and first six months of fiscal year 2014).) Having received an upfront payment of $100 million and at least $34.3 million in net payments under the basis swap, the Trustee cannot possibly complain that Morgan Stanley Capital and Goldman USA were unjustly enriched by that basis swap.

PBA Bonds "raised revenue" and paid "off old debt and swap termination" payments. (SAC ¶ 136; Ex. 1, K&K Rep. at 260.)

In any event, the Trustee's asserted remedy would only serve to unjustly enrich the Debtors under the circumstances alleged in the SAC. According to the SAC, the Debtors can retain the proceeds that flowed from their issuances of the Challenged Bonds, while somehow being able to recoup the fees they paid in exchange for those benefits. Such a remedy would only serve to unjustly enrich the Debtors. *See* P.R. Laws Ann. tit. 31, § 7 (providing that "natural justice" governs equitable claims such as unjust enrichment). In sum, Counts I-II should be dismissed because the Trustee has failed to allege them adequately.[40]

## VI.    COUNT II SHOULD BE DISMISSED BECAUSE THE CHALLENGED BONDS WERE LAWFULLY ISSUED

Even if Count II was not preempted by the Bankruptcy Code and even if there was a remedy available for the Challenged Bonds, the SAC also fails to allege sufficiently that the Refinancing Bonds, the so-called Excessive Debt Bonds, and the ERS Bonds violated Puerto Rico law. According to the SAC, the Purchase Contracts were "contrary to existing law" and therefore "null and void *ab initio*." (SAC ¶ 218.) Although, for the above reasons, the Court need not wade into issues of Puerto Rico constitutional law, Count II should be dismissed for the independent reason that none of the Challenged Bonds were illegal.

---

[40] Moreover, even if Puerto Rico law permitted recovery for Count II—allowing the Trustee to recover despite the Debtors' repeated assurances to Defendants that the Puerto Rico Constitution did not bar the issuances of the bonds—application of such purported law would violate Defendants' due process. *Cf. FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."). Here, the Debtors represented to Defendants that the bonds were legal under Puerto Rico law, (*See* Ex. 1, K&K Rep. at 257; *infra* § VI.C.1(c)), and that it had legal authority to issue the bonds, and now, the Trustee seeks to backtrack on that very assurance as a means to void the Purchase Contracts.

## A.      The SAC's Challenge To The Refinancing Bonds Is Meritless

The SAC's challenge to the Refinancing Bonds rests on the erroneous conclusion that the "Scoop and Toss Bonds were contrary to law and public order because each was not tied to the general welfare of all citizens and was not a scrupulous use of public funds." (SAC ¶ 221.) At bottom, the Trustee's disagreement with a legitimate policy decision made by Puerto Rico's democratically elected government is a non-justiciable political question.

As the Trustee notes, Article VI, § 9, of the Puerto Rico Constitution provides: "Public property and funds shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law." P.R. Const. art. VI, § 9. In addition, "contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order." P.R. Laws Ann. tit. 31, § 3372. The "public order" requires "the scrupulous use of public funds." *De Jesús González v. Autoridad de Carreteras*, 148 P.R. Dec. 255, 269-70 (1999) (Ex. 23).

But the circumstances in which a court can second-guess spending decisions made by government entities are few and far between. Indeed, the "initial determination from the political branches as to what constitutes a public purpose deserves great deference" and "[i]t is not the role of the courts to scrutinize on the wisdom or expediency of a legislative measure." *Aponte Rosario v. Presidente de la Comisión Estatal de Elecciones*, 205 P.R. Dec. 407, 105 P.R. Offic. Trans. 17, at 25 (2020) (citation omitted) (Ex. 24). Thus, the judicial branch must "uphold" the Legislative Assembly's determination that the disbursement of public funds has "a public purpose . . . unless it is clearly arbitrary or incorrect." *Id.* at 25-26. Otherwise, spending decisions are a "political matter," and are "not justiciable." *Id.* at 29; *see also Partido Independentista Puertorriqueño v. Comisión Estatal de Elecciones y Otros*, 120 P.R. Dec. 580, 20 P.R. Offic.

56

Trans. 607, at 634-38 (1988).

Government expenditures have been found to violate Article VI, § 9, or the public order in three limited circumstances, none of which are present here. First, where there is "no other purpose" for the disbursement of public funds than a private one, like "serv[ing] as a vehicle for political-partisan propaganda." *See, e.g.*, *Partido Popular Democrático v. Rosselló González*, 139 P.R. Dec. 643, 692 (1995) (Ex. 25). Second, where the purpose is not to provide a benefit to the government. *See, e.g.*, Ex. 23, *De Jesús*, 148 P.R. Dec. at 270-71 (holding that government contracts were against the public order because they only "benefited one of the parties, at the expense of the proper use of public funds" and there were "irregularities" in the granting of the contracts); *cf. Autoridad de Energía Eléctrica v. Partido Nuevo Progresista*, 128 P.R. Dec. 294, 294-95 (1991) (Negrón García, J., concurring) (Ex. 26) (holding that government contracts violated Article VI, § 9 because public funds were being disbursed to pay employees of a public corporation for services they were performing exclusively for a political party). Third, where the disbursement of public funds "fails to comply" with specific laws passed by the Legislative Assembly "that impose fiscal and government contracting controls," such as laws requiring public bidding. *See, e.g.*, *Cecort Realty Dev. Inc. v. Llompart-Zeno*, 100 F. Supp. 3d 145, 157-58, 163 (D.P.R. 2015) (quoting *Rodríguez Ramos v. E.L.A.*, 190 P.R. Dec. 448 (2014) (Ex. 26)); *see also* Ex. 27, *Rodríguez Ramos*, 190 P.R. Dec. at 455-57 (explaining that "[i]n order to comply with [Article VI, § 9], the Legislature has approved laws imposing fiscal and government contract controls," and "*[a]s a result*, in accordance with the above-cited provisions of the Civil Code, a contract between a private party and the State which does not comply with these laws shall be null and void." (emphasis added)); *Marina v. Comision*, 170 P.R. Dec. 847, 860 (2007) (Ex. 28) (same).

Here, the political branches' judgment to raise funds in the public debt markets (and pay the associated expenses), to provide public services and avoid default is a legitimate public purpose that is entitled to deference and not subject to judicial review. To illustrate, the Trustee itself alleges that "[s]cooping and tossing is a budget-stretching tactic employed by strapped local governments" which allows the government to "extend[] the deadline for fully paying off its debt." (SAC ¶ 133.) In so stating, the Trustee relies on an article discussing that refinancing municipal bonds is a legitimate budgetary tactic because it "help[ed] cities, states and other local entities to stay current on their obligations as they tr[ied] to claw out of one of the deepest economic downturns since the Great Depression." Cherney, *supra* n.9. Indeed, after refinancing helped Puerto Rico avoid default, the government planned to "put the island on stronger fiscal footing through tax increases and entitlement reform," thereby allowing it to "seek to end scoop and toss by 2015." *Id.* As such, there is no basis to conclude that the Legislative Assembly's decision to disburse funds to avoid default while supplying critical public services somehow lacked a public purpose. And, given the Legislative Assembly's clear public purpose in joining many other cities and states in adopting a refinancing strategy, "[t]he expediency or desirability of the devices or strategies . . . used to further [the] public purpose is a political matter" that is "not justiciable." Ex. 24, *Aponte Rosario*, 105 P.R. Offic. Trans. 17, at 29. Accordingly, because the Trustee's challenge to the Refinancing Bonds rests on a non-judiciable political question, the Court should dismiss the portion of Count II relating to those bonds.[41]

### B. The Commonwealth Did Not Exceed The Constitutional Debt Limit

According to the Trustee, the so-called Excessive Debt Bonds were illegal because they

---

[41] For the same reasons, the Court should dismiss the portions of Counts III-V relating to the Refinancing Bonds because each of those claims partially rests on the supposed illegality of those bonds.

each violated the constitutional debt limit on direct obligations. (SAC ¶¶ 144-45, 158, 220.) The
Trustee first argues that, contrary to decades of unanimous understanding, Puerto Rico
improperly "excluded debt service on the PBA Bonds from its calculation" of the constitutional
debt limit on direct obligations because "that debt service is a direct obligation of [Puerto Rico]
that counts towards the limit." (*Id*. ¶ 145.) In support, the Trustee alleges that Puerto Rico
"pledges its full faith, credit, and taxing power to guarantee debt service due on the PBA Bonds"
(*id*. ¶ 142), and that PBA is effectively the same entity as the Commonwealth, (*id*. ¶ 143).
Alternatively, the Trustee alleges that the capitalized interest portion of the 2014 GO Bonds that
was placed in a sinking fund should have been included in the calculation of the constitutional
limit on direct obligations. (*Id*. ¶ 158.) The Trustee's arguments fail because the Trustee
misreads Puerto Rico's Constitution's text, ignores history, and seeks to upend decades of settled
practice.

**1.      The Commonwealth properly excluded the PBA Bonds from its
calculation of the constitutional debt limit**

(a)      <u>The text of Puerto Rico's Constitution establishes that the
Commonwealth properly excluded the PBA Bonds from its
calculation of the debt limit</u>

The text of Puerto Rico's Constitution demonstrates that the Commonwealth properly
excluded its guarantee of the PBA Bonds from its calculation of the constitutional debt limit on
direct obligations. Article VI, § 2, of Puerto Rico's Constitution provides the government with
the "power . . . to contract and to authorize the contracting of debts." P.R. Const. art. VI, § 2.
Puerto Rico's Constitution includes <u>two</u> distinct limitations on debt for two different types of
obligations—direct and guaranteed. First, the limit on direct obligations applies if the debt is:
(1) a "<u>direct</u> obligations of the Commonwealth for" (2) "money borrowed <u>directly by the
Commonwealth</u>" and (3) "evidenced by bonds or notes for the payment of which the full faith,

credit and taxing power of the Commonwealth shall be pledged" ("Direct Obligation Debt

Limit"). *Id.* (emphasis added). The Commonwealth cannot issue those direct obligations "if the

total of":

> (i) the amount of principal of and interest on <u>such</u> bonds and notes, together with
> the amount of principal of and interest on all such bonds and notes theretofore
> <u>issued by the Commonwealth</u> and then outstanding, <u>payable</u> in any fiscal year and
>
> (ii) any amounts <u>paid</u> by the Commonwealth in the fiscal year next preceding the
> then current fiscal year for principal or interest on account of <u>any outstanding</u>
> <u>obligations evidenced by bonds or notes guaranteed by the Commonwealth</u>, shall
> exceed 15 percent of the average of the total amount of the annual revenues raised
> under the provisions of Commonwealth legislation and covered into the Treasury
> of Puerto Rico in the two fiscal years next preceding the then current fiscal year[.]

*Id.* (emphasis added).

Second, Article VI, § 2, provides a separate and independent debt limitation for when the

Commonwealth can "guarantee any obligations evidenced by bonds or notes" ("Guarantee Debt

Limit"). *Id.* The Guarantee Debt Limit (as opposed to the Direct Obligation Debt Limit) is

reached

> if the total of the amount <u>payable</u> in any fiscal year on account of principal of and
> interest on all the direct obligations referred to above theretofore issued by the
> Commonwealth and then outstanding and the amounts referred to in item (ii) above
> shall exceed 15 percent of the average of the total amount of such annual revenues.

*Id.* (emphasis added). Puerto Rico's Constitution thus expressly distinguishes between the Direct

Obligation Debt Limit and the Guarantee Debt Limit. The Trustee's claims are based on the

Direct Obligation Debt Limit (SAC ¶¶ 144-45), under which guaranteed bonds, like the PBA

Bonds, must be included in the calculation only when the Commonwealth paid on account of its

guaranteed obligations—payments that are not alleged here.

Despite the clear constitutional distinction between direct obligations and guaranteed

obligations, the Trustee seeks to sweep the PBA Bonds into the Direct Obligation Debt Limit

solely because the Commonwealth pledged its full faith and credit to guarantee those bonds.

60

(SAC ¶¶ 14, 47, 85.) But the Trustee's argument is foreclosed by the Direct Obligation Debt Limit's text. The PBA Bonds were not (1) "issued by the Commonwealth"; (2) "direct obligations of the Commonwealth"; or (3) exchanged "for money borrowed directly by the Commonwealth." P.R. Const. art. VI, § 2.

To begin, PBA Bonds are not "issued by the Commonwealth" because they are "issued . . . by the Public Buildings Authority." P.R. Laws Ann. tit. 22, § 907a. Next, the PBA Bonds are not "direct obligations of the Commonwealth." P.R. Const. art. VI, § 2. Instead, the Commonwealth only "<u>guarantees</u> the payment of the principal of and interest on outstanding bonds . . . issued from time to time by the [PBA]." P.R. Laws Ann. tit. 22, § 907a (emphasis added) (*see also* SAC ¶ 142 ("Puerto Rico also pledges its full faith, credit and taxing power to guarantee debt service due on the PBA bonds.").) Likewise, the Commonwealth only "<u>supports</u> PBA leases." (SAC ¶ 141 (emphasis added).)

In addition, the funds generated from the sales of the PBA Bonds were not "money borrowed directly by the Commonwealth." P.R. Const. art. VI, § 2. The direct borrower, instead, was the PBA. By providing that the Direct Obligation Debt Limit only applies to obligations that are both "for money borrowed directly by the Commonwealth" <u>and</u> "direct obligations of the Commonwealth," *id.*, Puerto Rico's Constitution made clear that money borrowed by another entity—such as the PBA—cannot count as a "direct obligation" under the Direct Obligation Debt Limit even if the Commonwealth adopts an obligation to repay that money. Indeed, had the drafters of the Constitution wanted to include debts incurred by the PBA in the Direct Obligation Debt Limit, they could have done so by adopting examples from state constitutions that include indirect obligations in their debt limits. *See, e.g.*, Pa. Const. art. VIII, § 7(c) (defining debt to include "outstanding obligations of the Commonwealth and . . . obligations of its agencies or

authorities to the extent they are to be repaid from lease rentals or other charges payable directly

or indirectly from revenues of the Commonwealth"). Thus, the unpaid guarantee of PBA Bonds

counted only against the Guarantee Debt Limit and the SAC does not allege that this limit was

exceeded. Accordingly, the Trustee cannot eliminate the constitutional distinctions by treating all

debt issued by the PBA and guaranteed by the Commonwealth as though it had been issued

directly by the Commonwealth.[42]

> (b)    History confirms that the PBA Bonds were properly
> excluded from the debt limit calculation

History reinforces the ineluctable conclusion from the Constitution's text: the

Commonwealth appropriately excluded the PBA Bonds from its calculations of the Direct

Obligation Debt Limit. Puerto Rico's Constitution reflects a conscious decision by its drafters to

distinguish between direct and guaranteed obligations. In the past, the Jones Act of Puerto Rico

established a strict debt limit for the Commonwealth—one that was predicated on all "public

indebtedness of Puerto Rico or of any subdivision or municipality thereof." Pub. L. No. 64–368,

§ 3, 39 Stat. 951 (1917). When Puerto Rico first ratified its Constitution, it contained similarly

strict limitations on the indebtedness that the Commonwealth and its municipalities could incur.

---

[42] The Trustee alleges that "Puerto Rico effectively conceded that debt service on the PBA Bonds is a
direct obligation of the Commonwealth that should be included in calculating the . . . Debt Limit" because
in 2011, 2012, and 2013 "Puerto Rico and the PBA temporarily suspended rent payment obligation under
the PBA's leases in respect of debt service on the PBA Bonds to balance the budget of its general
obligation fund." (SAC ¶ 144.) The Trustee therefore asserts that the Commonwealth "acknowledged that
money used to pay the interest and principal on the PBA Bonds comes from the Commonwealth." (*Id.*)
To begin, Defendants cannot be bound by statements or actions of the Commonwealth. In any event, the
allegation that the Commonwealth may have thought that actual payments pursuant to its guarantee of the
"unpaid balance of . . . rent," P.R. Laws Ann. tit. 2, § 916, would count against the Direct Obligation Debt
Limit, does nothing to show that the Commonwealth believed that its unpaid guaranty of the PBA Bonds
should have been included in the calculation of the Direct Obligation Debt Limit. Moreover, only
"outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth"—not
guarantees of rent payments—are included in the Direct Obligation Debt Limit calculation. P.R. Const.
art. VI, § 2.

In 1961, Puerto Rico amended its Constitution to adopt the more flexible limit on indebtedness currently contained in Article VI, § 2. And the Commonwealth's Direct Obligation Debt Limit is not unique. For example, Ohio's Constitution excludes guarantees by setting forth a debt limit only for "[d]irect obligations of the state," defined as "obligations issued by the state on which the state of Ohio is the primary or only direct obligor." Ohio Const. art. VIII, § 17 (adopted Nov. 2, 1999); *see also* Wash. Const. art. VIII, § 9 (excluding indebtedness from the state building authority from the debt limit). "The Commonwealth's wide-ranging self-rule, exercised under its own Constitution" to adopt a less stringent debt limit by excluding indirect, guaranteed obligations from the debt limit must be respected. *Puerto Rico v. Sánchez Valle*, 579 U.S. 59, 78 (2016).

Consistent with that legislative history, "Puerto Rico had a longstanding practice of treating direct debt and guaranteed debt differently for purposes of the Debt Limit Calculation." (K&K Rep. at 262.) Additionally, there is "no evidence that Puerto Rico officials believed that Puerto Rico's practice with respect to debt service payments on PBA Bonds violates the . . . Debt Limit." (*Id.*) The Secretaries of Justice and the Treasury also repeatedly affirmed that PBA Bonds should be excluded from the Direct Obligation Debt Limit. (*Id.* at 264, 266.) Indeed, shortly after that debt limit was added to the Constitution in 1961, the Commonwealth extended its full faith and credit guarantee to its rental obligations under its leases with PBA, *see* 1962 P.R. Laws 112, 112-13 (Act No. 51, § 1) (Ex. 29), to rent owed by Puerto Rico agencies and instrumentalities, *see* 1964 P.R. Laws 76, 76-78 (Act No. 27, § 1) (Ex. 30), and, finally, to principal and interest on PBA Bonds, 1968 P.R. Laws 27, 27-28 (Act No. 17, § 1) (Ex. 31). But there is no record of any policymaker claiming that these guarantees somehow brought PBA-issued bonds within the Direct Obligation Debt Limit. Notably, over half of the Puerto Rico

Senate and almost half of the Puerto Rico House of Representatives who were serving when the constitutional debt limit was adopted were also serving when the guarantee of PBA Bonds was authorized. *See* Records of Puerto Rico Senate and House Members from 1961 and 1968 (Ex. 32.) Yet there is no record of any of those founding senators or representatives stating that PBA-issued bonds counted towards the Direct Obligation Debt Limit. *See Alden v. Maine*, 527 U.S. 706, 743-44 (1999) ("[E]arly congressional practice . . . provides 'contemporaneous and weighty evidence of the Constitution's meaning.'") (citation omitted); *Vélez v. Superior Court of P.R.*, 75 P.R. Dec. 585, 628 (1953) (Lexis) (holding that "contemporaneous views" of Legislative Assembly members who participated in Puerto Rico's Constitutional Convention "should be given weight in passing on the validity of" legislation).

(c)      PBA is separate and distinct from the Commonwealth

The SAC also seeks to sweep the PBA Bonds under the Direct Obligation Debt Limit by alleging that PBA is a sham because the Commonwealth supposedly controlled PBA (SAC ¶ 143), but those allegations are insufficient to upset the constitutional order. As an initial matter, there is no precedent to support the SAC's claim that the Commonwealth's "control" of an agency is sufficient to include that agency's direct obligations within the Direct Obligation Debt Limit. To the contrary, Puerto Rico's Constitution provides a careful framework for which bonds count against that limit, *see supra* § VI.B.1(a), and does not mention the supposed "control" of a separate agency. This Court should decline the Trustee's implicit invitation to amend the Puerto Rico Constitution.

Even assuming that control had relevance, the SAC fails to allege that the Commonwealth controlled the PBA. All that the SAC alleges is that the Governor appoints the

PBA's board and resolves disputes between the PBA and its lessees.[43] (SAC ¶ 143.) Indeed, the Trustee's theory is inconsistent with the Supreme Court of Puerto Rico's conclusions that the PBA is a public corporation that "operate[s] practically as [a] private business[]" and "generat[es] [its] own money." *Rodríguez Torres v. Autoridad de Edificios Públicos*, 141 P.R. Dec. 362, 369 (1996) (Ex. 33). As such, it is unlike "agencies or government departments such as the Department of Education and the Puerto Rico Police Department" whose operating funds "come directly from the general government budget." *Id.*

The PBA also has several other indicia of independence. By law, the PBA has the "perpetual existence as a corporation" with the power to "exercise all corporate powers." P.R. Laws Ann. tit. 22, § 906(a)(1), (22). It exercises "complete control and supervision over each and every one of its properties and activities, and the investment of its funds." *Id.* § 906(a)(3). It has the capacity "[t]o sue and be sued." *Id.* § 906(a)(4). It can "execute contracts" and "acquire any kind of property and rights." *Id.* § 906(a)(5), (6), (8). The PBA's own audited financial statements show that it has approximately $3.5 billion in capital assets. *See* Public Buildings Authority, *Independent Auditors' Report and Basic Financial Statements and other Supplementary Information for the Fiscal Years Ended June 30, 2016, and 2015*, at 7, https://emma.msrb.org/ES1388910.pdf.[44] The PBA has its own material operating expenses. *See*

---

[43] The allegation that credit agencies choose to rely on the Commonwealth's guarantee of the PBA Bonds and rate them the same as GO Bonds (SAC ¶ 143) has no bearing on the constitutional framework set forth in Article VI, § 2.

[44] This publicly filed financial statement can be considered at this stage. *See U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 207-08 (1st Cir. 2016) (explaining that a "press release, news articles, [a Congressional Research Service] report, and record of congressional testimony" could be considered on a motion to dismiss); *see also Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993) (holding that on a motion to dismiss, defendants may refer to and include documents "the authenticity of which are not disputed by the parties; . . . official public records; . . . documents central to plaintiffs' claim; or . . . documents sufficiently referred to in the complaint").

*id.* at 23 (reporting approximately $217.9 million in operating expenses for Fiscal Year 2016).

And it has its own employees. *See* P.R. Laws Ann. tit. 22, § 911; *Iravedra v. Pub. Bldg. Auth.*,

196 F. Supp. 2d 104, 105 (D.P.R. 2002) (lawsuit by the PBA's Human Resources Director)[45];

*Soto-Padró v. Pub. Bldgs. Auth.*, 675 F.3d 1, 2-3 (1st Cir. 2012) (describing reorganization of

PBA staff). Accordingly, even if control had relevance, the Commonwealth's alleged control

over the PBA would be insufficient. Consequently, the Puerto Rico Constitution's plain text

controls, and the Commonwealth properly excluded the PBA Bonds from its calculation of the

Direct Obligation Debt Limit.

> ### 2. The Commonwealth properly excluded from the debt limit calculation interest payments funded from bond proceeds from the 2014 GO Bonds

The Trustee also claims that even if the Commonwealth properly excluded the PBA

Bonds from its calculations of the debt limit, the 2014 GO Bonds exceeded the Direct Obligation

Debt Limit in fiscal year 2016 because the Commonwealth's maximum debt service that year

was 15.1 percent. (SAC ¶ 158 & n.16.) Specifically, the Trustee alleges that $75 million of

capitalized interest that the Commonwealth set aside from the proceeds of the 2014 GO Bonds

and placed in a sinking fund to satisfy interest obligations in 2016 violated the Direct Obligation

Debt Limit. The Trustee's claim, however, is refuted by the 2014 GO Official Statement and

precedent.

First, the Commonwealth properly excluded the capitalized interest because it was not

"payable" in 2016 under the Puerto Rico Constitution's plain text. Although the Trustee asserts

---

[45] In the analogous Eleventh Amendment context, *Iravedra* also established that the Governor's appointment power does not convert the PBA into the Commonwealth's "alter ego." 196 F. Supp. 2d at 115; *see also Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (concluding that the entity at issue was not an arm of the state notwithstanding that four out of five of the entity's board members were appointed by the state's governor).

that the Direct Obligation "Debt Limit includes 'the amount of principal of and interest on'
bonds backed by Puerto Rico's full faith, credit, and taxing power" (SAC ¶ 158), the
Constitution provides that only "the amount of principal . . . and interest . . . <u>payable in any fiscal
year</u>" counts against the Direct Obligation Debt Limit, P.R. Const. art. VI, § 2 (emphasis added).
"[P]ayable" means an amount of money "that is to be paid." Payable, *Black's Law Dictionary*
(11th ed. 2019); *see also U.S. Bank Nat'l Ass'n v. Barclays Bank PLC*, No. 11-CV-9199 (WHP),
2013 WL 1180414, at \*6 (S.D.N.Y. Mar. 12, 2013). By the terms of the 2014 GO Official
Statement, the capitalized interest was not a sum of money that was "payable" in 2016, i.e., a
sum that had to be paid by the Commonwealth in 2016. *See, e.g.*, *Herman v. Fabri-Centers of
Am., Inc.*, 308 F.3d 580, 588 (6th Cir. 2002) ("[T]he term 'payable' is not customarily
understood to relate to future payments . . . ."). Instead, the capitalized interest was to be
deposited immediately in a fund "held for the benefit of all holders of general obligation bonds."
(Ex. 4, 2014 GO Official Statement, at 31.) So the alleged $75 million in capitalized interest did
not reflect a sum "to be paid" in fiscal year 2016—it had already been set aside for the
bondholders pursuant to the bond indenture agreement. *See First Am. Nat'l Bank-E. v. FDIC*,
782 F.2d 633, 637 (6th Cir. 1986) ("[W]hen a debtor makes payments into a sinking fund . . .
title passes from the debtor to the trustee who holds the fund for the benefit of the bondholders.
And ordinarily, once deposits are made into a sinking fund, they cannot be withdrawn."
(citations omitted)).

Second, it is "well-settled law" that cash in "a sinking fund" may be excluded when
"arriving at the amount of the constitutional debt limit . . . ." *Cutler v. Bd. of Educ. of Beaver
Cnty. Sch. Dist.*, 192 P. 621, 623 (Utah 1920); *accord City of Eau Claire v. Eau Claire Water
Co.*, 119 N.W. 555, 562-63 (Wis. 1909); *Farrar v. Britton Indep. Sch. Dist. of Marshall Cnty.*, 32

N.W.2d 627, 629-30 (S.D. 1948); *Hendricks v. Sch. Dist. No. 1*, 10 P.2d 970, 972-32 (Wyo. 1932); *Briggs v. Greenville Cnty.*, 135 S.E. 153, 155 (S.C. 1926); *City of Jackson v. First Nat'l Bank of Jackson*, 157 S.W.2d 321, 325 (Ky. 1941). This rule applies equally where, as here, the money in the sinking fund comes from the proceeds of a bond. For instance, in *Fults v. City of Coralville*, 666 N.W.2d 548 (Iowa 2003), the Iowa Supreme Court explained that money "from the initial proceeds of the sale of the notes and bonds" that "was set aside to pay interest on the notes and bonds" did "not constitute 'debt' because the monies [were] comprised of proceeds from the initial sale rather than monies that must be replenished by taxation." *Id.* at 558.

Excluding cash placed in a sinking fund accords with policy considerations. Debt limits exist so that current government officials cannot "bind[] the municipality to deplete its income for future years, imposing an extra burden on the taxpayer, or endangering the meeting of debts lawfully incurred." *Smith v. Town of Guin*, 155 So. 865, 868 (Ala. 1934); *see also City of Hartford v. Kirley*, 493 N.W.2d 45, 50-51 (Wis. 1992). But sinking funds, including the capitalized interest at issue here, neither "directly or indirectly increase[] the burden of taxation"—the capitalized interest was money the Commonwealth did not have before the issuance of the bonds. *Eagerton v. Second Econ. Dev. Co-op. Dist. of Lowndes County*, 909 So. 2d 783, 790 (Ala. 2005) (quoting *Taxpayers & Citizens of Georgiana v. Town of Georgiana*, 93 So. 2d 493, 496 (Ala. 1956)). Because the capitalized interest had no impact on the Commonwealth's taxation, it did "not constitute 'debt'" for purposes of calculating the Direct Obligation Debt Limit. *Fults*, 666 N.W.2d at 558; *Eagerton*, 909 So. 2d at 790. In sum, the Court should dismiss the portion of Count II predicated on the so-called Excessive Debt Bonds.[46]

---

[46] For all of the same reasons, the Court should dismiss the portions of Counts III-V relating to the so-called Excessive Debt Bonds because each of those claims partially rests on the supposed illegality of those bonds.

### C.     The ERS Was Authorized To Issue The ERS Bonds

The SAC alleges that the ERS Bonds were void because the ERS lacked statutory

authorization from the Legislative Assembly to issue the bonds. (SAC ¶¶ 112-13.) But the ERS

Bond claims fail for at least three reasons: (1) the ERS had authority to issue the ERS Bonds;

(2) the ERS was permitted to issue bonds even in the absence of express authorization; and (3)

even if the Trustee prevailed in showing that the ERS lacked the requisite authority, the bonds

still would not be void.

#### 1.     The ERS had statutory authorization to issue the ERS Bonds

##### (a)     The plain text of the ERS Enabling Act authorized the ERS Bonds

Contrary to the SAC, the ERS Enabling Act authorized the issuance of the ERS Bonds. In

1988, the Legislative Assembly amended the ERS Enabling Act in recognition of the "deficit" in

the system. 1988 P.R. Laws 203 (Act No. 46, Statement of Motives) (Ex. 34). One of the ERS's

new authorizations, § 779(d), was "to incur debts . . . through the direct placement of debts,

securing said debt with the assets of the System." P.R. Laws Ann. tit. 3, § 779(d) (2008).[47] The

ERS Bonds fit squarely within the authorization provided by § 779(d) because the ERS and

Defendants entered into a contract whereby the ERS directly placed debt, i.e., the ERS Bonds,

with Defendants in return for cash. And the ERS Bonds were secured with ERS's assets. (*See,*

*e.g.*, Official Statement for the Employees Retirement System of the Government of the

Commonwealth of Puerto Rico Bonds, Series A (Jan. 31, 2008), at 39 (Ex. 35).) Therefore, the

---

[47] Section 779(d) also authorized the ERS "to take on a loan from any financial institution." P.R. Laws
Ann. tit. 3, § 779(d) (2008). While this authorization dispositively provided authorization for the ERS
Bonds, the English translation of this provision omits a comma from the clause and incorrectly indicates
that the "financial institution" must be "of the Government of the Commonwealth of Puerto Rico or the
Federal Government of the United States of America." *Compare id.*, *with* P.R. Leyes An. tit. 3, § 779(d).

Trustee's allegation that the ERS Bonds were unauthorized is meritless. *See also Rivera Torres v. Junta de Retiro para Maestros*, 502 F. Supp. 2d 242, 254-55, 258 (D.P.R. 2007) (Gelpí, J.) (holding that the same language in the Teachers Retirement System's ("TRS") Enabling Act provided TRS with "the capacity to issue bonds" and that TRS was not "limited in its ability to enter into contracts, make loans, issue bonds and invest funds").[48]

Foreclosed by § 779(d)'s plain text, the Trustee resorts to an unsupported theory: the statutory authorization for the "direct placement of debts" allegedly only "permitted the ERS to privately sell securities directly to institutional investors, not to issue bonds to the public." (SAC ¶ 113.) But nothing in the text or legislative history of § 779 distinguishes between the purchasers of the debt. Moreover, to the extent the SAC alleges that "direct placement" is the equivalent of "private placement," § 779 forecloses that argument. Section 779(b)(2)(A)(ii)— added in the same 1988 Act in which the Legislative Assembly also added the authorization for "direct placement of debts"—authorizes the ERS to acquire stock subject to certain criteria, including that "[s]ecurities shall not be acquired through <u>private placings</u>." P.R. Laws Ann. tit. 22,§ 779(b)(2)(A)(2) (emphasis added). Thus, had the Legislative Assembly intended to limit the placement of debt to "private placements," it would have expressly used that term. *Compare* P.R. Leyes An. tit. 3, § 779(b)(2)(A)(ii) (using the Spanish "privadas"), *with id.* § 779(d) (using the

---

[48] Indeed, in *Rivera Torres*, the TRS "concede[d] that it [was] allowed to . . . issue bonds" even though such a concession harmed its argument that it could claim Puerto Rico's Eleventh Amendment immunity. 502 F. Supp. 2d at 254-55. The ERS has similarly conceded its authority to issue bonds in other legal proceedings. For example, in one proceeding, the ERS stipulated that the ERS Bonds were "authorized" by the ERS "[p]ursuant to the authority granted to it under the Enabling Act." (Joint Stip. of Movants, the Commonwealth Respondents, and the ERS ¶ 6, No. 16-CV-2696, ECF No. 65 (D.P.R. Nov. 2, 2016).) ERS also stipulated that "[t]he ERS Bond Resolution adopted on January 24, 2008, is a valid and binding contract between the ERS and holders of ERS Bonds." (*Id.* ¶ 11.) And in that same case, the ERS argued that "under the clear terms of the Bond Resolution, the [Bondholders] have valid and enforceable liens over hundreds of millions of dollars of ERS revenue, which will continue to grow." (ERS Opp'n to Mot. to Lift Stay, No. 16-CV-2696, ECF No. 52 (D.P.R. Oct. 26, 2016).)

Spanish "directa"); *see Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from

concluding here that the differing language in the two subsections has the same meaning in

each.").

The explanation for what the Legislative Assembly meant by "direct placement" is

obvious from the context in which it was adopted: The Legislative Assembly did not want ERS

to engage in conduit financing. Conduit financing is a scheme in which a government agency

"authorized by statute to issue municipal bonds . . . serves as a conduit, issuing the bonds on

behalf of a particular private entity and loaning the revenue from the issuance to the private

entity to finance a specific project or improvement." Trent Collier, *Revenue Bonds and Religious*

*Education: The Constitutionality of Conduit Financing Involving Pervasively Sectarian*

*Institutions*, 100 Mich. L. Rev. 1108, 1110-11 (2002). States began restricting conduit financing

in 1985, after Congress imposed a "money limit or cap on the amount of . . . private 'municipal'

bonds which could be issued . . . and the amount which would be accorded tax exempt status."

*Benton, Benton & Benton v. La. Pub. Facilities Auth.*, 897 F.2d 198, 201 (5th Cir. 1990). Thus,

beginning in 1985, it was necessary for each state to allocate which agencies had the authority to

issue conduit bonds and what percentage of the state's overall allocated volume each agency

could issue. *Id.*

Against this background, the Legislative Assembly used "direct placement" to prohibit

ERS from issuing conduit bonds that would count against Puerto Rico's total dollar limit of

conduit bonds. The Legislative Assembly amended the Act to "be of assistance in improving the

System's financial condition," but sought to bar ERS from using Puerto Rico's total dollar limit

for conduit financing. Ex. 34, 1988 P.R. Laws 203, 203 (Act No. 46, Statement of Motives).

Thus, when Act 46 of 1988—approved just a couple of years after Congress imposed limits on

71

conduit financing—allowed for "the direct placement of debts" it clearly meant to prohibit ERS from issuing conduit bonds.

(b)      <u>The Legislative Assembly confirmed the ERS's<br>authorization</u>

Even if the plain text of the ERS Enabling Act were not dispositive, which it is, the Legislative Assembly has repeatedly recognized the legality of the ERS Bonds. As an initial matter, around the same time that the ERS issued the bonds, the Legislative Assembly amended the ERS Enabling Act to increase pension payments upon recognition that "[t]he funds needed to cover the cost of the increase . . . shall proceed from the resources obtained through the issue of bonds of the Employees of the Government and the Judicature Retirement Systems Administration." 2007 P.R. Laws 103, 108 (Act No. 35, § 5) (Ex. 36). That is, the Legislative Assembly approved of the ongoing effort to issue the ERS Bonds and relied on the issuance in passing the pension increase.

Even more significant is the Legislative Assembly's 2011 amendment to the ERS Enabling Act. One of the Legislative Assembly's motivations for amending the ERS Enabling Act was its belief that the ERS had issued "badly structured" bonds. Ex. 8, 2011 P.R. Laws 1431, 1436 (Act No. 116, Statement of Motives). "For such reason," the Legislative Assembly explained, "the Retirement System should not be allowed to issue debt . . . to be secured with its assets." *Id.* at 1437. To accomplish this objective, the Act deleted "or through the direct placement of debts, securing said debt with the assets of the System" from the end of the first sentence of § 779(d). *Id.* at 1449; P.R. Laws Ann. tit. 3, § 779(d). Additionally, the Act added that: "Bond Issues are hereby prohibited as part of the direct placement of debts secured with the assets of the System." *Id.*

This 2011 amendment unequivocally demonstrates that the Legislative Assembly

believed that the ERS Bonds were legally issued as a "direct placement of debts" at the time of

issuance. *Id.* Its response to its belief that the ERS had unwisely issued bonds with poor terms

was to remove the language allowing "the direct placement of debts" and provide that "[b]ond

issues" were "prohibited as part of the direct placement of debts." *Id.* Indeed, if the Legislative

Assembly did not believe that the ERS Bonds were a "direct placement of debts," this

amendment would have been unnecessary.[49]

In the face of this clear understanding by the Legislative Assembly that the ERS Bonds

were authorized by § 779(d) at the time of their issuance, the Trustee seizes on a sentence in Act

116 of 2011 in which the Legislative Assembly stated that the ERS Bonds were "illegally made."

(SAC ¶ 115.) But as an initial matter, the Legislative Assembly's path to disagreeing with the

public policy decision of a previous administration is legislation—not political rhetoric—as it did

by amending § 779(d). Thus, the statement reflects only a new governing party's policy

disagreement with decisions made by the prior governing party. In any event, the Trustee isolates

two words—"illegally made"—but a review of the entire sentence defeats the Trustee's

argument. The Legislative Assembly's full statement is: "The Bond Issue was illegally made by

the System's Administration even though such transaction was submitted to the Legislative

Assembly for approval and rejected by the House of Representatives for deeming it detrimental

to the System." Ex. 8, 2011 P.R. Laws 1431, 1436 (Act No. 116, Statement of Motives). That is,

while the Trustee artfully pleads in a manner designed to indicate that the Legislative Assembly

believed that the ERS lacked statutory authorization to issue the Bonds, the reality is much

---

[49] In addition, when the Legislative Assembly discussed the ERS Bonds at length in relation to a 2013
Act, it made no mention of any illegality. *See* Ex. 22, 2013 P.R. Laws 39, 49-50 (Act No. 3, Statement of
Motives). To the contrary, it stated that the ERS was "under the obligation to repay these bonds"—hardly
a statement indicating a belief that the ERS lacked authorization to issue the ERS Bonds. *Id.* at 50.

different. The Legislative Assembly's issue was not that the statute did not authorize the ERS Bonds; it was that the Legislative Assembly wanted to require that ERS seek legislative approval.

But as the Trustee is undoubtedly aware, legislative approval was not required at the time when the ERS Bonds were issued; that requirement was not imposed until 2011. *See* P.R. Laws Ann. tit. 3, § 779(d). In the same 2011 amendment in which the Legislative Assembly stated that the ERS Bonds were "illegally made," it also amended the ERS Enabling Act to state: "For the direct placement of debts secured with the assets of the System, the consent of two-thirds of the members of the Board of Trustees of the System, through their secret vote, as well as the enactment of legislation by the Legislative Assembly to such purposes shall be necessary. . . ." Ex. 8, 2011 P.R. Laws 1431, 1449-450 (Act No. 116); P.R. Laws Ann. tit. 3, § 779(d). The Trustee cannot rely on the Legislative Assembly's *ex post* statement about the need for legislative approval to establish the supposed illegality of the ERS Bonds because the ERS Bonds had long been issued before the Legislative Assembly imposed a requirement for the ERS to obtain its approval.

(c)     <u>The ERS and government officials' interpretations confirm<br>that ERS legally issued the ERS Bonds</u>

To the extent this Court determines that § 779(d) is ambiguous, the Court should defer to the ERS's position that it had authority to issue the ERS Bonds. "[U]nder Puerto Rico law, great deference is due to an agency's construction of its powers pursuant to its organic act." *U.S.I. Props. Corp. v. M.D. Constr. Co.*, 860 F.2d 1, 8 (1st Cir. 1988). As here, in *U.S.I. Properties*, CDC, "a public corporation of the Commonwealth of Puerto Rico," entered into contracts that it later claimed were ultra vires as contrary to Puerto Rico law. *Id.* at 3, 7-8. The First Circuit, however, explained that CDC "had approval from its own counsel and from its finance

74

committee to enter the [challenged] agreements." *Id.* at 8. Because "great deference is due to an agency's construction of its powers," the court upheld the agreements "based on the statutory language and on the . . . agencies' reading of the statute." *Id.*

Here, the ERS Bonds were accompanied by a slew of approvals and legal opinions—including from Bond Counsel, the ERS's own counsel, and the Secretary of Justice—unanimously confirming their validity. Bond Counsel to ERS opined that the ERS "ha[d] the right and power" to issue the ERS Bonds. (Ex. 37 (compiling Bond Counsel Opinions); Ex. 1, K&K Rep. at 199). ERS's General Counsel opined that "[t]he Bonds have been duly and validly authorized and issued." (Ex. 5 (compiling General Counsel Opinions).) Likewise, the Secretary of Justice opined that the ERS Bonds "constitute[d] the legal, valid and binding agreements of the Commonwealth." (Ex. 6 (compiling Secretary of Justice Opinions).) Thus, to the extent the Court concludes § 779(d) is ambiguous, the Court should defer to the ERS's interpretation.

### 2. The Trustee incorrectly asserts that there must be express authorization for the issuance of negotiable bonds

Recognizing the weakness of the argument that § 779(d) did not authorize issuance of the ERS Bonds, the Trustee asserts that "[a] municipal entity's authority to issue 'negotiable bonds' for sale to the public must be expressly granted by the legislature and cannot be implied from a general power to borrow money or incur debts." (SAC ¶ 113.) That is, the SAC claims that the authorization to borrow money contained in § 779(d) is insufficient without an express invocation of the word "bond." But no Puerto Rico case so holds. And modern rules for statutory construction and practices of municipal finance demonstrate that the Supreme Court of Puerto Rico would likely join courts holding that a right to borrow includes a municipal right to issue negotiable bonds.

For most of the 19th Century, "the courts, federal and state, almost uniformly held that

the power to borrow money carried with it the power to issue negotiable bonds." *Russell v. Middletown City Sch. Dist.*, 125 A. 641, 642 (Conn. 1924). In the pre-*Erie* era, the Supreme Court of the United States decided hundreds of municipal bond cases, culminating in *City of Brenham v. German-Am. Bank*, 144 U.S. 173 (1892), *judgment vacated on rehearing*, 144 U.S. 549 (1892). There the Supreme Court overruled its prior opinions and held that a right to borrow did not include the right to issue bonds. *Id.* at 181.

But because the Supreme Court's interpretation of state law was not binding on state courts, state courts have not hesitated to reject *Brenham*. In *Russell*, before rejecting the *Brenham* rule, the Connecticut Supreme Court canvassed the nation and explained that "the older rule"—that the power to borrow money includes the power to issue negotiable bonds—was "in force in Massachusetts, Arkansas, Georgia, Kentucky, Nevada, Ohio, New York, Rhode Island, Virginia, and Wisconsin," while the *Brenham* rule was in force only "in Alabama, Illinois, Louisiana, New Jersey, and Texas." 125 A. at 643.

Puerto Rico's courts have yet to weigh in, but modern statutory interpretation analysis demonstrates that Puerto Rico would likely reject *Brenham* and its progeny. *Brenham* and its ilk are relics from a "bygone era of statutory construction." *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2364 (2019) (citation omitted). Rather than look to statutory text as courts do today, "[t]he underlying reason of decision in those states," was based upon courts' negative view of the underlying policy, i.e., they believed that "the power to issue bonds implied from the power to borrow money is . . . a dangerous one, in that . . . municipalities may suffer greatly from an indebtedness incurred under the forms of law . . . ." *Russell*, 125 A. at 644-45. For example, in *Brenham*, the Court based its decision on its assumption that the state would not want "to plunge the municipal corporation into a debt on which interest must be paid." 144 U.S.

at 181-82.

Today, the plain text plain text of § 779(d) controls. Judges no longer have authority to "add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and [their] own imaginations." *Bostock v. Clayton Cnty., Ga*, 140 S. Ct. 1731, 1738 (2020); *see also Univ. of P.R. v. Bonafide Union of Officers of the Univ. of P.R.*, 206 P.R. Dec. 140, 153 (2021) (Ex. 38) ("[W]e have repeatedly expressed that when a law is clear and free of ambiguity, the text communicates what the Legislative Assembly wanted to do."). Therefore, the plain text of § 779(d), which, as explained above, allowed ERS to issue bonds, is controlling. Because the plain text controls, in 2022, the Supreme Court of Puerto Rico would follow the older rule that provides that the power to borrow money includes the power to issue negotiable bonds.[50]

### 3. The ERS Bonds would not be void even if ERS lacked authority to issue them

The Trustee alleges that the lack of express authorization for the ERS to issue the ERS Bonds would mandate a conclusion that the ERS Bonds are void. (SAC ¶ 218.) And the relief sought by the Trustee is predicated on this conclusion; according to the Trustee, the government can recover funds unlawfully transferred under a void contract. (*Id.* ¶ 222.) However, even under *Brenham* and its outdated progeny, the lack of express authorization would not mean that the ERS Bonds are void.

---

[50] Even going beyond the plain text of § 779(d), the motivation behind the Supreme Court's decision in *Brenham* is no longer applicable. The *Brenham* Court sought to stamp out the practice "of imposing upon counties and other local jurisdictions burdens of a most fraudulent and iniquitous character, and of which they would have been summarily relieved had not the obligations been such as to protect them from question in the hands of bona fide holders." *Police Jury of Par. of Tensas v. Britton*, 82 U.S. 566, 571 (1872). But "the problem of policing governmental issuers" has been "alleviated by the present practice of requiring legal opinions as to the validity of the issue." UCC § 8-202 cmt. 3.

Even states that require express authority for municipalities to issue negotiable paper

provide that "where such authority is lacking, such a paper is not void, but merely not negotiable.

It is still an evidence of debt." *Port of Palm Beach Dist. v. Goethals*, 104 F.2d 706, 709 (5th Cir.

1939); *see also, e.g.*, *Pac. Improvement Co. v. City of Clarksdale*, 74 F. 528, 534 (5th Cir. 1896);

*Keel v. Pulte*, 10 S.W.2d 694, 697-98 (Tex. Comm'n App. 1928) (warrants issued by city would

be enforceable but nonnegotiable, "though couched in terms importing negotiability," because

the city lacked authority to issue negotiable instruments); *Forrest City v. Bank of Forrest City*,

172 S.W. 1148, 1150 (Ark. 1915) (holding that the city's lack of authority to issue negotiable

note did not render a note unenforceable, only subject to personal defenses). In *Brenham* itself,

even though the Supreme Court ruled that the city lacked authority to issue negotiable bonds, it

amended its judgment on rehearing to allow the holders to sue the city on the underlying debt.

*See City of Brenham v. German Am. Bank*, 144 U.S. 549, 549-550 (1892) ("It can scarcely be

said it is just for the city to avoid her bonds and keep the money she has derived from them

too."). Thus, because any lack of authority would not render the ERS Bonds void, the portion of

Count II based on the ERS Bonds fails for this reason, too.

## VII.   ALMOST ALL OF THE CLAIMS ASSERTED IN COUNTS I, II, AND V ARE TIME-BARRED

There is an additional, independent reason for dismissing Count I and the majority of

claims asserted in Counts II and V: they are barred by the four-year statute of repose.

### A.   Nearly All Of The Claims Asserted In Counts I And II Are Untimely

"Under Commonwealth law, an action for nullification of a contract cannot be brought

once four years have passed since the execution of the contract." *Ruiz v. Ambush*, 25 F. Supp. 3d

211, 213 (D.P.R. 2014) (quoting P.R. Laws Ann. tit. 31, § 3512). Specifically, § 3512 provides

that "[t]he action for nullity shall last four (4) years. [T]his term shall commence to run . . . in

[cases] of error or deceit . . . from the date of the consummation of the contract." P.R. Laws Ann.

tit. 31, § 3512. Moreover, § 3512 is a statute of repose or "caducity term" that cannot be

extended or tolled. *Id*. at 213-14; *see also Arrieta Gimenez v. Arrieta Negron*, 672 F. Supp. 46,

49 (D.P.R. 1987) ("[A]n action cannot be brought once four years have passed since the

execution of the contract. No reasonable period for discovery is given, nor will any other event

toll the statute of limitations. Simply put, we are faced with a civil law caducity term (period of

extinguishment) that cannot be extended.").

Count I is, in fact, an action for nullity. The SAC seeks to have "the contracting

parties . . . restore to each other the things which have been the object of the [Swap

Agreements]." P.R. Laws Ann. tit. 31, § 3514 (codifying an action for nullity under Puerto Rico

law). The Supreme Court of Puerto Rico's decision in *Millán Soto v. Caribe Motors Corp.*, 83

P.R.R. 494, 1961 WL 13796 (P.R. Sept. 19, 1961) (Ex. 39), is illustrative. In *Millán Soto*, a

contract did not comply with requirements of the Civil Code. Specifically, the plaintiff purchased

a truck, but the conditional sales contract did not comply with requirements of the Conditional

Sales Act set forth in Puerto Rico's Civil Code. *Id*. at 498-99. The plaintiff then filed an action

seeking "rescission of the contract," and for the defendant to return the payment for the truck and

to pay him expenses associated with the purchase. *Id*. at 499. In construing the plaintiff's claim,

the Court held that it "does not matter that the plaintiff described [the action] otherwise; the

claim seeking repayment for a contracting party's failure to comply with the Civil Code "is

really an action of nullity of contract." *Id*. at 510.

The same is true of the claims in Count I. While the Trustee did not label Count I as a

claim for nullity, there can be no dispute that Count I "is actually one of nullity" because the

Trustee seeks repayment of the fees it paid pursuant to the Swap Agreements due to the

Commonwealth and PBA's failures to comply with the requirements of the Civil Code, namely the registration requirement. *Id*. at 479, 489-90. There can also be no dispute that Count I cannot satisfy § 3512's statute of repose for nullity claims because the earliest a Debtor filed its Title III petition was May 3, 2017, approximately nine years after the Commonwealth executed the last Swap Agreement in 2008. (SAC Ex. 2.) Thus, Count I should be dismissed.

Almost all of the claims in Count II also are precluded by § 3512's statute of repose because the Trustee's allegations in Count II either are that Defendants deceived Debtors into issuing the Challenged Bonds or that Debtors erroneously issued the bonds.[51] Thus, those claims are timely only if the Purchase Contract was executed after May 3, 2013, i.e., within four years of the filing of Puerto Rico's Title III petition. The only Purchase Contract that was executed after that date was the Purchase Contract for the 2014 GO Bonds. (SAC Ex. 3.) Thus, all of the claims in Count II, except those based on the 2014 GO Bonds, are untimely under § 3512.

### B. The Majority Of The Claims Asserted In Count V Are Time-Barred

Except for the claims to avoid transfers made in connection with the 2014 GO Bonds, each of the transfers the Trustee seeks to avoid in Count V are time-barred by Puerto Rico law. While the Trustee attempts to co-opt a statute of limitations Congress provided to the IRS to try to recover for alleged transfers between May 3, 2007, and May 3, 2017, the majority of the claims in Count V to avoid those transfers are untimely for five reasons: (1) Puerto Rico's (not New York's) statute of repose applies; (2) Congress abrogated sovereign immunity for claims

---

[51] Error "refer[s] to the substance of the thing, which may be the object of the contract, or to those conditions of the same, which should have been principally the cause of its execution," P.R. Laws Ann. tit. 31, § 3405, and there is no "distinction between factual and legal error," *Commonwealth v. Crespo Torres*, 180 P.R. Dec. 776, 797 (2011) (Ex. 40). "Deceit may be found 'when by words or insidious machinations on the part of one of the contracting parties the other is induced to execute a contract which without them he would not have made.'" *Dopp v. HTP Corp.*, 947 F.2d 506, 510 (1st Cir. 1991) (quoting P.R. Laws Ann. tit. 31, § 3408).

asserted under § 544 of the Bankruptcy Code, leaving the IRS with the same rights as any other creditor at state law; (3) the Trustee cannot stand in the shoes of the IRS; (4) even if the Trustee could stand in the IRS's shoes, it fails to allege that the IRS was a creditor on the date of any of the challenged transfers; and (5) the challenged transfers were made before the IRS's prospective 10-year claim period began.

### 1. Puerto Rico's four-year statute of repose applies and bars the majority of the claims asserted in Count V

Puerto Rico law supplies the time-bar period for the claims in Count V asserted under state law through § 544(b), and those claims—except for the claims to avoid transfers made in connection with the 2014 GO Bonds—are untimely. Puerto Rico's choice of law rules—and not New York's—apply because the federal court "must apply the choice of law of the forum state." *Shelley v. Trafalgar House Pub. Ltd.*, 918 F. Supp. 515, 521 (D.P.R. 1996) (citing *Jimenez Puig v. Avis Rent-A-Car Sys.*, 574 F.2d 37, 40 (1st Cir. 1978)). "Puerto Rico has approved the 'dominant or significant contacts' test for contract and tort actions." *TC Invs., Corp. v. Becker*, 733 F. Supp. 2d 266, 276-77 (D.P.R. 2010) (citation omitted). "Among the contacts to consider are the parties' place of incorporation and business, the place where the injurious conduct occurred, the place where the injury materialized, and the place where the relationship between the parties is centered." *Rodríguez-Miranda v. Benin*, 829 F.3d 29, 43 n.18 (1st Cir. 2016) (citation omitted) (applying Puerto Rico law against a Pennsylvania LLC because the parties' relationships were centered in Puerto Rico, and the injury occurred there). In addition, Puerto Rico law "presum[es] that the local law of the state where the injury occurred should govern unless another state has a more significant relationship to the occurrence or to the parties." *Rodríguez v. Am. Airlines, Inc.*, 886 F. Supp. 967, 970 (D.P.R. 1995) (citation omitted); *see also Westernbank P.R. v. Kachkar*, No. 07-1606 (ADC), 2010 WL 11545590, at *3 (D.P.R. Sept. 27,

81

2010) (applying Puerto Rico law because "plaintiffs are a Puerto Rico company and the
employees that dealt with defendants' allegedly fraudulent representations are all located in
Puerto Rico . . . .").

Here, the SAC's allegations, which focus on the purported impact of Puerto Rico's
bankruptcy on its residents and its unsecured creditors (who allegedly are also overwhelmingly
Puerto Rico residences and businesses), require application of Puerto Rico law to the claims at
issue. (SAC ¶¶ 3, 181-89, 214.) The only connection the SAC draws to New York are allegations
that some Defendants have operations there. In light of the other allegations, that is not enough.
*See Westernbank*, 2010 WL 11545590, at *3 ("While defendants are not domiciliaries, such does
not outweigh the other factors present."). Accordingly, Puerto Rico law—along with the same
four-year statute of repose applicable to Counts I-II—applies to Count V.[52]

Actions brought under Puerto Rico law for supposed fraud of creditors must be brought
within four years from the date that the contract was executed. *FDIC*, 671 F. Supp. at 870;
*accord* P.R. Laws Ann. tit. 31, § 3512. Applying that time bar in conjunction with the
Bankruptcy Code, the claims in Count V, except for those to avoid the alleged transfers in
connection with the 2014 GO Bonds, should be dismissed as untimely because the Purchase
Contract for the 2014 GO Bonds was the only contract executed in the four years before Puerto
Rico filed for bankruptcy on May 3, 2017.[53]

---

[52] For Santander, New York's fraudulent transfer statute does not apply for the additional reason that,
when the claims arose its principal place of business was in Puerto Rico. Santander has never had its
principal place of business in New York, as incorrectly alleged in the SAC. (*See* SAC ¶ 35.)

[53] Even if New York's six-year statute of limitations applied, the Trustee would be limited to recovering
for claims dating back to only May 3, 2011 with regard to the GO Bonds, May 21, 2011 with regard to
the ERS Bonds, and September 27, 2013 with regard to the PBA Bonds. *See In re Sharp*, 403 F.3d at 53
(noting the six-year statute of limitations under New York law).

### 2.  The *nullum tempus* doctrine does not apply where Congress has abrogated sovereign immunity

The Trustee asserts that it is immune to the applicable state law time bars because

§ 544(b) permits it to use the ten-year claim period available to the IRS. (SAC ¶ 248.) Under

§ 544(b), a trustee can "avoid any transfer of an interest of the debtor in property or any

obligation incurred by the debtor that is voidable under applicable law by a creditor holding an

unsecured claim that is allowable under section 502 of [Title 11] or that is not allowable only

under section 502(e) of [Title 11]." 11 U.S.C. § 544(b)(1). Here, the "applicable law" invoked by

the Trustee is Internal Revenue Code § 6502, which provides: "Where the assessment of any tax

imposed by this title has been made within the period of limitation properly applicable thereto,

such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the

proceeding begun . . . within 10 years after the assessment of the tax . . . ." 26 U.S.C. § 6502(a).

The rationale for using the IRS's limitations period in § 544 actions is the *nullum tempus*

doctrine. Generally understood as "no time runs against the King," *nullum tempus* allows the

federal government to ignore state law statutes of limitations. *See United States v. Summerlin*,

310 U.S. 414 (1940) (holding that once a valid claim has accrued to the United States, it

generally cannot be invalidated by a state statute of limitations). But *nullum tempus* depends on

the sovereign immunity of the United States. *See In re Greater Se. Cmty. Hosp. Corp. I*, 365

B.R. 293, 306 (Bankr. D. D.C. 2006) ("Finally, the whole point of the *Summerlin* rule and the

doctrine of federal sovereign immunity in general is that the 'right to protection from liability'

(*i.e.*, statutes of limitations or repose) created by an individual state can be 'violate[d]' by the

federal government whenever it is in the public interest to do so." (emphasis added) (citation

omitted).))

83

*Nullum tempus* is unavailable here because the United States <u>expressly waived</u> its sovereign immunity in connection with fraudulent transfer claims. Specifically, § 106(a) of the Bankruptcy Code provides:

> Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:

> (1) Section[] . . . 544 . . . of this title.

11 U.S.C. § 106(a); *see also* 48 U.S.C. § 2161(a) (incorporating § 106 into PROMESA). Section 106(a) thus specifically abrogates the sovereign immunity of the IRS with respect to § 544. *See In re DBSI, Inc.*, 869 F.3d 1004, 1010 (9th Cir. 2017) ("Section 106(a)(1)'s abrogation of sovereign immunity is absolute with respect to Section 544(b)(1) and thus necessarily includes the derivative state law claim on which a Section 544(b)(1) claim is based."); *In re Yahweh Ctr., Inc.*, 27 F.4th 960, 966 (4th Cir. 2022) (holding that §106 abrogates sovereign immunity for purposes of a fraudulent transfer action under § 544).[54] Therefore, even if the Trustee stood in the IRS's shoes, it is bound by Puerto Rico's four-year time bar because the United States expressly waived its sovereign immunity in connection with fraudulent transfer claims.

### 3.    The Trustee cannot circumvent Puerto Rico's time bar because it cannot stand in the IRS's shoes

Even if Congress had not abrogated the *nullum tempus* doctrine, the Trustee cannot wield powers uniquely available to the IRS. Under the *nullum tempus* doctrine, "[t]he IRS benefits from a ten-year limitations period under IRC § 6502," because "the United States is not bound by state statutes of limitation . . . in enforcing its rights." *In re Vaughan Co.*, 498 B.R. 297, 303-04 (Bankr. D.N.M. 2013) (quoting *Summerlin*, 310 U.S. at 416). Therefore, the *nullum tempus*

---

[54] To Defendants' knowledge, no Court has ruled on the abrogation of sovereign immunity in the context of the IRS triggering creditor cases.

doctrine does not apply to a non-sovereign or private action, *see, e.g.*, *Dole v. Local 427, Int'l Union of Elec. Workers*, 894 F.2d 607, 611-12 (3d Cir. 1990), including even an "action brought in the name of the United States [that] does not involve public rights or interests," *In re Vaughan Co.*, 498 B.R. at 304; *see also United States v. Beebe*, 127 U.S. 338, 344 (1888).

The Trustee does not allege that Count V seeks to vindicate public rights, and it is certainly not "brought in the name of the United States." *In re Vaughan Co.*, 498 B.R. at 304 Instead, the Trustee seeks to recover only for Puerto Rico's creditors, and those types of claims are insufficient to invoke the 10-year claim period provided by IRC § 6502. *See In re Brooke Corp.*, 485 B.R. 650, 665 (Bankr. D. Kan. 2013) (holding that §544(b) "confers upon the trustee no greater rights of avoidance than a creditor would have had if it were asserting invalidity on its own behalf").

The federal government shares the understanding that trustees cannot "step into the shoes of the United States by bringing claims belonging to the IRS and to side-step the normal statute of limitations provided by the [state fraudulent transfer law]." United States' Motion to Dismiss at 10-17, *In re Yahweh Ctr., Inc.*, No. 18-AP-5 (E.D.N.C. Sept. 24, 2018), ECF No. 69. The United States argued that a contrary ruling "would be inconsistent with § 548 of the Bankruptcy Code, other federal statutes, the Constitution's exclusive delegation of collection authority to the IRS" as "Congress does not hide elephants in mouse holes." *Id*. Accordingly, because the Trustee cannot stand in the shoes of the IRS, even if Congress had not abrogated the *nullum tempus* doctrine, the Trustee's claim would be governed by Puerto Rico's four-year time bar.

### 4. Even if the Trustee could step into the IRS's shoes, doing so provides no ability to avoid Puerto Rico's time bar

Even if the Trustee could step into the IRS's shoes, and even if it could use the *nullum tempus* doctrine, Count V still would be time-barred for at least two reasons. First, blackletter

85

law requires that the Trustee allege that the IRS—the so-called "triggering" creditor—held an unsecured claim at both the transfer date and the date of commencement of the case. *See* 5 Richard Levin & Henry J. Sommer, Collier on Bankruptcy ¶ 544.06[1] (16th ed. 2022) ("[T]he so-called 'triggering' creditor must be the same creditor on both the transfer date and the date of commencement of the case . . . ."); *see also In re Allou Distribs., Inc.*, 392 B.R. 24, 34 (Bankr. E.D.N.Y. 2008) ("[A] triggering creditor must be the same creditor on both the Transfer Date and the Petition Date . . . ."). But the Trustee here fails to allege that the IRS was an unsecured creditor of Puerto Rico at the time of any allegedly fraudulent transfer. The Trustee instead lists five unsecured claims held by the IRS, but fails to allege that any of these unsecured claims existed at the time of any allegedly fraudulent transfer. (SAC ¶ 248.) In fact, the proofs of claims filed by the IRS demonstrate that all five claims relate to taxes assessed between 2016 and 2021—years after the alleged transfers took place between 2007 and 2014. (*See* Compilation of the Notice of Claims filed with IRS cited in the SAC (Ex. 41).)

Second, even if the Trustee could invoke IRC § 6502, the Trustee's claims still would be time-barred because the 10-year period provided by § 6502 applies only prospectively starting on the date that the IRS issues a tax assessment. The IRC provides that "such tax may be collected by levy or by a proceeding in court, <u>but only</u> if the levy is made or the proceeding begun . . . <u>within 10 years</u> after the assessment of the tax . . . ." 26 U.S.C. § 6502(a) (emphasis added). In other words, the plain text of § 6502 grants the IRS 10 years to sue a party after it assesses taxes without saying anything about how far back prior to the assessment the IRS can look in unwinding fraudulent transfers. The Trustee's interpretation would improperly render the statutory words "after the assessment of the tax" superfluous. *See Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011) (declining to

86

adopt interpretation of statute that ran counter to courts' "general 'reluctance to treat statutory

terms as surplusage'") (citation omitted).

The only court to have considered this issue in the First Circuit has enforced this plain

reading of § 6502. *See In re Kittery Point Partners, LLC*, No. 17-20316, 2018 WL 1613573, at

*10 (Bankr. D. Me. Mar. 12, 2018) ("[I]f the assessments were timely made, the IRS would have

10 years after the assessments, or until August and October 2027, to collect the penalties

assessed."). Courts outside this Circuit have also rejected trustees' attempt to use § 6502 as a

lookback period. For instance, in *In re Webster*, 629 B.R. 654 (Bankr. N.D. Ga. 2021), the debtor

filed for bankruptcy in July 2018. The trustee sought to invoke the IRS's 10-year statute of

limitations to set aside certain transfers from as early as 2008 under the theory that § 6502 was a

10-year lookback from the date of the petition. *Id*. at 673. The court rejected the trustee's

argument because a "plain reading of § 6502 . . . 'makes clear that it is the "assessment" itself

that, once made, starts the running of the 10-year period within which the IRS can commence

efforts to collect an assessed tax.'" *Id*. at 677 (citation omitted); *see also In re Taylor, Bean &*

*Whitaker Mortg. Corp.*, Nos. 09-bk-07047 (JAF), et al., 2018 WL 6721987, at *6 (Bankr. M.D.

Fla. Sept. 28, 2018) ("[T]he ten-year period appears to be a look-forward period rather than a

lookback period.").

Here, although the Trustee attempts to stand in the shoes of the IRS by seeking to recover

for transfers made between May 3, 2007, and May 3, 2017, the IRS's 10-year claim period

provides no avenue for the Trustee to recover during that time because § 6502(a) looks forward,

not backward.[55] Indeed, the Trustee concedes that the IRS did not seek recovery for taxes until

---

[55] The Trustee also is incorrect that the 10-year period for all of the Challenged Bonds should be
calculated based on the date of the filing of the Commonwealth's Title III petition on May 3, 2017. The

*(cont'd)*

after Puerto Rico filed for bankruptcy on May 3, 2017 (SAC ¶ 248), and the Trustee does not allege that any transfers took place after that time. Therefore, even if the Trustee could stand in the IRS's shoes and invoke the *nullum tempus* doctrine, it provides no benefit to the Trustee because it is not a lookback statute.

## VIII.   THE COURT SHOULD DISMISS THE SAC WITH PREJUDICE

The Court should deny any request for leave to replead by dismissing the SAC with prejudice because the SAC's defects are uncurable. Indeed, after several bites of the apple, any further amendment would be futile because there are no additional facts that would: (i) avoid § 546's safe harbors (ii) allege transfers within § 548's lookback period; (iii) overcome the sheer implausibility of the Trustee's fraudulent transfer claims; (iv) manufacture expressly barred remedies under Puerto Rico law; (v) square the Trustee's atextual reading of Puerto Rico's Constitution with its plain text; or (vi) avoid the statute of repose period applicable to Counts I, II, and V. *See In re Tribune Co.*, 2019 WL 1771786 at *12 ("Because the Trustee's [claims] are barred by Section 546(e), his proposed amendment would be futile."); *see also Brandon v. Musoff*, No. 10-CV-9017(KBF), 2012 WL 135592, at *4 (S.D.N.Y. Jan. 17, 2012) ("[W]hen a cause of action falls outside the applicable statute of limitations, dismissal with prejudice is justified.").

## CONCLUSION

For the foregoing reasons, the Court should dismiss the SAC against all Defendants with prejudice.

---

PBA and ERS filed their Title III petitions on May 21, 2017 and September 27, 2019, respectively. (SAC ¶ 197 n.21.)

Dated: New York, New York
December 29, 2022

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

/s/ Julie E. Cohen
Julie E. Cohen (*Pro Hac Vice*)
Sam Auld (*Pro Hac Vice*)
One Manhattan West
New York, New York 10001-8602
(212) 735-3000
(212) 735-2000
julie.cohen@skadden.com
sam.auld@skadden.com

*Counsel to Morgan Stanley & Co. LLC and
Morgan Stanley Capital Services LLC*

SIMPSON THACHER & BARTLETT LLP

/s/ Jonathan K. Youngwood
Jonathan K. Youngwood (*Pro Hac Vice*)
David Elbaum (*Pro Hac Vice*)
425 Lexington Avenue
New York, NY 10017
(212) 455-2000
(212) 455-2502
jyoungwood@stblaw.com
David.elbaum@stblaw.com

*Counsel to J.P. Morgan Securities LLC*

SALDAÑA, CARVAJAL & VÉLEZ-RIVÉ,
P.S.C.

/s/ Angel E. Rotger-Sabat
Luis N. Saldaña-Román
USDC-PR No. 208001
Ángel E. Rotger-Sabat
USDC-P.R. No. 208601
166 Avenida de la Constitución
San Juan, Puerto Rico 00901
(787) 289-9250
(787) 289-9253
lsaldana@scvrlaw.com
arotger@scvrlaw.com

*Counsel to Morgan Stanley & Co. LLC and
Morgan Stanley Capital Services LLC*

ANTONETTI MONTALVO & RAMIREZ-
COLL (AMRC)

/s/ José L. Ramirez-Coll
José L. Ramirez-Coll
USDC-PR No. 221702
P.O. Box 13128
San Juan, Puerto Rico 00908
(787) 977-0312
(787) 977-0323
jramirez@amrclaw.com

*Counsel to J.P. Morgan Securities LLC*

GOODWIN PROCTER LLP

/s/ Douglas H. Flaum
Douglas H. Flaum (*Pro Hac Vice*)
Charles A. Brown (*Pro Hac Vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018

WINSTON & STRAWN LLP

/s/ Carrie V. Hardman
Carrie V. Hardman (*Pro Hac Vice*)
200 Park Avenue
New York, NY 10166
(212) 294-6700
(212) 294-4700

(212) 813-8800
(212) 355-3333
dflaum@goodwinlaw.com
cbrown@goodwinlaw.com

*Counsel to Goldman Sachs & Co. LLC,
Goldman Sachs Bank USA, and Goldman
Sachs Mitsui Marine Derivative Products,
L.P.*

chardman@winston.com
                    -and-
Joseph L. Motto  (*Pro Hac Vice*)
35 W. Wacker Drive
Chicago, IL 60601
(312) 558-5600
jmotto@winston.com

*Counsel to BofA Securities a/k/a Banc of
America Securities, LLC a/k/a BofA Merrill
Lynch, and Merrill Lynch Capital Services,
Inc.*

MORELL, CARTAGENA & DAPENA LLC

/s/ Ramón E. Dapena
Ramón E. Dapena
USDC PR No. 125005
PO Box 13399
San Juan, PR 00908
787.723.1233
787.723.8763
ramon.dapena@mbcdlaw.com

*Co-Counsel to Goldman Sachs & Co. LLC,
Goldman Sachs Bank USA, and Goldman
Sachs Mitsui Marine Derivative Products,
L.P.*

McGUIRE WOODS LLP

/s/ E. Andrew Southerling
E. Andrew Southerling (*Pro Hac Vice*)
888 16th Street N.W., Suite 500
Washington, DC 20006
(202) 857-1772
(202) 828-3340
asoutherling@mcguirewoods.com
                    -and-
Aaron G. McCollough (*Pro Hac Vice*)
77 West Wacker Drive, Suite 4100
Chicago, IL 60601-1818
(312) 849-8256
(312) 698-4522
amccollough@mcguirewoods.com

*Counsel to Jefferies LLC and BMO Capital
Markets GKST, Inc.*

CROWELL & MORING LLP

/s/ Dan Zelenko
Dan Zelenko (*Pro Hac Vice*)
Sarah Gilbert (*Pro Hac Vice*)
590 Madison Avenue, 20th Floor
New York, NY 10022
(212) 223-4000
(212) 223-4134
dzelenko@crowell.com
sgilbert@crowell.com

*Counsel to Santander Securities LLC*

McCONNELL VALDÉS LLC

/s/ Antonio A. Arias-Larcada
Antonio A. Arias-Larcada, Esq.
USDC-PR Bar No. 204906
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
(787) 250-5064
(787) 759-9225
aaa@mcvpr.com

*Counsel to Samuel A. Ramirez & Co., Inc.*

NELSON ROBLES-DIAZ LAW OFFICES,
P.S.C.

/s/ Nelson Robles-Díaz
Nelson Robles-Díaz, Esq.
USDCPR NO. 204410
P. O. Box 192302
San Juan, Puerto Rico 00919-2302
(787) 294-9518
(787) 294-9519
nroblesdiaz@gmail.com

*Counsel for Santander Securities LLC*

GOODWIN PROCTER LLP

/s/ Marshall H. Fishman
Marshall H. Fishman (*Pro Hac Vice*)
Meghan K. Spillane (*Pro Hac Vice*)
The New York Times Building
620 Eighth Avenue
New York, NY 10018
(212) 813-8800
(212) 355-3333
MFishman@goodwinlaw.com
MSpillane@goodwinlaw.com

*Citigroup Global Markets Inc. and Citibank,
N.A.*

WEIL GOTSHAL & MANGES LLP

/s/ Robert M. Stern
Robert M. Stern (*Pro Hac Vice*)
2001 M Street, NW
Washington, D.C.  20036
(202) 682-7000
(202) 857-0940
robert.stern@weil.com

*Counsel for RBC Capital Markets, LLC;
Royal Bank of Canada*

KAYSER & REDFERN, LLP

/s/ Leo Kayser III
Leo Kayser III (*Pro Hac Vice*)
515 Madison Avenue
New York, NY 10022
(212) 935-5057
lkayser@515law.com

*Counsel to Samuel A. Ramirez & Co., Inc.*

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP

/s/ Paul J. Lockwood
Paul J. Lockwood (*Pro Hac Vice*)
One Rodney Square
P.O. Box 636
Wilmington, DE 19899
(302) 651-3000
(302) 651-3001
paul.lockwood@skadden.com

*Counsel to UBS AG and UBS Financial
Services Inc. of Puerto Rico*

NAVARRO-CABRER LAW OFFICES

/s/ Nilda M. Navarro-Cabrer
Nilda M. Navarro-Cabrer
USDC-PR Bar No. 201212
El Centro I, Suite 206
500 Muñoz Rivera Avenue
San Juan, Puerto Rico 00918
(787) 764-9595
(787) 764-7575
navarro@navarrolawpr.com

*Counsel to Jefferies LLC and BMO Capital
Markets GKST, Inc.*

AKIN GUMP STRAUSS HAUER & FELD
LLP

/s/ *Joseph L. Sorkin*
Joseph L. Sorkin (*Pro Hac Vice*)
One Bryant Park
New York, New York 10036
(212) 872-1000
(212) 872-1001
jsorkin@akingump.com

*Counsel to Barclays Capital Inc.*


McCONNELL VALDÉS LLC

/s/ Roberto C. Quiñones-Rivera
Roberto C. Quiñones-Rivera, Esq.
USDC-PR No. 211512
270 Muñoz Rivera Avenue
Hato Rey, Puerto Rico 00918
(787) 250-2631
(787) 759-8282
rcq@mcvpr.com

*Counsel to Barclays Capital Inc., RBC
Capital Markets, LLC, Royal Bank of
Canada, UBS Financial Services Inc. of
Puerto Rico, UBS AG, Citigroup Global
Markets Inc., and Citibank, N.A.*

BOBONIS, BOBONIS &
RODRIGUEZ POVENTUD

/s/ Enrique G. Figueroa-Llinás
Enrique G. Figueroa-Llinás
USDC-PR No. 201709
129 De Diego Avenue
San Juan, Puerto Rico 00911-1927
(787) 72579-41


*Counsel to BofA Securities a/k/a
Banc of America Securities, LLC a/k/a
BofA Merrill Lynch, and Merrill Lynch
Capital Services, Inc.*